## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## EASTERN DIVISION

| | |
|---|---|
| **SOPHIA WILANSKY,** | |
| **Plaintiff,** | **Case No. 3:23-cv-00142** |
| **v.** | |
| **PAUL D. BAKKE, in his personal capacity; THOMAS M. GROSZ, in his personal capacity; MATTHEW J. HANSON, in his personal capacity; MICHAEL W. HINRICHS, in his personal capacity; TRAVIS A. NELSON, in his personal capacity; JOSHUA W. RODE, in his personal capacity; EVAN M. SAVAGEAU, in his personal capacity; TRAVIS M. SKAR, in his personal capacity; GLEN G. TERNES, in his personal capacity; JUSTIN W. WHITE, in his personal capacity; DEREK J. ARNDT, in his personal capacity; KYLE KIRCHMEIER, in his official capacity; and MORTON COUNTY, NORTH DAKOTA,** | **FIRST AMENDED COMPLAINT** |
| **Defendants.** | |

## NATURE OF ACTION

1.     In the early hours of November 21, 2016, Sophia Wilansky was standing peacefully and unarmed in front of a police barricade on a public bridge thirty miles south of Mandan when law enforcement officers—including Defendants Paul Bakke, Thomas Grosz, Matthew Hanson, Michael Hinrichs, Travis Nelson, Joshua Rode, Evan Savageau, Travis Skar, Glen Ternes, Justin White, and Derek Arndt ("Law Enforcement Officer Defendants")—attacked her with less-lethal and explosive munitions.

2.     The Law Enforcement Officer Defendants rapidly fired at Sophia with less-lethal munitions, eventually hitting her, at which point she began running away from the police barricade.

3.     Despite the fact that she was clearly unarmed and not resisting, the Law Enforcement Officer Defendants continued to rapidly shoot at Sophia while she retreated.

4.     None of the Law Enforcement Officer Defendants ever made any attempt to stop or mitigate the attack on Sophia.

5.     Instead, the Law Enforcement Officer Defendants all actively participated in the attack from the beginning by either firing less-lethal munitions themselves or assisting the Law Enforcement Officer Defendants who were firing less-lethal munitions.

6.    Eventually Sophia was hit in the left forearm with an explosive munition that nearly severed her hand, altering her life forever.

7.    After Sophia was injured, the Law Enforcement Officer Defendants laughed and cheered. None offered to render any aid to Sophia.

8.    In the days following her injury, Defendant Kirchmeier attempted to conceal the Law Enforcement Officer Defendants' use of excessive force by lying about the munitions they deployed and falsely accusing Sophia of injuring herself with an improvised explosive device constructed from a propane tank.

9.    Despite enduring numerous painful surgeries to save her arm from amputation, Sophia still has almost no feeling in or ability to use her left hand and forearm. She is disabled and disfigured, and she will remain so permanently. Her disability severely limits her ability to participate in everyday life and causes her ongoing physical, mental, and emotional pain.

10.   This civil action arises from the horrific injury Sophia suffered as a result of Defendants' use of excessive force and failure to intervene. Plaintiff seeks compensatory economic and noneconomic damages, punitive damages, costs, and attorney fees under 42 U.S.C. § 1983, 42 U.S.C § 1988, and the common law of the State of North Dakota.

## PARTIES

11.     Plaintiff Sophia Wilansky is a citizen and resident of New York. At the time she was injured, she was only 21 years old.

12.     Upon information and belief, Defendant Paul D. Bakke is—and was at all times relevant to this action—an officer of the North Dakota Highway Patrol. Upon information and belief, Defendant Bakke is a citizen and resident of Grand Forks County, North Dakota.

13.     Upon information and belief, Defendant Thomas M. Grosz is an officer of the Bismarck Police Department, and was at all times relevant to this action an officer of the Dickinson Police Department. Upon information and belief, Defendant Grosz is a citizen and resident of Burleigh County, North Dakota.

14.     Upon information and belief, Defendant Matthew J. Hanson is—and was at all times relevant to this action—an officer of the Dickinson Police Department. Upon information and belief, Defendant Hanson is a citizen and resident of Stark County, North Dakota.

15.     Upon information and belief, Defendant Michael W. Hinrichs is—and was at all times relevant to this action—an officer of the North Dakota Highway Patrol. Upon information and belief, Defendant Hinrichs is a citizen and resident of Burleigh County, North Dakota.

16.     Upon information and belief, Defendant Travis A. Nelson is—and was at all times relevant to this action—an officer of the North Dakota Highway Patrol. Upon information and belief, Defendant Nelson is a citizen and resident of Grand Forks County, North Dakota.

17.     Upon information and belief, Defendant Joshua W. Rode is—and was at all times relevant to this action—an officer of the North Dakota Highway Patrol. Upon information and belief, Defendant Rode is a citizen and resident of Kidder County, North Dakota.

18.     Upon information and belief, Defendant Evan M. Savageau is—and was at all times relevant to this action—an officer of the North Dakota Highway Patrol. Upon information and belief, Defendant Savageau is a citizen and resident of Stutsman County, North Dakota.

19.     Upon information and belief, Defendant Travis M. Skar is—and was at all times relevant to this action—an officer of the North Dakota Highway Patrol. Upon information and belief, Defendant Skar is a citizen and resident of Morton County, North Dakota.

20.     Upon information and belief, Defendant Glen G. Ternes is—and was at all times relevant to this action—an officer of the Bismarck Police Department. Upon information and belief, Defendant Ternes is a citizen and resident of Burleigh County, North Dakota.

21.     Upon information and belief, Defendant Justin W. White is—and was at all times relevant to this action—an officer of the Dickinson Police Department. Upon information and belief, Defendant White is a citizen and resident of Stark County, North Dakota.

22.     Upon information and belief, Defendant Derek J. Arndt is—and was at all times relevant to this action—an officer of the North Dakota Highway Patrol. Upon information and belief, Defendant Arndt is a citizen and resident of Burleigh County, North Dakota.

23.     Defendant Kyle Kirchmeier is—and was at all times relevant to this action—the Sheriff of Morton County, North Dakota. At all times relevant to this action, Defendant Kirchmeier had ultimate decision-making authority over the law enforcement response to the Dakota Access Pipeline protests and had supervisory authority over the law enforcement officers who responded to those protests (including the other Defendants), regardless of those officers' regular employers. Defendant Kirchmeier is a citizen and resident of Morton County, North Dakota.

24.     Defendant Morton County is a political subdivision created and organized in and under the laws of the State of North Dakota. Morton County operates the Morton County Sheriff's Office, which at all times relevant to this action had law enforcement authority over the public bridge ("Backwater Bridge") where Sophia was injured on November 21, 2016.

## JURISDICTION AND VENUE

25.     This Action arises under the Fourth and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

26.     This Court has original jurisdiction over Plaintiff's constitutional and federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

27.     This Court also has original jurisdiction over this action because it is between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

28.     Venue is proper in the District of North Dakota pursuant to 28 U.S.C. §§ 1391, because the events giving rise to Plaintiff's claims occurred in the District of North Dakota, and also because at least one of the Defendants resides in this District, and all of the Defendants are residents of the State of North Dakota.

29.     Venue is proper in the Eastern Division of the District of North Dakota pursuant to Local Civil Rule 3.1 because several of the Defendants reside in counties in the Eastern Division.

