IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

CIVIL NO. 3:23-cv-00142

| | | |
|---|---|---|
| SOPHIA WILANSKY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| PAUL D. BAKKE, in his personal capacity; | ) | |
| THOMAS M. GROSZ, in his personal | ) | |
| capacity; MATTHEW J. HANSON, in | ) | |
| his personal capacity; MICHAEL W. | ) | |
| HINRICHS, in his personal capacity; | ) | **MEMORANDUM OF LAW IN** |
| TRAVIS A. NELSON, in his personal | ) | **SUPPORT OF CITY AND COUNTY** |
| capacity; JOSHUA W. RODE, in his | ) | **DEFENDANTS' MOTION TO DISMISS** |
| personal capacity; EVAN M. SAVAGEAU, | ) | **AND TO STRIKE** |
| in his personal capacity; TRAVIS M. | ) | |
| SKAR, in his personal capacity; GLEN G. | ) | |
| TERNES, in his personal capacity; JUSTIN | ) | |
| W. WHITE, in his personal capacity; | ) | |
| DEREK J. ARNDT, in his personal | ) | |
| capacity; KYLE KIRCHMEIER, in his | ) | |
| official capacity; and MORTON COUNTY, | ) | |
| NORTH DAKOTA, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*　　　　\*\*\*　　　　\*\*\*

## I.　INTRODUCTION

Defendants Morton County, Kyle Kirchmeier, in his official capacity only, Thomas M. Grosz, Matthew J. Hanson, Glen G. Ternes, and Justin White, all in their personal capacities, (collectively "City and County Defendants") request dismissal, with prejudice, of Plaintiff Sophia Wilansky's ("Wilansky") claims against all Defendants[1] contained in Wilansky's *First Amended*

---

[1] As Wilansky claims Morton County is responsible for the alleged conduct of all named defendants, City and County Defendants request dismissal of all of Wilansky's claims asserted

*Complaint* (doc. 14) pursuant to Federal Rules of Civil Procedure 12(b)(1).  As explained below, Wilansky has failed to allege any named-Defendant "seized" her in the context of the Fourth Amendment, and has also failed to allege facts to establish any force allegedly applied against her by any individual Defendant was unreasonable.   Wilansky's Fourteenth Amendment excessive force claim fails as a matter of law as the challenged force at issue was related to a legitimate object of the individual Defendants' employment as law enforcement officers, and therefore fails to satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation.  Even assuming, arguendo, facts establishing a "seizure" have been alleged, and that any force utilized was excessive, all individual Defendants are entitled to qualified immunity as the law was not clearly established as of November 21, 2016 that the alleged conduct of each individual Defendant violated Wilansky's constitutional rights.   Absent an underlying constitutional violation, Wilansky's derivative failure to intervene and conspiracy claims fail.  Wilansky's claim Defendants were engaged in a conspiracy to violate her federal constitutional rights further fails as a claim of conspiracy under § 1983 does not apply between a government entity and its own agents under the "intracorporate conspiracy doctrine".  Wilansky also fails to allege sufficient facts to support her failure to intervene and  conspiracy claims as to any Defendant.  Wilansky's *Monell* claim fails for lack of an underlying constitutional violation, and for lack of alleged facts to support such claim.

City and County Defendants also move to strike Wilansky's allegations in paragraphs 204 through 216 of her *First Amended Complaint* pertaining to Defendant Kirchmeier's alleged concealment of Defendants' alleged responsibility for Wilansky's injury, and defamation of

---

against all Defendants.

Wilansky as lacking relevance to any cause of action alleged, being impertinent, and as containing scandalous allegations. This Court previously dismissed, with prejudice, nearly identical allegations and Wilansky's associated defamation claim against Sheriff Kirchmeier and others in the companion case, namely *Wilansky v. Morton County et. al.*, Case No. 1:18-cv-00236, United States District Court for the District of North Dakota ("Companion Case")

## II. MATTERS WHICH MAY BE CONSIDERED BY THIS COURT IN CONSIDERING A MOTION TO DISMISS

### A. Applicable Federal Rule of Civil Procedure 12 Standard

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted. In reviewing a motion to dismiss, the court takes all facts alleged in the complaint to be true. *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id.* (citations omitted). The Court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that the plaintiff draws from the facts pled. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). Well-pleaded facts, not legal theories or conclusions, determine the adequacy of the complaint. *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* "[A] plaintiff 'must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims, . . ., rather than facts that are merely consistent with such a right.'" *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009), quoting *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th

Cir. 2007). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.E.2d 868 (2009).

> In this circuit, Rule 12(b)(6) motions are not automatically converted into motions for summary judgment simply because one party submits additional matters in support of or in opposition to the motion. *See Martin v. Sargent*, 780 F.2d 1334, 1336-37 (8th Cir. 1985). Some materials that are part of the public record or do not contradict the complaint may be considered by a court in deciding a Rule 12(b)(6) motion to dismiss. *See Papasan v. Allain*, 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Hollis v. United States Dep't of Army*, 856 F.2d 1541, 1543-44 (D.C. Cir. 1988).

*State v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999); *see Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record, such as documentation of the history of the Mississippi and other school lands grants.").

> While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;" without converting the motion into one for summary judgment. 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004).

*Miller v. Redwood Toxicology Laboratory, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (taking into consideration, in relation to Rule 12(b)(6) motion, plaintiff's initial and amended complaints, and the record created as a result of the plaintiff's motion for temporary restraining order, preliminary injunction and expedited discovery filed by plaintiff after the motion to dismiss was filed); *see, also Williams v. Employers Mutual Casualty Company*, 845 F.3d 891, 903-04 (8th Cir. 2017) (citing *Miller* for proposition "courts may consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items that appear in

the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned" without converting a motion for judgment on the pleadings into a motion for summary judgment.)

In the event the Court determines any material presented with this motion may not properly be considered by the Court under Federal Rule of Civil Procedure 12(b)(6), County Defendants request the Court disregard such material and decide the motion without consideration of such material, rather than deciding the motion on a summary judgment standard.

**B.** **Wilansky's Allegations in Her *First Amended Complaint***

Wilansky's *First Amended Complaint* (doc. 14) is comprised of 53 pages and 287 paragraphs. The majority of the pleading is comprised of legal conclusions, often cast in the form of factual allegations – all of which this Court may disregard for purposes of this motion to dismiss. Wilansky's allegations as to what occurred on November 21, 2016 are as follows:

131. Believing the DAPL protests to be an important historical moment, Sophia traveled to North Dakota to witness it. Sophia arrived at Oceti Sakowin on November 4, 2016, and began camping there in a tent.

132. Between November 4 and November 20, Sophia participated in a few DAPL protests, always peacefully.

133. Around 2:00 a.m. on November 21, 2016, Sophia walked from Oceti Sakowin to Backwater Bridge.

134. By the time Sophia arrived, the Bridge had been calm and peaceful for hours.

135. Sophia walked around the Bridge and talked to people for approximately an hour without any objection from the Law Enforcement Officer Defendants or any other law enforcement officers.

136. During this period, Sophia was in clear view of the Law Enforcement Officer Defendants, who could see that she was unarmed.

137. During this period, Sophia did not menace or threaten anyone. She was always peaceful and calm. She never engaged in any conduct that would indicate she posed a threat to anyone or intended to engage in any misconduct.

138. During this period, none of the Law Enforcement Officer Defendants or their colleagues ever issued any orders to Sophia or objected to her presence on the Bridge.

139. During this period, none of the Law Enforcement Officer Defendants or their colleagues ever stated that the Bridge was closed or told any of the protesters to move off the Bridge or otherwise disperse.

140.　After walking around the Bridge for approximately an hour, Sophia approached some individuals who appeared to be standing vigil next to the burned-out truck.

141.　A metal sheet about the size of a standard door was propped up against the driver-side front bumper of the truck.

142.　Sophia was unarmed, and her hands were empty when she approached the truck in clear view of the Law Enforcement Officer Defendants.

143.　Sophia then talked with the individuals standing next to the truck.

144.　When those individuals returned to the campfires to warm up, Sophia stayed near the truck to continue standing vigil.

145.　Sophia stood unarmed and empty handed near the truck for 30–60 minutes. During this entire time, the Law Enforcement Officer Defendants and their colleagues raised no objections and issued no orders to her.

146.　Shortly before 4:00 a.m. Stephen Joachinson approached Sophia, and they began to talk.

147.　Sophia and Stephen never shouted or made any threats. They never engaged in any violent, menacing, intimidating, threatening, or illegal activity.

148.　Sophia and Stephen were not hiding from the Law Enforcement Officer Defendants or attempting to obscure themselves in any way.

149.　At no time did Sophia, Stephen, or anyone else ever attempt to go underneath the truck.

150.　At approximately 3:57 a.m., as a pretext for attacking Sophia and Stephen, the Law Enforcement Officer Defendants issued a command for an unnamed undescribed individual to get out from under the truck.

151.　Upon information and belief, this command was issued by Defendant Ternes.

152.　Stephen responded to this command by telling the Law Enforcement Officer Defendants that no one was under the truck.

153.　Instead of responding to Stephen's explanation or issuing further commands, the Law Enforcement Officer Defendants immediately began rapidly firing less-lethal munitions at Sophia and Stephen.

154.　Defendant Arndt began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so for approximately several minutes.

155.　Defendant Hanson began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so for approximately several minutes.

156.　Defendant Skar began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so for approximately several minutes.

157.　Defendant White began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so for approximately several minutes.

158.　Officer Jonathan Moll began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so for approximately several minutes.

159.　On information and belief, other Law Enforcement Officer Defendants fired less-lethal munitions at Sophia and Stephen as well.

160.　This was a coordinated effort by the Law Enforcement Officer Defendants, all of whom actively participated in and encouraged the attack.

161.     The Law Enforcement Officer Defendants who were not personally shooting at Sophia and Stephen were actively assisting and encouraging the attack, by, for example, repositioning to get a better angle of fire on Sophia and Stephen and by helping to move obstructions so their fellow Defendants could get a better line of sight.

162.     To avoid getting hit, Sophia and Stephen cowered behind the metal sheet.

163.     While Sophia and Stephen were pinned behind the sheet unable to move or leave, Highway Patrolman Adam Dvorak lobbed two Stinger Ball Grenades over the barricade at them.

164.     In a blatant violation of the manufacturer's warning, his less-lethal training, and appropriate police tactics, Adam Dvorak did not inspect the likely detonation area to ensure no one would be hit by the grenades. Instead, he actively aimed the grenades toward Sophia and Stephen.

165.     The Stinger Ball Grenades landed and exploded within a few feet of Sophia, terrifying her and further preventing her from moving away from the metal sheet.

166.     While Sophia and Stephen were pinned behind the metal sheet, Jonathan Moll and at least Defendant Skar, Defendant Hinrich, Defendant Rode, and Defendant Arndt all moved west to get a better line of sight on Sophia.

167.     Defendant Grosz moved out from behind one of the military vehicles to get a better line of sight on Sophia.

168.     Jonathan Moll climbed into the turret of a Humvee with his 12-gauge shotgun, so he could better aim at Sophia and Stephen.

169.     Sophia was pinned behind the metal sheet for multiple minutes.

170.     All of the Law Enforcement Officer Defendants were present while Sophia was pinned behind the metal sheet. All of the Law Enforcement Officer Defendants were aware that Sophia was being attacked without any legitimate law enforcement justification.

171.     There was plenty of time for any of the Law Enforcement Officer Defendants to intervene to try to stop the attack on Sophia, but none did. None of the Law Enforcement Officer Defendants told their colleagues to stop shooting or to give Sophia a chance to leave. None of the Law Enforcement Officer Defendants did anything to try to intervene in, stop, or mitigate the attack on Sophia.

172.     To the contrary, all of the Law Enforcement Officer Defendants encouraged and participated in the attack on Sophia while she was pinned behind the metal sheet.

173.     All of the Law Enforcement Officer Defendants worked together in a conspiracy to injure Sophia and Stephen.

174.     After Defendant Dvorak inappropriately deployed the first Stinger Ball Grenade at Sophia and Stephen, none of the other Law Enforcement Officer Defendants tried to stop him from equipping and deploying the second grenade in the same inappropriate way.

175.     Eventually, one or more of the Law Enforcement Officer Defendants— including at least Defendant Arndt—hit Sophia with at least one lesslethal munition.

176.     One of the less-lethal munitions that hit Sophia caused an injury so severe that Sophia still has a scar today, more than six years later.

177.    In extreme pain and realizing she had no way to avoid getting hit with additional munitions, Sophia began running as fast as she could south, away from the barricade and truck.