## FACTUAL ALLEGATIONS

**A.     Construction of the Dakota Access Pipeline Draws Protesters from Across the Country.**

30.     The Dakota Access Pipeline ("DAPL") runs from the shale oil fields of the Bakken region of northwest North Dakota through South Dakota and Iowa to an oil terminal near Patoka, Illinois. DAPL is owned and operated primarily by

Dakota Access, LLC, a subsidiary of Energy Transfer Partners. The pipeline commenced commercial operations in 2017.

31.     Energy Transfer Partners first publicly announced its plan to build DAPL in 2014. The initial plan called for the pipeline to cross the Missouri River several miles north of Bismarck, North Dakota.

32.     Citizens of Bismarck opposed this plan on the grounds that it threatened the city's water supply, which comes from the Missouri River. Partly as a result of this opposition, the initial plan was rejected by the U.S. Army Corp of Engineers.

33.     The pipeline was then rerouted to cross the Missouri River at Lake Oahe, which is south of Bismarck, but several miles north of the Standing Rock Sioux Tribe reservation.

34.     The Standing Rock Sioux Tribe opposed this new route on the grounds that it would threaten their water supply, disrupt their sacred cultural sites, and violate their national sovereignty. The Tribe also objected that it had not been adequately consulted in the planning of the pipeline and that the pipeline would have a negative impact on the environment. Other Tribes and environmental groups opposed the pipeline on similar grounds.

35.     Despite this opposition, construction on DAPL commenced in early 2016.

36.    In response to the commencement of construction, individuals from around the country and the world traveled to North Dakota to support the Standing Rock Sioux Tribe and protest the pipeline. Many of these individuals referred to themselves as "water protectors."

37.    As early as April 2016, water protectors began holding public protests in Morton County to bring national attention to their concerns and to try to convince lawmakers to halt construction of the pipeline.

38.    By September 2016, water protectors had established a camp known as "Oceti Sakowin" east of North Dakota Highway 1806, approximately fifty miles south of Mandan and one mile south of Backwater Bridge.

39.    Oceti Sakowin was located on land owned by the federal government and overseen by the U.S. Army Corp of Engineers.

40.    The U.S. Army Corp of Engineers consented to the water protectors residing and protesting at Oceti Sakowin and the surrounding federal lands.

**B.     Morton County Recruits Hundreds of Law Enforcement Officers To Crack Down on the DAPL Protests.**

41.    Water protectors held peaceful protests against DAPL in North Dakota with increasing frequency over the course of the summer of 2016.

42.    These protests generated national media attention, which was often critical of Morton County and its law enforcement officials, including Morton County Sheriff Defendant Kirchmeier.

9

43.     Unhappy with this negative national spotlight, Defendant Kirchmeier decided to crack down on the DAPL protests.

44.     Defendant Kirchmeier requested assistance from numerous North Dakota law enforcement agencies.

45.     In response, North Dakota State Highway Patrolmen began routinely assisting the Morton County Sheriff's Office in responding to DAPL protests.

46.     Likewise, many cities and counties throughout North Dakota lent law enforcement officers to the Morton County Sheriff's Office for use in responding to DAPL protests.

47.     In October 2016, North Dakota made an Emergency Management Assistance Compact request to neighboring states for assistance with the DAPL protests. In response, eleven states—Wisconsin, South Dakota, Minnesota, Montana, Wyoming, Ohio, Louisiana, Indiana, Nebraska, Alabama, and Georgia— lent law enforcement officers to the Morton County Sheriff's Office for use in responding to the DAPL protests.

48.     All of these state, city, local, and out-of-state law enforcement agents were formally deputized as official Morton County law enforcement officers by Defendant Kirchmeier or his deputies.

49.     The purpose of this deputization process was to bring these law enforcement officers under the authority and supervision of the Morton County Sheriff's Office.

50.     To organize the law enforcement response to the DAPL protests, Morton County created a formal reporting structure, under which all of the law enforcement officers and entities responding to DAPL protests in Morton County ultimately reported to the "Unified Command."

51.     Defendant Kirchmeier was the leader and chairman of this Unified Command.

52.     Throughout 2016, Defendant Kirchmeier was the "Incident Commander" and ultimate law enforcement authority with respect to the DAPL protests in Morton County.

53.     When responding to DAPL protests in Morton County in 2016, all law enforcement officers were acting under the authority of the Morton County Sheriff's Office.

54.     When responding to DAPL protests in Morton County in 2016, all law enforcement officers reported to, were supervised by, and took their orders from Defendant Kirchmeier.

**C.**     **Under Defendant Kirchmeier's Supervision, Law Enforcement Officers Become Increasingly Aggressive and Violent toward DAPL Protesters.**

55.     September 3, 2016 was a watershed moment in Morton County's response to the DAPL protests.

56.     On that day, private security guards hired by Energy Transfer Partners arrived at a DAPL protest with patrol dogs, which attacked and bit several peaceful water protectors.

57.     This incident garnered significant national attention and widespread condemnation of Morton County law enforcement officials, including Defendant Kirchmeier.

58.     Hoping to suppress the DAPL protests, Defendant Kirchmeier authorized a massive increase in the use of force and aggression against DAPL protesters.

59.     Over the course of October and November 2016, under the supervision of Defendant Kirchmeier, law enforcement officers became increasingly aggressive and violent towards DAPL protesters, despite the fact that the vast majority of these protesters were peaceful and compliant.

60.     Law enforcement officers began arriving to DAPL protests in Bearcats (armored SWAT vehicles), Mine Resistant Ambush Protected vehicles (MRAPs), and military Humvees. They began wearing tactical riot gear, removing their badges, and brandishing riot batons. They routinely deployed OC spray

(commonly known as "pepper spray") and CS canisters (commonly known as "tear gas grenades") on protesters, including those who were unarmed and posed no safety threat.

61.     During a DAPL protest on October 22, 2016, law enforcement officers fired scores of rubber bullets and sprayed dozens of protesters with pepper spray, causing numerous injuries and respiratory problems.

62.     On October 27, 2016, dozens of law enforcement officers wearing tactical riot gear arrived at a DAPL protest in armored vehicles, along with SWAT teams and a sniper unit. These officers deployed pepper spray, beanbag rounds, impact munitions, and other less-lethal weapons at protesters who presented no safety threat. Numerous protesters suffered injuries caused by these weapons.

63.     On November 2, 2016, law enforcement officers wearing body armor deployed tear gas and other less-lethal munitions against DAPL protesters who presented no safety threat.

64.     At each of these protests, law enforcement officers deployed munitions at peaceful protesters who were neither committing serious crimes nor threatening anyone's safety. The officers deployed these munitions without providing adequate warnings or opportunities to disperse.

65.     By November 20, 2016, the misuse of less-lethal munitions against peaceful DAPL protesters by law enforcement officers under the supervision and authority of Defendant Kirchmeier was continual, widespread, and persistent.

66.     By November 20, 2016, Defendant Kirchmeier was aware of the massive overuse and misuse of less-lethal munitions by his officers. Indeed, he spoke about it publicly to the press, defending his officers and implicitly authorizing their continued misuse of force against DAPL protesters.