178.    As Sophia ran south, she pleaded with the Law Enforcement Officer Defendants, yelling, "I'm leaving. Please don't shoot."

179.    As Sophia ran, she was clearly unarmed and empty-handed. She was clearly fleeing and was not resisting or posing any safety threat to anyone.

180.    Over the course of the next few seconds, Sophia ran south away from the barricade.

181.    While Sophia was retreating and pleading for the violence to stop, the Law Enforcement Officer Defendants continued to shoot at her.

182.    Upon information and belief, Defendant Arndt continued to shoot at Sophia while she was retreating and pleading for him to stop.

183.    Upon information and belief, Defendant Hanson continued to shoot at Sophia while she was retreating and pleading for him to stop.

184.    Upon information and belief, Defendant White continued to shoot at Sophia while she was retreating and pleading for him to stop.

185.    Upon information and belief, other of the Law Enforcement Officer Defendants continued to shoot at Sophia while she was retreating and pleading for them to stop.

186.    All of the Law Enforcement Officer Defendants were present while Sophia was running away from the barricade. All of the Law Enforcement Officer Defendants were aware that Sophia was retreating and was not resisting. All of the Law Enforcement Officer Defendants were also aware that she was still being shot at while she was retreating. All of the Law Enforcement Officer Defendants were also aware that there was no legitimate law enforcement justification for continuing to shoot at Sophia while she was running away from the barricade.

187.    There was time for any of the Law Enforcement Officer Defendants to intervene to try to stop the continued attack on Sophia, but none did. None of the Law Enforcement Officer Defendants told their colleagues to stop shooting or to let Sophia leave. None of the Law Enforcement Officer Defendants did anything to try to intervene in, stop, or mitigate the attack on Sophia.

188.    While running away from the barricade, Sophia saw a piece of plywood on the ground.

189. Just as Sophia stopped to pick up the plywood, Jonathan Moll intentionally hit her with an explosive munition.

190.    Upon information and belief, the explosive munition was an Aerial Warning/Signaling Munition.

191.    This munition hit Sophia in the left forearm and exploded with a bright flash and loud bang.

192.    The explosion blew through Sophia's jacket and nearly severed her left hand from her arm. The blast destroyed almost all of the arteries, skin, tissue, muscle, nerves, tendons, and bone in her left forearm.

193.    Blood poured out of the wound and filled the sleeve of her jacket. Her forearm bone protruded from her sleeve.

194.    Sophia fell to the ground and began screaming in pain, yelling, "I lost my hand, I lost my hand!"

195.    While Sophia lay in the road, bleeding and screaming, the Law Enforcement Officer Defendants laughed and cheered. They congratulated Jonathan Moll on his marksmanship and celebrated the injury they caused.

196.    None of the Law Enforcement Officer Defendants offered to assist Sophia or made any attempt to render aid despite the fact that she was screaming and bleeding profusely.

197.    While the Law Enforcement Officer Defendants callously disregarded Sophia's suffering and failed to render any aid, individuals from the nearby campfires ran to help her.

198.    These individuals carried Sophia off the bridge and loaded her into a car.

199.    Because Backwater Bridge was closed and barricaded, Sophia could not be transported directly to Sanford Hospital in Bismarck. Instead, she was taken south to the Prairie Knights Casino and Resort, where she waited in agony for an ambulance to arrive.

(Doc. 14 at ¶¶ 131-199.) [2]

C.    **Wilansky's Pleading Allegations in the Companion Case**

Wilansky's claims against the Defendants in this action were initially alleged by Wilansky in the Companion Case.   The Court struck Wilansky's claims asserted against the individual Defendants named in this action from the Companion Case on the basis such amendments had not been authorized by the Court in the Companion Case.   Notably, Wilansky now omits from her *First Amended Complaint* in this case numerous of her pleading admissions contained in the

---

[2] Wilansky alleges non-parties Morton County Deputy Jonathan Moll and North Dakota Highway Patrol Sgt. Adam Dvorak deployed explosive munitions (aerial warning/signaling munition or stinger ball grenades) at her in numerous paragraphs of her *First Amended Complaint.*  These allegations and claims against Moll and Dvorak are the direct subject of the pending Companion Case.  In this case, Wilansky asserts, in part, claims against the Defendants which are derivative of Wilansky's claims against Moll and Dvorak at issue in the Companion Case – specifically claims of conspiracy and failure to intervene in relation to the alleged use of force by Moll and Dvorak.  Although the ultimate determination of Wilansky's conspiracy and failure to intervene claims in this case against the individual Defendants would necessarily require prior resolution of the constitutional claims against Moll and Dvorak in the Companion Case, as discussed in this brief, such derivative claims of conspiracy and failure to intervene should be dismissed for failure to state a claim at this time as Wilansky also fails to allege plausible violations of her constitutional rights by Moll and Dvorak.

Companion Case. As this case and the Companion Case involve the same incident, the same legal counsel representing the various parties, and because the allegations discussed below were asserted by Wilansky in the Companion Case against the individual Defendants in the present case, Wilansky should be bound by such prior admissions. Of particular relevance to this motion to dismiss are the following allegations (i.e. admissions) contained in Wilansky's operative pleading (*Second Amended Complaint* [doc. 259]) in the Companion Case which have been omitted from Wilansky's *First Amended Complaint* in this action:

> 98.  On the afternoon of November 20, several water protectors arrived at Backwater Bridge with a semi-truck and towed one of the burned-out vehicles off of the bridge and into a nearby ditch.
> 99.  Law enforcement officers prevented these water protectors from towing away the second burned-out vehicle.

(Companion Case at Second Amended Complaint [doc. 259] ¶¶ 98-99.) Wilansky's *First Amended Complaint* in this action makes no mention to the fact the burned-out vehicle was towed away by "several water protectors", or to the admission that "Law enforcement officers prevented these water protectors from towing away the second burned-out vehicle." Wilansky has also omitted her prior admission contained in her original *Complaint* (doc. 1) in the Companion Case that "[i]n response, Morton County issued a request for assistance of all available law enforcement officers in the state of North Dakota[]" (doc. 1, ¶ 87), an admission scrubbed from Wilansky's *Second Amended Complaint* in the Companion Case.

Wilansky's *First Amended Complaint* in the present case also omits the following admissions contained in her *Second Amended Complaint* in the Companion Case:

> 131.  At approximately 3:57 a.m., law enforcement officers ordered them to move away from the burned-out vehicle and accused them of having someone under the truck.
> ***
> 144.  While she was running, she was overtly complying with a law enforcement order to move south away from the barricade.
> ***

147.    [Wilansky] stopped at the plywood and attempted to pick it up to use as a shield. (Companion Case at *Second Amended Complaint* [doc. 259] ¶¶ 131, 144, 147.)  Wilansky's *First Amended Complaint* in this action makes no mention of law enforcement's commands to "move away from the burned-out vehicle" and to "move south away from the barricade", nor does it mention Wilansky's intention in bending down to pick up the plywood to use it as a shield.

In addition, Wilansky now alleges for the first time that various law enforcement officers continued to shoot at Wilansky as she ran south across the bridge from the barricade and prior to an alleged explosive munition allegedly deployed by non-party Morton County Deputy Jonathan Moll, injuring her left arm.  Wilansky's *Second Amended Complaint* in the Companion Case instead alleges at paragraphs 141, 144, 147 and 148 that upon "realizing she had no way to avoid getting hit with additional munitions, Sophia began running as fast as she could south, away from the barricade and truck", thereby "overtly complying with a law enforcement order to move south away from the barricade[]" and she was then allegedly struck with an explosive munition after Wilansky "stopped at the plywood and attempted to pick it up to use as a shield."  Wilansky's new allegations of allegedly being shot at while she proceeded south away from the barricade have not previously been alleged, and are contrary to Wilansky's own sworn deposition testimony, discussed below.

These are inappropriate and artful pleading tactics designed solely to avoid a Rule 12 challenge to the sufficiency of the pleadings and should not be condoned by the Court.  *See e.g. Sunkyong Int'l, Inc.. v. Anderson Land & Livestock Co*., 828 F.2d 1245, 1249 n.3 (8th Cir. 1987) (indicating that a pleading superseded through amendment can still be used as the admission of a party); *Fernandez v. School Board of Miami-Dade County*, 201 F.Supp.3d 1353, 1361 (S.D. Fla. 2016) (invoking exception to the general rule that amended pleadings supersede former pleadings "where plaintiffs have manipulated the allegations in their pleadings to avoid a dispositive

defense" or where the amendment contradicts the pleadings in the original pleading). Wilansky should be bound by her prior pleading admissions in the Companion Case, and her prior sworn deposition testimony in the Companion Case, discussed below.

### D. Testimony of Sophia Wilansky

Wilansky's own deposition testimony in the Companion Case may also be considered in the context of a Rule 12 motion to dismiss. *See Miller v. Redwood Toxicology Laboratory, Inc*., 688 F.3d 928, 931 n.3 (8th Cir. 2012) (taking into consideration, in relation to Rule 12(b)(6) motion, plaintiff's initial and amended complaints, and the record created as a result of the plaintiff's motion for temporary restraining order, preliminary injunction and expedited discovery filed by plaintiff after the motion to dismiss was filed); *Blount v. ADP, Inc., 2012 WL 12957379 *2 (S.D. Cal. 2012)* (considering the plaintiff's sworn deposition testimony which was part of the record in that case which contradicted allegations in complaint when ruling on Rule 12 motion to dismiss); *Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988, 996 (D. Minn. 2013) (internal quotation marks omitted), *aff'd*, 823 F.3d 462 (8th Cir. 2016) (when evaluating a motion to dismiss, if "a written instrument contradicts allegations in the complaint ... the exhibit trumps the allegations.") Wilansky cannot reasonably argue her own testimony cannot be used against her when evaluating the sufficiency of her pleadings.

Wilansky obtained a ride with people she did not know from Pittsburgh to North Dakota, and arrived in North Dakota on November 4, 2016. (Wilansky Depo. [exh. A] at 8.) She did not know anyone, and did not have contact with anyone already at the protest when she travelled to North Dakota. (*Id*. at 11.) While in North Dakota, Wilansky stayed in her own tent within the Oceti Sakowin camp, located a short distance south of the Backwater Bridge. (*Id*. at 18-19.)

On November 21, 2016, including at the time of the subject explosion, Wilansky was wearing goggles and a snowboarding helmet specifically for protection from police weapons.

(Wilansky Depo. [exh. A] at 20-23.) She was also wearing a green puff jacket, depicted in a photograph of her taken on November 21, 2016 after the subject explosion. (*Id*. at 52-54; doc. 120-11 [photograph].) Beneath the green puff jacket she wore a blue vest, with a long sleeve shirt beneath that. (*Id*. at 58.) She also wore long thin pants. (*Id*.)

Prior to coming to North Dakota, Wilansky claims she had heard law enforcement officers were shooting people in the head, so that's why she put the helmet on before going to the Backwater Bridge on November 20-21, 2016. (Wilansky Depo. [exh. A] at 24.) Wilansky asserts she knew before coming to the protests that less lethal weapons were being used by law enforcement officers, including impact rounds, flashbangs, and gas. (*Id*. at 27.) She states she was aware of the possibility of being subject to less lethal weapons if she engaged in protest activities. (*Id*. at 28.)

On November 20, 2016, Wilansky knew that law enforcement were utilizing less lethal munitions at the Backwater Bridge before she went to the bridge herself that night. (Wilansky Depo. [exh. A] at 28-29.) Despite this knowledge, Wilansky went to the Backwater Bridge during the evening of November 20, 2016 and observed other protesters being shot with less lethal impact rounds at that time. (*Id*. at 33-34.) Wilansky was on the Backwater Bridge for many hours on November 20, 2016, arriving after dark on the 20th, at approximately 6:00 p.m. (*Id*. at 34.) She claims she saw law enforcement deploy bean bag rounds, rubber bullets, teargas, light sound munitions and water cannons for hours that night. (*Id*. at 35-36.) Wilansky agrees hundreds of protesters were involved that night, maybe more. (*Id.* at 37.) Wilansky saw the razor wire along law enforcements' line, and concedes law enforcement officers remained north of the barricade. (*Id*. at pp. 45, 51-52.) Sometime between 10:00 or 11:00 pm on November 20, 2016, Wilansky returned to the protester camp to eat and warm up. (*Id.* at 60). She then returned to the Backwater Bridge around 2:00 a.m. on November 21. (*Id*. at 65.) Wilansky believes the subject explosion

occurred around 4:00 a.m. on November 21, 2016. (*Id*. at 59.) She recalls being on the Backwater Bridge for a long time during that two hour period. (*Id*. at 65-66.)