67.     Despite knowing about the pattern of munition misuse by his officers, Defendant Kirchmeier did nothing to try to stop or mitigate this misconduct. To the contrary, he continued to allow his officers to purchase, carry, and deploy all manner of munitions with no oversight or accountability.

68.     Defendant Kirchmeier did not require—or even request—that his officers log or track the munitions that they carried and deployed. Nor did he take any steps to ensure that the officers using these munitions were adequately trained in their use.

69.     Instead, piles of munitions were brought to protest sites, and the officers present could take and use whatever they pleased however they pleased against whomever they pleased. Officers were not required to account for their use of less-lethal munitions in any way.

70.    By November 20, 2016, it was self-evident that Morton County's training procedures for and supervision of the use of less-lethal munitions were woefully inadequate. It was likewise self-evident that these inadequacies were routinely resulting in violations of DAPL protesters' constitutional rights.

**D.    Under Defendant Kirchmeier's Supervision, Law Enforcement Officers Purchase and Recklessly Deploy Munitions Against DAPL Protesters Without Adequate Training or Tracking.**

71.    In September and October 2016, law enforcement entities reporting to Defendant Kirchmeier (via the Unified Command Structure) ordered at least the following munitions: (a) one hundred 12-gram low roll non-reloadable distraction devices, commonly known as "Flashbangs"; (b) dozens of stinger 32 caliber rubber ball grenades, commonly known as "Stinger Ball Grenades"; (c) hundreds of 12-gauge aerial warning/signaling 100 meter munitions, commonly known as "Aerial Warning/Signaling Munitions"; (d) hundreds of 40mm sponge rounds; (e) hundreds of 12-gauge drag stabilized beanbag rounds; (e) dozens of 40mm spede-heat projectiles, (f) dozens of 40mm skatshell projectiles; and (g) dozens of 40mm CS muzzle blast projectiles.

72.    These purchases were designated for rush delivery and were expressly intended for use by law enforcement officers against DAPL protesters in Morton County.

73.   Defendants Kirchmeier and Morton County were aware of these purchases.

74.   In addition to these purchases, officers coming to Morton County from other cities, counties, and states often arrived carrying their own explosive munitions to use against the DAPL protesters.

75.   Flashbangs are steel-bodied devices that contain flash powder and a fuse. When the pin is pulled from the device, the fuse initiates. When the fuse reaches the flash powder, the flash powder explodes producing a bright light and loud sound. The explosion can cause serious injury to anyone in immediate proximity of the device.

76.   Stinger Ball Grenades function similar to Flashbangs in that they contain flash powder, which is ignited by a fuse, producing a bright light and loud sound. However, Stinger Ball Grenades also contain dozens of rubber pellets, which are expelled in all directions upon detonation. Like Flashbangs, Stinger Ball Grenades can seriously injure anyone in close proximity to their detonation.

77.   Aerial Signaling/Warning Munitions are essentially Flashbangs connected to bullets. In fact, another name for these munitions are "Aerial Flashbangs." The 12-gauge version consists of a shotgun shell containing flash powder and a fuse. When the Aerial Signaling/Warning Munition is fired from a shotgun, the fuse initiates. The munition is designed to travel a prescribed distance

(often 50 meters, 100 meters, or 150 meters) before the fuse ignites the flash powder, creating the same type of explosive bright flash and loud sound as a Flashbang. Like a Flashbang, an Aerial Signaling/Warning Munition is likely to cause serious injury to anyone in close proximity to the explosion. In fact, Aerial Signaling/Warning Munitions are more dangerous than Flashbangs because they are fired from a gun and are therefore traveling at high speed when they explode.

78.    40mm sponge rounds, 12-gauge drag stabilized beanbag rounds, 40mm spede-heat projectiles, 40mm skatshell projectiles, and 40mm CS muzzle blast projectiles are all less-lethal munitions that are intended to be shot at individuals to induce severe pain.

79.    These less-lethal munitions can cause and have caused severe and permanent injuries.

80.    The manufacturers and suppliers of these less-lethal munitions prescribe that they only be equipped and deployed by individuals who have successfully completed formal training in their proper use. The product specifications for these munitions provide the same prescription that operators should be adequately trained in the use of less lethal impact munitions and should have a thorough understanding of the munition being used, including considerations such as shot placement, level of threat, and target distance and size.

17

81.     Flashbangs, Stinger Ball Grenades, and Aerial Warning/Signaling Munitions are all explosive munitions.

82.     These explosive munitions are extremely dangerous. They can cause severe injuries, including death, especially if used inappropriately or indiscriminately.

83.     There are numerous documented cases of these explosive munitions causing the loss of fingers, hands, arms, legs, and parts of faces.

84.     The manufacturers and suppliers of these explosive munitions prescribe that they only be equipped and deployed by individuals who have successfully completed formal training in their proper use. The product specifications for and warning labels on these explosive munitions provide the same prescription, as do many law enforcement organizations, such as the National Tactical Officers Association.

85.     For example, the product specification for the Defense Technology Stinger Grenades purchased for use at the DAPL protests states:

> **WARNING**: TO BE USED BY TRAINED LAW ENFORCEMENT, CORRECTIONAL OR MILITARY PERSONNEL WHO HAVE SUCCESFULLY COMPLETED A TRAINING PROGRAM FOR THE DEPLOYMENT OF DISTRACTION DEVICE UNITS. **IMPROPER USE OF THE DISTRACTION DEVICE UNIT CAN RESULT IN DEATH OR SERIOUS BODILY INJURY**.

86.     The manufacturers, suppliers, product specifications, and warning labels of these explosive munitions also all state that these munitions should never be aimed directly at individuals or deployed into crowds because of the high risk of serious injury or death.

87.     For example, the product specification for the CTI 40mm Aerial Warning/Signaling Munitions warns: "**CAUTION**: Do not fire this round directly at a crowd, or individual person."

88.     Likewise, the product specification for the Defense Technology 12 gauge Aerial Warning/Signaling Munitions warns: "Do **NOT** fire directly at personnel, as serious injury or death may result."

89.     Product specifications and standard training protocols warn that it is unreasonably dangerous even to deploy these explosive munitions without a prior visual inspection of the deployment area to ensure it is free of individuals.

90.     For example, the product specification for the Defense Technology Flashbangs purchased for use at the DAPL protests states:

> The Distraction Device unit should only be deployed in areas that have been visually observed to be clear of potential hazards. It is recommended that the immediate area for deployment be visually affirmed to be clear of personnel and that the device is delivered so that the ports are free from obstruction.

91.    The National Tactical Officers Association concluded that "sighted deliveries of distraction devices are necessary absent exigent circumstances" to ensure that the devices do not detonate in close proximity to any individuals.

92.    Over the past twenty years, numerous courts have ruled that deploying explosive munitions without a prior visual inspection of the deployment area to ensure no one is present constitutes unconstitutional excessive force.

93.    As of November 2016, it would have been obvious to any reasonable law enforcement officer, supervisor, or policy-maker that the explosive munitions purchased for use at DAPL protests were dangerous and could cause serious bodily harm if they detonated in close proximity to an individual.

94.    As of November 2016, it would have been obvious to any reasonable law enforcement officer, supervisor, or policy-maker that the explosive munitions purchased for use at DAPL protests should never be deployed directly at individuals or into crowds.