At the scene, Wilansky observed law enforcements' barricade with razor wire and had been told by someone that the burned-out truck was chained to the barricade, and she observed chains under the truck. (Wilansky Depo. [exh. A] at 77-78.) Wilansky was aware that protesters had the previous day removed one of two burned-out trucks from the barrier, and had attempted to move the remaining burned-out truck. (*Id*. at 79-81.) Wilansky asserts she stood immediately behind the burned-out truck, near the driver's side front bumper, often behind a large metal shield measuring approximately 7' tall by 4' wide which was positioned near that location along the truck, for approximately half an hour to an hour and half, but moved around in that vicinity. (*Id*. at 86-88.) She asserts she was maintaining a vigil until other protesters returned. (*Id*. at 96.) The shield was covered with a blue plastic tarp. (*Id*. at 92-93.) She doesn't remember if anyone was holding the shield up. (*Id*. at 87.) Wilansky did not speak to law enforcement officers located north of the barricade, and does not recall any other protesters doing so. (*Id*. at 95.) Wilansky asserts that during the last few minutes prior to the subject explosion, it was only her and Stephen Joachinson who were positioned near the burned-out truck. (*Id* at 90.) She denies anyone was underneath the burned-out truck during the time period she was near the truck. (*Id*. at 101-02.) She denies attempting to remove or detach the chain or chains underneath the truck while she was present. (*Id*. at 102.)

Wilansky recalls multiple less lethal impact rounds striking the metal shield she was standing behind. (Wilansky Depo. [exh. A] at 115.) She also recalls law enforcement making loud announcements over the LRAD on November 21, 2016, including to get out from underneath the truck. (*Id*. at 110-11, 113.) She recalls hearing the LRAD being utilized on November 20, 2016 as well. (*Id*. at 112.) She does not remember if law enforcement gave warnings to protesters

to "get back", "stay away from the bridge", "move back", "back away from the concertina wire and return to the south side of the bridge", "back away from the barricades", "stop trying to cut the razor wire", on November 20, 2016 or at any time prior to the warning being given over the LRAD to get out from under the truck near 4:00 a.m. on November 21, 2016.  (*Id*. at 194-95.)  Wilansky does not deny these warnings were given by law enforcement officers to protesters – she simply claims she does not remember hearing them.  (*Id*. at 195-96.)

Wilansky asserts law enforcement were not able to hit her at first with less lethal munitions when she was behind the metal shield (Wilansky Depo. [exh. A] at 110, 115), but she was ultimately shot with an impact round in her upper left arm by an officer to the west of her location, while she was standing in this position.  (*Id*. at 89, 126-27.)  She also believes Joachinson, who was also partially behind the shield with her, was hit several times by impact rounds.  (*Id*. at 123.)  She also recalls hearing one or two explosive munitions explode a few feet to the west of her while she claims she was behind the shield, about one minute prior to her being shot in her upper left arm, but after the LRAD announcements to get out from under the truck were made.  (*Id*. at 116-18, 120, 124.)  She says there was light and an explosive sound from these prior explosions, and she does not recall any flame, burning smell or smoke.  (*Id*. at 118, 120.)  Wilansky claims it was when she was struck in her arm by the impact munition that she decided she was going to leave the bridge.  (*Id*. at 120-21.)  Wilansky estimates the period of time between when the LRAD announcement to get out from under the truck was made until the explosions to the west of her occurred was within minutes.  (*Id*. at 126.)  She estimates the time period between when the impact rounds were fired against the shield until she was hit in the arm and decided to leave the bridge was about two minutes.  (*Id*. at 121.)  She did not say anything to law enforcement officers during that two minute period of time.  (*Id*. at 121-22.)  Wilansky claims that as she was proceeding south, she said "I'm leaving.  Please don't shoot".  (*Id*. at 129.)  She did not say

anything else thereafter until the subject explosion. (*Id*. at 129.)

Wilansky asserts she proceeded east and south at a jog on the bridge from the burned-out truck and she estimates she was approximately 30 feet south of the truck, and not less than 15 to 20 feet south of the truck, east of center on the bridge, and was passing a pile of plywood and bin lids located on the east side of the bridge when the subject explosion occurred. (Wilansky Depo. [exh. A] at 129-33.) Wilansky claims she reached with her right hand towards the pile intending to pick up a piece of plywood to provide some protection against being shot while retreating. (*Id*. at 134, 137.) She was not struck with any impact munitions from the time she left the truck until she reached down towards the pile. (*Id*. at 134.) She did not hear or see anything as she jogged between those two points that suggested someone was attempting to shoot something at her. (*Id*. at 134-35.) Wilansky claims she was injured when an object exploded upon impacting her left arm. (*Id*. at 136.) Wilansky claims her body was facing roughly east or southeast at the time of the explosion, towards the pile. (*Id*. at 136-37.)

Wilansky claims she saw a very bright light from the explosion, and denies seeing any flames or smoke. (Wilansky Depo. [exh. A] at 136, 140-41.) She did not look around to see what had exploded. (*Id*. at 140.) Neither the device which exploded, nor any fragments thereof, were located by anyone to Wilansky's knowledge. (*Id*. at 169.) Wilansky does not know the identity of any officer who allegedly used force against her surrounding the incident. (*Id*. at 142.) She does not know what law enforcement agency Officer Doe was with or affiliated with. (*Id*. at 142.) She does not know whether John Doe officer was employed by Morton County. (*Id*. at 158.) Wilansky does not know whether the object that exploded was launched or thrown or rolled – she did not see it coming towards her. (*Id*. at 142-43.) She did not have any burn marks on her forearm or body anywhere, and there was not any fire damage to her jacket or clothing. (*Id*. at 144.) A metal fragment was removed from Wilansky's arm at the Hennepin County Medical

Center shortly following the explosion, a photograph of which is attached as Exhibit B. Wilansky believes the metal fragment came from whatever exploded as she has no other explanation as to how the fragment got into her injured arm. (*Id*. at 145-46, 192.) Wilansky believes that whatever exploded broke up into little metal pieces. (*Id*. at 147.) Wilansky did not suffer any injury to any other portion of her body, other than to her lower left arm. (*Id*. at 146.)

Wilansky claims her injury was the result of a munition which exploded. (Wilansky Depo. [exh. A] at 106-07.) Wilansky does not recall any medical doctor telling her that her injury was caused by a less lethal munition of some type. (*Id.* at 108.) No person professing to be an expert in less lethal munitions has ever told her that her injury was caused by a less lethal munition. (*Id*. at 108.)

### E. Matters Of Public Record Or Of Which Judicial Notice May Be Taken Or Which Do Not Contradict Wilansky's Complaint

A district court may also consider matters of public record, matters for which judicial notice may be taken, and matters which do not contradict the plaintiffs' complaint without converting a motion to dismiss to a motion for summary judgment. Adjudicative facts which may or must be judicially noticed by the Court are governed by Rule 201 of the Federal Rules of Evidence, which provides, in part:

**(a)** **Scope**. This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

**(b) Kinds of Facts That May Be Judicially Noticed**. The court may judicially notice a fact that is not subject to reasonable dispute because it:

**(1)** is generally known within the trial court's territorial jurisdiction; or

**(2)** can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

**(c)** **Taking Notice.** The court:

(1) May take judicial notice on its own; or

> (2) Must take judicial notice if a party requests it and the court is supplied with the necessary information.

Fed. R. Evid. 201(a), (b), (c) (bold in original). Pursuant to Federal Rule of Evidence 201(c)(2), a court "<u>must</u> take judicial notice if a party requests it and the court is supplied with the necessary information." (Underline added for emphasis). "[C]ourts may take judicial notice of any fact which is capable of such instant and unquestionable demonstration, if desired, that no party would think of imposing a falsity on the tribunal in the face of an intelligent adversary." *United States v. Gould*, 536 F.2d 216, 219 (8th Cir. 1976) (quotation omitted). "Under Federal Rule of Evidence 201(b), a court may take judicial notice of a 'fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Williams v. Employers Mut. Cas. Co.*, 845 F.3d at 903 (taking judicial notice of well-established scientific theory and principles).

City and County Defendants request the Court take judicial notice of the following facts, or otherwise consider the following facts to the extent they do not contradict Wilansky's pleadings.

1. On August 15, 2016, the Morton County Board of Commissioners declared a state of emergency due to protester activity occurring at the DAPL project site which threatened the health, well-being and safety of Law Enforcement and the public, and required additional manpower, resources and other expenditures to protect life and property. (*Dundon v. Kirchmeier*, Case No. 1:16-cv-406, 577 F.Supp.3d 1007, 1019 ¶15 (D.N.D. 2021), *appeal docketed* No. 22-1246 (8th Cir. Feb. 1, 2022) (hereinafter "*Dundon*") (exh. O)

2. On August 19, 2016, North Dakota Governor Jack Dalrymple signed Executive Order 2016-04 (exh. C) authorizing total utilization of the North Dakota State Emergency Operations Plan to respond to the situation. (*Dundon,* at 1019 ¶16.)

3.  On September 8, 2016, Governor Dalrymple activated a military police unit of the North Dakota National Guard to support Law Enforcement efforts with primary responsibilities to be with traffic control points and administrative duties. (*Dundon*, at 1019-1020 ¶20; exh. D.)

4.  The State of North Dakota made an Emergency Management Assistance Compact request to other states for law enforcement assistance on October 7, 2016 due to the escalated unlawful tactics by individuals protesting the construction of the DAPL. (*Dundon*, at 1020 ¶23; exh. E.)

5.  During the course of the prolonged DAPL protest, protesters principally occupied three areas: the Sacred Stone Camp and the Rosebud Camp located south of the Cannonball River, and the Seven Council Fires Camp (i.e. Oceti Sakowin) located between the north bank of the Cannonball River and the south bank of the North Branch of the Cantapeta Creek, a tributary of the Cannonball River. (*Dundon*, at 1018, ¶13.)

6.  The Sacred Stone Camp and Rosebud Camps were located in Sioux County, whereas the Seven Council Fires Camp was located in Morton County. (*Dundon*, at 1018, ¶13.)

7.  The Backwater Bridge is located on North Dakota Highway 1806 approximately 35 miles south of Mandan, North Dakota and crosses the north branch of the Cantapeta Creek, north of where the Seven Council Fires Camp was located during the time frames at issue in this case. (*Dundon*, at 1018 ¶13.)

8.  The Backwater Bridge and North Dakota Highway 1806 in the vicinity at issue in this lawsuit are located in an isolated rural area of Morton County.

9.  A Site Map depicting the locations of protester camps and related areas of interest during the time frames at issue has been incorporated into the *Order Denying Plaintiffs' Motion*

*for Preliminary Injunction* issued by this Court in *Dundon*, document 99, 2017 WL 5894552 *1 (D.N.D. February 7, 2017). A copy of that map is provided in this case as exh. F.

10. The drill pad from which the Dakota Access pipeline was to pass under the Missouri River was located approximately one mile to the northeast of the Backwater Bridge. (*Dundon*, at 1019 ¶14.)

11. The Dakota Access pipeline drill pad, and the location of the North Camp, were on land privately owned by Dakota Access, LLC, an affiliate of the company building the DAPL at the time of the events at issue in this lawsuit. (Corrective Warranty Deed to Dakota Access, LLC effective September 20, 2016 [exh. G].)

12. Pursuant to a Uniform Incident Command Request for Support signed by then Governor Jack Dalrymple and Morton County Sheriff Kyle Kirchmeier dated October 7, 2016, Sheriff Kirchmeier was designated as the overall incident commander, and a Uniform Incident Command Policy Group was established to address the ongoing DAPL protests in Morton County, which included, among others, all Sheriffs from volunteering counties. (Exh. H.)

13. The Backwater Bridge was deemed unsafe and closed to all access on October 28, 2016 by the North Dakota Department of Transportation, and under the authority granted pursuant to N.D.C.C. § 39-10-21.1 and the Governor's Executive Order 2016-04, signed August 19, 2016. (NDDOT Press Release issued October 28, 2016 [exh. I]; NDDOT Press Release dated October 31, 2016 [exh. J]; *Dundon*, at 1021-1022 ¶¶ 27-29.)

14. As of October 28, 2016, law enforcement had made 411 arrests in relation to the DAPL protests, with 141 protesters being arrested on October 27, 2016 alone during their removal

from private lands located in the direct route of the DAPL project. (*See generally Dundon*, at 1019-1021 ¶¶ 17-25 [detailing numerous arrests of DAPL protesters in increasingly intense interactions between law enforcement and protesters from August through November of 2016 in vicinity of DAPL project route and Backwater Bridge].)