95.    As of November 2016, it would have been obvious to any reasonable law enforcement officer, supervisor, or policy-maker that the explosive munitions purchased for use at DAPL protests should only be equipped and deployed by officers who had successfully completed training in their proper use.

96.    As of November 2016, it would have been obvious to any reasonable law enforcement officer, supervisor, or policy-maker that the less-lethal munitions

purchased for use at DAPL protests were dangerous and could cause serious bodily harm if used indiscriminately, wantonly, maliciously, or unsafely.

97. As of November 2016, it would have been obvious to any reasonable law enforcement officer, supervisor, or policy-maker that the less-lethal munitions purchased for use at DAPL protests should only be equipped and deployed by officers who had successfully completed training in their proper use.

98. But Defendant Kirchmeier took no steps and implemented no procedures to limit or even track who was equipping and deploying these explosive and less-lethal munitions.

99. Defendant Kirchmeier took no steps and implemented no procedures to ensure that officers who equipped and deployed these explosive and less-lethal munitions were adequately trained.

100. Instead, Defendant Kirchmeier knowingly allowed officers to routinely deploy explosive and less-lethal munitions in unreasonably dangerous ways and without adequate training, thereby effectively approving this conduct.

101. As a direct and foreseeable result of this complete lack of accountability, upon information and belief, law enforcement officers with inadequate training equipped and deployed explosive and less-lethal munitions against DAPL protesters during DAPL protests.

102. Law enforcement officers acting at the direction and under the supervision of Defendant Kirchmeier repeatedly and dangerously misused explosive munitions by deploying them directly at individuals and into crowds.

103. Law enforcement officers acting at the direction and under the supervision of Defendant Kirchmeier repeatedly and dangerously misused less-lethal munitions by deploying them indiscriminately, wantonly, maliciously, unsafely, and without proper consideration for shot placement, level of threat, and target distance and size.

104. This pattern of dangerous misuse ultimately resulted in a devastating tragedy for Sophia Wilansky.

**E.     Morton County's Increasingly Violent Suppression of DAPL Protests Culminates in a Brutal Assault on Protesters at Backwater Bridge on November 20, 2016.**

105. In late October, law enforcement established the north side of Backwater Bridge as the "no cross line" for DAPL protesters, meaning that protesters were allowed to reside and move freely up to the north end of Backwater Bridge, but they were prohibited from moving beyond that point.

106. To demarcate and effectuate this "no cross line," law enforcement erected a massive barricade on the north side of Backwater Bridge.

107. The barricade spanned the width of the bridge (and beyond) and consisted of concrete roadblocks ("Jersey Barriers") covered in huge spirals of

concertina razor wire. Immediately in front of these concrete roadblocks, law enforcement left two large burned-out inoperable trucks.

108.  On the afternoon of November 20, a semi-truck towed one of these burned-out trucks off the bridge and into a nearby ditch.

109.  Shortly thereafter, law enforcement officers arrived at the north side of the barricade and began deploying less-lethal munitions, pepper spray, and tear gas at the protesters south of the barricade. This caused the situation to escalate dramatically.

110.  Over the next several hours, hundreds of water protectors gathered south of the barricade on Backwater Bridge to protest the continued closure of the bridge and law enforcement's violent response to the DAPL protests.

111.  In response, Defendant Kirchmeier issued a "Code Red," requesting that every law enforcement officer within 100 miles come to Backwater Bridge. Dozens, if not hundreds, of law enforcement officers converged on the north side of the barricade.

112.  The officers arrived in armored vehicles and wore tactical riot gear.

113.  These officers brought and equipped the hundreds of less-lethal and explosive munitions that had been purchased for use against the DAPL protesters.

114.  Defendants Kirchmeier and Morton County declined to implement any accountability system to track which officers were equipping and using these

explosive munitions or to ensure that only appropriately trained officers deployed these munitions.

115.   Between 6pm and midnight, law enforcement officers reporting to Defendant Kirchmeier through the Unified Command structure attacked the protesters with tear gas, pepper spray, and hundreds of less-lethal and explosive munitions.

116.   Throughout this entire time period, the law enforcement officers remained separated and protected from the protesters by the barricade of concrete jersey barriers and razor wire as well as the numerous armored vehicles they had parked directly north of the barricade.

117.   The vast majority of protesters were peaceful. Over the course of the entire confrontation, only a single protester crossed the barricade, and that protester was immediately apprehended by law enforcement and arrested.

118.   Despite the protection afforded by the massive barricade, law enforcement officers repeatedly deployed less-lethal and explosive munitions against protesters who presented no safety threat and were not attempting to breach the barricade. The explosive munitions included Flashbangs, Stinger Ball Grenades, and Aerial Signaling/Warning Munitions.

119.   In clear and flagrant violation of the product specifications, manufacturer's warnings, basic training directives, standard law enforcement

policies, and numerous Court decisions, law enforcement officers deployed explosive munitions directly at individuals and into crowds.

120.    Defendant Kirchmeier was aware of this repeated misuse of explosive munitions, but he took no steps to stop the misuse of explosive munitions by the law enforcement officers acting under his direction and authority. He thereby tacitly authorized this blatantly unconstitutional conduct.

121.    Similarly, Defendant Kirchmeier was aware of the repeated malicious, indiscriminate misuse of less-lethal munitions by law enforcement officer acting under his direction and authority, but he took no steps to stop it. He thereby tacitly authorized this blatantly unconstitutional conduct.

122.    The confrontation between protesters and law enforcement officers at Backwater Bridge lasted until approximately midnight.

## F.    By Midnight, the Confrontation Between Protesters and Law Enforcement Is Over and Backwater Bridge Is Calm and Peaceful.

123.    Around Midnight, the confrontation between protesters and law enforcement significantly de-escalated, as protesters returned to Oceti Sakowin.

124.    By midnight almost all of the protesters had returned to Oceti Sakowin or otherwise dispersed.

125.    Between midnight and 4:00 a.m. on November 21, 2016, the Bridge was quiet, tranquil, and peaceful.

126.   Between midnight and 4:00 a.m., a handful of individuals remained in the vicinity of the Bridge, but none of them were actively protesting or posing any threat to law enforcement, the Bridge, the public, or any private property.  All of the individuals that remained on the Bridge stayed south of the barricade and none tried to breach it or flank it.

127.   These individuals were not actively protesting. Instead, they were quietly maintaining a vigil at the barricade or were chatting and warming themselves at campfires near the bridge.

128. Despite the tranquility, numerous officers remained posted immediately north of the barricade, including the Law Enforcement Officer Defendants.

**G.   In the Early Morning Hours of November 21, 2016, Sophia Wilansky Is Grievously Injured by the Law Enforcement Officer Defendants.**

129.   In the fall of 2016, Sophia was 21 years old and had recently graduated from college.

130.   Sophia learned about the Standing Rock Sioux Tribe's efforts to halt the construction of DAPL from news articles in early 2016.

131.   Believing the DAPL protests to be an important historical moment, Sophia traveled to North Dakota to witness it. Sophia arrived at Oceti Sakowin on November 4, 2016, and began camping there in a tent.