15. The United States Army Corps of Engineers ("Corps") manages lands upon which all three camps were located, as well as additional federal lands in Morton County located along the north bank of the North Branch of the Cantapeta Creek extending from the Bridge and eastward to and then along the north bank of the Cannonball River, all the way eastward to the Missouri River. (Letter from Corps District Commander Col. Henderson to Morton County Sheriff Department dated November 1, 2016, with attached map [exh. K]; Corps Release no. 20160916-002 [exh. L]; Corps Release No. 20161127-001 [exh. M]; (*Dundon*, at 1018, ¶14.)

16. The Corps-managed land located along the north banks of the Cantepeta Creek and Cannonball River, as well as privately owned property north thereof, encompassed the DAPL project route and the location from which the DAPL project then planned to cross the Missouri River via horizontal directional drilling. (Letter from Corps District Commander Col. Henderson to Morton County Sheriff Department dated November 1, 2016, with attached map [exh. K]; *Dundon*, at 1018, ¶14.)

17. The Corps had not granted anyone any permits or permission with respect to public use of Corps managed lands located north of the Cantapeta Creek or north and east of the confluence of the Cantepeta Creek and Cannonball Rivers, extending to the Missouri River. (Letter from Corps District Commander Col. Henderson to Morton County Sheriff Department dated November 1, 2016, with attached map [exh. K]; *Dundon*, at 1022 ¶30.)

18. Pursuant to a lease with a private party, said Corps-managed lands located on the north banks described were at all times relevant herein subject to private grazing rights. (Corps Release No. 20161127-001 [exh. M]; Corps Release no. 20160916-002 [exh. L]; Department of the Army Lease for Agricultural or Grazing Purposes to Dave Meyer dated April 8, 2014 [exh. N].)

19. On November 1, 2016, the Corps requested the Morton County Sheriff's Department's assistance in removing what the Corps described to be trespassing protesters from federal lands located on the north side of the Cantapeta Creek. (Letter from Corps District Commander Col. Henderson to Morton County Sheriff Department dated November 1, 2016, with attached map [exh. K]; (*Dundon*, at 1022 ¶30.)

20. Aerial infrared video[3] [exh. P] of the protest scene at the Backwater Bridge during the evening hours of November 20, 2016 indisputably establishes: a large-scale riot occurred that evening on and around the Backwater Bridge; protesters attempted to remove the second burned out truck from law enforcement's defensive barricade in the face of less-lethal force applied by officers; protesters repeatedly made shield wall advances to the barricade and climbed on and around the barricade, including the remaining burned out truck in the face of force applied; protesters attempted to flank the barricade; protesters threw objects at law enforcement including numerous live CS canisters; and protesters lit unlawful fires on the Bridge and along the north shore of the Cantepeta Creek. An index to this video is provided as Exhibit Q.

---

[3] Court have considered video evidence in the context of motions to dismiss under Fed. R. Civ. P. 12(b)(6). *See, e.g. Jackson v. Brooklyn Center*, No. 21-CV-2072, 2023 WL 2368032 (D.Minn. March 6, 2023) (considering video/audio recordings from officer shoulder cams in considering Rule 12 motion; citing numerous supporting cases).

21. A North Dakota Supreme Court statement establishes that 553 criminal cases resulting from the DAPL protests had been filed in state district court by mid-December 2016. *See Matter of Petition to Permit Temp. Provision of Legal Servs.*, 889 N.W.2d 399, 401 (N.D. 2017).

These facts cannot reasonably be disputed as they are established by public records, have been the subject of voluminous media reports and law enforcement press releases (i.e. generally known within the trial court's territorial jurisdiction), and have been established and recognized by the Court in other litigation before this Court. *See* this Court's August 16, 2016 *Order Granting Plaintiff's Motion for Temporary Restraining Order* (doc. 7) and September 15, 2016 *Order Cancelling Hearing and Dissolving Temporary Restraining Order* (doc. 45) in an action entitled *Dakota Access, LLC v. Archambault, et al*., Case No. 1:16-cv-296 (discussing unlawful and violent activities of DAPL protesters-reproduced below), and this Court's *Order Granting Motion for Summary Judgment* in *Dundon v. Kirchmeier*, 577 F.Supp.3d 1007 (D.N.D. 2021), *appeal docketed* No. 22-1246 (8th Cir. Feb. 1, 2022).

### F.     Prior Determinations by This Court in Interrelated Cases – Context/Background

Further, the Court should take judicial notice of the basic facts surrounding the protests embraced by the *First Amended Complaint*, including but not limited to the mayhem and ongoing confrontations between law enforcement and protesters in the vicinity where the DAPL project was to cross Highway 1806 and otherwise in close proximity thereto, including at the Backwater Bridge on November 20, 2016 the evening prior to the incident at issue in this case, as not being reasonably disputable, irrespective of why such confrontations were occurring. *See Freshman v. Atkins,* 269 U.S. 121, 124 (1925) (a court may take judicial notice of, and give effect to, its own records in another, but interrelated, proceeding); *Insulate SB, Inc. v. Advanced Finishing, Inc*., 797

F.3d 538, 543 n.4 (8th Cir. 2015) (taking judicial notice of an order and documents in interrelated cases in relation to the existence of and basic facts surrounding the actions); *Rosemann v. Sigillito*, 785 F.3d 1175, 1178 n.3 (8th Cir. 2015) ("We may take judicial notice of judicial opinions, especially our own, and thus may reference the fact of Sigillito's conviction and his sentence in our consideration of this case."); *State of Florida Board of Trustees of Internal Improvement Trust fund v. Charley Toppino and Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975) ("It is not error . . . for a court to take judicial notice of related proceedings and records in cases before that court." (*citing National Fire Insurance Co. v. Thompson*, 281 U.S. 331, 335 (1930)); *Enterprise Bank v. Magna Bank of Missouri*, 894 F.Supp. 1337, 1341 (E.D. Mo. 1995) (taking judicial notice of records of two earlier actions before the same court for the purpose of establishing the facts leading up to the action then before the court). Such general background information has been addressed by this Court in *Dakota Access, LLC v. Archambault*, No. 1:16-cv-296, 2016 WL 5107005 (D.N.D. Sep. 6, 2016) ("Dakota Access"), and in this Court's order granting summary judgment dismissal of DAPL protesters' claims against law enforcement in relation to events occurring during this same incident on November 20-21, 2016 in *Dundon v. Kirchmeier*, 577 F.Supp.3d 1007 (D.N.D. 2021), *appeal docketed* No. 22-1246 (8th Cir. Feb. 1, 2022). This Court in *Dundon* referred to numerous "undisputed facts," including facts whose accuracy cannot seriously be questioned because they are recorded on videotape (via both ground level and aerial infrared surveillance video). *Id*. at 1018-23.

## III.    ARGUMENT

### A.    <u>Fed. R. Civ. P. 12(f) Motion to Strike - Wilansky's Allegations of Concealment and Defamation Should Be Stricken</u>

Wilansky asserts named individual Defendants used or conspired to use excessive force against her in violation of the Fourth and Fourteenth Amendments to the Constitution of the United

States, failed to intervene in relation thereto, and asserts a *Monell* claim against Morton County and Sheriff Kirchmeier, in his official capacity only (i.e. against Morton County). In paragraphs 204 through 216 of Wilansky's *First Amended Complaint*, she alleges Sheriff Kirchmeier, in his official capacity only, concealed Defendants' alleged role in injuring her by allegedly lying to the media and falsely accusing her of injuring herself. Such allegations should be stricken pursuant to Fed. Rule Civ. P. 12(f) as containing "immaterial, impertinent, or scandalous matter." None of the allegations contained in those paragraphs have any relevance to any of Wilansky's causes of action. In fact, this Court previously dismissed, with prejudice, Wilansky's nearly identical allegations and specific claim of defamation against Sheriff Kirchmeier and other government officials pursuant to *Order Granting, in Part, and Converting to Summary Judgment and Deferring, in part, County Defendants' Motion to Dismiss and Granting Defendant Iverson's Motion to Dismiss* (doc. 46 at ¶¶ 56-65) in the companion case of *Wilansky v. Morton County, et al.*, Case No. 1:18-cv-00236, United States District Court for the District of North Dakota.

**B.**     **Fed. R. Civ. P. 12(b)(6) Motion to Dismiss – Wilansky's Claims Should Be Dismissed for Failure To State A Claim Upon Which Relief May Be Granted**

Dismissal as to all Defendants is appropriate as Wilansky has failed to allege a plausible violation of her constitutional rights. Even assuming, arguendo, Wilansky has alleged a plausible claim for violation of a constitutional right, such right was not so clearly established at the time of the deprivation so that a reasonable officer would have understood his conduct was unlawful under the circumstances presented, thereby entitling the individual Defendants to qualified immunity as to all claims.

As Wilansky alleges Defendant Morton County is liable for the alleged conduct of all individual-Defendant officers, including North Dakota Highway Patrol Defendants Paul D. Bakke, Michael W. Hinrichs, Travis A. Nelson, Joshua W. Rode, Evan M. Savageau, and Travis M. Skar,

all in their personal capacities ("State Defendants"), City and County Defendants adopt and incorporate by reference arguments contained in the brief filed by State Defendants in support of their separate Rule 12 motion herein as additional bases for dismissal of Wilansky's claims. Additional arguments are provided below.

  **1.**  **Wilansky Has Failed to Allege A Plausible Violation of Her Federal Constitutional Rights Under the Fourth Amendment**

City and County Defendants deny Wilansky's alleged left arm injury was caused by any explosive munition deployed by any law enforcement officer, and deny any responsibility for her left arm injury. Regardless, even assuming the alleged aerial warning/signaling munition was deployed by non-party Morton County Deputy Moll against Wilansky, which is denied, Wilansky has failed to allege a plausible violation of her federal constitutional rights by non-parties Moll or Dvorak, or any Defendant in this case, as explained below.

  a.  <u>WILANSKY HAS NOT ALLEGED SHE WAS "SEIZED"</u>

Wilansky's purely factual allegations fail to allege a "seizure" as required to state a cognizable Fourth Amendment excessive force claim. The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. CONST. AMEND. IV. An excessive force claim under the Fourth Amendment requires an allegation of the use of excessive force by the government in connection with a "seizure" of the plaintiff by the government. *See Graham v. Connor*, 490 U.S. at 393-396 (noting the Fourth Amendment guarantees citizens right " 'to be secure in their persons . . . against unreasonable . . . seizures' of the person", and noting excessive force claims under the Fourth Amendment relate to the use of force in the context of seizures).

The Supreme Court of the United States has recognized two types of seizures under the

Fourth Amendment, each of which has a separate common law pedigree and for which different principals are applied. As reiterated by the Supreme Court in *Torres v. Madrid*, 141 S.Ct. 989, 995 (2021), "[a]n arrest requires *either* physical force . . . or, **where that is absent**, submission to the assertion of authority." (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (italics in original, bold added). In other words, where physical force has been applied to the body, the common law standards applicable to use of force apply, not the standards applicable to a show of authority, also referred to as a seizure through acquisition of control (whether pursuant to a show of authority complied with or termination of freedom of movement through intentional acquisition of physical control). This is demonstrated by the United States Court of Appeals for the Eighth Circuit's analysis of alleged Fourth Amendment seizures in *Martinez v. Sasse*, 37 F.4th 506 (8th Cir. 2022) and *Quraishi v. St. Charles County, Mo.*, 986 F.3d 831 (8th Cir. 2021), as well as in the United States District Court for the District of Columbia decision in *Black Lives Matter D.C. v. Trump*, 544 F.Supp.3d 15, 48-49 (D.C. 2021) ("BLM"). In each of those cases, officers applied either direct (pushing lawyer to the ground in *Martinez*) or indirect force (deploying teargas in *Quraishi* and flashbang grenades, rubber bullets and tear gas in *BLM*) to the bodies of individuals. In each of those cases, the courts applied the use of force test in ascertaining whether a "seizure" had occurred, and not the seizure through acquisition of control test (whether through show of authority complied with or through the termination of freedom of movement through intentional acquisition of physical control test), despite the fact that in all three of those cases the plaintiffs' freedom of movement was impacted (i.e. repelled or dispersed). *See, also Meggs v. City of Berkeley*, 2005 WL 483445, at * (N.D. Cal. Mar. 2, 2005) (an officer's use of police baton to push back protester from police line, and chop strike to protester's arm while directing protester to stay back was intended to repel rather than restrain, and therefore did not constitute a seizure

under Fourth Amendment).  Once an officer applies force to the body, the use of force test only applies.  *Torres* essentially confirmed this is the proper analysis by holding whether an individual against which force is applied complies (i.e. submits) is irrelevant under the use of force test, and noted that an example of a seizure through termination of freedom of movement is *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) where police seized a driver when he crashed into their roadblock (i.e. the termination of movement did not involve the use of officer force).  "Such a seizure [by termination of freedom of movement] requires that 'a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result[]'" through "an intentional acquisition of physical control."  *Torres*, at 1001 (quoting *Browe*r, 489 U.S., at 596, 599).  A seizure through acquisition of control through a termination of freedom of movement involves an instrumentality other than officer application of force to the body of a person which results in the intentional acquisition of physical control. The required elements for a seizure through acquisition of control are discussed in more detail in the section below that specifically discussed the applicable standards.