26

132.    Between November 4 and November 20, Sophia participated in a few DAPL protests, always peacefully.

133.    Around 2:00 a.m. on November 21, 2016, Sophia walked from Oceti Sakowin to Backwater Bridge.

134.    By the time Sophia arrived, the Bridge had been calm and peaceful for hours.

135.    Sophia walked around the Bridge and talked to people for approximately an hour without any objection from the Law Enforcement Officer Defendants or any other law enforcement officers.

136.    During this period, Sophia was in clear view of the Law Enforcement Officer Defendants, who could see that she was unarmed.

137.    During this period, Sophia did not menace or threaten anyone.  She was always peaceful and calm.  She never engaged in any conduct that would indicate she posed a threat to anyone or intended to engage in any misconduct.

138.    During this period, none of the Law Enforcement Officer Defendants or their colleagues ever issued any orders to Sophia or objected to her presence on the Bridge.

139.    During this period, none of the Law Enforcement Officer Defendants or their colleagues ever stated that the Bridge was closed or told any of the protesters to move off the Bridge or otherwise disperse.

140.   After walking around the Bridge for approximately an hour, Sophia approached some individuals who appeared to be standing vigil next to the burned-out truck.

141.   A metal sheet about the size of a standard door was propped up against the driver-side front bumper of the truck.

142.   Sophia was unarmed, and her hands were empty when she approached the truck in clear view of the Law Enforcement Officer Defendants.

143.   Sophia then talked with the individuals standing next to the truck.

144.   When those individuals returned to the campfires to warm up, Sophia stayed near the truck to continue standing vigil.

145.   Sophia stood unarmed and empty handed near the truck for 30–60 minutes. During this entire time, the Law Enforcement Officer Defendants and their colleagues raised no objections and issued no orders to her.

146.   Shortly before 4:00 a.m. Stephen Joachinson approached Sophia, and they began to talk.

147.   Sophia and Stephen never shouted or made any threats.  They never engaged in any violent, menacing, intimidating, threatening, or illegal activity.

148.   Sophia and Stephen were not hiding from the Law Enforcement Officer Defendants or attempting to obscure themselves in any way.

149.   At no time did Sophia, Stephen, or anyone else ever attempt to go underneath the truck.

150.   At approximately 3:57 a.m., as a pretext for attacking Sophia and Stephen, the Law Enforcement Officer Defendants issued a command for an unnamed undescribed individual to get out from under the truck.

151.   Upon information and belief, this command was issued by Defendant Ternes.

152.   Stephen responded to this command by telling the Law Enforcement Officer Defendants that no one was under the truck.

153.   Instead of responding to Stephen's explanation or issuing further commands, the Law Enforcement Officer Defendants immediately began rapidly firing less-lethal munitions at Sophia and Stephen.

154.   Defendant Arndt began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so for approximately several minutes.

155.   Defendant Hanson began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so for approximately several minutes.

156.   Defendant Skar began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so for approximately several minutes.

157.   Defendant White began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so for approximately several minutes.

158.    Officer Jonathan Moll began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so for approximately several minutes.

159.    On information and belief, other Law Enforcement Officer Defendants fired less-lethal munitions at Sophia and Stephen as well.

160.    This was a coordinated effort by the Law Enforcement Officer Defendants, all of whom actively participated in and encouraged the attack.

161.    The Law Enforcement Officer Defendants who were not personally shooting at Sophia and Stephen were actively assisting and encouraging the attack, by, for example, repositioning to get a better angle of fire on Sophia and Stephen and by helping to move obstructions so their fellow Defendants could get a better line of sight.

162.    To avoid getting hit, Sophia and Stephen cowered behind the metal sheet.

163.    While Sophia and Stephen were pinned behind the sheet unable to move or leave, Highway Patrolman Adam Dvorak lobbed two Stinger Ball Grenades over the barricade at them.

164.    In a blatant violation of the manufacturer's warning, his less-lethal training, and appropriate police tactics, Adam Dvorak did not inspect the likely detonation area to ensure no one would be hit by the grenades. Instead, he actively aimed the grenades toward Sophia and Stephen.

165.   The Stinger Ball Grenades landed and exploded within a few feet of Sophia, terrifying her and further preventing her from moving away from the metal sheet.

166.   While Sophia and Stephen were pinned behind the metal sheet, Jonathan Moll and at least Defendant Skar, Defendant Hinrich, Defendant Rode, and Defendant Arndt all moved west to get a better line of sight on Sophia.

167.   Defendant Grosz moved out from behind one of the military vehicles to get a better line of sight on Sophia.

168.   Jonathan Moll climbed into the turret of a Humvee with his 12-gauge shotgun, so he could better aim at Sophia and Stephen.

169.   Sophia was pinned behind the metal sheet for multiple minutes.

170.   All of the Law Enforcement Officer Defendants were present while Sophia was pinned behind the metal sheet.  All of the Law Enforcement Officer Defendants were aware that Sophia was being attacked without any legitimate law enforcement justification.

171.   There was plenty of time for any of the Law Enforcement Officer Defendants to intervene to try to stop the attack on Sophia, but none did.  None of the Law Enforcement Officer Defendants told their colleagues to stop shooting or to give Sophia a chance to leave.   None of the Law Enforcement Officer

Defendants did anything to try to intervene in, stop, or mitigate the attack on Sophia.

172.   To the contrary, all of the Law Enforcement Officer Defendants encouraged and participated in the attack on Sophia while she was pinned behind the metal sheet.

173.   All of the Law Enforcement Officer Defendants worked together in a conspiracy to injure Sophia and Stephen.

174.   After Defendant Dvorak inappropriately deployed the first Stinger Ball Grenade at Sophia and Stephen, none of the other Law Enforcement Officer Defendants tried to stop him from equipping and deploying the second grenade in the same inappropriate way.

175.   Eventually, one or more of the Law Enforcement Officer Defendants—including at least Defendant Arndt—hit Sophia with at least one less-lethal munition.

176.   One of the less-lethal munitions that hit Sophia caused an injury so severe that Sophia still has a scar today, more than six years later.

177.   In extreme pain and realizing she had no way to avoid getting hit with additional munitions, Sophia began running as fast as she could south, away from the barricade and truck.

178.   As Sophia ran south, she pleaded with the Law Enforcement Officer Defendants, yelling, "I'm leaving. Please don't shoot."

179.   As Sophia ran, she was clearly unarmed and empty-handed. She was clearly fleeing and was not resisting or posing any safety threat to anyone.

180.   Over the course of the next few seconds, Sophia ran south away from the barricade.

181.   While Sophia was retreating and pleading for the violence to stop, the Law Enforcement Officer Defendants continued to shoot at her.

182.   Upon information and belief, Defendant Arndt continued to shoot at Sophia while she was retreating and pleading for him to stop.

183.   Upon information and belief, Defendant Hanson continued to shoot at Sophia while she was retreating and pleading for him to stop.

184.   Upon information and belief, Defendant White continued to shoot at Sophia while she was retreating and pleading for him to stop.

185.   Upon information and belief, other of the Law Enforcement Officer Defendants continued to shoot at Sophia while she was retreating and pleading for them to stop.

186.   All of the Law Enforcement Officer Defendants were present while Sophia was running away from the barricade. All of the Law Enforcement Officer Defendants were aware that Sophia was retreating and was not resisting. All of the

Law Enforcement Officer Defendants were also aware that she was still being shot at while she was retreating.  All of the Law Enforcement Officer Defendants were also aware that there was no legitimate law enforcement justification for continuing to shoot at Sophia while she was running away from the barricade.