As explained below, Wilansky's purely factual allegations as to what each individual Defendant did establish none of them individually seized Wilansky under the Fourth Amendment under either the use of force or seizure by control tests.  The claims against the individual Defendants must be analyzed separately from each other, and separately from the alleged conduct of other officers on the scene.  "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed.  Section 1983 does not sanction tort by association."  *Smith v. City of Minneapolis*, 754 F.3d 541, 547 (8th Cir. 2014) (internal quotation marks omitted).  "'An officer may be held liable only for his or her own use of excessive force.'"  *Id*. at 547-48 (quoting *Smith v. Kansas City, Mo. Police Dep't*,

586 F.3d 576, 581 (8th Cir. 2009)). Wilansky's attempt to impute the conduct of each individual Defendant to the other Defendants runs afoul of these principles.

### i. No Seizure Through Officer Use Of Force

Under a use of force test, the inquiry is whether the use of force objectively manifested an intent to restrain. *Torres*, at 998. "Only an objective test **allows the police to determine in advance** whether the conduct contemplated will implicate the Fourth Amendment." *Id* (bold added). "Nor does the seizure depend on the subjective perceptions of the seized person." *Id*. at 999. Wilansky's perceptions in relation to the force allegedly applied by officers is irrelevant to the seizure inquiry (i.e. Wilansky's perception she was trapped or pinned behind the metal shield by force directed at her), and instead the proper inquiry is whether the officer's contemplated use of force would have been understood by a reasonable officer under the totality of the circumstances presented to manifest an intent to restrain, or manifest some other intent, such as to repel or disperse. How else could officers "determine in advance whether the conduct contemplated would implicate the Fourth Amendment"? *Torres*, at 998.

The Court in *Torres* held that "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Torres*, at 1003 (underline added).

A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. Nor will force intentionally applied for some other purpose satisfy this rule. In this opinion, we consider only force used to apprehend. We do not accept the dissent's invitation to opine on matters not presented here – pepper spray, flash-bang grenades, lasers, and more.

Moreover, the appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context. Only an objective test "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment. . . . .

Nor does the seizure depend on the subjective perceptions of the seized person.

*Torres*, at 998 (citations omitted, italics in original, underline added).  In *Torres*, a seizure occurred because the officers were trying to enforce an arrest warrant at the time they fired live ammunition which struck the fleeing suspect, thereby objectively manifesting an intent to acquire possession of the suspect.

The Eighth Circuit has questioned whether the application of force to the body without an objective manifestation of intent to restrain, but rather to disperse or repel someone, constitutes a "seizure" under the Fourth Amendment.  In *Martinez v. Sasse*, 37 F.4th 506 (8th Cir. 2022), an officer who pushed an attorney to the ground and locked the door to an ICE facility to prevent the attorney's entry was entitled to qualified immunity in relation to a Fourth Amendment excessive force claim <u>because the law was not clearly established as of June 2018</u> that the application of physical force for the purpose of repelling someone, rather than apprehending someone, constituted a seizure under the Fourth Amendment.  *Id*. at 509-10.  *Martinez* distinguished *Atkinson v. City of Mountain View*, 709 F.3d 1201 (8th Cir. 2013) on the basis officer's conduct in *Atkinson* objectively manifested an intent to restrain the plaintiff because after bull-rushing the plaintiff, plaintiff was immediately hand-cuffed and arrested.  "The 'bull rush' was not performed to repel the citizen, and the decision did not provide clear guidance on whether force used only for that purpose constitutes a seizure." *Martinez* at 510.  The seizure in *Atkinson* was not the result of simply a mere touch.

In 2021, even before *Torres* was decided, the Eighth Circuit determined in *Quraishi v. St. Charles County, Mo*., 986 F.3d 831 (8th Cir. 2021) that an officer who deployed tear gas to disperse a crowd of protesters was entitled to qualified immunity in relation to a Fourth Amendment excessive force claim brought by members of the press who were intermingled with protesters

because the law was not clearly established as of August 2014 that deploying tear gas for the purpose of dispersing a crowd, rather than to restrain anyone, constituted a seizure under the Fourth Amendment. *Id.* at 840. The court rejected plaintiffs' argument they were restrained because they could not stay in their chosen location, noting the cited cases did not give fair warning the use of tear gas to disperse a crowd constituted a seizure. *Id.* At the very least, even assuming, arguendo, any use of force to repel or disperse constituted a seizure under the Fourth Amendment, *Quraishi* and *Martinez* establish that at the time of the events at issue in this case, November 20-21, 2016, the law was not clearly established that the use of force for the purpose of repelling or dispersing, rather than to restrain, constituted a seizure under the Fourth Amendment. This alone establishes individual Defendants are entitled to qualified immunity on Wilansky's Fourth Amendment excessive force and derivative failure to intervene and conspiracy claims. Neither the United States Supreme Court nor the United States Court of Appeals for the Eighth Circuit has ever held that an officer's use of force alone constitutes a per se seizure under the Fourth Amendment.

In *Dundon v. Kirchmeier*, this Court also properly noted Eighth Circuit precedent, pre-dating the November 20, 2016 riot, recognized the Fourth Amendment seizure requirement of an objective manifestation of intent to arrest in *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201 (8th Cir. 2013). 577 F.Supp.3d at 1038-39. Although this Court concluded *Atkinson* to be inapplicable to the question of seizure in the indirect physical touch crowd control case – it noted *Atkinson* falls in line with *Torres*. *Id.* In *Atkinson*, a plain-clothed police officer tackled and "bull rushed" the plaintiff, resulting in physical injuries to the plaintiff, with the plaintiff being arrested thereafter. The court in *Atkinson* noted "a reasonable jury could find that [the officer] 'objectively manifested,' an intent to arrest Atkinson. The reported fury of [the officer's] charge temporarily incapacitated Atkinson, and immediately thereafter [the officer] ordered Mountain View police

officers to take Atkinson into custody." *Atkinson*, 709 F.3 at 1212, n. 4 (citation omitted). The requirement of an objective manifestation of intent to arrest in the context of Fourth Amendment seizures was recognized by the United States Court of Appeals for the Eighth Circuit prior to the November 2016 riot at issue.

In *Dundon*, this Court also properly distinguished other cases decided prior to the events in this case, and involving application of less-lethal force against protesters, including *Rauen v. City of Miami*, 2007 WL 686609 (S.D. Fla Mar. 2, 2007); *Jennings v. City of Miami*, 2009 WL 413110 (S.D. Fla. Jan. 27, 2009); *Coles v. City of Oakland*, 2005 WL 8177790 (N.D. Cal. April 27, 2005); and *Nelson v City of Davis*, 685 F.3d 867 (9th Cir. 2012). *Dundon*, at 1039. In each of these cases, the protesters "essentially had no egress after force was used against them while they were 'herded' and encircled by officers into a certain location." *Id*. Such circumstances evidenced an objective manifestation of intent by the officers to restrain the protesters.

As explained above, the seizure through use of officer force test applies where an officer has applied force to the body of a person. If an officer applies force to the body of another, only the use of force test is applied in ascertaining whether a seizure under the Fourth Amendment occurred. The show of authority complied with and termination of freedom of movement tests are not also applied. An officer's use of force which impacts the body constitutes a seizure if such use of force objectively manifests an intent to restrain, rather than for some other purpose, such as to repel or disperse.

Wilansky alleges she was struck one time by an impact round allegedly fired by Arndt while Wilansky was behind the metal shield (¶ 175). She also alleges she was later struck by an explosive aerial warning/signaling munition allegedly deployed by non-party Morton County Deputy Jonathan Moll (doc. 14 at ¶¶ 189-90) (the subject of the Companion Case and which Moll

denies) when she stopped proceeding south across the Bridge (i.e stopped complying with the admitted command to move south away from the barricade), and bent down to pick up a piece of plywood to use as a shield (again, admitting Wilansky's intent to defy admitted command to proceed south way from the barricade). Wilansky does not allege her body was actually impacted by any other use of force by any other officer, including with respect to the two Stinger Ball Grenades allegedly deployed by non-party NDHP Sgt. Dvorak. Wilansky's alleged perceptions, including her perception she was "pinned" or "trapped" behind the metal shield/barricade, are not relevant to the seizure analysis. *Torres* at 998.

In the present case, Wilansky admits that over a period of months (September through November) leading up to the incident at issue, other protests occurred in Morton County involving confrontations between protesters and law enforcement (doc. 14 at ¶¶ 59-64), including a large confrontation between protesters and officers only a few hours prior to the events at issue in this case. (Doc. 14 at ¶¶ 108-18. *See also* Exh. P (aerial surveillance footage from November 20, 2016, and index thereto (exh. Q).) Wilansky admits not all of the protesters on November 20, 2016 were peaceful by alleging only "[t]he vast majority of protesters were peaceful", and admitting "a protester was able to cross the concertina wire and jersey barrier barricade, who "was immediately apprehended by law enforcement and arrested. (*Id.* at 117.) These admitted facts establish continuing chaos and tension between protesters and law enforcement. Wilansky acknowledges law enforcements' presence significantly grew over the fall months of 2016, with requests being made by Sheriff Kirchmeier and the State of North Dakota for assistance in responding to the DAPL protests from multiple law enforcement agencies within North Dakota and surrounding states. (*Id*. at ¶¶ 44-47.) Wilansky also acknowledges a large crowd of protesters gathered on the Bridge on November 20, 20216 hours earlier, with protesters removing one of two

burned-out trucks from the barricade, and with protesters attempts to remove the second burned-out truck being thwarted due to the application of less-lethal force by law enforcement. (*Id*. at ¶¶ 107-09; Companion Case *Second Amended Complaint* (doc. 259) at ¶¶ 98-99.) Wilansky has testified she knew that law enforcement officers were utilizing less lethal munitions at the Bridge before she went to the Bridge herself on November 20, 2016, and she alleges that while she was at the Bridge for several hours before the incident at issue she observed law enforcement deploying bean bag rounds, rubber bullets, teargas, light sound munitions and water cannons for hours that night, all prior to her positioning herself along the barricade. (Wilansky Depo. [exh. A] at pp. 35-36.) This observance alone constituted a prior warning. Wilansky alleges that prior to force being applied against her, law enforcement manning the barricade warned her to move south away from the burned-out vehicle forming a part of the barricade - away from law enforcement. Wilansky admits the Bridge itself was closed and barricaded at the time of the incident. (Doc. 14 at ¶ 199.) Although Wilansky characterizes the closure of the Bridge as meaning she was permitted to proceed up to the barricade located along the north end of the Bridge (doc. 14 at ¶¶ 105-06), the falsity of such allegations is established through official government records for which judicial notice may be taken. Press releases issued by the North Dakota Department of Transportation on October 28 and 31, 2016 (exhs. I & J), stated the Bridge was closed due to the structural integrity of the Bridge, and "the Bridge is unsafe for anyone to cross." As noted by this Court in Dundon, "[e]ven if an ambiguity exists, it is hard to envision a situation where an officer, or even a reasonable juror for that matter, would think it was safe for a a pedestrian to be on the Bridge when engineers were concerned about the safety of the Bridge's structure." *Dundon*, at 1044. It cannot reasonably be disputed Wilansky was trespassing at all locations where force was allegedly applied

against her. Wilansky admits officers were positioned north of the barricade. (Doc. 14 at ¶ 128.) It is not disputed officers made no attempt to proceed south of the barricade to apprehend anyone.

Wilansky has not alleged she was arrested or restrained by law enforcement, or even advised by law enforcement she was not free to terminate the encounter with law enforcement. Wilansky does not allege law enforcement at any time told her to remain where she was. Wilansky does not allege nonconclusory facts to infer the force was applied for the purpose of law enforcement gaining physical control over Wilansky. Wilansky admits following the explosion, she proceeded with the assistance of other protesters south off the Bridge, and was transported further south to the Prairie Knights Casino and Resort, from where she was transported to a hospital.