187.   There was time for any of the Law Enforcement Officer Defendants to intervene to try to stop the continued attack on Sophia, but none did.  None of the Law Enforcement Officer Defendants told their colleagues to stop shooting or to let Sophia leave.  None of the Law Enforcement Officer Defendants did anything to try to intervene in, stop, or mitigate the attack on Sophia.

188.   While running away from the barricade, Sophia saw a piece of plywood on the ground.

189.   Just as Sophia stopped to pick up the plywood, Jonathan Moll intentionally hit her with an explosive munition.

190.   Upon information and belief, the explosive munition was an Aerial Warning/Signaling Munition.

191.   This munition hit Sophia in the left forearm and exploded with a bright flash and loud bang.

192.   The explosion blew through Sophia's jacket and nearly severed her left hand from her arm. The blast destroyed almost all of the arteries, skin, tissue, muscle, nerves, tendons, and bone in her left forearm.

193.   Blood poured out of the wound and filled the sleeve of her jacket. Her forearm bone protruded from her sleeve.

194.   Sophia fell to the ground and began screaming in pain, yelling, "I lost my hand, I lost my hand!"

195.   While Sophia lay in the road, bleeding and screaming, the Law Enforcement Officer Defendants laughed and cheered. They congratulated Jonathan Moll on his marksmanship and celebrated the injury they caused.

196.   None of the Law Enforcement Officer Defendants offered to assist Sophia or made any attempt to render aid despite the fact that she was screaming and bleeding profusely.

197.   While the Law Enforcement Officer Defendants callously disregarded Sophia's suffering and failed to render any aid, individuals from the nearby campfires ran to help her.

198.   These individuals carried Sophia off the bridge and loaded her into a car.

199.   Because Backwater Bridge was closed and barricaded, Sophia could not be transported directly to Sanford Hospital in Bismarck. Instead, she was taken south to the Prairie Knights Casino and Resort, where she waited in agony for an ambulance to arrive.

200.   While she waited at the casino, officers from the Bureau of Indian Affairs applied a tourniquet to her wound in an attempt to stop the bleeding and save her arm.

201.   Eventually, an ambulance arrived at the casino and raced Sophia to Sanford Hospital in Bismarck.

202.   The doctors at Sanford took one look at Sophia's injury and immediately concluded they were not equipped to handle it. Almost her entire left forearm was missing. Her hand was barely connected to her arm. The doctors arranged for Sophia to be flown to Hennepin County Medical Center in Minneapolis, the nearest level one trauma center.

203.   The doctors at Hennepin rushed Sophia into surgery. They debrided her wound and grafted veins from her thigh into her arm to restore blood flow, narrowly avoiding a complete amputation.

## H.   Defendant Kirchmeier Conceals Defendants' Role in Injuring Sophia by Lying to the Media and Falsely Accusing Sophia of Injuring Herself.

204.   News of Sophia's injury spread quickly. Almost immediately, local and national news organizations began covering the story.

205.   In an attempt to avoid the ensuing negative media coverage, Defendant Kirchmeier embarked on a public campaign of misinformation and false accusations to cover up the misconduct of the Law Enforcement Officer Defendants that he had tacitly authorized and endorsed.

206.   To date, Defendants Kirchmeier and Morton County have never conducted any investigation at all into the cause of Sophia's injuries or Defendants' use of explosive munitions on the night she was injured.

207.   Despite knowing that law enforcement officers equipped and deployed numerous explosive munitions on the night Sophia was injured, Defendant Kirchmeier falsely told the national press on numerous occasions that the officers under his direction and command possessed no weapons that could have caused Sophia's injury.

208.   Defendant Kirchmeier also told the national media that no law enforcement officer threw anything explosive at Sophia on the night she was injured, a statement directly belied by Adam Dvorak's own incident report, in which he admits he threw two Stinger Ball Grenades at her.

209.   Defendants Kirchmeier and Morton County even filed a legal brief in 2019 in which they stated, "Defendants deny any explosive device was fired at or near Plaintiff by law enforcement," and "Defendants deny a flashbang or any explosive device was utilized by law enforcement against Plaintiff." These statements are directly contradicted by Adam Dvorak's own incident report (and a multitude of other evidence), which Defendants Kirchmeier and Morton County possessed at the time they filed the legal brief.

210.   In addition to lying about the conduct of the law enforcement officers under his direction and command, Defendant Kirchmeier also falsely accused Sophia of causing her own injury.

211.   Despite conducting no investigation into the cause of Sophia's injury and having no forensic evidence to support the accusation, public information officers reporting to Defendant Kirchmeier and acting on behalf of Defendant Morton County issued press releases the day after Sophia was injured, in which they claimed that Sophia injured herself with a propane tank she had rigged as an improvised explosive device.

212.   Sophia has never participated in the creation or deployment of any improvised explosive device, against law enforcement or anyone else.

213.   Defendant Kirchmeier publicly repeated this false accusation on multiple occasions, including at a December 3, 2016, press conference and during a June 2017 presentation on the law enforcement response to the DAPL protests.

214.   Defendants Morton County and Kirchmeier made these false accusations despite the fact that no explosive, fuse, explosive residue, or exploded propane tank was ever recovered from the site where Sophia was injured.

215.   Defendants Morton County and Kirchmeier never attempted to explain how Sophia could have made an improvised explosive device from a propane tank. They likewise never offered any explanation for how an exploding

propane tank—something that would normally obliterate an entire car or knock a house off its foundation—could have caused an injury only to Sophia's left arm, leaving the rest of her body unaffected and unburned.

216.   Instead, in a theatrical act that bordered on the absurd, Defendants Morton County and Kirchmeier published photos of intact, unruptured, unexploded propane tanks and told the national media that these tanks were the cause of Sophia's injury. They offered no explanation for how Sophia could have been injured by an unexploded intact propane tank.

## I.   Sophia Continues to Suffer the Physical, Mental, Emotional, and Economic Harms Caused by Defendants.

217.   Since her injury, Sophia has had five surgeries to save and reconstruct her arm. These surgeries were painful and invasive, resulting in significant and permanent damage to many parts of Sophia's body.

218.   During the first surgery, doctors opened Sophia's left thigh and removed two veins, which they implanted in her left arm to replace the destroyed arteries. Only one of these two transplants succeeded.

219.   During the second surgery, doctors further debrided her arm and removed additional dead tissue from her wound.

220.   During the third surgery, doctors opened Sophia's back and removed her right latissimus dorsi muscle, which they used to replace the muscle she had lost from her left arm. They also removed skin from Sophia's right thigh, and used

it to cover the newly transplanted muscle tissue. They left holes in her lower back to drain the blood oozing from the space where her back muscle used to be.

221.   Before the fourth surgery, doctors warned Sophia they may need to remove one of her leg bones (the fibula) to use to reconstruct the bone in her arm. Fortunately, doctors were able to avoid this by using the fibula from a cadaver, but they did remove part of her pelvic bone (the iliac crest) to complete the reconstruction. During the fourth surgery, the doctors also implanted a metal plate, interlocking screws, and nerves from a cadaver in her arm.