Wilansky's allegation the deployment of stinger ball grenades (which did not impact her), or any other munition prevented her from proceeding south across the Bridge is contrary to her own admission that she did in fact proceed south across the Bridge. As a practical matter, the stinger ball grenades and other less-lethal munitions allegedly deployed did not, as a matter of common sense, create any barrier to Wilansky's retreat. Wilansky admitted during her deposition that she was not struck with any impact munitions from the time she left the truck until she reached down towards the debris pile to pick up a piece of plywood. (Wilansky Depo. [exh. A] at 134.) She did not hear or see anything as she jogged between those two points that suggested someone was attempting to shoot something at her. (*Id.* at 134-35.)

Under Wilansky's alleged facts and materials this Court may consider in ruling upon this Rule 12 motion, the alleged application of force against Wilansky objectively manifested an intent to repel/disperse Wilansky and the other protester (Joachinson) hiding behind the burnt-out truck and propped up metal shield, not an intent to restrain them. Wilansky and other protesters were

always able to, and did, leave the area where force was being applied by proceeding south across the bridge. *See Martinez v. Sasse*, 37 F.4th at 509-10 (in a case decided post-*Torres*, determining the law was not clearly established as of June of 2018 that pushing attorney to ground to prevent entry into facility constituted a seizure under the Fourth Amendment; attorney was not restrained but rather repelled); *Quraishi v. St. Charles County, Missouri*, 986 F.3d at 839-40 (in a case decided pre-*Torres*, determining the law was not clearly established as of August 2014 that the use of tear gas by an officer to disperse a crowd constituted a seizure under the Fourth Amendment; plaintiff reporters' freedom of movement was not terminated or restrained but only dispersed); *Black Lives Matter D.C. v. Trump*, 544 F.Supp.3d 15, 48-49 (D.C. 2021) (citing *Torres*, and determining the law was not clear as of June 2020 that officers seized protesters under the Fourth Amendment through the use of flashbang grenades, rubber bullets and tear gas because they were used to disperse the crowd, not to restrain them or attempt to seize them in place). This Court in *Dundon* properly concluded "[t]he evidence in this case [*Dundon*] shows only one conclusion: officers objectively manifested an intent to move protesters away from the Bridge, get them to disperse, and control the crowd." *Dundon*, at 1040. The events at issue in *Dundon* occurred only a few hours prior the events at issue in this case at the very same location.

Wilansky's allegations, even if accepted as true, objectively manifest law enforcement's intention in applying the alleged force of keeping Wilansky and other protesters away from law enforcement – the exact opposite of what is required for a seizure under the Fourth Amendment. Wilansky has failed to allege a "seizure" by law enforcement governed by the Fourth Amendment. Wilansky's Fourth Amendment excessive force claim therefore fails as a matter of law and should be dismissed.

ii.     <u>No Seizure Through Control</u>

In the absence of an officer's application of force to the body, a seizure may occur through acquisition of control, whether through a show of authority complied with, or through termination of freedom of movement. *Hodari D.*, at 626. Neither are alleged to have occurred in this case.

Wilansky does not allege she complied with any show of authority by any individual Defendant in this case. Although Wilansky alleges Ternes commanded her to "get out from under the truck" (Doc. 14 at ¶ 150), she expressly alleges nobody was under the truck and that Joachinson yelled back to the officers that "no one was under the truck" (*Id.* at ¶ 152). That is the only allegation made by Wilansky in the *First Amended Complaint* which specifically refers to conduct by Ternes. Wilansky does not allege she complied with Ternes' command to get out from under the truck because she denies she was under the truck to begin with.

With respect to Wilansky's prior admissions in the Companion Case that she was commanded to "move away from the burned-out vehicle" (Companion Case *Second Amended Complaint* [doc. 259] at ¶ 131) and to "move south away from the barricade" (*id.* at ¶ 144), Wilansky does not identify who gave those commands. As a result, such allegations are too vague to advise the individual Defendants that such conduct is being attributed to them individually. In addition, Wilansky admits she did not leave the immediate vicinity of the barricade until later when she was allegedly hit with an impact round by Arndt, and then realizing her position behind the metal shield was no longer safe, she ran south. (Doc. 14 at ¶¶ 175, 177.) These admissions establish Wilansky did not comply with any of these verbal commands, but instead complied with Arndt's alleged application of force to her body (only properly analyzed under the use of force test, discussed above).

In addition, Wilansky does not allege any show of authority was made by Defendants Grosz, Bakke, Hinrichs, Nelson, Rode, or Savageau, let alone any show of authority by them she

complied with. Defendants Bakke, Nelson, and Savageau are not even specifically referenced in relation to the events on November 21, 2016. The only reference to Defendants Hinrichs and Grosz in relation to the events of November 21 was that Hinrichs allegedly "moved west to get a better line of sight on Sophia" (doc. 14, ¶ 166), and "Grosz moved out from behind one of the military vehicles to get a better line of sight on Sophia[]" [*id.* ¶ 167]. Wilansky does not allege Defendants Ternes, Grosz, Bakke, Hinrichs, Nelson, Rode, or Savageau used any force against her at all, whether impacting her or being directed at her. After specifically identifying Defendants Arndt, Hanson, Skar, White and non-party Moll as individuals who allegedly shot at Wilansky while she "cowered behind the metal sheet" to avoid getting hit, Wilansky expressly alleges not all individual Defendants were personally shooting at her. (Doc. 14 at ¶ 161.) Wilansky's additional allegation that "[o]n information and belief, other Law Enforcement Officer Defendants fired less-lethal munitions at Sophia and Stephen as well" (*id.* at ¶ 159) is too vague to place Defendants Ternes, Grosz, Bakke, Hinrichs, Nelson, Rode, or Savageau on notice whether Wilansky is asserting they are alleged to have been shooting at Wilansky.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citations omitted). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' Fed. Rule Civ. Proc. 8(a)(2)." *Id.* at 679.

Even assuming, arguendo, Wilansky's pleadings were construed to allege all individual Defendants were shooting at her, (which is not alleged), Wilansky does not allege she complied with any such show of authority and instead only complied with Arndt's alleged application of force to her body (the only impact round alleged to have struck her). The same is true with respect to non-party Dvorak's alleged deployment of two stinger ball grenades "toward Sophia and Stephen" (¶ 164) prior to Wilansky being hit by the impact round allegedly fired by Arndt – Wilansky did not comply with any show of authority in relation to the stinger ball grenades, which are not alleged to have hit Wilansky, as she remained behind the metal shield until subsequently struck by an impact round allegedly fired by Arndt. "A seizure is a single act, and not a continuous fact." *Torres*, at 1002 (quoting *California v. Hodari D.*, 499 U.S. at 625).

Although Wilansky alleges in her *First Amended Complaint* in this case that after she began running south from the barricade and truck "the Law Enforcement Officer Defendants continued to shoot at her" (doc. 14 at ¶¶ 181, 185), and specifically identifies Arndt, Hanson, and White as doing so (*id.* at ¶¶ 182-84), such allegations are too vague to place any Defendant aside from Arndt, Hanson and White on notice that they are alleged to have engaged in such conduct. In addition, such allegations are directly contrary to Wilansky's sworn deposition testimony where she admitted she was not struck with any impact munitions from the time she left the truck until she reached down towards the plywood, and she did not hear or see anything as she jogged between those two points that suggested someone was attempting to shoot something at her. (Wilansky Depo. [exh. A] at 134-35.) Wilansky's allegations concerning the deployment of impact munitions toward her as she proceeded south was not alleged in the Companion Case and first appears in her *First Amended Complaint* in this action. Such allegations which are contrary to Wilansky's sworn testimony should be disregarded. But even if such allegations are accepted as true (which are

denied), Wilansky none-the-less fails to allege a seizure in relation to such alleged conduct. The Eighth Circuit in *Quraishi* rejected the argument that an officer's deployment of tear gas terminated or restricted the plaintiffs reporters' freedom of movement because they could not stay in their chosen location, noting the reporters were instead dispersed. *Quraishi*, at 840 (citing *Johnson v. City of Ferguson*, 926 F.3d 504, 506 (8th Cir. 2019 (en banc) (no seizure where plaintiff was not "ordered to stop and remain in place" and "was able to leave the scene")). In other words, being dispersed or repelled does not constitute a termination or restriction upon freedom of movement under the Fourth Amendment.

Wilansky does not allege any officer commanded or instructed her to stop and remain in place. Wilansky alleges the exact opposite, that officers made commands to "get out from under the truck" (doc. 14 at ¶ 150), "move away from the burned out truck" (Companion Case *Second Amended Complaint* [doc.259], ¶ 131) and "move south away from the barricade" (*id.*, ¶ 144). Wilansky denies she was under the truck, but admits she did not comply with the other commands, and did not move away as a result of impact rounds fired at her prior to her being hit by one round allegedly fired by Arndt, at which point she alleges she ran south away from the barricade because she "real[ized] she had no way to avoid getting hit with additional munitions." (Doc. 14, ¶ 177.) Wilansky does not allege officers engaged in "kettling" by encircling her, as officers remained north of the barricade. To the extent an officer continued to fire impact rounds at her as she proceeded south (which is contrary to her prior pleadings and her sworn testimony), Wilansky was not complying with any show of authority in relation to such alleged shots as she admits she was already proceeding south away from the barricade because of previously being hit while at the barricade. Wilansky does not allege she stopped proceeding south because of the alleged impact rounds being fired at her, but instead she stopped to pick up a piece of plywood to use as a shield. Wilansky does

not allege she complied with any such show of authority. Consistent with the analysis in *Quraishi*, any alleged munitions fired at Wilansky as she proceeded south did not constitute a seizure through control as she continued to proceed south and was being repelled/dispersed. *See Torres*, at 839 ("To be seized, 'a reasonable person would have believed that he was not free to leave.'" (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

With respect to non-party Moll, who allegedly fired an explosive aerial warning/signaling munition which allegedly injured Wilansky's left arm (all of which is denied), as discussed, Wilansky admits she was hit by the explosive munition after she stopped proceeding south as commanded, and bent down to pick up a piece of plywood to use as a shield (again, in defiance of commands). Under these circumstances, even assuming the Court were to apply the seizure by control test to such incident (as discussed above, only the seizure through use of force test applies where officer force is applied to the body of a person), no seizure of Wilansky through control occurred. This is because even under the seizure by control analysis, the instrumentality put in place by Moll must have been for the purpose of acquiring control over Wilansky. A seizure by acquisition of control requires "an intentional acquisition of physical control" and that "a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Torres*, at 1001 (quoting *Brower*, 489 U.S., at 596, 599) (underline added). Wilansky's alleged facts establish Moll's alleged use of force was for the purpose of repelling Wilanksy, not for the purpose of acquiring physical control over her. The difference between a seizure by force and a seizure by control is that the requirements of acquiring actual physical control or submission do not extend to seizures by force. *See Torres*, at 1001 ("But that requirement of control or submission [under a seizure by control] never extended to seizures by force.").

Wilansky's allegation of serious injury to her left arm and requiring assistance by other protesters to proceed south off the Bridge does not change the seizure analysis. A seizure by acquisition of physical control requires an intentional acquisition of physical control. *Compare Brower*, at 598-99 (decedent who was killed as a result of the stolen vehicle he was driving impacting a road block during a high speed chase was seized through police acquisition of control because the decedent "was meant to be stopped by the physical obstacle of the roadblock – and [] he was so stopped.") *with County of Sacramento v. Lewis*, 523 U.S. at 843-44 (decedent motorcyclist was not seized when his motorcycle tipped over during high speed chase and pursuing officer accidentally ran into him, resulting in fatal injuries, because the officer only sought to stop the suspect only by a show of authority represented by flashing lights and continuing pursuit, but accidentally stopped the suspect by crashing into him – means not intentionally applied). As explained by the Supreme Court in *Brower*, and quoted in *Lewis*:

> [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Lewis*, 523 U.S. at 844 (quoting *Brower*, at 596-97). In both *Brower* and *Lewis*, officers intended to stop the fleeing suspect. Wilansky's alleged facts establish the opposite – officers' actions were intended to repel Wilansky away from the barricade and officers. Whether any force allegedly applied was reasonable is a separate question which only becomes relevant if a seizure occurred in the first instance.