222.   This nerve transplant did not work, and Sophia did not recover any feeling in her left palm or fingers. To the contrary, the surgery caused Sophia to lose the little sensation she still had in her left pinky finger and the ulnar side of her hand.

223.   During the fifth surgery, doctors removed tendons from the dorsal side of Sophia's hand and transplanted them to her thumb.

224.   Recovery from these surgeries took months and was incredibly painful. For months, Sophia could not work or perform basic daily activities because she was in too much pain.

225.   To ameliorate the extreme pain and help her recovery, Sophia's doctors gave her opioids. For months, these medications left Sophia too groggy to work or actively participate in daily life.

226.   After Sophia's pain finally subsided, she had to endure months of the physically exhausting and mentally taxing process of weaning herself off the opioid pain medications.

227.   Sophia's left arm is still scarred and disfigured and will remain so for the rest of her life.

228.   Sophia still has essentially no feeling in or use of her left hand and forearm. She is unlikely to ever recover feeling in or use of her left arm and hand.

229.   The loss of all use of her left arm makes even the most mundane acts of daily life, such as zipping up a jacket or opening a bottle, nearly impossible. Even today, she must open containers and food packaging with her teeth.

230.   The inability to use or feel her left hand and arm makes Sophia unsuited and unqualified for numerous occupations, permanently limiting her career options. The fact that she cannot type with both hands or use a keyboard and mouse at the same time makes it difficult for her to do many modern professional jobs.

231.   Sophia cannot do any jobs or perform any tasks that require lifting or significant physical exertion.

232.   Because of the precarious status of her arm, Sophia's doctors have warned her that even a minor injury to or infection in her left arm could lead to amputation.

233.   Sophia's injury has caused and continues to cause her extraordinary mental trauma. She must live with the knowledge that she will never be able to use her left hand or participate in activities that require both hands.

234.   Her doctors have warned her that there is a reasonable chance that her transplants will eventually fail and that she will one day lose her left hand.

235.   The surgeries Sophia endured were extraordinarily expensive, as were the hospital stays, doctors' appointments, medications, and physical therapy sessions that accompanied them. To date, the medical bills directly related to her injury total approximately $500,000.

## CLAIMS FOR RELIEF

### CLAIM I
### VIOLATION OF 42 U.S.C. § 1983
### (FOURTH AMENDMENT - EXCESSIVE FORCE)
(*Defendants Arndt, Bakke, Grosz, Hanson, Hinrichs,*
*Nelson, Rode, Savageau, Skar, Ternes, and White*)

236.   Sophia incorporates all preceding paragraphs above, as if fully stated herein.

237.   While acting under the color of law, the Law Enforcement Officer Defendants intentionally aimed and deployed less-lethal munitions directly at Sophia.

238.   Via these munitions, the Law Enforcement Officer Defendants intentionally applied physical force to Sophia.

239.   This intentional application of force terminated Sophia's movement and detained her, first by confining her to the space behind the metal sheet and second by knocking her to the ground and grievously injuring her left arm.

240.   The Law Enforcement Officer Defendants' uses of force against Sophia—both when she was cowering behind the metal sheet and when she was running south away from the police barricade—was objectively unreasonable and therefore excessive under the totality of the circumstances.

241.   All of the Law Enforcement Officer Defendants knew that excessive force was being used by their colleagues against Sophia as soon as those colleagues began deploying less-lethal and explosive munitions at Sophia when she was trapped behind the metal sheet while unarmed and posing no safety threat to anyone.

242.   All of the Law Enforcement Officer Defendants likewise knew that excessive force was being used by their colleagues against Sophia when those colleagues continued to fire less-lethal and explosive munitions at Sophia while she was running south away from the barricade in compliance with law enforcement commands.

243.   The attack on Sophia took place over several minutes, during which dozens of munitions were fired at Sophia. During this time, the Law Enforcement Officer Defendants had the opportunity and means to prevent Sophia's injury by

telling their colleagues to stop attacking her or by otherwise intervening to stop the attack.

244.   The Law Enforcement Officer Defendants failed to take any steps to attempt to intervene in the ongoing violation of Sophia's constitutional rights.

245.   Instead, the Law Enforcement Officer Defendants conspired in, encouraged, and assisted in the unconstitutional attack.

246.   The duration of the attack upon Sophia was sufficiently long and the conduct of the Law Enforcement Officer Defendants was sufficiently collusive to infer tacit collaboration among them in subjecting Sophia to excessive force.

247.   The unconstitutionality of the Law Enforcement Officer Defendants' use of excessive force was clearly established by prior binding and persuasive legal authority at the time they attacked Sophia.

248.   The unconstitutionality of the Law Enforcement Officer Defendants' failure to intervene in the unconstitutional attack on Sophia was clearly established by prior binding and persuasive legal authority at the time Sophia was attacked.

249.   As a direct and foreseeable consequence of the Law Enforcement Officer Defendants' actions and failures to intervene, Sophia suffered and continues to suffer substantial economic loss, physical pain and suffering, physical impairment and disfigurement, mental anguish, emotional distress, fear of injury,

loss of past and future employment opportunities, loss of past earnings, and loss of future earning capacity.

250.   As a direct and foreseeable consequence of the Law Enforcement Officer Defendants' actions and failures to act, Sophia was subjected to excessive force and deprived of her rights under the Fourth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

**CLAIM II**
**VIOLATION OF 42 U.S.C. § 1983**
**(FOURTEENTH AMENDMENT - EXCESSIVE FORCE)**
*(Defendants Arndt, Bakke, Grosz, Hanson, Hinrichs,*
*Nelson, Rode, Savageau, Skar, Ternes, and White)*

251.   Sophia incorporates all preceding paragraphs above, as if fully stated herein.

252.   While acting under the color of law, the Law Enforcement Officer Defendants intentionally aimed and deployed less-lethal munitions directly at Sophia.

253.   The Law Enforcement Officer Defendants' use of force against Sophia—both when she was cowering behind the metal sheet and when she was running south away from the police barricade—was objectively unreasonable and therefore excessive under the totality of the circumstances.

254.   All of the Law Enforcement Officer Defendants likewise knew that excessive force was being used by their colleagues against Sophia when those

colleagues continued to fire less-lethal and explosive munitions at Sophia while she was running south away from the barricade in compliance with law enforcement commands.

255.   All of the Law Enforcement Officer Defendants likewise knew that excessive force was being used by their colleagues against Sophia when those colleagues continued to fire less-lethal and explosive munitions at Sophia while she was running south away from the barricade in compliance with law enforcement commands.

256.   The attack on Sophia took place over several minutes, during which dozens of munitions were fired at Sophia. During this time, the Law Enforcement Officer Defendants had the opportunity and means to prevent Sophia's injury by telling their colleagues to stop attacking her or by otherwise intervening to stop the attack.

257.   The Law Enforcement Officer Defendants failed to take any steps to attempt to intervene in the ongoing violation of Sophia's constitutional rights.

258.   Instead, the Law Enforcement Officer Defendants conspired in, encouraged, and assisted in the unconstitutional attack.

259.   The duration of the attack upon Sophia was sufficiently long and the conduct of the Law Enforcement Officer Defendants was sufficiently collusive to infer tacit collaboration among them in subjecting Sophia to excessive force.

260.   The conduct of the Law Enforcement Officer Defendants was sufficiently brutal and inhumane to shock the conscience.