Wilansky's excessive force claims under the Fourth Amendment fail to allege a "seizure" by any Defendant, or by nondefendants Moll and Dvorak. As a result, Wilansky's Fourth

Amendment excessive force claims, including Wilansky's derivate claims of conspiracy and failure to intervene should be dismissed, with prejudice.

b.     **ALLEGED FORCE APPLIED WAS OBJECTIVELY REASONABLE, AND DID NOT VIOLATE WILANSKY'S FOURTH AMENDMENT RIGHTS**

An officer's use of force is not excessive if no injuries are alleged to have resulted from the officer's acts. *See Grider v. Bowling,* 785 F.3d 1248, 1252 (8th Cir. 2015) (if the suspect does not allege injuries from the officer's acts, then the use of force was not excessive); *Johnson v. Carroll,* 658 F.3d 819, 830 (8th Cir. 2011) (finding force not excessive in part because the plaintiff sustained no injury); *Chambers v. Pennycock*, 641 F.3d 898, 906 (8th Cir. 2011) (a "*de minimis* use of force is insufficient to support a claim" of excessive force under the Fourth Amendment, "and it may well be that most plaintiffs showing only *de minimis* injury can show only a corresponding *de minimis* use of force.").

Wilansky does not allege she sustained any injuries as a result of any alleged conduct by Defendants Bakke, Grosz, Hanson, Hinrichs, Nelson, Rode, Savageau, Skar, Ternes, or White. As discussed, Wilansky does not allege any Defendant applied physical force to her body other than Arndt (one impact round) and non-party Moll (alleged aerial warning/signaling munition). Wilansky does not allege Dvorak's deployment of two stinger ball grenades actually touched her – the stinger ball grenades landed and exploded within a few feet of Wilansky (Doc. 14 at ¶ 137). Such alleged munition deployments which did not actually touch and injure her could not constitute excessive force as a matter of law – force was not actually applied upon her nor injured her. Wilansky's Fourth Amendment excessive force claims against Defendants Bakke, Grosz, Hanson, Hinrichs, Nelson, Rode, Savageau, Skar, Ternes or White should be dismissed on this basis as well.

In addition, the severity of the injury alleged is not dispositive of whether Wilansky has alleged a plausible claim of excessive force under the Fourth Amendment, or determinative of whether individual Defendants are entitled to qualified immunity. Instead, the appropriate inquiry is whether it was objectively reasonable for officers to use the force alleged to achieve their lawful objectives under the totality of the circumstances, not whether it was objectively reasonable to cause the injury alleged by Wilansky. The focus is on the force applied, not the resulting injury. *See Plumhoff v. Rickard*, 572 U.S. 765 (2014) (officer's firing of 15 shots into vehicle resulting in death of suspect during high speed car chase was objectively reasonable and did not amount to excessive force under the circumstances); *Mullenix v. Luna*, 136 S.Ct. 305 (2015) (trooper did not violate clearly established law by shooting and killing motorist who was fleeing from arrest during high-speed pursuit as the officer's actions in utilizing deadly force were objectively reasonable under the circumstances presented).

Further, Wilansky's factual admissions, and matters which this Court may consider in ruling upon this Rule 12 motion, establish a reasonable officer under the totality of the circumstances would have believed Wilansky and Joachinson presented an imminent threat to their safety and were engaged in a serious crime. Wilansky admits a history of confrontations between law enforcement and protesters for several months leading up to the November 20-21, 2016 events at issue. Wilansky admits that only hours earlier, a large scale confrontation occurred at the very location at issue, with protesters removing one of two burned-out trucks forming a part of the barricade, and attempting to remove the second burned-out truck in the face of force applied. Wilansky admits at the time of the events at issue she and Joachinson were positioned alongside the remaining burned-out truck, and behind a metal shield "to avoid getting hit". (Doc. 14 at ¶ 162.) She admits officers commanded her and Joachinson to "get out from under the

truck" (doc. 14 at ¶ 150), "move away from the burned out truck" (Companion Case *Second Amended Complaint* [doc.259], ¶ 131) and "move south away from the barricade" (*id.*, ¶ 144), and yet Wilansky and Joachinson remained behind the metal shield while impact rounds and two stinger ball grenades were deployed in their direction, allegedly for several minutes (doc. 14 at ¶¶ 154-58; Wilansky Depo. [exh. A] at p. 121 (alleging two minutes elapsed from when first impact rounds hit the metal shield until she was hit in her arm with an impact round). Wilansky does not allege she said anything to officers while this was occurring, and she admitted during her deposition that she did not say anything to officer while she was alongside the barricade. (Wilansky Depo. [exh. A] a pp. 121-22.) She only proceeded south away from the barricade after she was hit by an impact munition allegedly deployed by Arndt as she realized her position behind the metal shield was no longer safe. Wilansky's allegations that officers continued to fire impact rounds at her as she proceeded south across the Bridge are asserted for the first time in this action, nearly seven years after the events at issue, and directly contrary to her sworn deposition testimony. Wilansky admits she stopped proceeding south across the Bridge in contravention of law enforcement commands, the bent down to pick up a piece of plywood to use as a shield (again in defiance of officer commands) before she was allegedly struck by an aerial warning/signaling munition allegedly deployed by non-party Moll. Under these circumstances, a reasonable officer would have believed Wilansky and Joachinson were engaged in a serious crime and posed an immediate threat to their safety.

### 3. Wilansky Does No Allege A Plausible Excessive Force Claim Under the Fourteenth Amendment

The United States Court of Appeals for the Eighth Circuit has stated that "[o]nly a purpose to cause harm *unrelated to the legitimate object of* the government action in question will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation."

*Troung v. Hassan*, 829 F.3d 627, 631 (8th Cir. 2016) (Fourteenth Amendment substantive due process claim against a bus driver failed, in part, because the bus driver's action of throwing the plaintiff passenger off a bus for failing to pay a fee were related to his legitimate responsibilities of driving the bus, and therefore not inspired by malice or sadism) (emphasis in original). *See also Helseth v. Burch*, 258 F.3d 867, 870 (8th Cir. 2001) (holding "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking the conscience, necessary for a due process violation."). It cannot reasonably be disputed that the individual Defendants' alleged conduct at issue related to their employment responsibilities as law enforcement officers.

In addition, the alleged conduct of the individual Defendants does not otherwise shock the conscience in a constitutional sense. "Whether conduct shocks the conscience is a question of law." *County of Sacramento v. Lewis*, 523 U.S. 833, 844-45 (1988). "[T]he alleged substantive due process violations must involve conduct 'so severe … so disproportionate to the need presented, and … so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'" *Dundon v. Kirchmeier*, 577 F.Supp.3d at 1060 (quoting *Truong v. Hassan*, 829 F.3d at 631). Wilansky's Fourteenth Amendment claim fails as a matter of law.

### 4.     Wilansky Does Not Allege A Plausible Failure To Intervene Claim

Wilansky alleges individual Defendants failed to intervene to stop other officers from allegedly violating her constitutional rights. "[A] police officer may be liable if he does not intervene to prevent the use of excessive force when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Robinson v. Payton*, 791 F.3d

824, 829 (8th Cir. 2015). As Wilansky has failed to allege a plausible claim of excessive force as explained above, her derivative failure to intervene claim should be dismissed.

In addition, Wilansky's claims of alleged failures to intervene with respect to non-party Moll's alleged one time deployment of an aerial warning/signaling munition which allegedly injured her left arm as Wilansky has not alleged facts to establish any individual Defendant was aware Moll allegedly possessed any such explosive munition (which is denied), or that they had both the opportunity and means to prevent such alleged one-time use of force. Similarly, Wilansky's failure to intervene claims pertaining to non-party Dvorak's alleged deployment of two stinger ball grenades fails to allege any individual Defendant was aware Dvorak allegedly possessed such munitions, or that they had both the opportunity and means to prevent such alleged use of force. Wilansky does not allege the amount of time which elapsed between the alleged deployment of the first and second stinger ball grenades. All failure to intervene claims pertaining to the alleged use of explosive munitions by non-parties Moll and Dvorak should be dismissed.

### 5. Wilansky Does Not Allege A Plausible Conspiracy Claim

Wilansky alleges individual Defendants conspired to use excessive force against her in violation of the Fourth and Fourteenth Amendments. As Wilansky has failed to allege a violation of her constitutional rights as explained above, her derivative conspiracy claim should be dismissed. *See Deutsche Fin. Servs. Corp. v. BCS Ins. Co.*, 299 F.3d 692, 700 (8th Cir. 2022) ("[A Plaintiff] cannot prevail on its claim for civil conspiracy where the underlying tort claim fails.").

Even assuming, arguendo, Wilansky has alleged a violation of her constitutional rights, Wilansky has none-the-less failed to allege a conspiracy:

To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance
of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (internal citation omitted).

*Faulk v. City of St. Louis, Mo.*, 30 F.4th 739, 747 (8th Cir. 2022). The first element "requires allegations of specific facts tending to show 'meeting of the minds' among the alleged conspirators." *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010).

Wilansky has failed to "allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *City of Omaha Employees Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir. 1989). In addition, a claim of conspiracy requires an overt act which injured the plaintiff. Here, Wilansky only alleges injury as a result of being hit by a less-lethal munition (impact round) allegedly fired by Arndt while she was behind the metal sheet along the barricade, and as a result of an alleged aerial warning/signaling munition allegedly deployed by non-party Moll. Wilansky does not allege any injury as a result of any other overt act by any other Defendant, or by non-party Dvorak in relation to his alleged deployment of the stinger ball grenades which did not hit her. Although Wilansky makes the conclusory allegation individual Defendants on the scene "actively participated in and encouraged the attack", the alleged conduct of participation was their alleged "repositioning to get a better angle of fire on Sophia" and "by helping to remove obstructions so their fellow Defendants could get a better line of sight." These allegations do not establish, or even imply, a "meeting of the minds" by the Defendants to utilize excessive force against Wilansky. The act of repositioning to get a better line of sight does not allege any actual use of force, or any agreement between the Defendants. Similarly, the removal of obstructions so other officers could get a better angle of fire on Wilansky does not allege a meeting of the minds to use excessive force.

In addition, as discussed above, Wilansky has not alleged facts alleging any individual Defendants was even aware either non-party Moll or non-party Dvorak possessed any alleged explosive munitions, let alone had knowledge or any intended use thereof against Wilansky. Wilansky does not allege anyone instructed Moll or Dvorak to allegedly deploy explosive munitions. Wilansky has failed to allege a "meeting of minds" in relation to the alleged use of any explosive munition against Wilansky.

Further, even if Wilansky has alleged a plausible claim of conspiracy, to the extent any alleged conspiracy was between officers employed by the same law enforcement agency, such officers and their employer would be entitled to qualified immunity. The United States Court of Appeals for the Eighth Circuit has repeatedly determined that officers are entitled to qualified immunity in relation to conspiracy claims under § 1983 due to the unresolved scope of the "intracorporate conspiracy doctrine" in relation to conspiracy claims. *See, e.g. Green v. City of St. Louis*, 52 F.4th 734, 740-41 (8th Cir. 2022) (on Rule 12 motion to dismiss, determining police officers who were in an armored police vehicle deployed to break up protests at the time they fired tear gas in the direction of protesters were entitled to qualified immunity from plaintiff's § 1983 claim officers conspired to deprive plaintiff of her First Amendment rights as it was not at that time [September of 2017] clearly established that officers could conspire with one another to violate a First Amendment right); *Street v. Leyshock*, 41 F.4th 987, 990 (8th Cir. 2022) (on Rule 12 motion to dismiss, determining supervisory police officers who allegedly conceived plan to kettle plaintiffs were entitled to qualified immunity in relation to § 1983 conspiracy claims, arising from plaintiffs' arrests while protesting, since unresolved scope of intracorporate conspiracy doctrine as of September 2017 meant that reasonable officers would not have known with any certainty that alleged agreements were forbidden by law); *Faulk v. St. Louis, Missouri*, 30 F.4th 739, 750 (8th Cir. 2022) (determining officers were entitled to Rule 12 dismissal of §

1983 conspiracy to violate federal constitutional rights claims due to the uncertainty of the applicability of the intracorporate conspiracy doctrine as of September 2017; noting it was not clearly established under either Eighth Circuit or United States Supreme Court case law that officers within a department could conspire to violate constitutional rights). "The intracorporate conspiracy doctrine provides that 'a local government entity cannot conspire with itself through its agents acting within the scope of their employment'." *Street v. Leyshock*, at 990 (quoting *L.L. Nelson Enters. v. County of St. Louis*, 673 F.3d 799, 812 (8th Cir. 2012)).

Wilansky's derivative conspiracy claims should be dismissed for the reasons discussed above. In addition, all individual Defendants are also entitled to qualified immunity in relation to Wilansky's constitutional claims, as explained below.