261.   The failure of any of the Law Enforcement Officer Defendants to attempt to intervene in the attack on Sophia was sufficient egregious and outrageous to shock the conscience.

262.   Sophia was acting peacefully and complied with law enforcement commands as quickly as she could. As a result, the attack on Sophia was so disproportionate to the need presented that it was inspired by malice.

263.   The Law Enforcement Officer Defendants' failure to intervene was so egregious that one can infer these Defendants were inspired by malice.

264.   Because Sophia presented no safety threat to law enforcement or anyone else and was actively complying with law enforcement commands, the attack on her was unrelated to any legitimate objective of government action.

265.   The unconstitutionality of the Law Enforcement Officer Defendants' use of excessive force was clearly established by prior binding and persuasive legal authority at the time they attacked Sophia.

266.   The unconstitutionality of the Law Enforcement Officer Defendants' failure to intervene in the unconstitutional attack on Sophia was clearly established by prior binding and persuasive legal authority at the time Sophia was attacked.

267.   As a direct and foreseeable consequence of the Law Enforcement Officer Defendants' actions and failures to intervene, Sophia suffered and continues to suffer substantial economic loss, physical pain and suffering, physical impairment and disfigurement, mental anguish, emotional distress, fear of injury, loss of past and future employment opportunities, loss of past earnings, and loss of future earning capacity.

268.   As a direct and foreseeable consequence of the Law Enforcement Officer Defendants' actions, Sophia was deprived of her rights under the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## CLAIM III
## VIOLATION OF 42 U.S.C. § 1983
## (MONELL CLAIM - 436 U.S. 658 (1977))
### (*Defendants Morton County and Kirchmeier*)

269.   Sophia incorporates all preceding paragraphs above, as if fully stated herein.

270.   Throughout 2016, Defendant Kirchmeier had final policymaking authority over how law enforcement officers—including the Law Enforcement Officer Defendants—responded to DAPL protests in Morton County.

271.   Law enforcement officers reporting to Defendant Kirchmeier and acting under the authority of Defendant Morton County began using excessive force against DAPL protesters in September 2016, primarily by deploying less-

lethal munitions against protesters who were peaceful, non-resisting, and not committing any serious crimes or posing any safety threat. These law enforcement officers also used excessive force by aiming and deploying munitions in ways that were unreasonably dangerous and contraindicated by the munitions' product specifications and warnings.

**A.**  **Defendant Kirchmeier's Policy of Allowing Excessive Force by His Law Enforcement Officers against DAPL Protesters Resulted in Sophia's Injury.**

272.   Defendant Kirchmeier was aware of the use of excessive force by his law enforcement officers against DAPL protesters in September, October, and November 2016.

273.   Defendant Kirchmeier publicly defended his officers' use of such excessive force, thereby authorizing such constitutional violations and creating a policy of allowing such constitutional violations.

274.   The Law Enforcement Officer Defendants were acting pursuant to and in accordance with this authorization and policy of misusing munitions and engaging in excessive force against peaceful DAPL protesters when they attacked and injured Sophia.

275.   As a direct and foreseeable consequence of Defendant Kirchmeier's policy, Sophia was seriously injured and was deprived of her rights under the

Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

**B.     Defendant Morton County Had a Custom of Allowing Excessive Force against DAPL Protesters That Resulted in Sophia's Injury.**

276.   Law enforcement officers acting under the authority of Defendant Morton County repeatedly and persistently engaged in the widespread use of excessive force against peaceful protesters at DAPL protests throughout September, October, and November 2016.

277. Defendant Kirchmeier knew about this persistent pattern of unconstitutional conduct by the law enforcement officers under his supervision.

278.   Defendant Kirchmeier was deliberately indifferent to and tacitly authorized this unconstitutional conduct.

279.   The Law Enforcement Officer Defendants were acting pursuant to and in accordance with this custom of misusing munitions and engaging in excessive force against peaceful DAPL protesters when they attacked and injured Sophia.

280.   As a direct and foreseeable consequence of Defendant Morton County's custom of using excessive force against DAPL protesters, Sophia was seriously injured and was deprived of her rights under the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

**C.**   **Defendant Kirchmeier Failed to Properly Supervise and Train the Law Enforcement Officers Acting Under His Authority and Supervision.**

281.   Defendant Kirchmeier was aware of the use of excessive force by law enforcement officers acting under his authority and supervision against DAPL protesters in September, October, and November 2016.

282.   Defendant Kirchmeier was aware during this time that law enforcement officers under his command were using less-lethal munitions without adequate training.

283.   Defendant Kirchmeier was aware during this time that law enforcement officers under his command were using less-lethal munitions without adequate supervision.

284.   Defendant Kirchmeier was aware during this time that this inadequate training and supervision was resulting in a pattern of munition misuse and unconstitutional excessive force against DAPL protesters.

285.   Defendant Kirchmeier was deliberately indifferent to the high risk that this inadequate training and supervision would lead to future constitutional violations.

286.   Defendant Kirchmeier failed to take any remedial action or to adequately train and supervise the law enforcement officers under his command with respect to the use of less-lethal and explosive munitions.

287.   As a direct and foreseeable consequence of Defendant Kirchmeier's failure to adequately train and supervise the law enforcement officers under his command—including the Law Enforcement Officer Defendants—Sophia was seriously injured and was deprived of her rights under the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

### PRAYER FOR RELIEF

WHEREFORE, to redress the injuries directly and foreseeably caused by Defendants' conduct as stated in the preceding paragraphs, Plaintiff hereby requests the following relief:

A.   Economic compensatory damages of millions of dollars, in a particular amount to be established at trial, as compensation for Sophia's past and future medical care, rehabilitation services, loss of earning and earning capacity, and loss of employment opportunities;

B.   Noneconomic compensatory damages of millions of dollars, in a particular amount to be established at trial, as compensation for Sophia's past and future pain and suffering, physical impairment, physical disfigurement, mental anguish, emotional distress, fear of injury, injury to reputation, and humiliation;

C.   Punitive damages in an amount to be established at trial;

D.   An award of attorney fees and expert fees pursuant to 42 U.S.C. § 1988 and any other applicable statutes, laws, or grounds;

E.     An award for the costs, expenses, and interest incurred in pursuit of this action pursuant to 42 U.S.C. § 1988 and any other applicable statutes, laws, or grounds; and

F.     Whatever additional relief the Court may deem proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all claims so triable.


Dated: October 11, 2023                    Respectfully submitted,

                                           */s/ Benjamin Stoll*
                                           Benjamin M. Stoll
                                           CARLTON FIELDS P.A.
                                           1025 Thomas Jefferson Street Northwest
                                           Suite 400 West
                                           Washington, DC 20007
                                           (202) 965-8160
                                           bstoll@carltonfields.com

                                           Lauren C. Regan
                                           CIVIL LIBERTIES DEFENSE CENTER
                                           1430 Willamette Street #359
                                           Eugene, OR 97401
                                           (541) 687-9180
                                           lregan@cldc.org

                                           Edward Barnidge
                                           WILLIAMS & CONNOLLY LLP
                                           680 Maine Avenue Southwest
                                           Washington, DC 20024
                                           (202) 434-5000
                                           ebarnidge@wc.com

                                           *Attorneys for Plaintiff*