### 6. Individual Defendants Are Entitled To Qualified Immunity

As summarized by the United States Court of Appeals for the Eighth Circuit:

> Qualified immunity protects government officials from liability under § 1983 when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 Led.2d 666 (2002). The test for whether an officer is entitled to qualified immunity is twofold: (1) whether the facts alleged, taken in the light most favorable to the injured party, show that the officer's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the deprivation so that a reasonable officer would understand his conduct was unlawful. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009); *Henderson v. Munn*, 439 F.3d 497, 501-02 (8th Cir. 2006). If no reasonable factfinder could answer yes to both of these questions, the officer is entitled to qualified immunity. *See Plemmons v. Roberts*, 439 F.3d 818, 822 (8th Cir. 2006).

*Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). The defense of qualified immunity must be evaluated from the perspective of a reasonable officer based on facts available to the officer at the time of the alleged constitutional violation. *Gladden v. Richbourg*, 759 960, 964 (8th Cir. 2014). If "based on those facts, the officer reasonably failed to comprehend that he was violating a

person's clearly established constitutional rights, he is entitled to qualified immunity from suit."

*Id.*

> "[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability.' " Watson v. Boyd, 2 F.4th 1106, 1110 (8th Cir. 2021) (citation omitted). Accordingly, it " 'is effectively lost if a case is erroneously permitted to go to trial,' [and] law enforcement officers are at least 'entitled to a thorough determination of their claim of qualified immunity if that immunity is to mean anything at all.' " Id. (citations omitted). "Indeed, [the Supreme Court] ha[s] made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that " 'insubstantial claims" against government officials [will] be resolved prior to discovery.' " Pearson v. Callahan, 555 U.S. 223, 231 (2009) (third alteration in original) (citation omitted).

*Thunderhawk v. Morton Cnty.*, No. 20-3052, 2022 WL 2441323, at *1 (8th Cir. July 5, 2022).

As discussed above, Wilansky has failed to allege a plausible claim of violation of her federal constitutional rights. Even assuming, arguendo, Wilansky has alleged a plausible claim of violation of her constitutional rights, such rights were not clearly established as of November 21, 2016, thereby entitling the individual Defendants to qualified immunity from suit.

As explained by the Supreme Court of the United States:

> Although this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law. This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality.

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.

> ***

> . . . Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

*Kisela v. Hughes*, 138 S.Ct. 1148, 1152-53 (2018) (per curiam) (numerous citations and quotations omitted). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Graham v. Barnette*, 5 F.4th 872, 887 (8th Cir. 2021), reh'g denied (Aug. 20, 2021). "This generally requires a plaintiff to 'point to existing circuit precedent that involves sufficiently 'similar facts' to 'squarely govern' the officers' conduct in the specific circumstances at issue, or, in the absence of binding precedent, to present 'a robust consensus of cases of persuasive authority' constituting settled law." *Id*. (citing *De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017). *Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020) (alterations to original)). "The plaintiff has the burden to prove that a right was clearly established at the time of the alleged violation." *Id*. (citing *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018)). "A right is not clearly established by 'controlling authority' merely because it may be 'suggested by then-existing precedent.'" *Id*. (quoting *District of Columbia v. Wesby*, 138 S. Ct 577, 589-90 (2018)). "'[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Kidd*, 563 U.S. 731, 741 (2011). Qualified immunity applies when a plaintiff has "failed to identify a case where an [official] acting under similar circumstances . . . was held to have violated the [Constitution]." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks and citations omitted).

It was not clearly established as of November 21, 2016 that the application of force for the objectively manifested intent to disperse or repel, rather than to restrain, constituted a seizure under the Fourth Amendment, thereby entitling Individual Defendants to qualified immunity from suit. *Quraishi* establishes that the law was not clearly established as of August of 2014 that the application of tear gas which objectively manifested an intent to disperse a crowd rather than to restrain constituted a seizure under the Fourth Amendment. *Martinez* establishes that the law was

not clearly established as of June of 2018 that the application of direct physical force which objectively manifested an intent to repel rather than restrain constituted a seizure under the Fourth Amendment. The events at issue in this case occurred in November of 2016, between the events involved in *Quraishi* and *Martinez*. Both *Quraishi* and *Martinez* are binding Eighth Circuit appellate precedent. The *BLM* case (District of Columbia) further establishes that the law was not clearly established as of June of 2020 that the use of flashbang grenades, rubber bullets and tear gas which manifests an intent to disperse rather than restrain constituted a seizure under the Fourth Amendment.

In addition, there is no clearly established, existing precedent establishing the use of less-lethal munitions from a strictly defensive position to repel or disperse constitutes a seizure within the meaning of the Fourth Amendment, and the individual officers would none-the-less be entitled to qualified immunity from suit in relation to Wilansky's Fourth Amendment excessive force claim. By comparison, existing case law supports the use of less-lethal munitions for the purpose of preventing the unlawful access to property, and protecting public and private property rights. *See e.g. Bernini v. City of St. Paul*, 655 F.3d 997 (8th Cir. 2012) (involving law enforcement's cordoning off downtown St. Paul, Minnesota as a no-go zone during Republican National Convention in 2008 due to prior heavy property damage by protesters in the vicinity, and utilizing less-lethal munitions to hold back aggressive protesters attempting to breach barricades); *Dundon v. Kirchmeier*, 577 F.Supp.3d at 1060 (a recent decision by this Court determining officers were entitled to qualified immunity in relation to DAPL protesters' claims of excessive force as a result of use of less-lethal munitions against protesters at the Backwater Bridge barricade during the evening of November 20, 2016 as there was no clearly established law prohibiting such conduct at that time). There simply is no existing precedent which establishes beyond debate the

unconstitutionality of Defendants' alleged conduct in this case.  *See Kisela v. Hughes*, 138 S.Ct. at 1151 ("Although this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.").  The alleged conduct of the individual Defendants did not violate clearly established federal constitutional rights of Wilansky at the time of the alleged conduct, and the individually-named Defendants are therefore entitled to qualified immunity as to all claims.

   7. **Wilansky Does Not Allege A Plausible *Monell* Claim Against Morton County**

  Wilansky alleges Morton County, through Sheriff Kirchmeier in his official capacity only, had a policy or custom of using widespread excessive force against DAPL protesters throughout September, October, and November of 2016, and failed to properly train and supervise officers under Sheriff Kirchmeier's alleged authority and supervision.  (Doc. 14 at ¶¶ 270-87.)  As discussed above, Wilansky has failed to allege a violation of her constitutional rights by any Defendant, and her derivative *Monell* claim should be dismissed on this basis alone.  In addition, even assuming, arguendo, Wilansky has alleged a plausible claim of violation of a constitutional right, she has otherwise failed to allege a plausible *Monell* claim.

  "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017) (citations omitted). "Policy and custom are not the same thing." *Id.* "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Id.* "[T]he plaintiff must prove that the policy was the "moving force" behind a constitutional violation." *Schaffer v. Beringer*, 842 F.3d

585, 596 (8th Cir. 2016). In the alternative, "a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating:

> 1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Id.* "Before a municipality can be held liable, however, <u>there must be an unconstitutional act by a municipal employee</u>." *Russell v. Hennepin Cty*., 420 F.3d 841, 846 (8th Cir. 2005) (emphasis added).

Wilansky has not alleged facts to establish any violation of her constitutional rights was caused by any official policy or unofficial custom of Morton County, or by any failure to train or supervise by Morton County. Wilansky 's Monell cause of action is alleged at paragraphs 269 through 287, all of which merely contain a formulaic recitation of the elements of *Monell* claim without any supporting factual basis contained in those paragraphs. While Wilansky's allegations contained in the "Factual Allegations" section of her *First Amended Complaint* contain numerous legal conclusions which should be disregarded in relation to this Rule 12 inquiry, her purely factual allegations are insufficient to establish a plausible *Monell* claim. *See Ashcroft v. Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.").

As a preliminary matter, this Court has already specifically addressed Wilansky's nearly identical pleadings asserted by Wilansky against Morton County and Sheriff Kirchmeier in the Companion Case in relation to claims of alleged use of explosive munitions against Wilansky and dismissed Wilansky's *Monell* claims, with prejudice. (Companion Case at *Order Granting, in*

*Part, and Converting to Summary Judgment and Deferring, in Part, County Defendants' Motion to Dismiss and Granting Defendant Iverson's Motion to Dismiss* (doc. 46) filed October 29, 2020, at ¶¶ 77-91.)   "A dismissal with prejudice has the effect of a final adjudication on the merits." *TCBY Sys., Inc. v. EGB Assocs., Inc.*, 2 F.3d 288, 290 (8th Cir. 1993) (quotation cite omitted). Wilansky has subsequently amended her pleadings in the Companion Case (*Second Amended Complaint* [doc. 259]) and added additional factual allegations pertaining to the previously dismissed *Monell* claim in an inappropriate attempt to revive such claim.  As the Companion Case already addresses Wilansky's *Monell* claim against Morton County and Sheriff Kirchmeier as to the alleged use of explosive munitions, the Court should not also entertain such claim in this lawsuit due to the risk of inconsistent results.  Moll and Dvorak are not parties to this lawsuit.

Wilansky also fails to allege a plausible *Monell* claim in this case with respect to the alleged use of non-explosive less-lethal munitions (i.e. impact rounds).  Wilansky has failed to allege facts from which it could be determined any use of impact rounds by law enforcement officers on prior occasions violated anyone's constitutional rights as required to establish a "continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." *Schaffer v. Beringer*, 842 F.3d at 596.  While Wilansky alleges unspecified officers utilized such munitions without adequate warnings or opportunities to disperse against allegedly peaceful but unspecified protesters who did not pose a safety threat and were not committing serious crimes (doc. 14 at ¶ 64), such allegations are far too generalized and are insufficient to establish the alleged prior uses of force involved a "seizure" as required to trigger the Fourth Amendment, or that any such use of force was excessive.  For example, even assuming any prior use of force involved a seizure, which cannot be determined from Wilansky's allegations, Wilansky does not allege whether the individuals against which force was applied were resisting

or evading arrest.  Wilansky also fails to allege facts from which it can be ascertained whether any warnings would have been feasible or futile under the unspecified circumstances of each prior alleged use of force.  *See Dundon* at 1050 ("warnings need only be given if feasible", and "[c]ourts have also found that there are times when giving a warning is futile." (citations omitted)).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. at 678.  *See Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009) ("[A] plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims, . . . rather than facts that are merely consistent with such a right." (quoted citation omitted)).  Wilanksy's *Monell* claims should be dismissed.

## IV.     CONCLUSION

For the reasons discussed above, the Court should dismiss Wilansky's claims against all Defendants, in their entirety and with prejudice.   In the alternative, if all claims are not dismissed with prejudice, the Court should strike paragraphs 204-16 of the *First Amended Complaint* as lacking relevance to any cause of action alleged, being impertinent, and as containing scandalous allegations.  This Court previously dismissed, with prejudice, nearly identical allegations and Wilansky's associated defamation claim against Sheriff Kirchmeier and others in the Companion Case.

Dated this 30th day of October, 2023.

BAKKE GRINOLDS WIEDERHOLT


By:    */s/Shawn A. Grinolds*
         Randall J. Bakke (#03898)
         Shawn A. Grinolds (#05407)
         Special Assistant State's Attorneys for Morton County

300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247
(701) 751-8188
rbakke@bgwattorneys.com
sgrinolds@bgwattorneys.com

Attorneys for Defendants Morton County, Kyle Kirchmeier, Thomas Grosz, Matthew Hanson, Glen Ternes, Justin White

## CERTIFICATE OF SERVICE

I hereby certify that on October 30th, 2023, a true and correct copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF CITY AND COUNTY DEFENDANTS' MOTION TO DISMISS AND TO STRIKE** was filed electronically with the Clerk of Court through ECF.


Benjamin M. Stoll
Carlton Fields
1025 Thomas Jefferson Street NW
Suite 400 West
Washington, DC 20007-5208
(202) 965-8160
bstoll@carltonfields.com

Edward C. Barnidge
Williams & Connolly LLP
680 Main Avenue Southwest
Washington, DC 20024
ebarnidge@wc.com

Lauren C. Regan
Civil Liberties Defense Center
1430 Willamette St. #359
Eugene, OR 97401
lregan@cldc.org

Courtney R. Titus
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND  58501-4509
(701) 328-3640
ctitus@nd.gov

Jane G. Sportiello
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND  58501-4509
(701) 328-3640
jsportiello@nd.gov


By:    */s/ Shawn A. Grinolds*
      SHAWN A. GRINOLDS