1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NORTH DAKOTA
2

3                                    )
     SOPHIA WILANSKY,                )
4                                    )
                      Plaintiff,     )
5                                    )          Civil No.
        vs.                          )     1:18-CV-00236-CSM
6                                    )
     MORTON COUNTY, NORTH DAKOTA;    )
7    "JOHN DOE" law enforcement officer)
     in his personal capacity; KYLE  )
8    KIRCHMEIER; in his personal and )
     official capacities; PAUL LANEY,)
9    in his personal capacity; and   )
     THOMAS IVERSON, in his personal )
10   capacity,                       )
                                     )
11                    Defendants.    )

12

13

                    V I D E O T A P E D
14
              V I D E O C O N F E R E N C E
15
                 D E P O S I T I O N
16
                         OF
17
                  SOPHIA WILANSKY
18
              NONCONFIDENTIAL PORTIONS
19
                 February 17, 2021
20
                    10:03 A.M.
21

22

23   TAKEN AT:        East Hampton, NY - Remote

24   REPORTER:        Jesse L. Anders

25                (PURSUANT TO NOTICE)



**Exhibit A**

```
 1                A P P E A R A N C E S

 2   RANDALL J. BAKKE
             Attorney at Law
 3                Of
             Bakke Grinolds Wiederholt
 4           300 West Century Avenue
             PO Box 4247
 5           Bismarck, ND 58502-4247
             rbakke@bgwattorneys.com
 6   Counsel for Defendants Morton County, Kyle Kirchmeier,
     and Paul Laney

 7

 8   BENJAMIN M. STOLL
             Attorney at Law
 9                Of
             Willaims & Connolly, LLP
10           725 Twelfth Street Northwest
             Washington, DC 20005
11           bstoll@wc.com
     Counsel for Plaintiff

12

13   LAUREN C. REGAN
             Attorney at Law
14                Of
             Civil Liberties Defense Center
15           1430 Willamette St.
             #359
16           Eugene, OR 97401
             lregan@cldc.org
17   Counsel for Plaintiff

18
     ALSO PRESENT:
19
     BIRCH BURDICK
20        Cass County States Attorney

21
     JEFF CAHILL
22        Claims Manager at ND Insurance Reserve Fund

23

24

25
```



```
 1                        INDEX

 2   WITNESS:                                    PAGE
         SOPHIA WILANSKY
 3          Direct Exam by RANDALL J. BAKKE        5
            Cross Exam by BENJAMIN M. STOLL      199
 4

 5
                *      *      *      *
 6
               CONFIDENTIAL PORTIONS EXCERPTED
 7
     Page 6,      Line 3 through 6
 8   Page 183,    Lines 3 through 18

 9

10              *      *      *      *

11
     EXHIBITS AND/OR REFERRED-TO EXHIBITS
12   EXHIBIT NUMBER - DESCRIPTION                 PAGE

13   Ex. No. 1 - (No Trespassing on Bridge Sign
     11/21/2016 - UnicornRiot.Ninja)            155
14   Ex. No. 2 - (MORO134 11/21/16 Photograph of
     Burnt Out Truck with "NO DAPL" Sign)        75
15   Ex. No. 8 - (DEF000001 Site Map)            14
     Ex. No. 9 - (DEF000001 Site Map Blown Up)   43
16   Ex. No. 10- (Potential Plaintiff/Witness
     Intake Form)                               167
17   Ex. No. 11- (Evidence Collection Form)     168
     Ex. No. 13- (Photograph of Stephen Joachinson)  97
18   Ex. No. 16- (Photographs of Ms. Wilansky
     WILANSKY_002157 and WILANSKY_0002153)       52
19   Ex. No. 17- (Foreign Body Release Form from
     Hennepin County Medical Center WILANSKY_0001674)  145
20   Ex. No. 18- (Photographs of Intended Weapons
     MORO0082 through MORO0090)                 170
21   Ex. No. 22- (Photograph of the Backwater
     Bridge at Night Taken by Frank Finan)      151
22   Ex. No. 27- (Discovery Answers With Information on
     Different Type of Less-Lethal Munitions)   148
23

24              *      *      *      *

25
```



1          THE VIDEOGRAPHER:  We are now on the record.

2     The time is 10:03 a.m. on February 17, 2021.  This

3     begins the video conference proceeding of Sophia

4     Wilansky in the matter of Wilansky versus Morton County,

5     North Dakota; John Doe, et al., filed in the US District

6     Court for the District of North Dakota.  Case

7     No. 1:18-CV-00236-CSM.  My name is Jeff Burton.  I am

8     your remote videographer.  Your court reporter is Jesse

9     Anders.  We are representing Esquire Deposition

10    Solutions.  As a courtesy, will everyone who is not

11    speaking, please mute your audio, and remember to unmute

12    when you're ready to speak.  Counsel, will you please

13    introduce yourselves, and the witness will be worn.

14          MR. STOLL:  This is Benjamin Stoll from

15    Williams & Connolly on behalf of plaintiff and the

16    witness, Sophia Wilansky.

17          MS. REGAN:  And Laurence Regan, the Civil

18    Liberties Defense Center, also with Ms. Wilansky.

19          MR. BAKKE:  And this is Randy Bakke on

20    behalf of the Morton County defendants.  Jesse, you can

21    go ahead and swear in the witness.

22          THE STENOGRAPHER:  Okay.  My name is Jesse

23    Anders.  I am a Minnesota state notary public.  This

24    deposition is being held via Zoom videoconference.  The

25    witness and reporter are not in the same room.  The



1  witness will be sworn in remotely pursuant to agreement

2  of all parties.  I would ask that the parties stipulate

3  that the testimony is being given as if the witness was

4  sworn in person.

5          MR. STOLL:  Agreed.

6          MR. BAKKE:  Agreed by the defendants.

7          SOPHIA WILANSKY, a witness, called by the

8  Defendants, being first duly sworn, testified on her

9  oath as follows:

10 BY MR BAKKE                        DIRECT EXAMINATION

11    Q.  Good morning, Ms. Wilansky.  I introduced myself

12 to you before the deposition started here today.  I'm

13 Randy Bakke.  I'm one of the attorneys for the Morton

14 County defendants in, in this lawsuit.  First of all,

15 can you tell me where you're physically at today?

16    A.  I'm at my house in New York.

17    Q.  Okay.  And is what address is that?

18          MR. STOLL:  Mr. Bakke, I'm happy to provide

19 that to you off the record, but given, like privacy

20 concerns of that something, I'd prefer that that wasn't

21 on the record.  Is that something I can provide you

22 later.

23          MR. BAKKE:  Well, if she just, we can agree

24 that portion can be sealed.  I don't have a problem with

25 that.



1           MR. STOLL:  Okay.  Assuming that that

2    portion is redacted and sealed, Sophia, you can answer.

3       (Confidential Portions Lines 3 through 6 Redacted.)

4

5

6

7       A.  Yes.

8       Q.  Okay.  And do you reside there by yourself or

9    with others?

10      A.  I live with others.

11      Q.  Okay.  And, and who are the others you lived

12   with?

13      A.  My father and his girlfriend.

14      Q.  Okay.  Have you ever had your deposition taken

15   before?

16      A.  No.

17      Q.  Have you ever testified in court before?

18      A.  No.

19      Q.  Just a few ground rules to hopefully allow the

20   deposition to proceed more smoothly here today.  First

21   of all, the nature of conversation is such that we tend

22   to talk over each other, but, because the court reporter

23   is taking down everything verbatim, that makes his job

24   very difficult, so please wait to give your answer until

25   I'm finished with my question.  I'll try to extent you



1    the same courtesy.  I don't won't give you the next

2    question until you're done with the answer.  Fair

3    enough?

4        A.  Yes.

5        Q.  Okay.  We, we will take some breaks periodically,

6    but if you need a break for any reason, just let me

7    know, and I'd be happy to accommodate you, and the only

8    thing I would ask, that if there is a question pending,

9    that before we take the break, you answer the question.

10   Okay?

11       A.  Yes.

12       Q.  Okay.  And if I'm unclear with a question or you

13   don't understand my question, can you let me know that.

14   In other words, I only want you to answer questions that

15   you understand.

16       A.  Yes.

17       Q.  And you understand you're under oath today to

18   tell the truth under penalty of perjury; do you

19   understand that?

20       A.  Yes.

21       Q.  Okay.  I, I want to talk to you about the DAPL

22   protests in North Dakota, and that's a protest that

23   started in the summer of 2016 and then extended into the

24   spring of 2017.  If I call it the DAPL protests, will

25   you know what I mean by that?



1    A.  Yes.

2    Q.  And so when did you first hear about the DAPL

3  protests in North Dakota?

4    A.  The day it started.

5    Q.  And when was that?

6    A.  I believe it was April 1, 2016.

7    Q.  And how did you learn about it on April 1, 2016?

8    A.  I saw a news article about it.

9    Q.  Okay.  Do you recall where you saw the, the news

10 article?

11   A.  No.

12   Q.  And then did you continue to follow the protest

13 activities on media after that?

14   A.  Yes.

15   Q.  At the time you first learned about the DAPL

16 protests, what were you doing at that time?  Were you in

17 school?  Were you working?

18   A.  I was in school.

19   Q.  Okay.  At where?

20   A.  Williams College.

21   Q.  And then did you graduate from there?

22   A.  Yes.

23   Q.  When was that?

24   A.  June of that year.

25   Q.  June of 2016?



1    A.  Yes.

2    Q.  Okay.  And when did you first go to the DAPL

3  protests in North Dakota?

4    A.  November.

5    Q.  November what?

6    A.  November 4th, I believe.

7    Q.  And, and how did you get there?

8    A.  I got a ride.

9    Q.  Who did you get a ride from?

10   A.  There were a few vehicles going from Pittsburgh.

11   Q.  And were these people that you knew before that?

12   A.  No.  I was invited by one person who I met once

13  or twice.

14   Q.  And who was that?

15   A.  I don't remember his name.

16   Q.  Okay.  Where, where was he from?

17   A.  I don't know.

18   Q.  So the people you got the ride from, from

19  Pittsburgh to North Dakota, did you know any of those

20  people?

21   A.  No.

22   Q.  Do you know any of their names?

23   A.  Yes.

24   Q.  And which names do you know?

25   A.  Genevieve Wallace.



1    Q.  And is, is that someone that you spent time with

2    at the DAPL protests?

3    A.  Yes.

4    Q.  Okay.  And where is Ms. Wallace from?

5    A.  I don't know.

6    Q.  Do you have her contact information?

7    A.  I don't know.

8    Q.  Why don't you know if you have her contact

9    information or not?

10   A.  I have a lot of people's contact information.  I

11   haven't contacted her recently.

12   Q.  Well, at one point, did you have her cell number?

13   A.  Yes.

14   Q.  So you believe you would still have her contact

15   information in your cellphone?

16   A.  I believe that I probably have her number in my

17   cellphone.

18   Q.  Okay.  Other than Ms. Wallace, was there anybody

19   else from the group from Pittsburgh that you knew or

20   have their contact information for?

21   A.  Not that I can remember.

22   Q.  Why did you decide to go to North Dakota in

23   relation to the DAPL protests?

24   A.  I thought that what was happening there was very

25   special, and I wanted to be there.



1    Q.   Why did, why did you feel it was special?  What

2    was special about it in your mind?

3    A.   The fact that so many nations from all over were

4    gathering together and uniting.

5    Q.   Well, when you say "so many nations," are you

6    talking about Native American tribes?

7    A.   Yes.

8    Q.   Was there any other reason that you wanted to go

9    to North Dakota to participate in the DAPL protest other

10   than your view that so many nations were uniting?

11   A.   More broadly, the sense of it being a historical

12   moment.

13   Q.   In, in what way?

14   A.   There was a sense, like a zeitgeist of it being

15   important, culturally.

16   Q.   What, what did you do in terms of research to try

17   to understand what the protest was about?

18   A.   I wouldn't say I did research.

19   Q.   Before you went to the DAPL protest, did you know

20   any protesters that were there?

21   A.   I wasn't aware at the time that I went.

22   Q.   So you weren't in contact with, with anyone by

23   cellphone or e-mail or otherwise who was already at the

24   DAPL protest before you arrived there?

25   A.   No.



1    Q.  Prior to the DAPL protest, had you participated

2    in any other protest activities elsewhere?

3         MR. STOLL:  Randy, we're about 15 minutes

4    into this now, and you haven't asked a single question

5    that's related to the three limited topics in which

6    discovery is allowed in this deposition, and, you know,

7    I'm going to ask that you move on to topics that are

8    actually allowed under this.  You're, you're, you're

9    entitled to, you know, lay some foundation, but

10   questions about her prior protest activities are outside

11   the scope of this deposition.

12        MR. BAKKE:  I, I, I don't think so and, and

13   here's why, and I don't want to spend my time arguing

14   about these issues, Mr. Stoll, but her motivations, her

15   intentions, what she planned to do, what she was willing

16   to do, are all at issue in relation to the, to those,

17   the issues that have been identified by Judge Traynor,

18   and so, you know, as to the issue of what the protesters

19   were doing, her motivations, her intentions all go with

20   that, but, like I say, I'm, I'm not going to spend time

21   arguing with you on the record and eating up my, my

22   time, so I, I'm assuming you'll probably ask similar

23   questions of my clients, but this, but if this is going

24   to be an, an issue, we may have to get the magistrate

25   judge involved.



1          MR. STOLL:  Well, you can make that

2   decision, but her prior protest activity is not relevant

3   to the three topics, so I'm not going to instruct her

4   not to answer that.

5       Q.  Okay.  So, Ms. Wilansky, I'll move on to another

6   topic, and we'll let the magistrate judge address that

7   at the appropriate time.  In regards to the DAPL

8   Pipeline, what did you understand the purpose of that

9   pipeline to be?

10      A.  The purpose of the pipeline?

11      Q.  Yes.

12      A.  To transport fossil fuels.

13      Q.  Did, did you know what kind of fossil fuels?

14      A.  I don't remember.

15      Q.  Okay.  Did, did you know where the fossil fuels

16  were coming from?

17      A.  I don't remember.

18      Q.  Did you, did you know whether those fossil fuels

19  would be transported in some other manner if the DAPL

20  protest, DAPL Pipeline did not go online?

21      A.  I don't know.

22      Q.  Did you do any research or did you learn

23  anything, either before you got to the protests or after

24  you were there, about whether there were or were not

25  existing, what you call fossil fuel pipelines underneath



1   the Missouri River?

2        A.  Can you repeat the question.

3        Q.  Sure.  Did, did you learn, either before you got

4   to the protest or after you were there, whether there

5   were already existing pipelines that went under the

6   Missouri River which carried fossil fuels?

7        A.  Not that I can remember.

8        Q.  Did you learn anything about who owned the land

9   where the protests were occurring?

10       A.  Not that I can remember.

11       Q.  When you got to North Dakota, did you know which

12  land, if any, was tribal land on the Standing Rock Sioux

13  Reservation?

14            MR. STOLL:  Objection to form.

15       A.  Sort of.

16       Q.  Okay.  Maybe you can explain that to me.

17       A.  I don't know the exact boundaries of the

18  reservation.

19       Q.  Well, you know where the Backwater Bridge is?

20       A.  Yes.

21       Q.  Okay.  We'll put up a map.

22            MR. BAKKE:  And this is Exhibit 8.

23  (Defendant's Exhibit #8 was marked for identification.)

24       Q.  And you should see that on the screen in front of

25  you in, in a moment here.  Do you see that here?



1              MR. STOLL:  Randy, I'm going to object to

2       the use of exhibits on the screen where the witness has

3       no ability to see the whole thing and manipulate it.

4       Will you, will you grant me a running objection on that

5       throughout this deposition so that I don't have to

6       object to every exhibit and every question?

7              MR. BAKKE:  Well, I, I think we can address

8       that.

9         Q.  Ms. Wilansky, if there's something you want us to

10      zoom in or zoom out on during our questioning, we'd be

11      happy to do that.  Just let us know.

12             MR. STOLL:  Same objection stands, just for

13      ease of the deposition, can I just have a running

14      objection on that?

15             MR. BAKKE:  Yeah.  You, you can, but, like I

16      said, we, we're, I think we're able to address that.

17        Q.  So can you see the map, Exhibit 8, Ms. Wilansky?

18        A.  Yes.

19        Q.  Okay.  And do you see where the Backwater Bridge

20      is labelled on that map?

21        A.  Yes.

22        Q.  Okay.  And is that accurate based on your memory

23      of being at the DAPL protest?

24        A.  Yes.

25        Q.  Okay.  And so if we take Cantapeta Creek -- and



1  you see that on the map.  Correct?

2      A.  Yes.

3      Q.  If we, if we look at the land, and Cantapeta

4  Creek's shown in read, so if we take the land to the

5  north of that, do you know whose land that was, or is?

6              MR. STOLL:  Objection it form.

7      A.  To the north, you said?

8      Q.  To the north, yep?

9      A.  No.

10     Q.  Okay.  And then how about the land south of the

11 Cantapeta Creek, do you know whose land that was during

12 the protests?

13             MR. STOLL:  Objection to form.

14     A.  How far south?

15     Q.  Directly south and, and showing to the bottom of,

16 of the map.

17     A.  I believe so.

18     Q.  Okay.  Whose land was it?

19     A.  I believe that it was managed by the Army Corps

20 of Engineers.

21     Q.  And how, how did you come to learn that?

22     A.  I think that was common knowledge.

23     Q.  And so is it your understanding, and was it your

24 understanding during the protest, that the land south of

25 the Cantapeta Creek that you were at was not tribal



1  land?

2          MR. STOLL:  Objection, vague.

3     A.  No.

4     Q.  I'm sorry.  I don't understand your answer.  Are

5  you saying you did think it was tribal land?

6     A.  What do you mean by tribal land?

7     Q.  Owned, owned or part of the Standing Rock

8  Reservation?

9     A.  No.  I didn't believe it was part of the

10  reservation.

11     Q.  Okay.  You, you thought it was Corps of Engineer

12  land owned by the US government?

13     A.  I don't know about the ownership.

14     Q.  Well, what, what did you say was common

15  understanding about the Corps of Engineers' land that

16  you have identified south of Cantapeta creek?

17     A.  Can you rephrase the question.

18     Q.  Yeah.  What, what did you believe the role of the

19  Corps of Engineers was in relation to the land south of

20  Cantapeta Creek?

21     A.  That it was in their control in some technical

22  sense.

23     Q.  Ms. Wilansky, are, are you Native American?

24     A.  No.

25     Q.  Okay.  You're not a, a tribal member in, in any



1  tribe, a Native American tribe in the US?

2      A.  No.

3      Q.  I, I want to turn to when you got to North

4  Dakota, which I believe you said, was it November 4 that

5  you arrived?

6      A.  Yes.

7      Q.  And the incident in question where you were

8  injured was on November 21, 2016.  Correct?

9      A.  Yes.

10     Q.  And would that have been the last day you were at

11 the DAPL protests, was November 21, 2016?

12     A.  Yes.

13     Q.  So using the map, Exhibit 8, and we'll scroll

14 down on that, where, where did you stay between

15 November 4 and November 21 while at the DAPL protests?

16     A.  Oceti Sakowin.

17            THE STENOGRAPHER:  What, what was that

18 answer?

19     A.  Oceti Sakowin.

20            THE STENOGRAPHER:  Can you -- oh, I see it.

21 Thank you.

22            MR. BAKKE:  It, it's up, shows on the map,

23 Jesse.

24            THE STENOGRAPHER:  Yep.  I see it.  Thanks.

25     Q.  And you stayed at the camp?



1    A.  Yes.

2    Q.  And did you stay with someone else?

3    A.  Can you clarify.

4    Q.  Yeah.  Was there any, did, did you have a

5  residence or a place that you slept and stayed at with

6  someone else, or did you have your own accommodations?

7    A.  I had my own tent.

8    Q.  And you were staying in a tent?

9    A.  Yes.

10   Q.  And did you stay in the, the same tent the entire

11 time you were there?

12   A.  Yes.

13   Q.  And did you pay your own expenses, or did, were

14 those paid by someone else?

15   A.  There weren't expenses at camp.

16   Q.  Everything was provided for you?

17       MR. STOLL:  Objection to form.  And, Randy,

18 I feel, I, I'm going to let the witness answer this, but

19 I still fail to see how this is relevant to any of the

20 topics that you're, that it was in the scope of this

21 deposition.

22   A.  Can you repeat the question.

23   Q.  Yeah.  Was everything provided for you so that

24 you didn't have to buy food or other supplies that you

25 needed while you were at the DAPL protests?



1              MR. STOLL:  Objection, vague.

2      A.  There were a lot of donated materials at camp.

3      Q.  And what type of supplies did you get at the

4  camp?

5      A.  Food, mostly.

6      Q.  Anything else?

7      A.  A jacket.  I can't remember anything else that I

8  got from donations.

9      Q.  Okay.  Did you have a gas mask while you were at

10  the DAPL protests?

11      A.  No.

12      Q.  Did you ever use a gas mask while you were at the

13  DAPL protests?

14      A.  No.

15      Q.  How about goggles?

16      A.  Yes.

17      Q.  Okay.  And is that something you brought with you

18  or you were supplied there?

19      A.  I don't remember.

20      Q.  And what were the goggles for?

21      A.  To provide some protection to my eyes.

22      Q.  Okay.  Protection from what?

23      A.  Any kind of police weapons.

24      Q.  And, and when did you first start using the

25  goggles?



1    A.  I don't remember.

2    Q.  Was it sometime before November 20, 2016?

3    A.  I don't remember.

4    Q.  Well, do, do you think November 20, 2016, was the

5    first day you wore the goggles?

6              MR. STOLL:  Objection to form, lacks

7    foundation.

8    A.  I don't know.

9    Q.  Describe the goggles for me.

10   A.  They were the soft kind that you would use in the

11   high school chemistry class, splash goggles.

12   Q.  Okay.  Were they colored or were they just

13   transparent lens, lenses or plastic material that you

14   look through?

15   A.  Transparent.

16   Q.  Did you have a helmet you used?

17   A.  Yes.

18   Q.  And describe the helmet.

19   A.  It was a snowboarding helmet.

20   Q.  Is that something you brought with you?

21   A.  Yes.

22   Q.  And, and is that something you brought with you,

23   the snowboarding helmet, because you, you believed it

24   would be helpful in relation to any confrontations or

25   incidents you might have with law enforcement while you



1  were protesting?

2          MR. STOLL:  Objection to form and objection

3  outside the scope of the deposition.  Sophia, I'm

4  instructing you not to answer that.

5          MR. BAKKE:  Well, this goes to Issue No. 3

6  of the judge's order, and it also goes to Issue 2

7  dealing with whether Officer Doe was acting in a

8  defensive position at the time of the incident.

9          MR. STOLL:  Officer Doe had no idea why she

10  was wearing a helmet, if she was waring a helmet that

11  night, so her motivations don't have anything to do with

12  2 or 3, and her helmet doesn't have anything to do with

13  the explosive device, so, you know, I continue to

14  instruct the witness not to answer that.

15          MR. BAKKE:  Well, with all due represent,

16  Mr. Stoll, I don't think you can determine what Officer

17  Doe's motivations were or what he or she may have seen

18  or what he or she may have thought depending upon what

19  was being worn by Ms. Wilansky at the time, so I think

20  it is relevant to the issues, but, you know, I'll just

21  keep plugging away here understanding that, in many

22  areas, you're going to instruct her not to answer.  Any,

23  any of the objection time, I am going to note, is going

24  to come off the record, but you're really handicapping

25  me from asking about the issues that Judge Traynor has



1  said are at issues in this case.

2      Q.  Ms. Wilansky, did you have the helmet on, on

3  November 20 and 21?

4      A.  Only on November 21st.

5      Q.  And about what time do you believe you would have

6  put the helmet on, on November 21st?

7      A.  Sometime after 2:00 a.m.

8      Q.  And, and why did you put the helmet on sometime

9  after 2:00 a.m. on November 21?

10     A.  Because I had heard that, earlier in the night,

11 on November 20th, the police were shooting people in the

12 head.

13     Q.  And who did you hear that from?

14     A.  A lot of people were saying that.

15     Q.  Can you tell me a specific person who told you

16 that?

17     A.  I don't remember specifically.

18     Q.  Okay.  Do you recall where you were at when, when

19 people or someone told you that police were shooting

20 people in the head?

21     A.  Yes.

22     Q.  Where were you at?

23     A.  I was in between Oceti Sakowin Camp and Backwater

24 Bridge.

25     Q.  And to make the court reporter's job and



1  everybody else's life easier, can we just call the Oceti

2  Sakowin camp, the camp, you'll know what I mean?

3      A.  Yes.

4      Q.  And why were you between the camp and the

5  Backwater Bridge at that time when you heard that the

6  police were shooting people in the head?

7      A.  I was walking towards the bridge.

8      Q.  Okay.  And why were you walking towards the, the

9  bridge?

10     A.  Because I knew there was something happening up

11 there.

12     Q.  When you heard the police were shooting people in

13 the, the head, did you put your helmet on because you

14 felt if you went to the, the Backwater Bridge, you might

15 be in harms way in terms of the same thing happening to

16 you?

17     A.  Sorry.  I'm a little confused.  I heard that on

18 November 20th, but I didn't put my helmet on until the

19 21st.

20     Q.  And, and you put your helmet on, on November 21st

21 prior to going to the Backwater Bridge?

22     A.  I don't remember exactly when I put it on.

23     Q.  But you didn't put it on, on the bridge.  Did

24 you?

25     A.  I don't remember.



1    Q.  Well, did you have it on, on the bridge on the,

2    on the night of this incident on November 21, the

3    helmet?

4    A.  Yes.

5    Q.  You had put it on sometime before you got to the

6    Backwater Bridge that early morning.  Correct?

7    A.  I don't remember.

8    Q.  When you heard that, from other protesters, that

9    the police were shooting people in the head, did they

10   indicate to you that was people that were on the

11   Backwater Bridge?

12   A.  Can you repeat the question.

13   Q.  Yes.  When, when other protesters told you, on

14   November 20, that there were protesters being shot in

15   the head by police, did they indicate to you that that

16   was people who were on the Backwater Bridge that were

17   being shot by the police?

18   A.  I don't remember, specifically.

19   Q.  Did they say what they were being shot with?

20   A.  I don't think so.

21   Q.  I mean, did you understand it, it wasn't with

22   live ammunition from guns?

23   A.  I didn't --

24       MR. STOLL:  Objection, vague.

25       MS. WILANSKY:  Yeah.



1              MR. STOLL:  You can answer, Sophia.

2       A.  I didn't assume that it was live ammunition.

3       Q.  At that point in time, did you know what

4    less-lethal munitions were?

5       A.  Yes.

6       Q.  Okay.  And tell me what you knew about that?

7       A.  Sorry.  That's very broad.  I know that

8    less-lethal munitions is an umbrella term for all kinds

9    of police weaponry other than live ammunition.

10      Q.  Well, after you got to the camp on November 4,

11   when did you first learn that the law inform was using

12   less-lethal munitions against protesters?

13             MR. STOLL:  Objection, vague.

14      A.  I already knew before I got there.

15      Q.  And what did you know about that before you

16   already got there?

17      A.  I knew that the police were using a wide variety

18   of munitions indiscriminately.

19      Q.  And tell me what you mean by wide variety.  Give

20   me specifics on what you knew in terms of the types of

21   less-lethal munitions that were being used.

22      A.  They were using several types of impact

23   munitions, pepper spray, tear gas, flash bang grenades,

24   probably more.  That's all I can think of.

25      Q.  Okay.  And when you say "impact munitions," what,



1  what do you mean by that?

2      A.  There are bean bag rounds as well as rubber

3  bullets.

4      Q.  Okay.  And so you knew, before you got to the

5  protest, that the protesters were being exposed or shot

6  or injured by law enforcement using impact munitions

7  against the protesters; is that correct?

8      A.  Yes.

9      Q.  And you knew, before you got to the DAPL protests

10  in North Dakota, that law enforcement was using pepper

11  spray and tear gas against the protesters at the DAPL

12  protests?

13      A.  Yes.

14      Q.  And you knew, before you got to the DAPL protests

15  in North Dakota, that law enforcement was using what

16  you're calling flash-bang grenades against the

17  protesters?

18      A.  Yes.

19      Q.  And despite, so you, despite knowing that, you

20  decided to come and participate in the DAPL protests.

21  Correct?

22      A.  Knowledge of the indiscriminate use, by police,

23  of all these types of munitions was part of what drove

24  the general outrage about what was happening and part of

25  what was drawing people to the protests.



1    Q.  Okay.  But that doesn't answer my question.

2               MR. BAKKE:  Jesse, could you read the

3    question back.

4               (The requested portion of the record was

5    read by the reporter.)

6    A.  My answer was taking issue with the word despite,

7    but, other than that, yes.

8    Q.  But, but you knew, before you came to North

9    Dakota to participate in the DAPL protests, that it was

10   likely that if you engaged in protest activities, you

11   would be exposed to the type of less-lethal munitions

12   you just described.  True?

13   A.  I was aware of that possibility.

14   Q.  And, and you knew that possibility of being

15   exposed to these less-lethal munitions was happening

16   primarily on the Backwater Bridge during the protest

17   activities?

18               MR. STOLL:  Objection to form, lacks

19   foundation.

20   A.  No.

21   Q.  So you had not learned or heard from other

22   protesters that there was less-lethal munitions used on

23   protesters on the Backwater Bridge prior to your

24   incident on November 21 at approximately 3:30 to

25   4:00 a.m. in the morning?



1    A.  Are you not including November 20th in that.

2    Q.  I'm including anytime before that, anytime before

3    your incident.

4            MR. STOLL:  Objection to the form, vague.

5    A.  I was aware that that was happening on

6    November 20th.

7    Q.  On the Backwater Bridge?

8    A.  Yes.

9    Q.  Okay.  So you knew, at least by November 20,

10   2016, that protesters who went on the Backwater Bridge

11   were being shot at by law enforcement with the type of

12   less-lethal munitions you described?

13           MR. STOLL:  Objection, misstates prior

14   testimony.

15   A.  Can you repeat the question.

16           MR. BAKKE:  Jesse, could you read it back.

17           (The requested portion of the record was

18   read by the reporter.)

19           MR. STOLL:  Same objection.

20   A.  Yes.

21   Q.  And despite knowing that, you decided to go onto

22   the Backwater Bridge on the early morning hours of

23   November 21 shortly prior to when your injury occurred?

24   A.  Yes.

25   Q.  We were talking about what you were wearing on



1  the, the night of the incident, and, and I, I gave a

2  time of the incident occurring sometime between 3:30

3  and, and 4:00 a.m. Central Time in the morning on

4  November 21; is, is that accurate?

5    A.  Yes.

6    Q.  Can you pinpoint the time any better than that

7  when the incident, which you're claiming involved a, a

8  flash-bang grenade occurred?

9        MR. STOLL:  Objection, misstates the record.

10   A.  I believe that it was close to 4:00 a.m.

11   Q.  Are you able to be any more precise than that?

12   A.  No.

13   Q.  Okay.  And, and why do you say the incident

14 occurred -- and, and can we just call, for purposes of

15 the questioning here today, the incident where you claim

16 you were injured by the flash-bang, the incident?

17        MR. STOLL:  Objection.  Well, can we, can we

18 just characterize it as the incident, like the incident

19 referring to when she was injured, that's the subject of

20 this case?

21        MR. BAKKE:  I think that's kind of what I

22 just said.

23        MR. STOLL:  Well, I just want to --

24        MR. BAKKE:  I don't want to have to repeat

25 every time Ms. Wilansky, nor do I want you to have to



1   repeat the flash-bang incident so...

2          MR. STOLL:  I used the word flash-bang from

3   that description of the incident, is that still

4   something that, you know, is at issue in this case.

5      Q.  Anyway, Ms., Ms. Wilansky, if I call the incident

6   where you're claiming your injury from the flash-bang,

7   the flash, the incident, are you, you'll know what I

8   mean?

9          MR. STOLL:  Objection.

10     A.  No.

11     Q.  So you don't understand that that, the alleged

12  flash-bang incident would be something that we could

13  refer to as the incident to speed things up here?

14         MR. STOLL:  Objection to form.

15     A.  You can refer to the incident where I was injured

16  as the incident.

17     Q.  Okay.  That's fine.  So you said it was close to

18  4:00 a.m.  What, what, what is there in your memory or

19  otherwise that, that tells you that was the time of the

20  incident?

21     A.  I was checking the time periodically on my phone.

22     Q.  And when was the last time you recall checking

23  the time on your phone before the incident occurred?

24     A.  I don't remember specifically.  And can we take a

25  break, please?



1          MR. STOLL:  Sure.

2          MR. BAKKE:  Yep.

3          MR. STOLL:  Go off the record.

4          THE VIDEOGRAPHER:  We are off the record at

5   8:57, excuse me --

6          MR. STOLL:  10:57.

7          THE VIDEOGRAPHER:  10:57 -- I'm unable to

8   see because of the share screen -- a.m.

9          (Recess taken at 10:57 a.m.)

10         THE VIDEOGRAPHER:  We are back on the record

11  at 11:06 a.m.

12    Q.  Okay.  Ms. Wilansky, we were talking about

13  November 20 and November 21, 2016, and your activities

14  at the protest.  You mentioned that, on November 20, you

15  had heard from protesters that they were being shot in

16  the head by law enforcement with less-lethal munitions.

17  Correct?

18         MR. STOLL:  Objection, misstates prior

19  testimony.

20    A.  I didn't say what they were being shot with.

21    Q.  Okay.  Okay.  What did you understand they were

22  being shot with?

23    A.  I don't know.

24    Q.  Well, did, did you discuss less-lethal,

25  less-lethal munitions with any other protesters?



1    A.  I don't remember specifically.

2    Q.  Okay.  Well, you, you told me that you knew

3  before you got to the protest, and you described the

4  type of less-lethal munitions that were being against

5  the protesters.  Is that what you understood was being

6  used on November 20 to shoot the protesters in the head?

7              MR. STOLL:  Object to form.

8    A.  I understood that those were among possible

9  things.

10    Q.  Okay.  Did you see anyone on November 20 that was

11  injured by less-lethal munitions used by law

12  enforcement?

13    A.  Yes.

14    Q.  Okay.  And what type of injuries did you observe

15  with protesters on November 20?

16    A.  Mostly being shot with impact munitions.

17    Q.  Well, what were the nature of the injuries that

18  you either saw or had described to you by other

19  protesters on November 20 from the impact munitions?

20    A.  Other than hearing that people were shot in the

21  head, I didn't see any injuries up close.

22    Q.  Did you see any of these head injuries from being

23  shot in the head by police on November 20?

24    A.  Not that I can remember.

25    Q.  Did you physically observe any injuries to any



1    protesters on November 20?

2        A.  I saw people being shot --

3        Q.  Okay.

4        A.  -- with impact munitions.

5        Q.  On November 20?

6        A.  Yes.

7        Q.  Tell me about that.

8        A.  I'm not sure what else to say about that.

9        Q.  Tell me what you saw, where you were at?

10       A.  I was on and near the bridge for a long time.

11       Q.  On November 20?

12       A.  Yes.

13       Q.  And when you say, "for a long time," how long a

14   time?

15       A.  Many hours.

16       Q.  And approximately from when to when or was it

17   intermittent?

18       A.  I arrived not long after dark.  I'm not sure what

19   time I left.

20       Q.  So when you say "not long after dark," would that

21   put it sometime around the 6:00 o'clock p.m. Central

22   Time timeframe?

23       A.  Yes, approximately.

24       Q.  And then, you remained there continuously for,

25   for many hours at or on the Backwater Bridge?



1     A.  On or near the bridge, yes.

2     Q.  And when you say, "Many hours," is that three

3  hours; is that five hours?

4     A.  More than three hours.

5     Q.  Continuously?

6     A.  On or near the bridge, continuously.

7     Q.  And, and is that when you observed less-lethal

8  munitions being used on the protesters by law

9  enforcement on November 20?

10     A.  Yes.

11     Q.  During those three hours?

12     A.  Well, it was more than three hours.

13     Q.  Okay.  But during the more than three hours that

14  you were on or near the Backwater Bridge, law

15  enforcement were using the less-lethal munitions you

16  described?

17     A.  Yes.

18     Q.  Okay.  And, and tell me what you saw in regards

19  to the type of less-lethal munitions being used by law

20  enforcement during that more than three hours you were

21  on and near the bridge?

22     A.  I saw people being shot, I believe, with bean bag

23  rounds.  I don't remember if there were rubber bullets

24  as well, or I don't remember seeing them.  There were

25  lots of tear gas, tear gas grenades as well as other



1  types of grenades.

2     Q.  When you say other types of grenades, what do you

3  mean by that?

4     A.  Munitions that exploded with lights and sound but

5  that didn't contain tear gas.

6     Q.  Okay.  Any other less-lethal munitions you

7  observed while you were on or near the bridge on

8  November 20 other than the ones you've just described?

9     A.  Well, there were, were water cannons.

10    Q.  Okay.  Anything else being used by law

11 enforcement?

12    A.  Not that I remember.

13    Q.  And, and was law enforcement using the

14 less-lethal munitions you described during the entire

15 time period of the more than three hours you were on or

16 near the bridge on November 20?

17    A.  Can you repeat the question?

18    Q.  Sure.

19         MR. BAKKE:  Jesse, could you read it back?

20         (The requested portion of the record was

21 read by the reporter.)

22         THE STENOGRAPHER:  I'm sorry.  Let me, let

23 me say that again.  I got something wrong.  And was law

24 enforcement --

25         MR. BAKKE:  Here, I'll just --



1    THE STENOGRAPHER:  Can I repeat it again?

2    MR. BAKKE:  Jesse, let me just rephrase it.

3    THE STENOGRAPHER:  All right.

4    MR. BAKKE:  No.  I'll, I'll, I'll repeat it

5  to speed this up.

6    Q.  What, what I'm trying to understand, Ms.

7  Wilansky, is, during that three-plus hours that you were

8  on or near the Backwater Bridge on November 20, was law

9  enforcement using the less-lethal munitions you

10  described on a continuing basis?

11    A.  They, they were using less-lethal munitions much

12  of the time.  I don't know that it was all of the time.

13    Q.  And do you have an estimate during that

14  three-hour time period, and it may have changed and you

15  can tell me if it did, how many protesters there were at

16  or near or on the Backwater Bridge area that night of

17  November 20?

18    A.  I'm not great at estimating crowd size but in the

19  realm of hundreds.

20    Q.  Okay.  Could it be over a thousand?

21    A.  I don't know.

22    Q.  And were you able to observe how many law

23  enforcement there was on the north side of Backwater

24  Bridge when you arrived shortly after dark around

25  6:00 p.m. on November 20 at the Backwater Bridge?



1    A.  No, I'm not sure how many.

2    Q.  Was it less than the amount of protesters that

3  were on the other side?

4    A.  I don't know.

5    Q.  Did the number of law enforcement officers

6  increase, decrease, stayed the same over the more than

7  three hours you were on or near the Backwater Bridge on

8  November 20?

9    A.  I don't know.

10    Q.  Did the number of protesters, from when you got

11  there around 6:00 p.m. on November, increase, decrease

12  or stayed the same over the more than three hours you

13  were on or near the bridge?

14    A.  I'm not sure.

15    Q.  You mentioned what you called water cannons.

16  Where those something that was being used from a fire

17  truck, if you know?

18    A.  I believe they were mounted on the armored

19  vehicle.

20    Q.  And do you recall there being more than one, what

21  you call, the water cannon?

22    A.  I'm not sure.

23    Q.  You recall one, one water cannon?

24    A.  I recall at least one.

25    Q.  And the water cannon you recall, where was it



1  spraying water?

2      A.  Onto the bridge.

3      Q.  And was that the location where the water cannon

4  was spraying water, was on the bridge, the, during the

5  time period you were there for the more than three

6  hours?

7              MR. STOLL:  Objection to form, vague.

8      A.  Can you rephrase?

9      Q.  Yeah.  Was the location where the water canon was

10 directed, where the water landed, was it always on the

11 Backwater Bridge during the time period you were there

12 on November 20?

13     A.  I don't think it was in use the whole time so I

14 can't say always.

15     Q.  Okay.  Whenever the water cannon was used, was it

16 directed to protesters on the Backwater Bridge on

17 November 20?

18     A.  When I witnessed it being used, it was directed

19 at protesters on the bridge.

20     Q.  Okay.  And did you get sprayed by the, the water

21 being used by law enforcement when you were on the

22 Backwater Bridge on November 20?

23     A.  Yes.

24     Q.  Did you have some type of shield or poncho or

25 tarp or something that you were using to try to avoid



1    getting wet from the water?

2        A.  Not me personally.

3        Q.  And am I correct in understanding that if a

4    protester such as you did not want to be exposed to the

5    water cannon being used by law enforcement, you simply

6    could have avoided going on the Backwater Bridge so that

7    you didn't get exposed to the water cannon.  Correct?

8            MR. STOLL:  Objection to form.

9        A.  Well, there was a large crowd at that time.

10       Q.  That, that doesn't answer my question.  I'll,

11   I'll restate it.  The only people who were getting water

12   on them when you were there on November 20 in the

13   evening where people who, protesters who went on the

14   Backwater Bridge.  Correct?

15       A.  As far as I can remember.

16       Q.  So if, as a protester, for instance, you, if you

17   wanted to avoid getting sprayed by the water cannon, it

18   would be simply a matter of staying off the Backwater

19   Bridge on the evening of November 20.  Correct?

20           MR. STOLL:  Objection to form.

21       A.  Not necessarily.

22       Q.  Okay.  Explain why you say not necessarily.

23       A.  If, if somebody was on the bridge when they

24   started using the water cannon, they would have to make

25   their way through a crowd of people to get away.



1    Q.  Okay.  When, when you got there around dark, was

2   the water cannon already in use?

3    A.  I don't believe so.

4    Q.  Okay.  And did you go onto the Backwater Bridge

5   when the water was being sprayed there, or were you on,

6   already on the bridge and then the water cannon started

7   and you didn't know it was going to start?

8    A.  I was already on the bridge.

9    Q.  Okay.  And so, in response to the water cannon,

10   did you stay on the bridge, or did you get off the

11   bridge?

12    A.  I don't think I can isolate the water cannon

13   alone as the motivating factor.

14    Q.  Well, but did you say on the bridge when the

15   water cannon was being used for some period of time?

16    A.  Yes.

17    Q.  Okay.  And how long did you stay on the bridge

18   with the water cannon being used and it was getting you

19   wet?

20    A.  A few minutes.

21    Q.  Do you recall there being protesters that were

22   getting sprayed with the water cannon who was, who were

23   acting as if they were showering?

24          MR. STOLL:  Objection to form.

25    A.  I'm not sure how someone acts when they are



1  showering.

2     Q.  Like rub, rubbing themself with a bar of soap.

3     A.  I don't remember that.

4     Q.  Okay.  Do you recall protesters dancing in the

5  water coming from the water cannon?

6     A.  Yes.

7     Q.  Okay.  Do you recall protesters saying, when the

8  water was spraying on them, hit me, hit me?

9     A.  No, I don't remember that.

10     Q.  Do you recall them saying, protesters saying,

11  when they were on the Backwater Bridge, whether the, the

12  water's on or off, to law enforcement, you are

13  outnumbered?

14     A.  No.

15     Q.  Do you recall protesters saying, on the night of

16  November 20, to law enforcement, when they were on the

17  bridge, we are willing to die for this?

18     A.  No.

19     Q.  Do you recall protesters, while on the Backwater

20  Bridge on November 20 saying, we get paid for this?

21     A.  Definitely not.

22     Q.  When you were on the bridge out of that more than

23  three hours where you said you were on or near the

24  bridge, how many of those hours would you have

25  physically been on the bridge?



1    A.  I don't know.

2    Q.  Was it more than an hour?

3    A.  I don't know.

4    Q.  Okay.  Was it more than five minutes?

5    A.  Yes.

6    Q.  Okay.  So give me your best estimate of, of, out

7  of the more than three hours you're on or near the

8  bridge, how much of that time was spent near the bridge

9  versus on the bridge?

10    A.  I believe most of it was not on the bridge.

11    Q.  And when you say, most of it not on the bridge,

12  can you give me a time estimate?

13    A.  No.

14    Q.  If we put up Exhibit 8, the, the map, and,

15  actually, let's use a, a closer up map of the Backwater

16  Bridge area, we'll use Exhibit 9.

17  (Defendant's Exhibit #9 was marked for identification.)

18    Q.  Okay.  Do you see Exhibit 9 on your screen?

19    A.  Yes.

20    Q.  Okay.  And do you see where the Backwater Bridge

21  is located?

22    A.  Yes.

23    Q.  Okay.  And so when you were telling us that you

24  were on or near the bridge, when you say you were near

25  the bridge, where were you physically located at in that



 1  more than three hour time period for the part of that

 2  time that you were near the bridge?

 3      A.  I was a lot of places.  The area to the, the

 4  northeast as well as the southwest as well as on the

 5  south side of the bridge.

 6      Q.  When, when you were on or near the Backwater

 7  Bridge on November 20, were you with anyone that you

 8  knew?

 9      A.  No.

10      Q.  In other words, you didn't have a person or

11  persons that you were doing things with that, that

12  evening of November 20?

13      A.  Correct.

14      Q.  And when you say you were northwest of the

15  bridge, you know, how many feet away from the bridge was

16  the furthest point you got to the, did you say the

17  northeast?

18      A.  Northeast.

19      Q.  Yeah.

20      A.  Can you repeat the question.

21      Q.  Yeah.  I'm just trying to understand, what's the

22  furthest to the northeast you got from the bridge during

23  that three-plus hours that you were on or near the

24  bridge?

25      A.  I'm not sure.



1    Q.   Okay.  Were you up close to the Cantapeta Creek?

2    A.   How close?

3    Q.   That's what I'm asking you?

4    A.   I don't remember how close to the creek.

5    Q.   Okay.  What, what was the closest you got to the

6    creek on the northeast side on November 20?

7    A.   I don't remember going near the creek.

8    Q.   Okay.  Do you remember seeing a razor wire

9    barrier along the creek on the northeast side of

10   Backwater Bridge on November 20?

11   A.   I remember seeing razor wire on the bridge that

12   extended out to both sides.

13   Q.   Okay.  And was that present the entire time you

14   were at the DAPL protests, the razor wire on the north

15   side of the Backwater Bridge extending both to the east

16   and west from the bridge?

17   A.   I don't know.

18   Q.   Okay.  That razor wire was present, however, on

19   November 20 and 21 when you were on or near the

20   Backwater Bridge.  Wasn't it?

21   A.   Yes.

22   Q.   Okay.  When, when you were on the Backwater

23   Bridge on the evening of November 20, how close did you

24   get to the razor wire on, on the north side of the

25   Backwater Bridge?



1      A.  I don't remember.

2      Q.  Well, do you remember whether you were right up

3   next to the razor wire on the Backwater Bridge on

4   November 20?

5      A.  I don't think so.

6      Q.  Okay.  How close is the closest you got to the

7   razor wire on November 20 when you were on the Backwater

8   Bridge?

9      A.  I'm not great at gaging distance.  I'm not sure.

10      Q.  Well, was it, was it a car length away?  Can you

11   give me some sense of whether you got within ten feet or

12   a hundred feet or...

13      A.  At, at least a car length away.

14      Q.  Okay.

15      A.  And within a hundred feet.

16      Q.  So just, just so I'm clear on your, your answer,

17   what you're saying is, when you were on the Backwater

18   Bridge itself on November 20, when you were on there,

19   you would estimate that, during that time period,

20   depending upon the precise time, you would have been

21   about a car length away from the razor wire up to a

22   hundred feet away from the razor wire; is that correct?

23          MR. STOLL:  Objection to form, misstates

24   prior testimony and vague.

25      A.  The closest I ever got, as far as I can remember,



1  was more than a car length but less than a hundred feet.

2     Q.  Okay.  And, and when you were in this position

3  where you were more than a car length but less than a

4  hundred feet from the razor wire, how long did you

5  remain there?

6     A.  Well, there may have been other times that I was

7  less than a hundred feet away, but at the closest point,

8  not long, a few minutes.

9     Q.  Okay.  Was there ever a time on November 20 when

10  you were on the Backwater Bridge when you were the, in

11  the front row or the closest group of protesters to the

12  razor wire?

13     A.  No.

14     Q.  There were always protesters in front of you to

15  the north closer to the razor wire than you?

16     A.  Yes.

17     Q.  When you were on the Backwater Bridge on

18  November 20, in the evening, was the Backwater Bridge

19  essentially covered with other protesters?

20          MR. STOLL:  Objection, vague.

21     A.  I don't know.

22     Q.  Well, was it crowded with protesters when you

23  were on the Backwater Bridge on November 20?

24     A.  At some points, it was crowded.

25     Q.  I want to talk, for a few moments, about the law



1    enforcement activity on November 20.  When you're on the

2    bridge or near the bridge for that three-plus hours on

3    November 20, did law enforcement, at all times, stay

4    behind their side of the razor wire?

5        A.  No.

6        Q.  And same question regarding the early morning

7    hours of November 21 up to and leading up, the time of

8    the incident, did law enforcement ever cross over the

9    razor wire and come on the south side of the razor wire?

10       A.  Not that I know of but that's --

11       Q.  And you --

12       A.  -- the opposite question of the one you asked

13   before.

14       Q.  I'm sorry?

15       A.  I was just saying, that's the opposite question

16   of what you asked before.

17       Q.  Well, I don't think so, but I, I can ask it again

18   to make sure we're on the same wavelength here.  What I

19   was asking about is, on November 21, in the early

20   morning hours leading up to and, and when your injury

21   occurred, was there ever a time, when you're aware of or

22   that you saw, the law enforcement did not remain on the

23   north side of the razor wire on the Backwater Bridge?

24       A.  No.  But they didn't stay on their side the

25   entire time on November 20th.



1    Q.   Okay.  When you say, "They didn't stay on, on

2    their side the entire time on November 20th," tell me

3    about that.

4    A.   There was one point where, where some police

5    officers came around the western side of the barrier.

6    Q.   When you say "the western side of the barrier,"

7    are you talking some distance away from the Backwater

8    Bridge?

9    A.   Yes.  The end of the barrier.

10   Q.   Okay.  Where the, where the razor wire ended,

11   wherever that was?

12   A.   Yes.

13   Q.   Okay.  And do you know how far west the razor

14   wire ended from the Backwater Bridge on November 20?

15   A.   No.

16   Q.   And is it something you observed that you saw

17   some officer on the, the west side on November 20?

18   A.   Yes.

19   Q.   Okay.  And what did you observe in that regard?

20   A.   Just that people were spreading out more on the

21   west side and then the police came around and pushed

22   people back.

23   Q.   Okay.  But you weren't one of those people over

24   there?

25   A.   Over where?



1    Q.  On the west side where you say the police pushed

2   people back, were you one of those people that got

3   pushed back?

4    A.  I wasn't close to the police.

5    Q.  Okay.  Did you observe the police pushing people

6   back on the west side of the Backwater Bridge on

7   November 20?

8    A.  Yes.

9    Q.  Okay.  And were they, when you say pushing people

10  back, what were the police doing?

11   A.  Well, they were moving towards the people, and I

12  believe they were also shooting at them.

13   Q.  Did, did you -- with less-lethal munitions?

14   A.  Yes.

15   Q.  Okay.  Do you know what type of less lethal

16  munitions?

17   A.  No, I don't remember.

18   Q.  Was there any physical contact when you looked on

19  the west side and the police were pushing people back

20  between the protesters and law enforcement?

21   A.  Well, the people were shooting people with impact

22  munitions.

23   Q.  Okay.  And when I say physical contact, I mean

24  the police officers themselves touching protesters or

25  vice versa with their bodies or hands?



1    A.  No.  I didn't see that kind of physical contact.

2    Q.  Okay.  And then, turning back to November 21,

3  2016, leading up to and at the time of the incident, am

4  I correct in understanding the law enforcement officers

5  remained on the north side of the razor wire on the

6  Backwater Bridge?

7    A.  As far as I know, yes.

8    Q.  Where they essentially defending their position

9  on the north side of the razor wire on the Backwater

10  Bridge?

11          MR. STOLL:  Objection to form, vague, calls

12  for speculation.

13    A.  I don't know what their, what their motivations

14  were.

15    Q.  But, but they didn't move across that razor wire

16  and try to come onto the bridge north of the razor wire,

17  nor in any other area that you saw on November 21

18  leading up to or at the time of your incident?

19    A.  Correct --

20          MR. STOLL:  Object -- sorry.  Sophia, you

21  got to give me an opportunity --

22          MS. WILANSKY:  Sorry.

23          MR. STOLL:  -- to object before you answer.

24  So, objection, vague.  Sophia, you can answer if you

25  can.



1    A.  Correct.  I never saw them cross.

2    Q.  I'm going to put up what's been marked as

3    Deposition Exhibit 16.  Can you see that photograph?

4    (Defendant's Exhibit #16 was marked for identification.)

5    A.  Yes.

6    Q.  Okay.  And is that a photograph of you taken by

7    another protester shortly following your injury on

8    November 21?

9         MR. STOLL:  Objection, calls for

10   speculation.

11   A.  It was taken on November 21.

12   Q.  Okay.  Was it taken by one of the protesters

13   shortly following your injury?

14        MR. STOLL:  Objection, lacks foundation.

15   A.  I don't know if they were protesting.

16   Q.  Well, it's, it's got on the bottom what we call a

17   bates label, and it says WILANSKY-0002157 which means it

18   was a document you produced to us in this case with your

19   discovery answers.  Where did you get that photograph

20   from?

21        MR. STOLL:  Objection, lacks foundation.

22   A.  I didn't have that.  I think my lawyers produced

23   it.

24   Q.  Okay.  And, and we've seen it posted on Facebook

25   by other protesters.  Do you believe this would have



1  been the earliest photograph taken of you following your

2  injury on November 21?

3           MR. STOLL:  Objection to the statement

4  before the question and objection, lacks foundation.

5     A.  That was the first photograph that I was aware of

6  being taken of me.

7     Q.  Okay.  And we can see in the photograph that you

8  had on a, a green, kind of a, I'll call it a puff

9  jacket; is that correct?

10    A.  Yes.

11    Q.  Okay.  And do you recall where and when you got

12  that jacket?

13    A.  I got it from the clothing donations and I don't

14  remember when.

15    Q.  Okay.  At the supply tent at the camp?

16    A.  There was a, a tent for clothing donations.

17    Q.  And, and we'll back up a little bit further in

18  the photograph so we can see most of your body at that

19  time.  Was this the clothing that you would have been

20  wearing at the time of the incident on the Backwater

21  Bridge on November 20?

22           MR. STOLL:  You mean 21?

23    Q.  I'm sorry.  November 21.

24    A.  Yes.  I was wearing those clothes.

25    Q.  Okay.



1    A.  (Inaudible) --

2    Q.  So you had on two winter coats or jackets?

3    A.  No.

4    Q.  Okay.  Because it, it appears in the photograph,

5    and, and I'm, I'm just trying to understand what you

6    were wearing, it appears like you have a green jacket on

7    and also kind a navy blue jacket on.  Was this a

8    multicolor jacket or is it...

9    A.  I believe that's a vest under the jacket.

10   Q.  Well, I see the vest, but if you look below your,

11   your right arm or your right elbow there in the

12   photograph, the lower portion appears to show a jacket

13   that's kind of a navy blue in color.  Is that a jacket

14   or is it something else you were wearing?

15   A.  Under my right arm?

16   Q.  Under your right arm, right.

17   A.  I don't know what that is.

18   Q.  Okay.  So what color was the jacket you were

19   wearing on the night of this incident?

20   A.  Green.

21   Q.  Okay.  I mean, is it the green we see in the

22   photograph on your arm there?

23   A.  Yes.

24   Q.  Do you recall what brand it was?

25   A.  No.



1    Q.  You recall how far down it went on your body when

2  you had it on?

3    A.  No.

4    Q.  Do you remember whether it was waist length, or

5  did it go down to your knees?

6    A.  More like waist length.

7    Q.  And was it a, a warm jacket?

8    A.  It was relatively warm.

9    Q.  Was it some sort of fill material like a goose

10  down or some other insulating material?

11    A.  I don't think I checked what the material was.

12    Q.  And where is that jacket now?

13         MR. STOLL:  Objection, lack of foundation.

14    A.  I don't know.

15    Q.  What, what did you, when, when did you last see

16  it?

17    A.  The last time that it was in tact was at the

18  casino.

19    Q.  Okay.

20    A.  Just not long after this picture was taken.

21    Q.  Okay.  When you say, "The last time it was intact

22  was at the casino," at some point, was it removed from

23  you?

24    A.  I don't remember exactly, but it must have been

25  cut off.



1    Q.  Okay.  And do, do you know, did, did somebody

2  keep it so that it's available today, with someone?

3    A.  Well, at that point, it was in two pieces, and I

4  don't know what happened to the larger piece.

5    Q.  Okay.  Was there part of it that was kept?

6    A.  The, the smaller part?

7    Q.  Sure.

8    A.  I believe the FBI took it.

9    Q.  Shortly prior to when the incident occurred,

10  it's, it's my understanding and, and it's in your

11  complaint that you allege that you were hit by some type

12  of munition impact; is that correct?

13    A.  Can you repeat the question.

14    Q.  Yes.  If, if I understand it, you're claiming

15  that, at the time shortly prior to this incident, that

16  you were struck with some type of impact munition prior

17  to when the explosion occurred.  Correct?

18    A.  Yes.

19    Q.  And that you were struck by an impact munition in

20  your arm?

21    A.  Yes.

22    Q.  Okay.  And, and which arm?

23    A.  My left arm.

24    Q.  Okay.  And, and where on your left arm?

25    A.  Do you want me to show you?



1    Q.  Sure.

2    A.  Oh, the light's not great.  I have a scar right

3  here.

4          MR. BAKKE:  Jeff, is there a way you can

5  zoom in on that?

6          THE VIDEOGRAPHER:  I do not have the ability

7  to zoom, ironically.

8    Q.  You, could you stand back up, Ms. Wilansky, and

9  just put, point to there, where that is with your

10  finger.  Okay.  And so, just so we can describe this,

11  it's about midway from the top of your shoulder to your

12  elbow, roughly?

13    A.  Yes.

14    Q.  Okay.  And you're pointing to the, the front of

15  your left arm.  Correct?

16    A.  I'm not sure how you define the front.

17    Q.  Well, the, the front would be on the front of

18  your body as opposed to the backside of your body.

19  Correct?

20          MR. STOLL:  It appears more like on the

21  outside part of her arm to me.

22    Q.  Well, you're, you're pointing to where it is, so

23  I think we've got a, a good enough picture we can see

24  that.  You can go ahead and sit down.  Thank you.  And

25  that, you believe, was a some sort of an impact round



1  that, that struck you there?

2      A.  Yes.

3      Q.  Okay.  Do, do you know what kind of impact round,

4  a bean bag, a sponge round, a rubber bullet, something

5  else?

6      A.  I don't know.

7      Q.  Okay.  And was anything recovered following this

8  incident the terms of what hit you in your upper-left

9  arm there that you're aware of?

10     A.  Relating to me, specifically, I don't know.

11     Q.  Okay.  In the photograph, we can see, we'll put

12  Exhibit 16 back up, and you've told us that you had some

13  type of clothing on underneath the, the green winter

14  coat; is that correct?

15     A.  Yes.

16     Q.  And at, at the time of the incident, what is the

17  black clothing you had on inside the green jacket?

18     A.  I was wearing a base layer and a vest and no

19  overalls.

20     Q.  When you say a base layer, what do you mean by

21  that?

22     A.  A long sleeve shirt and long pants, thin.

23     Q.  Okay.  And then the vest, that I assume, did not

24  cover your arms, it was just your upper body?

25     A.  Yes.



1    Q.  So when this impact munition hit your upper-left

2    arm, did it perforate or make a hole in your green

3    jacket?

4    A.  I don't think so.

5    Q.  Did it cut it or tear the jacket in any way?

6    A.  Not that I remember.

7    Q.  Any, anything else that you were wearing other

8    than shows up in Exhibit 16 in terms of outerwear at the

9    time of the incident on November 21?

10   A.  Well, I had a helmet.

11   Q.  And do you know what happened to the helmet?

12   A.  No.

13   Q.  Okay.  Do you still have it?

14   A.  No.

15   Q.  Okay.  Let, let's turn to the November 21

16   incident.  And you indicated that the explosion where

17   you were injured happened shortly prior to 4:00 a.m.

18   Correct?

19   A.  It was around 4:00 a.m.

20   Q.  Okay.  And after the three-plus hours that you

21   were on or near the Backwater Bridge on November 20, did

22   you go back to the camp for a time period?

23   A.  Yes.

24   Q.  Okay.  And what were you doing back at the camp?

25   A.  I ate.



1      Q.  Okay.  Anything else?

2      A.  I stopped by a fire.

3      Q.  At the camp?

4      A.  Yes.

5      Q.  And then how long was it between when you got

6   back to the camp until you decided to go back to the

7   Backwater Bridge on the early morning hours of

8   November 21?

9      A.  I was at camp for a few hours.

10      Q.  Can you give me an estimate of from when to when?

11      A.  Maybe 10:00 or 11:00 p.m. to 2:00 a.m.

12   approximately.

13      Q.  Was it about 2:00 a.m. when you headed back to

14   the Backwater Bridge on November 21?

15      A.  I headed back towards the bridge around 2:00 a.m.

16      Q.  And, and from that 10:00 to 11:00 p.m. to

17   2:00 a.m. time period, had you consumed any alcohol?

18      A.  No.

19      Q.  Were you under the influence of any drugs?

20      A.  No.

21      Q.  On November 20 or 21, at any time prior to this

22   incident, did you consume any alcohol?

23             MR. STOLL:  Objection, vague.

24      A.  No.

25      Q.  Or were you under the influence of any drugs



1 during that time period?

2 A.  No.

3 Q.  When you were at the camp between 10:00 to

4 11:00 to 2:00 a.m. on November 20, '21, who else do you

5 recall interacting with?

6 A.  Somebody served me at the kitchen.

7 Q.  You said you were at the fire.  Do you remember

8 who you were at the fire with?

9 A.  No.

10 Q.  Can you tell me the, the names of any individuals

11 when you were back at the camp between 10:00 and

12 11:00 p.m. to 2:00 a.m. that you spoke with or were

13 conversing with?

14 A.  No.

15 Q.  You didn't know any of the people that were at

16 the fire?

17 A.  I don't remember who was at the fire.

18 Q.  On November 20, when you were on or near the

19 Backwater Bridge, can you tell me the names of any

20 individuals who were also there when you were there?

21 A.  I know Richard Fisher was there.

22 Q.  Who's Richard Fisher?

23 A.  He was somebody who was near me in camp.

24 Q.  So you got to know him?

25 A.  To some extent.



1    Q.  Okay.  And where is Mr. Fisher from?

2    A.  South Dakota, I believe.

3    Q.  Do you have Mr. Fisher's contact information?

4    A.  I don't think so.

5    Q.  And what do you know about Mr. Fisher?  You know

6  where he lives, what he does?

7    A.  What he does now.

8    Q.  What he did then, what he does now?

9    A.  I don't know where he lived or what he does now.

10   Q.  Okay.  So did you know back at the time, did he

11  tell you what he did or where he's from or anything

12  about his family or anything like that?

13   A.  I believe he told me that he was from a

14  reservation in South Dakota.

15   Q.  Okay.  Did he tell you anything else about

16  himself?

17   A.  I don't remember specifically.

18   Q.  And, and what interaction did you have with Mr.

19  Fisher on November 20 in relation to being at or near or

20  on the Backwater Bridge?

21   A.  We walked there together on November 20th.

22   Q.  Okay.  And did you walk there together with

23  anyone else you knew?

24   A.  There was another woman with us, but I didn't

25  know her very well.



1    Q.  Do you know her name?

2    A.  No.

3    Q.  So turning back to that time period between

4  10:00 to 11:00 p.m. and 2:00 a.m. when you're at the

5  camp, was there some discussion or planning about going

6  back to the Backwater Bridge?

7          MR. STOLL:  Objection, vague.

8    A.  I didn't hear any planning.

9    Q.  What did you hear?

10    A.  I heard that people were planning to be there the

11  following day.

12    Q.  You mean the, the, the next morning when it was

13  light out?

14    A.  Yes.

15    Q.  Okay.  And, and what were they planning on doing

16  on November 21 during daylight hours, the protesters?

17          MR. STOLL:  Objection, calls for

18  speculation.

19    A.  I don't know.

20    Q.  What were you told?

21    A.  That more people would be at the bridge the

22  following morning and day.

23    Q.  Okay.  To do what?

24          MR. STOLL:  Objection, calls for

25  speculation.



1    A.  I, I don't have any way of knowing what, if

2  anything, people wanted to do the following day.

3    Q.  How did it come about that you decided to go back

4  to the Backwater Bridge around 2:00 a.m. on November 21?

5    A.  I think I already intended to go back.

6    Q.  Why?

7    A.  Because there were still people around there when

8  I left.

9    Q.  Around the Backwater Bridge, around the Backwater

10  Bridge?

11    A.  Yes.

12    Q.  How far was it from where you were at, at camp to

13  the Backwater Bridge?

14    A.  About a mile.  Can we take a break?

15         MR. BAKKE:  Sure.

16         MR. STOLL:  Let's go off the record.

17         THE VIDEOGRAPHER:  We are off the record at

18  12:16 p.m.

19         (Recess taken at 12:16 p.m.)

20         THE VIDEOGRAPHER:  We are back on the record

21  at 12:26 p.m.

22    Q.  Okay.  Ms. Wilansky, we were talking about that

23  timeframe at about 2:00 a.m. when you went back to the

24  Backwater Bridge, and is that the time you got to the

25  Backwater Bridge on the morning of November 21 was about



1  2:00 a.m.?

2      A.  Yes.

3      Q.  Okay.  And so would you estimate that you were at

4  the Backwater Bridge on November 21 before the incident

5  occurred for about two hours?

6      A.  Can you repeat the question.

7      Q.  Yes.  You, you, you told me that you got to the

8  Backwater Bridge on November 21 at about 2:00 a.m. and

9  then you had told me earlier it was close to 4:00 a.m.

10  when the incident occurred.  Correct?

11     A.  Yes.

12     Q.  Okay.  And so my question was, were you at the

13  Backwater Bridge, on the Backwater Bridge for about two

14  hours between 2:00 a.m. until close to 4:00 a.m. when

15  the incident occurred?

16     A.  I was on/or in the vicinity of the bridge for

17  about two hours.

18     Q.  Okay.  And when you say "in the vicinity of the

19  bridge," what does that mean?

20     A.  There were several campfires between the bridge

21  and Cantapeta Creek as well as.  There may have been at

22  least one south of the bridge, but I don't remember if

23  that was still going at the time.

24     Q.  So, of that two hours between 2:00 a.m. and close

25  to 4:00 a.m., how much of that time did you actually



1  spend on the bridge?

2     A.  I don't remember.

3     Q.  Well, if we take the incident itself, for how

4  long had you been on the Backwater Bridge itself before

5  the incident occurred?

6     A.  It felt like a long time.

7     Q.  So you, you'll have to tell me what a long time

8  is for you.

9     A.  I'm not sure.

10    Q.  Was it 15 minutes, an hour, over an hour?

11    A.  I'm not sure.

12    Q.  Okay.  Can you give me any estimate at all what

13 you mean by "a long time" on the bridge?

14    A.  Well, it was definitely less than two hours.

15    Q.  So, of that, that two hours when you're back or

16 near the Backwater Bridge from 2:00 a.m. to about

17 4:00 a.m., was most of that time spent by you on the

18 bridge?

19    A.  I don't know if it was most of the time.

20    Q.  All you can tell me is, out of the two hours, it

21 was a long time you spent on the bridge?

22    A.  Yes.

23    Q.  When you left the camp, did you bring anything

24 with you at 2:00, shortly prior to 2:00 a.m. when you

25 went back to the Backwater Bridge?



1    A.  My cellphone was in my pocket.

2    Q.  And you told me, told us early you had, had your

3  helmet on.  Correct?

4    A.  I don't remember when I put it on.

5         MR. STOLL:  Objection, misstates her

6  testimony.

7    Q.  But, but you had it on when you were there at the

8  Backwater Bridge for that, roughly, two-hour time period

9  where you were on or near the bridge.  Correct?

10   A.  I don't know if I had it on the whole time.

11   Q.  And the helmet, was that something that you kept

12 in the tent at the camp?

13   A.  Yes.

14   Q.  Okay.  In other words, you brought it with you

15 from the camp when you went back to the Backwater Bridge

16 at about 2:00 a.m.?

17   A.  Yes.

18   Q.  And did you have a backpack with you?

19   A.  I'm pretty sure that I did not have a backpack.

20   Q.  Did you have a backpack with you there at the

21 protests?

22        MR. STOLL:  Objection, vague.

23   A.  I had at least, at least one or two backpacks at

24 camp.

25   Q.  When, were you, were you carrying anything with



1   you when you left the camp and arrived at the Backwater

2   Bridge at about 2:00 a.m. on November 21?

3       A.   My cellphone was in my pocket.

4       Q.   Okay.  Other than your cellphone, were you

5   carrying anything else?

6       A.   I was either carrying or wearing my helmet.

7       Q.   Anything else?

8       A.   Not that I can remember.

9       Q.   Did anyone accompany you from the camp to the

10  Backwater Bridge on the early morning of November 21?

11      A.   No.

12      Q.   Okay.  And when you were at the Backwater Bridge

13  between 2:00 and 4:00 a.m. on November 21, were there

14  any protesters there that you knew?

15      A.   I don't know.

16      Q.   Do you know the names of any of the protesters

17  that were there with you between 2:00 a.m. and 4:00 a.m.

18  on November 21?

19      A.   I wasn't there with anybody.

20      Q.   Okay.  So when you were on the bridge on November

21  21, between 2:00 and 4:00 a.m., were you there by

22  yourself?

23      A.   Well, it depends.

24      Q.   I'm talking about during that entire time period;

25  was there anybody else there with you?



1    A.  There were other people there, but I wouldn't say

2    they were with me.

3    Q.  Okay.  And do you know the names of any of the

4    other people there between 2:00 and 4:00 a.m. on

5    November 21?

6    A.  I know that Richard Fisher says that he was there

7    at one of the campfires.

8    Q.  And anyone else that was either at the campfires

9    or on the bridge with you between 2:00 a.m. and

10   4:00 a.m. that you can tell us the names of?

11   A.  No.

12   Q.  Have you, have you ever talked to anyone who has

13   indicated they were an eyewitness to the incident where

14   you were injured on November 21?

15   A.  Yes.

16   Q.  Okay.  And who was that?

17   A.  Well, there were several people who reached out

18   saying they were witnesses, Brandi King.

19   Q.  Okay.  And when did you speak with Ms. King

20   following the incident?

21   A.  I don't think I ever spoke with her.

22   Q.  And how did you communicate with her, and, and

23   how did she let you know she was there when the incident

24   occurred?

25   A.  She sent me a message.



1    Q.  How did she send you a message?

2    A.  On Facebook.

3    Q.  And what did she say in the message?

4    A.  That she was there during the incident.

5    Q.  Did she tell you what she saw, if anything?

6    A.  I don't remember.

7    Q.  Do you still have that Facebook message?

8    A.  Yes.

9    Q.  Okay.  Did you turn it over to your attorneys?

10   A.  Yes.

11       MR. BAKKE:  And, Ben, I don't think that's

12   been produced.  Has it?

13       MR. STOLL:  You know, Randy, I don't think

14   it has been produced.  I, we can discuss that off the

15   record in more detail if you want, but I will certainly

16   go and look for it again and produce it if we still have

17   it.

18       MR. BAKKE:  Okay.

19   Q.  Okay.  Anyone else -- and, and was Brandi King

20   someone you understand, Ms. Wilansky, who was involved

21   in transporting you to, from the protest location to the

22   Prairie Knights Casino immediately following the

23   incident?

24   A.  Yes.

25   Q.  And was the other person Steve Martinez who



1   transported you?

2        A.   That's my understanding.

3        Q.   Okay.  Was there anybody else in the vehicle that

4   transported you from the protest site to Prairie Knights

5   after the incident?

6        A.   No.

7        Q.   Okay.  We were talking about eye-, eyewitnesss.

8   Has anybody else, other than Brandi King, indicated to

9   you that they were an eyewitness to the incident?

10       A.   I believe there were a few other people.

11       Q.   Who are the few other people?

12       A.   I don't remember.

13       Q.   Do you have the contact information from them?

14       A.   No.

15       Q.   Do you know a Stephen Joachinson,

16  J-o-a-c-h-i-n-s-o-n?

17       A.   I wouldn't say I know him.

18       Q.   What would you say?

19       A.   I know that he was a witness.

20       Q.   And how do you know that?

21            MR. STOLL:  Sophia, I'll just caution you

22  not to disclose any attorney-client communications in

23  your answer to that question.  Assuming you can answer

24  it without that, go ahead and answer it.

25       A.   Right.  I mainly know through my attorneys, but I



1  belive he also did interviews.

2      Q.  Have you ever spoken to Mr. Joachinson about the

3  incident or the events leading up to the incident?

4      A.  Not that I can remember.

5      Q.  Have you ever communicated with Mr. Joachinson

6  either by Facebook or e-mail or text or any means of

7  communication regarding the events leading up to the

8  incident or the incident itself?

9      A.  Not as far as I can remember.

10     Q.  So, turning back to between 2:00 a.m. and

11 4:00 a.m., and, and, incidentally, before I go there, in

12 terms of eyewitnesss, anybody else other than Mr.

13 Joachinson and Ms. King that you understand may have

14 been eyewitnesss to the incident?

15     A.  There were a few other people who claimed to be

16 witnesses, some of them credible, some not so credible

17 but I don't remember specifically.

18     Q.  Okay.  Did any of these people who claim to be

19 eyewitnesses contact you, or did you contact them in any

20 form?

21     A.  Like I said, I think there were a few other

22 people who messaged me claiming to be witnesses.

23     Q.  Okay.  And you, was that by Facebook?

24     A.  Yes.

25     Q.  Okay.  And would you still have those messages



1  from those other individuals who claim to be eyewitnesss

2  to this incident?

3      A.  Yes.

4      Q.  And have those been turned over to your attorney?

5      A.  Yes.

6          MR. BAKKE:  And, Ben, once again, we'll have

7  that conversation off the record but we're obviously

8  requesting them.

9          MR. STOLL:  Absolutely.  I believe we have

10  disclosed, well, I can tell you we've disclosed

11  everything that I was able to find, and I'm pretty sure

12  that that includes at least somebody who claimed to be

13  an eyewitness, but we can talk more if there's

14  additional searches you'd like me to do.

15      Q.  Ms. Wilansky, between 2:00 a.m. and 4:00 a.m.,

16  what do you recall being physically present on the

17  Backwater Bridge at that time?  And I'm not talking

18  about people.  I'm talking about property or items or

19  vehicles.

20          MR. STOLL:  Objection, vague.

21      A.  Well, there was the barrier.  There was a large

22  vehicle next to the barrier.  There was a lot of stuff.

23      Q.  Okay.  And when you say "a lot of stuff," what do

24  you mean by that?

25      A.  Bullets, medic supplies, pieces of plywood and



1  rubber bin lids, and people were actually cleaning up

2  all of the random objects when I arrived.

3      Q.  On the bridge?

4      A.  Yes.

5      Q.  And when you say "people," were those other

6  protesters or somebody else?

7            MR. STOLL:  Objection, calls for

8  speculation.

9      A.  I wouldn't say they were protesting at the time.

10 They were cleaning up.

11     Q.  Yeah.  Were, were people that were on the south

12 side of the barricade, did you consider those

13 individuals there on the early morning hours of November

14 21 to be protesters?

15     A.  Not necessarily.

16     Q.  So, for instance, was there someone who was there

17 from some tribal entity from the Standing Rock

18 Reservation such as people that were not affiliated with

19 the protest, or was everyone there affiliated in some

20 way with the protest to your understanding?

21           MR. STOLL:  Objection, vague and calls for

22 speculation.

23     A.  I don't know that presence there constitutes

24 affiliation.

25     Q.  Well, maybe I can ask it a different way.  Did



1  you understand the people on the bridge on November 21

2  in the early morning hours to be opposed to the DAPL

3  pipeline?

4          MR. STOLL:  Objection, calls for

5  speculation.

6    A.  I would have no way of knowing that from their

7  actions at the time.

8    Q.  So the people cleaning up random objects on the

9  bridge, what were they using to, to clean up the

10  objects?

11   A.  They were collecting them and piling them up.  I,

12  and I think somebody might have come with a vehicle to

13  take objects back to camp.

14   Q.  Are you talking about the pieces of plywood,

15  those type of things that could potentially be reused?

16   A.  Not specifically, just any objects that were

17  around.

18  (Defendant's Exhibit #2 was marked for identification.)

19   Q.  I'm going to show you what's been marked as

20  Exhibit 2.  This is a photograph taken from the law

21  enforcement side on November 21, 2016, after the

22  incident.  You can see it's daylight hours.  What you

23  described as the barrier, does that show up in the

24  photograph?

25   A.  Yes.



1      Q.   Okay.   And that, that's the concrete berms and

2    the razor wire shown on the photograph?

3      A.   Yes.

4      Q.   And then you described the large vehicle that you

5    said is next to the barrier.   Is that the burnt out

6    truck we see on Exhibit 2?

7      A.   Yes.

8      Q.   So it's a, appears to be a dump truck of some

9    type; is that correct?

10     A.   I don't know that much about vehicles.

11     Q.   And was there any other vehicle on the bridge on

12   the early morning hours of November 21 other than this

13   burnt out truck?

14     A.   Can you repeat the question.

15     Q.   Yeah.   Was there any other vehicles on the bridge

16   between 2:00 a.m. and 4:00 a.m., when you were there,

17   other than this burnt out truck on Exhibit 2?

18     A.   I think when I first got there that people who

19   were cleaning up put things in a vehicle to send back to

20   camp.

21     Q.   Okay.   Was that vehicle on the bridge itself, or

22   was it off the bridge on the south side?

23     A.   I don't remember.

24     Q.   And did that vehicle that you think may have been

25   there when you arrived be fairly shortly after you got



1   back to the Backwater Bridge around 2:00 a.m.?

2       A.  Yes.

3       Q.  So the only vehicle that would have been on the

4   Backwater Bridge in, say, the hour or so before the

5   incident would have been this burnt out truck shown on

6   Exhibit 2?

7       A.  As far as I can remember.

8       Q.  And is the burnt out truck in the same position

9   you would call it being in prior to and at the time of

10  the incident?

11      A.  I don't know.  I'm looking at it backwards.

12  Probably.

13      Q.  Okay.  And when you say "looking at it

14  backwards," you would have been, your viewpoint would

15  have been from the south looking north, and this

16  photograph is from the north looking south.  Correct?

17      A.  Right.

18      Q.  Do you recall whether that truck was chained to

19  anything at the time of your incident and prior to that

20  on November 21?

21      A.  Yes.

22      Q.  Okay.  Tell me what you remember about that?

23      A.  I remember somebody saying that it was chained to

24  the barrier.

25      Q.  And when you say "the barrier," you're talking



1   about the concrete berms, what they call Jersey

2   Barriers, that's shown on the bottom of Exhibit 2?

3       A.  Yes.

4       Q.  And is that something you recall observing

5   yourself, was that the burnt out truck was chained to

6   the, the barrier?

7       A.  I didn't get a very good look at it.

8       Q.  At the chains?

9       A.  Right.

10      Q.  Okay.  But you, you, you did see that there were

11  chains that were attached to the burnt out truck that

12  went to the barrier?

13      A.  I could see that there were chains under the

14  truck.

15      Q.  And that's something you saw on November 21

16  between 2:00 a.m. and 4:00 a.m.?

17      A.  Yep.

18      Q.  And you understood, at the time, those chains

19  were attached on one end to the truck and on the other

20  end to the concrete barrier?

21      A.  I didn't get a very good look at the other end.

22      Q.  When you say "the other end," are you talking

23  about the, the front end of the truck that we see in the

24  photograph which would be the right passenger side near

25  the bumper?



1    A.  I mean that I don't remember clearly seeing where

2    the chain was attached on the barrier.

3    Q.  Do you recall whether there was more than one

4    chain that ran from the, being attached to the truck to

5    being attached to the barrier on November 21?

6    A.  No.  I remember seeing at least one.

7    Q.  And did you understand that it was either law

8    enforcement or some public agency in North Dakota that

9    had attached the chain between truck and the barrier?

10           MR. STOLL:  Objection, calls for

11   speculation.

12    A.  Not necessarily.

13    Q.  Okay.  So who did you think the other possibility

14   was that someone who might have attached that chain or

15   chains?

16    A.  I didn't think about who put the chain there.

17    Q.  Well, were the chains there, to you

18   understanding, to prevent that truck from being moved?

19           MR. STOLL:  Objection, lack of foundation.

20    A.  I don't know what the purpose of the chains was.

21    Q.  Was it your understanding that, that one of the

22   things that the protesters were trying to accomplished

23   on November 20 during the protest was the removal of

24   this burnt out truck from the Backwater Bridge?

25    A.  I was aware that some people attempted to move



1    the truck.

2        Q.  The one that we see in Exhibit 2.  Correct?  Yes?

3        A.  Yes.

4        Q.  Okay.  And what did you know about that, the

5    attempts by the protesters on November 20 to try to

6    remove the truck shown on Exhibit 2 from the Backwater

7    Bridge?

8        A.  Can you repeat the question.

9            MR. BAKKE:  Jesse, can you read it back.

10           (The requested portion of the record was

11   read by the reporter.)

12       A.  I heard that they were not able to because it

13   would change the barrier.

14       Q.  Do you recall who told you that?

15       A.  No.

16       Q.  So you understood a goal of the protesters on

17   November 20 was to remove this burnt out truck from the

18   Backwater Bridge.  Correct?

19           MR. STOLL:  Objection, vague and

20   mischaracterizes prior testimony.

21       A.  I was aware that some people were trying to move

22   the truck, but I wouldn't characterize that as a goal of

23   the protesters as a whole.

24       Q.  And, and why were some people trying to remove

25   the burnt out truck from the Backwater Bridge?



1          MR. STOLL:  Objection, calls for

2    speculation.

3      A.  I'm not entirely sure what their motivations

4    were.

5      Q.  Well, did you learn or understand, their

6    motivation was to, to try to make it easier for them to

7    breach or come through the Backwater Bridge?

8          MR. STOLL:  Objection, lacks foundation.

9      A.  No.

10     Q.  Did you learn that on November 20 there was a

11   second burnt out truck on the Backwater Bridge that the

12   protesters were successful in removing?

13     A.  Yes.

14         MR. STOLL:  Objection.

15         MR. BAKKE:  Did you get her answer, Jesse?

16         THE STENOGRAPHER:  Nope.  What was the

17   answer?

18         MR. BAKKE:  She said yes, is --

19         THE STENOGRAPHER:  Okay.  Thank you.

20     A.  Yes.

21     Q.  And what did you learn about that, the removal

22   of, of one of the burnt out trucks by the protesters on

23   November 20?

24     A.  That they successfully moved it.

25     Q.  Okay.  Did you have an understanding of why the

1   protesters removed one of the two burnt out trucks from

2   the Backwater Bridge on November 20?

3           MR. STOLL:  Objection, vague.

4       A.  I don't know what the motivations were of the, of

5   whoever did that.

6       Q.  Was it your understanding that on November 20,

7   2016, that law enforcement was opposed to having the

8   burnt out trucks removed from the Backwater Bridge?

9           MR. STOLL:  Objection, lacks foundation.

10      A.  Not necessarily.

11      Q.  Well, when you say, "Not necessarily," is it your

12  testimony that you were unaware that law enforcement

13  wanted both of these burnt out trucks to stay on the

14  Backwater Bridge on November 20 and 21?

15          MR. STOLL:  Objection, lacks foundation.

16      A.  I wouldn't assume that law enforcement would want

17  burnt out trucks to remain on a roadway.

18      Q.  Okay.  So your, your assumption on November 20

19  and 21 was that law enforcement would be, perhaps in

20  favor of the protesters removing the burnt out trucks

21  from the Back-, Backwater Bridge?

22          MR. STOLL:  Objection, vague and misstates

23  prior testimony.

24      A.  I don't know what they were opposed or in favor

25  of.



1    Q.  The, the chains that were attached to the burnt

2    out truck that was there on November 21 when you were at

3    the Backwater Bridge, was it your understanding those

4    chains were put in place by law enforcement?

5              MR. STOLL:  Objection, lacks foundation.

6    A.  I don't know who put them there.

7    Q.  Did you understand the purpose of the chaining

8    between the truck and the barrier was to prevent its

9    removal from the Backwater Bridge?

10             MR. STOLL:  Objection, lacks foundation.

11   A.  I don't know why the chains were there.

12   Q.  In Exhibit 2, we can see the right-front of the

13   truck.  Do you see that there, the front bumper?

14   A.  Yes.

15   Q.  Okay.  And on the far left-hand side from the

16   view we're looking at, we can see the right-front bumper

17   of that truck.  Correct?

18   A.  The truck's right bumper?

19   Q.  Yes.

20   A.  Yes.

21   Q.  Can you tell me what the distance was between the

22   right-front pumper of that truck and the closest

23   concrete barrier?

24   A.  It likes like a few feet to me.

25   Q.  And then from the, the front of the truck, the



1 right-front to the left-rear or the back end of the

2 truck, can you tell me, approximately, how far that was?

3    A.  No.

4    Q.  Were you at this burnt out truck on November 21

5 prior to the incident?

6          MR. STOLL:  Objection, vague.

7    A.  I was next to it.

8    Q.  And when you say "next to it," tell, tell me what

9 you mean by that.

10    A.  I was near the front-left corner of the truck.

11    Q.  And so, just so we're clear here, left,

12 front-left would be the driver's side of the truck?

13    A.  Yes.

14    Q.  And that would be close to where, on this

15 photograph, we see the "NO DAPL" sign attached?

16    A.  Yep.  That's the corner.

17    Q.  Okay.  Okay.  And when you say you were near the

18 corner where the "NO DAPL" sign appears on the

19 photograph, does that mean you're right next to the "NO

20 DAPL" sign location?

21          MR. STOLL:  Objection, vague.

22    A.  That sign is on the front of the truck.

23    Q.  Correct.  And I, I'm trying to understand your,

24 your position when you say you were near the left-front

25 corner near the "NO DAPL" sign.  The, the handicap we



1 have here is, typically, in depositions, we'd physically

2 be in the same room, and I could have you draw it for

3 me, but because of having to do this by zoom, it's more

4 cumbersome to try, for me to understand where you were

5 at, so what I'm trying to understand is, in relation to

6 the "NO DAPL" sign on November 21, how close were you to

7 that sign?

8    A.  A few feet but not in front of the truck.

9    Q.  Okay.  So when you say "a few feet," were you

10 hugging the side, the driver's side of that vehicle, or

11 were you more straight out from the left-front bumper?

12            MR. STOLL:  Objection to form, vague.

13    A.  I was close to the corner.  I am not sure if I

14 was more out from the truck or hugging the driver's

15 side.

16    Q.  Okay.  But you were close enough that you could

17 touch the driver's side front of the burnt out truck?

18    A.  I think so.

19    Q.  I'm sorry?

20    A.  I think so.

21    Q.  Okay.  And how long were you in this location by

22 the left-front of the burnt out truck on November 21?

23    A.  That's where I was for a long time.

24    Q.  Okay.  And when you say "a long time," tell me

25 what a long time is?



1    A.  The same discussion we had before.

2    Q.  Well, was it five minutes, was it a half an hour,

3    was it an hour?

4    A.  I can estimate that I was near that corner for

5    half an hour to an hour and a half, approximately, but I

6    didn't stay in the exact same place the entire time,

7    necessarily.

8    Q.  Were you behind anything when you were at the

9    location by the "NO DAPL" sign by the truck?

10               MR. STOLL:  Objection, vague.

11   A.  Other than the truck?

12   Q.  Yes.

13   A.  There was at least one metal sheet.

14   Q.  And was that metal sheet being used as a shield?

15               MR. STOLL:  Objection to form.

16   A.  I don't know how people had been using it.

17   Q.  Well, was it being held by someone or more than

18   one person while you were near the "NO DAPL" sign by the

19   truck?

20   A.  I can't remember if anyone was holding it up or

21   not.

22   Q.  Well, was it something that was attached to the

23   ground or attached to the truck, or was it something

24   that had been physically carried that night by one or

25   more protesters to that location?



1            MR. STOLL:  Objection, calls for

2     speculation.

3        A.  I don't know how it got there, but it was propped

4     upright.

5        Q.  When you say "propped upright," by one or more

6     protesters?

7        A.  I can't remember if it was held by people or if

8     it was just propped up, freestanding.

9        Q.  And, and how, how big was this metal sheet?

10       A.  About the size of a typical door.

11       Q.  When you say "a typical door," you mean a, what's

12    sometimes referred to as a, a man door like you might

13    have in your, your home or in an office that you walk

14    through?

15       A.  I have never heard it referred to as a man door

16    but yes.

17       Q.  So if a door is roughly seven feet high, would

18    that be the size of this metal shield that was near the

19    left-front of the, of the truck on November 21?

20       A.  Approximately.

21       Q.  And was it roughly four feet wide?

22       A.  Approximately.

23       Q.  And did it have something on the bottom like a

24    stand or something that would allow it to stay

25    stationary on its own?



1   A.  Not that I remember.

2   Q.  And was it being used such that the, like a door

3   in the respect that the long end, the seven-foot end

4   would be from the ground up?

5   A.  Yes.

6   Q.  And the four-feet distance would have been the

7   sideways or a horizontal distance of the shield?

8   A.  Yes.

9   Q.  Okay.  And was this something that, while you

10  were at the left-front of the truck, you were hiding

11  behind this shield?

12          MR. STOLL:  Objection to form.

13  A.  When?

14  Q.  In that time period where you told me that you

15  were at the left-front of the burnt out truck for

16  between a half an hour to an hour and a half until

17  shortly prior to when the incident occurred.  Correct?

18          MR. STOLL:  Objection to form.

19  A.  I wouldn't call it hiding.

20  Q.  Were you behind the metal shield during that time

21  period, the half an hour to an hour and a half?

22          MR. STOLL:  Objection to form.

23  A.  I was behind it at some point.

24  Q.  Well, let's, let's take the time period, say,

25  within a, a minute or two of when the incident occurred.



1  Up until a minute or two before the incident occurred,

2  perhaps less than that, were you behind this metal

3  shield?

4            MR. STOLL:  Objection to form.

5     A.  I was behind it when I was shot in the upper arm.

6     Q.  Had, had you been in that location for that half

7  an hour to an hour and a half before you were shot in

8  the arm?

9     A.  I was near that spot, but I, I don't think I was

10  behind it the entire time.

11     Q.  Where else were you during that time period?

12     A.  A few feet south or west.

13     Q.  During that half an hour to an hour and a half

14  that you're behind the shield or a few feet south or

15  west, were there other protesters in that location?

16            MR. STOLL:  Objection to form.

17     A.  There were several people who came near me at

18  various points.

19            MS. WILANSKY:  Should we take lunch?

20            MR. STOLL:  Yeah.  We've been going about an

21  hour, Randy.

22     Q.  Let, let, let me finish, let, let me finish up

23  with my question here.

24     A.  Okay.

25     Q.  When you said there were several people who came



1  near me at various points when you were behind the

2  shield or in that area, do you know the names of any of

3  those individuals?

4          MR. STOLL:  Objection to form.

5     A.  I know that the last one was Stephen Joachinson.

6     Q.  Okay.  And so was there a time period that it was

7  just you and Ms. Joachinson behind the shield shortly

8  prior to when the incident occurred?

9          MR. STOLL:  Objection to form.

10    A.  Can you repeat the question.

11    Q.  Yes.  Was there a time shortly prior to the

12 incident where Mr. Joachinson and you were the only two

13 people behind the shield or in that general location?

14         MR. STOLL:  Objection to form.

15    A.  Shortly before the incident, we were the only

16 people near the metal sheet.

17    Q.  And, and how long were Mr. Joachinson and you the

18 only two people behind or near the metal sheet?

19         MR. STOLL:  Objection to form.

20    A.  He was there at least a few minutes.

21    Q.  Okay.  When you say at least, "at least a few

22 minutes," can you give me a better estimate than that?

23 Was it five minutes, was it ten minutes, was it

24 15 minutes that just Mr. Joachinson and you were behind

25 the metal sheet?



1          MR. STOLL:  Objection to form.

2     A.  I don't know how many minutes.  It didn't feel

3    like a very long time.

4     Q.  And, and before you got to the Bridge on November

5    21 and spent that time, the half an hour to an hour and

6    a half behind or in the area of the, the metal shield,

7    was that metal shield there on November 20 at any point

8    in time while you were on the Backwater Bridge?

9          MR. STOLL:  Objection to form and calls for

10   speculation.

11    A.  I don't know.

12    Q.  Okay.  You never saw the metal sheet there on the

13   front of the, left-front of the burnt out truck on

14   November 20, 2016.  Did you?

15    A.  I don't remember, specifically.

16    Q.  Do you know who brought or put the metal sheet on

17   of left-front of the burnt out truck on November 21?

18    A.  No.

19    Q.  Okay.

20          MR. BAKKE:  We can go off the record.

21          THE VIDEOGRAPHER:  We are off the record at

22   1:27 p.m.

23          (Recess taken at 1:27 p.m.)

24          THE VIDEOGRAPHER:  We are back on the record

25   at 2:17 p.m.



1      Q.  Okay.  Ms. Wilansky, before we broke for lunch,

2   we were talking about the Deposition Exhibit 2, which is

3   the burnt out truck and to the south of the barrier, and

4   that metal sheet you described, can, can you tell me

5   what that metal material was that it was made out of?

6      A.  No.

7      Q.  Okay.  I mean, do you know what corrugated tin is

8   or corrugated metal that's kind of wavy, like you might

9   see on a silo or a farm structure or ranch structure?

10     A.  Vaguely.

11     Q.  Okay.  I mean, was this a, a, a metal sheet that

12  was flat?

13     A.  As opposed to corrugated?

14     Q.  Sure.  Or bent or curved or...

15     A.  I think it may have been corrugated.

16     Q.  Okay.  And was it, what you're calling the, the

17  metal sheet, was it all metal, was it attached to

18  plywood, was there any wood portion of it?

19     A.  I don't think so.

20     Q.  Was there a tarp or something over it or covering

21  part of it?

22     A.  I think so.

23     Q.  Okay.  And, and what do you recall about the tarp

24  or the material covering all or part of the metal sheet?

25     A.  I don't remember specifically.  I think it was a



1 normal tarp.

2     Q.  Okay.  Like out of some sort of a plastic

3 material or was it cloth?

4     A.  Plastic, I think.

5     Q.  Was it blue in color?

6     A.  Probably.

7     Q.  Okay.  And was the blue-in-color side of the

8 metal sheet the side that was facing law enforcement?

9     A.  You mean the tarp?

10     Q.  Yes.

11     A.  I think the tarp was on the side of the metal

12 sheet that was closer to the truck and further from me.

13     Q.  Well, what I'm asking is, you told me that that

14 metal sheet was being held up, or was up and down with

15 one side facing towards law enforcement.  Correct?

16     A.  Well, I don't know that law enforcement were all

17 gathered in one place.

18     Q.  Right.  But you were behind that metal sheet at

19 times.  Correct?

20          MR. STOLL:  Objection to form.

21     A.  That depends on your perspective.

22     Q.  Well, from your perspective, you were behind it,

23 correct, at times in that half an hour to an hour and a

24 half prior to the incident?

25          MR. STOLL:  Objection to form.



1    A.  It was between me and the barrier.

2    Q.  Okay.  And was the blue tarp covering both sides

3  of the metal sheet or just one side?

4    A.  I'm not a hundred percent sure.

5    Q.  Okay.  Was the blue tarp covering the entire

6  metal sheet or just part of it?

7    A.  I'm not sure.

8    Q.  Were there handles on the metal sheet on the side

9  you were on that would allow someone to hold it up?

10   A.  I don't remember.

11   Q.  Was the metal sheet, during the half an hour to

12  an hour and a half you were either behind it or near it,

13  flush to the ground?

14        MR. STOLL:  Objection to form.

15   A.  Flush like the bottom of it --

16   Q.  Right.

17   A.  -- on the ground?

18   Q.  Or were you, or were you or another protester

19  holding it up in the air?

20   A.  I believe it was flush with the ground.

21   Q.  Were you trying, at times in that half an hour to

22  an hour and a half that you were at or near the metal

23  shield, trying to conceal yourself?

24        MR. STOLL:  Objection to form.

25   A.  I wouldn't characterize it as concealing.



1    Q.  Okay.  Were you trying to hide from law

2    enforcement so they could not see you behind the metal

3    sheet?

4    A.  It wasn't my intention to hide.

5    Q.  During that half an hour to an hour and a half

6    you're behind our near the metal sheet at the left-front

7    of the burnt out truck, did you have any conversations

8    with anyone on the law enforcement side of the

9    barricade?

10   A.  No.

11   Q.  Did any of the other protesters, during that time

12   period, the half an hour to an hour and a half you were

13   at the left-front of the burnt out truck, have any

14   conversations that you overheard with law enforcement?

15   A.  I don't remember.

16   Q.  You don't recall any conversations between

17   protesters and law enforcement while you were at the

18   left-front of the burnt out truck; is that correct?

19   A.  That's correct.

20   Q.  Why were you there at the left-front of the burnt

21   out truck for a half an hour to an hour and a half?

22   A.  I was there to be present and maintain a sort of

23   vigil until more people arrived when it was light out.

24   Q.  Well, was there some concern that, if you weren't

25   present, that something was going to happen?



1          MR. STOLL:  Objection, vague.

2     A.  I don't know.

3     Q.  What were you doing in the half an hour to the

4  hour and a half that you were at the left, left-front of

5  the burnt out truck?

6     A.  Most of the time, I was just standing there

7  maintaining the vigil.

8     Q.  Maintaining the what?

9     A.  The vigil, just being present.

10    Q.  Okay.  What was the purpose of your being present

11  in that location, why that spot?

12    A.  There were already people in that spot who left

13  and I took their place.

14    Q.  Well, if you wanted to be present for the protest

15  activities the next morning when it got light out, there

16  were one or more campfires on the south side of the

17  bridge at that time during the night.  Correct?

18          MR. STOLL:  Objection to form.

19    A.  I don't remember if there were still campfires on

20  the south side.

21    Q.  What was Mr. Joachinson doing while you were

22  present at the burnt out truck for a half an hour to an

23  hour and a half?

24    A.  Well, I don't know what he was doing for the

25  entire duration of that time period other than when he



1   was near me.

2       Q.  Can you see, on the screen now, Deposition

3   Exhibit 13?

4   (Defendant's Exhibit #13 was marked for identification.)

5       A.  Yes.

6       Q.  Okay.  And do you recognize that as Mr.

7   Joachinson?

8       A.  I can't usually recognize people unless I have

9   met them several times.

10      Q.  So you're not sure?

11      A.  Correct.

12      Q.  What discussions, if any, did you have with Mr.

13  Joachinson when you were at the left-front of the burnt

14  out truck from a half hour to an hour and a half?

15      A.  I don't remember exactly but I believe we were

16  generally discussing the events of November 20th.

17      Q.  Tell me what you recall discussing with Mr.

18  Joachinson?

19      A.  Well, because we were standing near the truck, we

20  talked about how people had moved the other truck and

21  tried to move the one that was still there.

22      Q.  Anything else you can recall talking to Mr.

23  Joachinson about other than the events of November 20?

24      A.  No.

25      Q.  If we take the time period you're at the



1  left-front of the truck, between a half an hour and hour

2  and a half, were there any other protesters in that

3  location during any part of that time?

4     A.  There had been several people who came up and

5  went back to the fires.

6     Q.  When, when you say "several," how many is

7  "several"?

8     A.  I don't know.

9     Q.  Well, is it, is it two people, is it ten people,

10 is it a hundred people?

11    A.  At least two people.

12    Q.  Can you tell me what the maximum number of people

13 in that hour and a half prior to the incident were in

14 the location of the burnt out truck?

15    A.  There probably weren't more than ten people in

16 that entire time period.

17    Q.  And did they come in and leave intermittently so

18 it wasn't ten people all at once?

19    A.  Yes.

20    Q.  And for what time period prior to the incident

21 was it just Mr. Joachinson and you that were in the

22 location of the left-front by the metal sheet?

23    A.  A few minutes.

24    Q.  When you say "a few minutes," is that five

25 minutes, is it ten minutes or is that twenty minutes?



1    A.  I don't remember but I would say on the shorter

2  end.

3    Q.  So do you think it was five minutes that it was

4  just Mr. Joachinson and you there behind the metal sheet

5  there in that location?

6    A.  I don't know.

7    Q.  Did, did Mr. Joachinson or you, at any point in

8  time, move further towards the barricade than being

9  behind the metal sheet?

10    A.  Can you repeat the question.

11    Q.  Yes.  During the time period Mr. Joachinson and

12  you are at the left-front of the, the burnt out truck,

13  did you ever get any closer, or did Mr. Joachinson get

14  any closer than that metal shield?

15           MR. STOLL:  Objection to form.

16    A.  Not that I saw.

17    Q.  The, the up to or, or the not more than ten

18  people that were on the bridge in the hour and a half

19  before your incident occurred, were those people also in

20  the vicinity of the burnt out truck?

21    A.  Yes, generally.

22    Q.  And, and were they all behind the burnt out

23  truck, these up to ten other people in the hour and a

24  half before the incident?

25           MR. STOLL:  Objection to form.



1    A.  I wouldn't say behind.

2    Q.  Okay.  What would you say; where were they?

3    A.  I vaguely remember people standing more towards

4  the center of the bridge, like west of the truck.

5    Q.  Okay.  So behind the truck to the south?

6         MR. STOLL:  Objection to form.

7    A.  Not necessarily to the south.

8    Q.  Okay.  So where do you remember other protesters

9  being located in relation to the truck in the hour and a

10  half before the incident?

11   A.  Relatively close to the corner, maybe a little to

12  the left of the truck.

13   Q.  So when you say the corner of the truck, which

14  corner?

15   A.  The front driver side corner.

16   Q.  Okay.  And so were those people, if we look at

17  Deposition Exhibit 2, showing the burnt out truck, are

18  you saying that that, at some point in the hour and a

19  half before the incident, there were people, as we look

20  at the photograph, positioned on the right where we see

21  the road surface of the bridge?

22   A.  Yes.

23   Q.  Okay.  And how, when was the last time there were

24  any people there, prior to the incident, in that

25  location?



1     A.  I think Stephen Joachinson might have been in
2   that area at the time of the incident.
3     Q.  Anybody else that you recall being in that area
4   at any time in that hour and a half before the incident?
5     A.  I remember there being at least a couple of times
6   that one or two people came up to that area.
7     Q.  Okay.  And when was the last time before the
8   incident where you recall one or two people coming up to
9   the area to the west of the burnt out truck?
10    A.  Other than Stephen Joachinson?
11    Q.  Correct.
12    A.  I don't remember specifically.
13    Q.  Was there somebody underneath the burnt out truck
14  while you were at the left-front of the truck during
15  that half an hour to an hour and a half?
16    A.  No.
17          MR. STOLL:  That, that cut out for a second.
18  Can you repeat that question for me.
19          MR. BAKKE:  Did, did you get her answer,
20  Jesse?
21          MS. WILANSKY:  Jesse, you're on mute.
22          THE STENOGRAPHER:  Sorry.  I got her saying,
23  as saying, "No."  Is that correct?
24          MR. STOLL:  Well, I just, can I hear the
25  question again?



1           THE STENOGRAPHER:  Sure.

2           (The requested portion of the record was

3   read by the reporter.)

4       Q.  And your testimony is, Ms. Wilansky, during that

5   entire time, there was no one underneath the truck?

6       A.  Correct.

7       Q.  You were never under the truck?

8       A.  I was never under the truck.

9       Q.  Was Mr. Joachinson ever under the truck?

10      A.  No.

11      Q.  Did, did you attempt to do anything to try to

12  remove the chains or chain that was attaching, attached

13  to the truck with the barrier?

14      A.  No.

15      Q.  Did Mr. Joachinson try to do that?

16      A.  No.

17      Q.  Did you see anyone trying to remove or detach the

18  chain or chains underneath the truck while you were near

19  the truck on November 21?

20      A.  No.

21      Q.  If law enforcement, various law enforcement

22  witnesses testify that they observed one or more people

23  underneath the truck in that time period prior to the

24  explosion occurring, are they wrong?

25          MR. STOLL:  Objection to form.



1    A.  Yes.

2    Q.  And if they heard someone behind the shield, the

3  metal shield working on the chains and could hear the,

4  the sound of chains being manipulated under the truck or

5  on the truck, are they wrong about that?

6              MR. STOLL:  Objection, vague, lacks

7  foundation.

8    A.  Yes.

9    Q.  I, I want to talk to you about less-lethal

10  munitions, and you identified, before, less-lethal

11  munitions that you are familiar with.  Correct?

12    A.  Yes.

13    Q.  And prior to the DAPL protests, had you ever been

14  at an event where less-lethal munitions were used?

15    A.  No.

16    Q.  Prior to the DAPL protest, did you have any

17  training with less-lethal munitions?

18              MR. STOLL:  Objection, outside of the scope

19  of the deposition.  I'm going to instruct the witness

20  not to answer that.

21              MR. BAKKE:  Well, this goes to the very

22  heart of the issues that Judge Traynor has identified,

23  which, Issue No. 1, "Whether Defendant, Officer Doe used

24  an explosive less-lethal munition at the time and place

25  of Ms. Wilansky's injury."  Obviously, her knowledge



1  base, experience, expertise, if any, in less-lethal

2  munitions goes directly to the heart of that issue.  Is

3  that your position, I can't ask her about less-lethal

4  munitions and whether it was an explosive less-lethal

5  munition?

6            MR. STOLL:  Generally, I object to you

7  asking her about her prior experiences prior to the

8  protest, but if what you're getting at is her

9  credibility as somebody who can judge less-lethal

10  munitions, I, I take your point, and I, I, I will let

11  her answer the question.

12            MR. BAKKE:  Okay.

13    Q.  So in relation to less-lethal munitions, prior to

14  the incident, did you have any training with less-lethal

15  munitions?

16    A.  No.

17    Q.  You don't hold yourself out as an expert on

18  less-lethal munitions.  Do you?

19    A.  No.

20    Q.  You'd never gone to any training course on

21  less-lethal munitions.  Correct?

22    A.  Correct.

23    Q.  Prior to the incident, did you research

24  less-lethal munitions?

25    A.  I've read about them.



1    Q.  Well, did you read about them before the incident

2    where you were injured in North Dakota?

3    A.  Yes.

4    Q.  Okay.  And, and tell me about that.

5    A.  I have, I've read a lot of things that describe

6    police's use of less-lethal munitions.

7    Q.  Well, my, my question, though, is did you do it

8    before your incident on November 21, 2016, or has it

9    been since your injury?

10   A.  Both.

11   Q.  And so what research had you done on less-lethal

12   munitions prior to the incident on November 21, 2016?

13   A.  I had read several zines.

14   Q.  Several memes?

15   A.  Zines.

16   Q.  Spell that for me.

17   A.  Z-i-n-e-s.

18   Q.  And what are zines?

19   A.  Pamphlets, essentially.

20   Q.  Published by who?

21   A.  I don't know.

22   Q.  Do you know whether the zines you're referring to

23   were published by the manufacturer of the less-lethal

24   munitions?

25   A.  I would imagine they were not.



1    Q.  And I, I've just looked up zines on the internet,

2    not that that's necessarily, totally reliable, but,

3    according to Wikipedia, it says it's "a

4    small-circulation self-published work of original or

5    appropriated texts and images."  Is that your

6    understanding of what a zine is?

7                MR. STOLL:  I'm going to object to the form

8    of that question.

9    A.  Can you repeat the question.

10   Q.  I'll, I'll move on to something else.  Prior to

11   the incident, had you ever reviewed any product

12   information from any product manufacturers of

13   less-lethal munitions?

14   A.  No.

15   Q.  What is it you're claiming caused your injury,

16   what type of less-lethal munition, if you know?

17   A.  I don't know, specifically.

18   Q.  Do you know whether or not -- or strike that.

19   Can you tell me whether there's more than one

20   possibility of less-lethal munition that you're claiming

21   caused your injury?

22                MR. STOLL:  Objection, lacks foundation,

23   calls for speculation.

24   A.  It depends how specific you're getting.

25   Q.  Well, I, I'm asking you if, if you know.  Is it,



1  is it a, is it a distraction device, is it the Blast CS

2  Grenade, is it a rubber bullet?

3           MR. STOLL:  Objection to form, lacks

4  foundation.

5     A.  It was a munition that exploded.

6     Q.  You don't know what type?

7     A.  Not specifically.

8     Q.  Has anybody told you, and I'm excluding your

9  attorneys, has anybody told you that it was a

10  less-lethal munition that caused your injury?

11     A.  Nobody would have to tell me because I already

12  knew.

13     Q.  Okay.  So I, that seems to contradict what you

14  just told me.  So what did you already know was the

15  specific less-lethal munition that caused your injury?

16           MR. STOLL:  Objection to the statement

17  before that question.

18     A.  I'm not saying that I knew specifically which

19  type.

20     Q.  Okay.  And so that, my question that I asked,

21  then, other than your attorneys, has anybody told you

22  what specific type of munition it was, if it was a

23  munition, that caused your injury?

24     A.  Not specifically.

25     Q.  No, no medical doctor has told you that?



1    A.  Not with complete specificity.

2    Q.  Well, has, has any medical doctor told you that

3  your injury was caused by a less-lethal munition of some

4  type?

5    A.  I don't remember.

6    Q.  Has any expert, and I'm setting aside medical

7  doctors, has anyone who professes to be an expert on

8  less-lethal munitions or injuries caused by less-lethal

9  munitions ever told you that your injury was caused by a

10  less-lethal munition?

11    A.  No.  I don't think that somebody would make such

12  a certain statement without physical evidence.

13    Q.  I'm, I'm going to show you, from your complaint

14  in this lawsuit, Paragraph 109.  Do you see that on the

15  screen in front of you?

16    A.  Yes.

17    Q.  And paragraph 109 says, "Upon information and

18  belief, the explosive less-lethal munition was a

19  flash-bang.  Upon information and belief, the flash-bang

20  was a defense technology low roll non-reloadable

21  distraction device."  Do you believe that to be an

22  accurate statement?

23         MR. STOLL:  Objection to form.

24    A.  Yes.

25    Q.  Okay.  And where does that information come from?



1          MR. STOLL:  I'm going to object.  Sophia,

2  you can only answer that to the extent it doesn't reveal

3  attorney-client communications.  Okay?

4    A.  I can speak to the first sentence.

5    Q.  Go ahead.

6    A.  A flash-bang means that it exploded with light

7  and sound, and that's a bit of an umbrella term.

8    Q.  Okay.  And when you say "A flash-bang means it

9  exploded with light and sound," where does that

10  information come from, setting aside your attorneys?

11          MR. STOLL:  Objection, vague.  Do you mean,

12  how does she understand that term, or how does she know

13  that it exploded with light and sound?

14          MR. BAKKE:  Either one, the question speaks

15  for itself.

16          MR. STOLL:  Jesse, can, can you read back

17  the question for me.

18          (The requested portion of the record was

19  read by the reporter.)

20          MR. BAKKE:  Actually, Jesse, the word was

21  "with light and sound," not without.

22          THE STENOGRAPHER:  Oh, I'm sorry.

23          MR. BAKKE:  Maybe I should rephrase it.

24    Q.  Where does your information come from that a

25  flash-bang explodes with light and sound?



1        MR. STOLL:  And, again, Sophia, just make

2   sure you don't reveal any attorney-client communications

3   in your answer.

4        A.  I would say that that was common knowledge.

5        Q.  I, I want to turn to the timeframe, and let,

6   let's back up to five minutes before the explosion

7   occurs.  Tell me what you recall happening when you are

8   at or near the metal sheet at the left-front of the

9   burnt out truck from that point until when the explosion

10  occurs.

11       A.  Five minutes.

12       Q.  Yes.

13       A.  I'm not sure if Stephen Joachinson was already

14  there five minutes before.  I was just standing in that

15  area, and when Stephen Joachinson got there, we were

16  talking.  Then, at some point, the police started to

17  make announcements over the LRAD, and they started

18  shooting at us.  They weren't able to hit me at first

19  but they shot Stephen Joachinson.  A little bit later,

20  they shot me in the upper arm, which really hurt, and I

21  couldn't handle the pain of being shot in the upper arm,

22  so I shouted, I'm leaving, please don't shoot me, and I

23  began retreating to the south side of the bridge.  I

24  passed a pile of plywood and bin lids, and I reached

25  towards the pile.  Just as I started reaching, I was hit



1  in the left forearm with something that exploded on

2  contact, and I believe that takes us to the incident.

3      Q.  Okay.  So let me follow up.  You said you were

4  talking with Mr. Joachinson, and, at some point, the

5  police started to make announcements over what you call

6  the LRAD.  Correct?

7      A.  Yes.

8      Q.  Okay.  And is the LRAD a very loud audio system

9  that can transmit voices at very high decibels so they

10 can be heard for a long distance?

11     A.  Yes.

12     Q.  And you knew that from being on the bridge and in

13 the area of the Backwater Bridge on November 20.

14 Correct?

15     A.  I think I already knew what an LRAD was.

16     Q.  Right.  But had you heard it in use before you

17 heard it prior to the incident?

18     A.  I believe so.

19     Q.  And, and there had been a number of times when

20 law enforcement, on November 20, used the LRAD to

21 provide warnings and requests to the protesters.

22 Correct?

23          MR. STOLL:  Objection to form.

24     A.  On November 20th, I wasn't really focussed on the

25 sound from the LRAD.



1    Q.  Was the LRAD in use on November 20?

2              MR. STOLL:  Objection, calls for

3    speculation.

4    A.  I believe so.

5    Q.  Okay.  And, and it was your understanding the

6    LRAD was used by law enforcement to provide warnings to

7    the protesters.  Correct?

8              MR. STOLL:  Objection to form.

9    A.  Not necessarily.

10   Q.  Well, what, what type of explanation -- well,

11   let, let me explore that answer first.  When you say

12   "not necessarily," you agree law enforcement, prior to

13   your incident on November 21, used the LRAD system to

14   provide some warnings to the protesters.  Correct?

15             MR. STOLL:  Objection to form.

16   A.  No.

17   Q.  So is it your testimony you never heard any

18   warnings to the protesters from law enforcement from the

19   LRAD on November 20 or prior to the incident?

20             MR. STOLL:  Objection, mischaracterizes

21   prior testimony.

22   A.  I don't specifically remember hearing something I

23   would characterize as a warning.

24   Q.  Well, what do you recall hearing from the LRAD

25   system prior to the incident on November 20?



1    A.  I don't remember, specifically, what the

2    announcements were.

3    Q.  So then let's turn to when you're at the, the

4    metal sheet with Mr. Joachinson, and there's

5    announcements being made over the LRAD by law

6    enforcement, what were they saying?

7    A.  I believe the gist of it was, get out from under

8    the truck.

9    Q.  Okay.  And did you say anything in response?

10   A.  I don't remember.

11   Q.  Did Mr. Joachinson say anything in response to

12   law enforcement saying, over the LRAD, get out from

13   under the truck?

14   A.  I believe so.

15   Q.  And do you recall what he said?

16   A.  I think the gist of it was, there's nobody under

17   the truck.

18   Q.  Okay.  Is there anything else that, that, that

19   law enforcement said over the LRAD before any shooting

20   occurred?

21   A.  I don't remember and I'm not even sure the, the

22   first announcement was before any shooting occurred.

23   Q.  Did, did you understand that the, what the police

24   were saying on the LRAD was directed towards Mr.

25   Joachinson and you?



1    A.  No.

2    Q.  Okay.  Was there anybody else by the burnt out

3  truck at, on the Backwater Bridge at the time law

4  enforcement gave the announcement over the LRAD which

5  you heard?

6    A.  No.

7    Q.  Okay.  So you can't tell me how long it was

8  between the announcement over the LRAD and when any

9  shots of less-lethal munitions were taken by law

10  enforcement?

11        MR. STOLL:  Objection to the form.  I think

12  she just said that she didn't know what order they even

13  happened in.

14    A.  Yeah.  I'm not sure what order.

15    Q.  Okay.  So you don't know whether the warning were

16  directed by law enforcement to, get out from under the

17  truck, happened before or after any less-lethal

18  munitions were fired?

19    A.  Right.

20    Q.  You said, "They were not able to hit me at

21  first."  Were you concealed behind the shield, the metal

22  shield at that point?

23        MR. STOLL:  Objection to form.

24    A.  I wouldn't say I was concealed behind the metal

25  sheet.



1    Q.  Were you out in the open, behind nothing?

2            MR. STOLL:  Objection to form.

3    A.  From whose perspective?

4    Q.  From the perspective, your perspective, looking

5    towards the barricade, were you out to the west away

6    from the metal sheet?

7    A.  I was not out to the west away from the sheet.

8    Q.  So when you say they were not able to hit you at

9    first, was there something that told you they were

10   trying to shoot you with some less-lethal munitions?

11   A.  There were munitions hitting the metal sheet.

12   Q.  That was in front of you at the time?

13   A.  Yes.

14   Q.  And how long were the munitions hitting the metal

15   sheet in front of you before you were hit with an impact

16   munition on your upper-left arm?

17   A.  I don't know how long it was.

18   Q.  Can you tell me how many times any munitions hit

19   the metal sheet before you were struck?

20   A.  No.

21   Q.  The munitions that were hitting the metal sheet,

22   did that have any sound to it in terms of a explosive

23   sound, or, or, or did it sound like what you thought was

24   rubber bullets or bean bag rounds hitting the metal

25   sheet?



1    A.  The latter.

2    Q.  So it sounded what, like what you thought was

3  either a rubber bullet or a bean bag round?

4    A.  Yes.

5    Q.  Do you have any estimate of how many of these

6  bean bag rounds or rubber bullets hit the metal sheet in

7  front of you?

8    A.  No.

9    Q.  Do you have any time estimate of how long it was

10 that these rubber bullets or bean bag rounds were

11 hitting the metal sheet in front of you before you were

12 struck?

13   A.  Well, it was less than five minutes.

14   Q.  Can you be any more precise than that?

15   A.  No.

16   Q.  And when these, what you thought were bean bag

17 rounds or rubber bullets were hitting the metal sheet,

18 were there any explosive-type sound?

19   A.  Not against the sheet.

20   Q.  Was there any flashes of, of light or sound of

21 the munitions that were striking the metal sheet in

22 front of you?

23   A.  No.  But there were at least one or two to the

24 west.

25   Q.  One or two what to the west?



1    A.  Explosive munitions.

2    Q.  During the time period you were behind the metal

3   seat and there's rubber bullets or bean bag rounds

4   hitting it?

5    A.  Yes.

6    Q.  And did you see what the source of those

7   explosive sounds was?

8    A.  I couldn't see whoever was throwing or firing

9   them.

10   Q.  Well, these explosive sounds, the one or two to

11  the west, do you know how far away those explosive

12  sounds were from you?

13   A.  A few feet.

14   Q.  A few feet to the west of where you were standing

15  behind the metal sheet at the time?

16        MR. STOLL:  Objection to form.

17   A.  They were a few feet west of where I was

18  standing.

19   Q.  So close to you on the bridge?

20   A.  Yes.

21   Q.  Did you look over to see what it was that was

22  causing the explosive sound?

23   A.  I don't remember looking at the munitions after

24  they exploded.

25   Q.  Well, when you say "exploded," what, what do you



1  mean by the term "exploded"?

2      A.  There was light and, and explosive sound.

3      Q.  Okay.  You're not saying, and don't mean to

4  suggest by using the word "exploded," that whatever the

5  device was broke apart into pieces such as might occur

6  with an explosion.  Are you?

7           MR. STOLL:  Objection to form, calls for

8  speculation.

9      A.  I didn't see if there were pieces afterwards.

10     Q.  Or while it was exploding or making the light and

11  sound?

12     A.  I don't remember.

13     Q.  Did you hear anything suggesting that the devices

14  to your west had exploded into pieces such as debris

15  flying through the air?

16           MR. STOLL:  Objection to form.

17     A.  I didn't get hit with or see any debris as far as

18  I can remember.

19     Q.  And this one or two to the west of you a few

20  feet, do you know what type of less-lethal munition that

21  was?

22     A.  Not specifically.

23     Q.  At the point that you were hit with what you

24  believed to be a rubber bullet, did you say it was a

25  rubber bullet or a bean bag round you think you hit, you



1   got hit in your upper-left arm?

2       A.  I didn't say.

3       Q.  Well, I think you did earlier today, and I just

4   don't want to misstate it.  Was, was it one of those

5   two?  Is that your belief, that you either got hit in

6   your upper-left arm by a rubber bullet or a bean bag

7   round?

8       A.  Or some other similar type of impact munition.

9       Q.  And were you still behind the metal sheet at the

10  time you were struck with the impact munition?

11          MR. STOLL:  Objection to form.

12      A.  From who's perspective?

13      Q.  From your perspective.

14          MR. STOLL:  Objection to form.

15      A.  I was still standing next to the metal sheet with

16  the sheet between me and the barrier.  Can we take a

17  break?

18      Q.  We're kind of right in the middle of a question

19  area --

20          MR. STOLL:  Randy, just, just a five minute

21  break.  I need to go to the bathroom anyway.

22          MS. WILANSKY:  Me too.

23          MR. STOLL:  Let's go off the record.

24          THE VIDEOGRAPHER:  We are off the record at

25  3:22 p.m.



1           (Recess taken at 3:22 p.m.)

2           THE VIDEOGRAPHER:  We are back on the record

3    at 3:30 p.m.

4      Q.  Okay.  Ms. Wilansky, you had described what you

5    indicated was a explosive light and sound to the west of

6    you, one or two, while you were still at the metal sheet

7    by the burnt out pickup truck.  Correct?

8      A.  Yes.

9      Q.  Okay.  And do you know, from that metal sound,

10   from that sound and light, whether there was any flames

11   from that device?

12     A.  I don't believe there were any flames.

13     Q.  Do you recall the smell of any burning from that

14   device?

15     A.  No.

16     Q.  Do you recall any smoke from that device to your

17   west?

18     A.  No.

19     Q.  How long after you saw the one or two light and

20   sound devices to your west was it before you were hit in

21   your upper arm with the impact munition?

22     A.  About a minute.

23     Q.  And then it was after the impact munition hit you

24   in the arm that you then decided you were going to leave

25   the bridge; is that correct?



1     A.  Yes.

2           MR. STOLL:  Objection.  Sorry.  Go ahead,

3     Sophia -- (inaudible) --

4           THE STENOGRAPHER:  Was that an objection?

5     A.  Yes.

6           MR. STOLL:  That was an objection, yeah.

7           THE STENOGRAPHER:  Okay.  Thank you.

8     Q.  So from the time that the impact munitions

9     against the metal sheet started to when you were struck

10    in the left arm and decided to leave the bridge, how

11    many minutes was that?

12          MR. STOLL:  Objection to form.

13    A.  A couple of minutes.

14    Q.  Okay.  And during that time period when the

15    impact, impact munitions are hitting the metal sheets in

16    front of you and when you are struck in the left arm

17    with the impact munition, did you say anything to law

18    enforcement?

19    A.  Can you repeat the question?

20    Q.  Yes.  From when the impact munitions started to

21    hit the metal sheet you had in front of you to when you

22    were struck in the left-upper arm with the impact

23    munition, did you say anything during that two-minute or

24    longer time period to the law enforcement?

25    A.  I don't remember.



1    Q.  Do you remember saying anything to law

2   enforcement during that two-minute-plus time period?

3    A.  No.

4    Q.  When you were struck in the left-upper arm, other

5   than you said it hurt a lot, did it do anything to you

6   if terms of moving you, causing you to fall over, affect

7   your balance?

8    A.  Not that I can remember.

9    Q.  And, at that point, you decide you're going to

10   leave the bridge?

11          MR. STOLL:  Objection to form.

12   Q.  Correct?  After you got shot in the left-upper

13   arm with the impact munition.  Correct?

14   A.  That's when I felt I had to get off the bridge as

15   quickly as possible.

16   Q.  And, and where was Mr. Joachinson at the time you

17   were struck with the impact munition in your upper-left

18   arm?

19   A.  He was very close to me.

20   Q.  Was he on your right, was he on your left, was he

21   behind you?

22   A.  I don't remember.

23   Q.  When you say "very close to me," does that mean

24   you're brushing up against each other or you're several

25   feet away, if you remember?



1    A.  I don't remember if we were touching or not but

2  close enough to be touching.

3    Q.  And you don't know whether he was to your left,

4  he was to your right or whether he was behind you?

5    A.  No.

6    Q.  Was he behind the metal sheet as well as you?

7         MR. STOLL:  Objection to form.

8         MR. BAKKE:  Well, that's a poor question.

9    Q.  Was Mr. Joachinson behind the metal sheet at the

10  same time you were when the impact munitions were

11  hitting the metal sheet?

12         MR. STOLL:  Unfortunately, still objection

13  to form.

14    A.  Maybe partially.

15    Q.  Do you remember either way?

16    A.  I believe he was further from the sheet at first

17  and then was shot several times and got closer to the

18  sheet.

19    Q.  And did you see Mr. Joachinson get shot?

20    A.  I don't remember.

21    Q.  Other than the one or two light and sound you

22  heard to your west, prior to getting hit in the

23  upper-left, left-upper arm with the impact munition, did

24  you hear any other sounds that you thought might be

25  explosions before that?



1    A.  Sorry.  What's the time period?

2    Q.  At, at any point when you were at the burnt out

3  truck for the half an hour to an hour and a half, until

4  the impact munitions start hitting the metal shield, did

5  you hear or see any light or sound devices or

6  explosions?

7    A.  No.

8    Q.  So the first time there were any light or sound

9  or what you're calling explosions were the one or two to

10  the west of you after law enforcement had already

11  started to use the impact munitions that were hitting

12  the metal sheet in front of you?

13    A.  Not including the one that hit me, shortly after,

14  yes.

15    Q.  And am I correct in understanding that the one or

16  two light and sound explosions you heard to your west

17  would have been sometime after law enforcement said,

18  over the LRAD, get out from underneath the truck?

19    A.  Yes.

20    Q.  Okay.  How much longer was it after law

21  enforcement said, get out from underneath the truck,

22  when you first heard what you've described as an

23  explosion to the west of you on the bridge?

24    A.  I don't know exactly.

25    Q.  But there was some time period when, from,



1   between when law enforcement said get off the bridge and

2   when that first explosion to the west of you occurred?

3       A.  I don't remember if they said get off the bridge.

4       Q.  Okay.  From when you heard law enforcement say,

5   get out from underneath the truck, it was some time

6   period after that before you saw one or two explosions

7   to your west?

8       A.  Yes.

9       Q.  How long of a time period that was, you don't

10  recall?

11      A.  Within the window of minutes.

12      Q.  Okay.

13      A.  Not more specifically.

14      Q.  Okay.  And then, after you're hit in the

15  left-upper arm with the impact munition, you indicated

16  you decided to leave the bridge and said to law

17  enforcement, "I'm leaving.  Please don't shoot."  Is

18  that what you said?

19              MR. STOLL:  Objection to form.

20      A.  Can you repeat the question.

21      Q.  Yeah.  After you were hit in the left-upper arm,

22  you indicated that you said, "I'm leaving.  Please don't

23  shoot."  Is that what you said?

24      A.  Yes.

25      Q.  At that point, were you still behind the metal



1  sheet?

2          MR. STOLL:  Objection to form.

3      A.  From whose perspective?

4      Q.  Well, the metal sheet would be in from front of

5  you, so it would have to be from your perspective.

6          MR. STOLL:  Objection, vague.

7      A.  I was near the sheet.  I couldn't have been

8  behind the sheet from the perspective of the person who

9  shot me because they had a line of sight.

10     Q.  I'm not asking you about somebody else's

11 perspective.  I'm asking you because I think you said

12 that, that when you got shot in the left-upper arm that

13 you were behind the metal sheet.  Correct?

14         MR. STOLL:  Objection, mischaracterizes her

15 prior testimony.

16     A.  I was still next to the sheet, with the sheet

17 between me and the barrier.

18     Q.  Okay.  Which would mean, if you're facing towards

19 the metal sheet, you're facing to the north, correct, on

20 the bridge?

21     A.  Roughly, to the north.

22     Q.  Okay.  Which would mean whoever shot you in the

23 upper-left arm would have had to be to the west of you

24 some distance away in order to be able to see part of

25 your body.  Correct?



1    A.  Yes.

2    Q.  Okay.  And, makes sense that you were hit in your

3  up left, upper-left arm because the only way that would

4  be possible is if the person who shot the less-lethal

5  munition was to your left to the west.  Correct?

6    A.  Yes.

7    Q.  Okay.  And so when you said, "I'm leaving.

8  Please don't shoot," are you still in your same position

9  behind the metal sheet?

10         MR. STOLL:  Objection to form.

11    A.  I believe I was already moving south as I was

12  saying that.

13    Q.  Okay.  And other than to say, "I'm leaving, don't

14  shoot", did you do anything else other than to start to

15  move to the south?

16    A.  No.

17    Q.  Didn't put your hands up in the air?

18    A.  I don't remember.

19    Q.  Okay.  And at any point after you're on the

20  bridge, did you ever put your hands up in the air?

21    A.  I don't remember.

22    Q.  And, and you know what I mean by "put your hands

23  up in the air" as if to surrender.  Correct?

24    A.  Yes.

25    Q.  You, you never did that on the Backwater Bridge



1   on the early morning hours of this incident before your

2   injury occurred.  Did you?

3          MR. STOLL:  Objection, asked and answered.

4   A.  I may have done that while I was retreating but I

5   don't remember.

6   Q.  You don't remember doing that while you were

7   retreating.  Do you?

8   A.  It would have been a logical thing to do, but I

9   don't specifically remember doing it.

10  Q.  And other than to say to law enforcement, "I'm

11  leaving.  Please don't shoot," did you say anything else

12  to them after you had been stuck with the impact

13  munition on your upper-left arm up until the time the

14  incident occurred?

15         MR. STOLL:  Objection to form.

16  A.  No.

17  Q.  And then you said you started to the south.

18  Would that mean that you would have your back towards

19  the barricade as you were moving south?

20  A.  I don't remember when I turned around but at some

21  point, yes.

22  Q.  But were you turned around at the time the

23  incident occurred to your lower-left arm resulting in

24  the severe injury?

25  A.  I was, roughly, facing the direction of the pile



1   of plywood and bin lids.

2      Q.  Okay.  And which direction would that have been?

3      A.  I'm not sure but I think east.

4      Q.  Was the pile of plywood and the bin lids on the

5   east side of the bridge?

6      A.  It was east of me when I reached, I believe it

7   was most likely east of center on the bridge.

8      Q.  And when you were passing the pile of plywood and

9   bin lids on the bridge, were you further south than the

10  back end of the truck on the bridge?

11     A.  Yes.

12     Q.  Okay.  How far south were you of the back end of

13  the truck when you passed the pile of plywood and bin

14  lids?

15     A.  I was far enough from the truck that I couldn't

16  have quickly run back to it.

17     Q.  Well, if we take the south end, the back end of

18  the truck to the point where the incident occurred where

19  the explosion injured your arm, how many feet were, were

20  you south of the back end of the truck when the

21  explosion occurred?

22     A.  Again, I'm not great at gaging distances, but I

23  would guess at least 15 or 20 feet away.

24     Q.  From the back end of the burnt out truck?

25     A.  Isn't the back end to the northeast?



1    Q.  We can put up the exhibit again showing the

2    position of the burnt out truck.  That's Exhibit,

3    Exhibit 2, putting that up on the screen for you.

4    A.  Oh, okay.  I see.  Yes, I was at least 15 or

5    20 feet away.

6    Q.  Okay.  From the back end of the truck when the

7    explosion occurred?

8    A.  Yes.

9    Q.  Okay.  And where were you positioned at the time

10   of the explosion in relation to the center of the road?

11   A.  I think I was pretty close to the center.

12   Q.  When you say "pretty close," do you believe you

13   were to the east or west of the center of the bridge

14   when the explosion occurred?

15   A.  I'm not sure but I'd say east is more likely.

16   Q.  And after you got hit with the impact munition in

17   your upper-left arm, you, you said that hurt a lot.  Did

18   the pain last or, or was it something where you got

19   struck and, and noticed the pane, but then it didn't

20   have an, an impact on you in terms of your left arm

21   after that?

22           MR. STOLL:  Form.

23   A.  The pain lasted.

24   Q.  Okay.  Did, once you were hit with the impact

25   munition in your upper-left arm, did that affect the



1  mobility in your left arm, at that point, in any way?

2      A.  I don't remember.

3      Q.  From the, the front end of the truck by the "NO

4  DAPL" sign that you were behind the sheet metal to the

5  point of the explosion, how many feet was that?

6              MR. STOLL:  Objection to form.

7      A.  I was also at least 15 to 20 feet from the front

8  driver's side corner of the truck.

9      Q.  Okay.  So we would take that 15 to 20 feet and

10 add that onto the 15 or 20 feet that you were further to

11 the south of the back end of the truck.  Correct?

12             MR. STOLL:  Objection to form.

13     A.  I'm saying I was at least 15 to 20 feet from any

14 part of the truck but probably more like 30 feet.

15     Q.  Okay.  So if we take that 15 or 20 feet from the

16 front of the truck to the, to the back of the truck and

17 add on 30 feet, that would be from the left-front of the

18 truck behind the metal sheet from where the explosion

19 occurred, you had gone about 45 to 50 feet.  Does that

20 sound accurate?

21             MR. STOLL:  Objection to form.

22     A.  No.  You can't just add those two distances

23 together.

24     Q.  Okay.  You, you tell me the total distance you

25 believe you were from where you were behind the metal



1  sheet at the left-front of the truck to the point you

2  reached to the south when the explosion occurred.

3           MR. STOLL:  Objection to form.

4    A.  I believe I was around 30 feet away from any part

5  of the truck but at least 15 to 20 feet away.

6    Q.  Well, but, but that's a different measurement.

7  What I'm trying to understand is, from where you were

8  at, at the left-front of the truck when you're behind

9  the metal sheet, you get hit by the impact munition,

10  from that location to where the explosion occurred, how

11  many feet was it?

12           MR. STOLL:  Objection to form.

13   A.  Again, I'm not great at gaging distances, but I

14  think I moved 30 feet, at least 15 to 20 feet.

15   Q.  And, and that, that answer doesn't make any sense

16  to me because you can't be, well, 30 feet and 15 to 20.

17   A.  At least 15 to 20.

18   Q.  Okay.  So from where you were hit with the less

19  lethal impact munition to where the explosion occurred,

20  you believe was at least 15 to 20 feet?

21   A.  Yes.

22   Q.  Or perhaps more?

23   A.  Perhaps more.

24   Q.  Okay.  And so where was Mr. Joachinson during

25  this time after you were hit in the upper-left arm with



1  the impact munition to, when the explosion occurred?

2    A.  I don't know.

3    Q.  After you were hit with the impact munition, did

4  you see where Mr. Joachinson was?

5    A.  He was still right next to me at the time, but I

6  didn't see whether he moved or not after I started

7  moving south.

8    Q.  So you didn't observe whether Mr. Joachinson left

9  the bridge at about the same time you were leaving the

10  bring or whether he remained by the burnt out truck?

11    A.  I did not observe that, correct.

12    Q.  When you decided to leave the metal sheet after

13  you were hit with impact munition, were you walking,

14  were you jogging, were you running?

15    A.  I was moving as quickly as I could, but it was

16  icy so I'm not sure if I was full on running.

17    Q.  So were you at a, a jog pace?

18    A.  Maybe.

19    Q.  Do you know?  Were you walking?

20        MR. STOLL:  Objection, compound.

21    A.  Somewhere between a brisk walk and a light run.

22    Q.  And were you pumping your arms, walking with your

23  arms by your side?  Where do you recall your arms being

24  at that point as between the point when you are struck

25  with the impact round to the point where the explosion



1  occurs?

2          MR. STOLL:  Objection to form.

3     A.  I don't remember.  I was just focussed on getting

4  out of there.

5     Q.  Were you carrying anything at the time after you

6  were shot in the upper-left arm to the point of the

7  explosion?

8     A.  No.

9     Q.  Did you reach for anything during that time

10 period?

11    A.  I had just started to reach towards the pile.

12    Q.  Why were you reaching towards the pile?

13    A.  I was intending to pick up a piece of plywood.

14    Q.  Why?

15    A.  To provide some protection against being shot

16 while retreating.

17    Q.  Between the time period from when you were struck

18 in the upper-left arm to the point where the explosion

19 occurred, were you struck at all by any rubber bullets

20 or impact munitions or anything else?

21    A.  No.

22    Q.  Did you see anything or hear anything that

23 suggested that, in that distance that you made it from

24 when the impact munition hit you in the upper-left arm

25 and the point where the explosion occurred, that someone



1  was attempting to shoot something at you?

2    A.  No.  I knew it was possibility because they were

3  just shooting at us right before.

4    Q.  But you didn't hear or see anything to suggest

5  that, as you were retreating, that any law enforcement

6  officer was attempting to shoot at you at that point

7  until the explosion occurred?

8        MR. STOLL:  Objection to form.

9    A.  I wasn't looking at the police.

10    Q.  I understand that but did you hear anything

11  whizzing by you or anything that you, you saw or heard

12  land by your feet or in the area that suggested that law

13  enforcement were shooting at you while you were

14  retreating?

15        MR. STOLL:  Objection, calls for

16  speculation.

17    A.  Not that I can recall.

18    Q.  Prior to the explosion that injured you, did you

19  see anything strike you?

20        MR. STOLL:  Objection to form, vague.

21    A.  How far prior?

22    Q.  Well, I, I thought you had indicated, and maybe I

23  didn't write it correctly, but I thought you had said

24  that whatever hit you on the left forearm that caused

25  your injury exploded on contact.  Is that what you said?



1    A.  Yes.

2    Q.  And so what I'm asking about is, did you get any

3  notice that something was going to explode on your left

4  forearm or anywhere else on your body before the

5  explosion occurred?

6    A.  No.

7    Q.  Did you see what exploded on your left forearm?

8    A.  I saw the light of the explosion.

9    Q.  Was that when the explosion occurred?

10    A.  Yes.

11    Q.  And when the explosion occurred were you still

12  between what you call the fast walk and a run?

13    A.  Not necessarily.

14    Q.  Were you stopped?

15    A.  No.

16    Q.  You were still moving to the south when the

17  explosion occurred?

18    A.  No.

19    Q.  Okay.  What direction were you moving at the

20  moment the explosion occurred?

21    A.  Towards the pile which was roughly east or

22  southeast.

23          THE STENOGRAPHER:  Can you repeat that

24  answer, please?

25    Q.  In which direct was your body --



1    A.  Towards the pile which was roughly east or

2  southeast.

3          THE STENOGRAPHER:  Thank you.

4    Q.  What, what was the position of your body at the

5  moment the explosion occurred?

6    A.  I was just beginning motion of reaching towards

7  the pile.

8    Q.  With which hand?

9    A.  With my right hand.

10   Q.  So was the pile to the east on your right or the

11 left side of your body?

12         MR. STOLL:  Objection to form.

13   Q.  Or was it directly in front of you to the, to the

14 south or east?

15   A.  I was also turning to face it.

16   Q.  To face the plywood?

17   A.  Yes.

18   Q.  And so was the plywood located, then, to the, the

19 south, if you were reaching with it, with your right

20 hand?

21   A.  It was roughly east or southeast.

22   Q.  Okay.  So were you essentially facing to the east

23 or parallel to the bridge when you were just starting to

24 reach for the plywood?

25   A.  Can you repeat the question.



1 Q. Yes. Were you facing to the east on the bridge,

2 essentially parallel to the bridge, when you were

3 starting to reach for the plywood and the explosion

4 occurred?

5 A. I was facing roughly east or southeast.

6 Q. And were you still upright when the explosion

7 occurred?

8 A. Mostly.

9 Q. Well, if you, when you, when you say "mostly,"

10 can you show me on the camera what your body position

11 was in relation to the ground at the point when the

12 explosion occurred?

13   MR. STOLL: Objection to, to that question.

14 A. I don't think I can replicate it exactly.

15 Q. Well, can you do your best to, to, to the best of

16 your memory of your body position at the point the

17 explosion occurred in relation to the, the ground?

18   MR. STOLL: Same objection.

19 A. I, I don't think I can replicate my body position

20 with a, with a great degree of certainty.

21 Q. Was the, the plywood laying flat on the ground,

22 or was it higher up on, in the air on top of something

23 else that you were about to reach for?

24 A. It was in a pile, so not fully on the ground.

25 Q. But you never reached the plywood; is that



1  correct?

2      A.  That's correct.

3      Q.  Do you remember how big the piece of plywood was

4  or what it was shaped like?

5      A.  It was a rectangle, a, a few feet long by about a

6  foot or so wide.

7      Q.  Is, is this something that you believe one of the

8  other protesters had used as a shield?

9              MR. STOLL:  Objection, calls for

10  speculation.

11     A.  I don't know how anyone else used it.

12     Q.  You indicated that you saw a light when the

13  explosion occurred on your left forearm.  Correct?

14     A.  Yes.

15     Q.  Describe the light.

16     A.  It was very bright.

17     Q.  Was there any color to the light?

18     A.  Not as far as I can recall.

19     Q.  So you can't tell me anything about the light

20  other than it was very bright?

21     A.  It wasn't a colored light.  I don't know if I

22  would call it white or yellow.  It was just light.

23     Q.  At, at the, the time the explosion occurred, were

24  you standing at the time?  In other words, you weren't

25  on the ground already?



1    A.  Yes.

2    Q.  And were you partially bent over?

3    A.  I was just starting to reach out and down, so a

4    little bit.

5    Q.  So bent over very slightly?

6    A.  Yes.

7    Q.  Mostly upright?

8    A.  Yes.

9    Q.  And other than to see the very bright light, did

10   you see anything else at the time of the explosion?

11   A.  No.

12   Q.  Before the explosion occurred, did you feel

13   anything on your left forearm?

14   A.  Maybe milliseconds before.

15   Q.  Did, did you look down to see what had struck you

16   on the left forearm?

17   A.  No.  I didn't have time.

18   Q.  Did, did you see anything immediately prior or at

19   the time of the explosion that you recognized as being a

20   less lethal munition?

21   A.  No.  I didn't look around for what it was.

22   Q.  And, and you didn't see anything metal, for

23   instance, on your forearm at the point when the light

24   occurred and the explosion happened?

25   A.  I wasn't looking at my arm.



1    Q.  So when the light occurred the explosion occurred

2    simultaneously?

3    A.  Yes.

4    Q.  Now, were there any flames when the explosion

5    occurred?

6    A.  No.

7    Q.  Was there any smoke when the explosion occurred?

8    A.  Not that I noticed.

9    Q.  Was there a noise when the explosion occurred?

10   A.  I can't isolate that from the feeling of the

11   explosion.

12   Q.  Well, do you recall hearing any bang or noise

13   when the explosion occurred?

14   A.  Yes.  But I recall it so closely tied to the

15   kinesthetic sensation.

16   Q.  Well, are you able to describe for me any noise

17   that you heard at the time of the explosion?

18   A.  The whole thing was overwhelming, visually,

19   orally and kinesthetically.

20   Q.  Was it a bright light, the time of the explosion?

21   A.  Yes.

22   Q.  Was the light that you saw at the time of the

23   explosion the same or different from the light or sound

24   you heard when there was one or two explosions to your

25   west when you were by the metal sheet?



1    A.  It didn't seem different except that I was at the

2    center as opposed to further away.

3    Q.  Did you know who the officer was who you are

4    claiming shot or issued the flash-bang that injured you?

5          MR. STOLL:  Objection to form.

6    A.  I don't know who the officer was who injured me.

7    Q.  Do you know who the officer was that, that shot

8    you in your upper-left arm with the impact munition?

9    A.  No.

10   Q.  Do you know who the officer was that you're

11   claiming shot the flash-bang that injured you in terms

12   of who they were employed by?

13         MR. STOLL:  Objection to form.

14   A.  I don't know who it was.

15   Q.  And that was a poor question.  What I'm trying to

16   understand is, do you know what law enforcement agency

17   Officer Doe was with or affiliated with?

18         MR. STOLL:  Objection to form.

19   A.  No.

20   Q.  Did you see or hear anything that told you the

21   direction from which the, you're claiming that the

22   flash-bang reached you?

23         MR. STOLL:  Objection to form and

24   mischaracterizes prior testimony.

25   A.  Can you rephrase the question.



1    Q.  Yeah.  What I, what I'm trying to understand is,

2    the, what you're claiming is a flash-bang, do you think

3    that was rolled at you on the ground on the bridge, do

4    you think it came through the air and was projected,

5    somehow, your way?

6              MR. STOLL:  Objection to form and

7    mischaracterizes prior testimony.

8    A.  The thing that hit me came through the air.  I

9    don't know if it bounced off the ground or not, but I

10   don't see how it could have rolled on the ground.

11   Q.  And do you know how it was projected, whether it

12   was shot out of some type of loader or gun, or was it

13   thrown by hand; do you know anything about that?

14   A.  I assumed that it was launched rather than thrown

15   but I don't know.

16   Q.  And why do you say that?

17   A.  Because I felt a hard impact.

18   Q.  When the explosion occurred, did you see anything

19   flying through the air such as metal fragments or

20   anything of that nature, or was it just the light that

21   you saw?

22   A.  I only remember seeing light.  And I'm really

23   sorry, I know we're in the middle, but I need to take

24   another break.

25   Q.  Okay.



1      MR. STOLL:  Let's go off the record.

2      THE VIDEOGRAPHER:  We are off the record at

3  4:27 p.m.

4      (Recess taken 4:27 p.m.)

5      THE VIDEOGRAPHER:  We are back on the record

6  at 4:35 p.m.

7   Q.  Okay.  Ms. Wilansky, after the explosion

8  occurred, were there any burn marks that you're aware of

9  on your forearm or your body anywhere?

10   A.  No.

11   Q.  Was there any fire damage to your jacket or

12  clothing?

13   A.  No.

14   Q.  Did you find any metal fragments or other

15  evidence you thought came from the explosion either on

16  your clothing or that you were advised came from your

17  body?

18   A.  Yes.

19   Q.  And tell me about that.

20   A.  I believe that there were fragments removed in

21  surgery.

22   Q.  And when you say "fragments removed in surgery,"

23  are you talking about in Minneapolis at the Hennepin

24  County Medical Center?

25   A.  Yes.



1   (Defendant's Exhibit #17 was marked for identification.)

2       Q.  Let me show you what's been marked as Deposition

3   Exhibit 17.  This is a document provided to us by your

4   attorney with your discovery answers, and this is some

5   records he obtained from the Hennepin County Medical

6   Center.  Have you seen this before?

7       A.  No.

8       Q.  I'm going to fast forward here to a photograph of

9   a metal fragment that's part of Exhibit 17.  Have you

10  seen this before?

11      A.  No.

12      Q.  When you said there were fragments removed in the

13  surgery, are, are you aware of any fragments being

14  removed from the surgery other than the one shown in the

15  photograph in front of you from Deposition Exhibit 17?

16      A.  No.  I don't know if it was one or more pieces.

17      Q.  Okay.  But you believe it was at the Hennepin

18  County Medically Center where they removed whatever

19  metal fragment was, was found in your left forearm area

20  where the injury occurred?

21      A.  Yes.

22      Q.  Do you know what that metal fragment is from?

23      A.  Not exactly.  My attorneys have not been able to

24  get it tested.

25      Q.  Do you, do you believe that's a fragment from



1  whatever exploded and caused your injury?

2      A.  If that's what they removed from my body, yes.

3      Q.  But you don't have any other explanation for it

4  being there.  Do you?

5      A.  No.

6      Q.  Okay.  Did you have any injuries from the

7  explosion other than in the area of your left forearm,

8  in other words, other parts of your body where metal or

9  shrapnel may have flown during the explosion?

10     A.  It did blow all the way through to the other side

11 of my arm but not elsewhere on my body.

12     Q.  When you say on the other side of your arm, are

13 you talking about your left forearm on the outside?

14     A.  Yes.  Do you want me to show you?

15     Q.  Sure.

16     A.  Well, let me turn the light on.

17     Q.  So is there still metal there now or, or has that

18 been removed?

19     A.  Not metal from the explosion.

20     Q.  Okay.  And so where were you pointing, do that

21 again, if you would, on your arm where you believe this

22 metal fragment was removed from?

23     A.  I don't know where exactly it was removed from.

24     Q.  Okay.  So what were you pointing to us on your

25 arm; what, what, what was that location?



1    A.  I was showing that it was not just my forearm but

2   that it also blew through to the other side of my arm.

3    Q.  Okay.  When you say "blew through," are you

4   talking about the metal fragment or just the force of

5   the explosion or don't you know?

6    A.  I don't know.  But there are like long gashes.

7    Q.  Okay.  The, the, the flash-bang that you believe

8   caused your injury, do you know, was that intended to

9   explode?

10          MR. STOLL:  Objection to the form.

11   A.  I believe that the munition that caused my injury

12   was a type of munition that is intended to explode.

13   Q.  And break up into metal fragments?

14          MR. STOLL:  Objection, calls for

15   speculation.

16   A.  I don't know if the metal was supposed to break

17   up or not.

18   Q.  But, apparently, whatever exploded on your left

19   forearm did break up into some metal pieces.  Correct?

20          MR. STOLL:  Objection to form,

21   mischaracterizes the evidence.

22   A.  I believe so.

23   Q.  And, and so are these less-lethal munitions

24   including a flash-bang supposed to explode into metal

25   pieces, if you know?



1          MR. STOLL:  Objection, calls for

2   speculation.

3   (Defendant's Exhibit #27 was marked for identification.)

4      Q.  And we've been provided with your discovery

5   answers with information on different type of

6   less-lethal munitions.  I'm going to show you

7   Exhibit 27, and, and we can see in the upper-left hand

8   corner it's got a date of February 3, 2017, and do you

9   know where this information comes from?

10     A.  Well, I can see a URL on the bottom.

11     Q.  Okay.  Did, did you find this or, or did somebody

12  else?

13     A.  It wasn't me.

14     Q.  And on the second page of an Exhibit 27, there's

15  a depiction or drawing or photograph of the Low Roll

16  Distraction Device.  Is that what you are claiming in

17  the, in this case is the flash-bang?

18          MR. STOLL:  Objection to form, calls for

19  speculation.

20     A.  I don't know.

21     Q.  And, and you don't know if this distraction

22  device breaks apart at all once it's deployed?

23          MR. STOLL:  Objection to form, calls for

24  speculation.

25     A.  No, I don't know.



1    Q.  After the -- well, well, let me ask you this,

2    there will be eyewitness testimony that there was

3    someone behind this metal shield with a blue tarp on it

4    that was wearing a, a green jacket prior to the

5    explosion.  Were you the only one there that you recall

6    wearing the green jacket?

7              MR. STOLL:  Objection to the statement that

8    came before the question and objection to the form,

9    calls for speculation and lack of foundation.

10   Q.  Can you answer my question, Ms. Wilansky?

11   A.  I was the only person right there wearing a green

12   jacket that I can remember, but I don't remember what

13   color Stephen Joachinson's jacket was.

14   Q.  And there, there will be eyewitness testimony

15   that, while the person with the green jacket was behind

16   the shield, that there were propane tanks rolled on the

17   ground from behind the person in the green jacket by

18   other protesters on the south side of, of the bridge.

19             MR. STOLL:  Objection, that's not a question

20   and it's stating a bunch of facts not in evidence.

21   Q.  Okay.  Did, did that occur, Ms. Wilansky?  Did

22   someone roll propane tanks on the ground, other

23   protesters, towards Mr. Joachinson and you?

24   A.  No.

25   Q.  Did you see propane tanks in the area of the



1  burnt out truck on November 21 before the explosion

2  occurred?

3      A.  No.

4      Q.  Were you involved in discussions about

5  improvising explosive devices using propane tanks on the

6  night of November 21 to either damage or destroy the

7  burnt out truck and/or the chain securing it in place?

8      A.  No.

9      Q.  There'll be testimony that you were leaving the

10 bridge just prior to when the explosion occurred, and it

11 looked like you were carrying something in the position

12 of what a running back might do with a football when

13 they are carrying it with both arms around it.  Do you

14 recall being in that position as you were exiting the

15 bridge just moments prior to the explosion?

16          MR. STOLL:  Objection to the statement

17 preceding that question, that there is no testimony to

18 that effect in evidence.

19     A.  No.

20     Q.  Okay.  There will be testimony that this person,

21 who looked like they were carrying a football, turned

22 around after going south and then came back towards the

23 bridge.  Did you do that?

24          MR. STOLL:  Same objection, there hasn't

25 been any testimony in this case except for hers.



1          MR. BAKKE:  Yeah.  And, and this will all be

2    established at the appropriate time.  Obviously, this is

3    the first deposition so, and it --

4          MR. STOLL:  Yeah.  But we haven't even

5    noticed any additional depositions yet, so how do you

6    know what will be in testimony?

7      Q.  You can go ahead and, and answer, Ms. Wilansky.

8      A.  No.

9      Q.  Okay.  Did you drop anything just a, a second or

10   a moment before the explosion occurred?

11     A.  No.

12     Q.  On the night of the explosion, did you understand

13   that no trespassing on the bridge was allowed?

14     A.  No.

15     Q.  Were there any signs or warnings that told you,

16   on the evening of November 20, that no trespassing on

17   the bridge was allowed?

18          MR. STOLL:  Objection, lack of foundation.

19     A.  I don't remember.

20     Q.  Okay.  Let me see if I can refresh your memory.

21   We'll show you Exhibit 22.

22   (Defendant's Exhibit #22 was marked for identification.)

23        This is a photograph taken by a protester by the

24   name of Frank Finan on November 20.  Do you recognize

25   this as being the Backwater Bridge?



1          MR. STOLL:  Objection to the form of the

2   question.

3      A.  The bottom right corner?

4      Q.  Right.  If you look at the photograph, we can see

5   a guardrail in about the middle of the photograph

6   towards the bottom which would be the west side of the

7   Backwater Bridge.  Does that sound accurate to you?

8          MR. STOLL:  Objection to the form of the

9   question.

10     A.  That looks like the guardrail --

11     Q.  Okay.

12     A.  -- on the bridge.

13     Q.  On the back site of the Backwater Bridge?

14         MR. STOLL:  Objection to the form of the

15  question.

16     A.  I think so.

17     Q.  Okay.  And this, if we look on the right-hand

18  side of the photograph, which would show, looking to the

19  north from the south side of the Backwater Bridge; is

20  that correct?

21     A.  Yes, I think so.

22     Q.  And then we could see some floodlights in the

23  upper right-hand side on the law enforcement side; is

24  that correct?

25     A.  Yes, I think so.



1  Q.  And do you see the sign in the photograph in

2  about the middle in white with some printing on it,

3  which, from this distance, is faint?

4  A.  I'm not sure.

5  Q.  And the word "no trespassing," what do you

6  understand that to mean?

7  A.  No trespassing means that unauthorized people

8  aren't allowed to be in an area defined by the "no

9  trespassing" sign.

10  Q.  That you shouldn't go there in the location

11  identified where no trespassing is allowed.  Correct?

12         MR. STOLL:  Objection to form.

13  A.  It just generally means that people aren't

14  allowed to be in a given area without permission.

15  Q.  Okay.  And, and we'll zoom in on the sign just to

16  the immediate west of the Backwater Bridge as of the

17  evening of November 20.

18         MS. REGAN:  I'm sorry.  Can we just clarify,

19  is this, this sign is not actually on the bridge, or is

20  it on the Jersey Barrier?  I'm just not really

21  understanding where this is located.

22         MR. BAKKE:  Yeah.  I, I guess if you have

23  questions for people on that, Ms. Regan, I'll, I'll, you

24  can certainly ask when you take your depositions, but,

25  and my understanding, also, is there's just one attorney



1  who can be involved in objections or issues relating to

2  the witness' testimony.

3      Q.  So, Ms. Wilansky, we zoomed into the, you can see

4  the razor wire next to the sign; is that correct?

5              MR. STOLL:  Objection to form.

6      A.  Yes.  I see razor wire nearby.

7      Q.  And do you believe that to be the razor wire you

8  described earlier just to the west of the Backwater

9  Bridge?

10             MR. STOLL:  Objection, calls for

11  speculation.

12     A.  I believe that to be part of what I've been

13  referring to as a, as the barrier that extended beyond

14  the bridge.

15     Q.  Okay.  And can you read what it says on the sign?

16             MR. STOLL:  I will just note for the record

17  that we are zoomed in 400 percent on this photo.

18     A.  It says "No Trespassing" and then the next word

19  it's partly blocked out, but there's the letter "N" and

20  then "Bridge."

21     Q.  Okay.  So do you believe that sign says, "No

22  Trespassing on Bridge"?

23     A.  Most likely.

24     Q.  And then I'm going to show you another exhibit.

25  Well, and, and let, let me, let me ask you this, Ms.



1  Wilansky, you, you would have known from this sign, if

2  you looked at it on the night of, both November 20 and

3  the early morning hours of November 21, that no

4  trespassing on the bridge by the protesters was allowed.

5  Correct?

6              MR. STOLL:  Objection to form, calls for

7  speculation.

8     A.  Can you repeat the question.

9              MR. BAKKE:  Jesse, can you read it back.

10             (The requested portion of the record was

11  read by the reporter.)

12             MR. STOLL:  Same objections.

13    A.  I would have had to get close to that sign which

14  would have been dangerous.

15    Q.  Well, how well you could see it from the bridge,

16  you don't know.  Correct?

17             MR. STOLL:  Objection to form, vague.

18    A.  I don't remember seeing it at all.

19    Q.  Did you, at that time, have any vision problems

20  on November 20 or 21, 2016?

21    A.  No.

22    Q.  Okay.  We'll show you another photograph taken

23  the next day on November 21.

24  (Defendant's Exhibit #1 was marked for identification.)

25             MR. STOLL:  Objection to the



1   characterization of the document.

2              MR. BAKKE:  Well, it, it identifies on the

3   photograph below it from an entity called

4   "unicornriot.ninja" that this is published on

5   November 21, 2016, and appears to show the same "No

6   Tresspassing on Bridge" sign as we just looked at a

7   moment ago on Exhibit 22.  Correct?

8              MR. STOLL:  Objection to the statement

9   before the question.

10     A.  Can you repeat the question.

11     Q.  Yeah.  This appears to, to show the same sign as

12  we saw on, on November 20, Exhibit 22, but now from a

13  photograph published on November 21, 2016.  Correct?

14             MR. STOLL:  Objection, calls for

15  speculation.

16     A.  I can't know if that's the, the same sign.

17     Q.  Well, it's, it's, you can see the razor wire in

18  what appears to be the same location as Exhibit 22.

19  Correct?

20             MR. STOLL:  Objection, calls for

21  speculation.

22     A.  This photo is covered in gas, so all I see is a

23  sign and razor wire.

24     Q.  Right.  But that appears to be the razor wire

25  from the law enforcement's side of the Backwater Bridge.



1    Correct?

2              MR. STOLL:  Objection to form.

3        A.  Are you asking me if it's the same razor wire

4    from the last picture?

5        Q.  Yes.  Does it appear to be to you?

6              MR. STOLL:  Calls for speculation.

7        A.  It looks similar but I don't know.

8        Q.  On the night of November 20, do you recall the

9    law enforcement issuing warnings over the LRAD and by

10   bullhorn advising protesters to stay off the bridge?

11       A.  I don't remember.

12       Q.  Do you recall warnings being given that the water

13   hose was going to be used before they used it?

14       A.  I don't remember.

15       Q.  In, in terms of the less-lethal munition that

16   caused your injury, are you aware of any information to

17   suggest it was a law enforcement officer from Morton

18   County who was the one that shot or projected the

19   less-lethal munition you're claiming caused your injury?

20             MR. STOLL:  Objection to form and I'll

21   caution the witness not to answer that to the extent it

22   would reveal any attorney-client communications.

23       A.  My general understanding is that any law

24   enforcement officers there were there under the offices

25   of Morton County.



1    Q.  Well, we'll talk about that in a moment, but I'm,

2   I'm asking you specifically about the John Doe officer

3   you're claiming projected the less-lethal munition that

4   caused your injury, and are you aware of any

5   information, other than what your attorneys may have

6   told you, that that John Doe officer was someone

7   employed by Morton County?

8            MR. STOLL:  Objection, asked and answered.

9    A.  No, I don't know who it was.

10   Q.  And do you know what role, if any, Sheriff Kyle

11  Kirchmeier, the Morton County Sheriff had in relation to

12  the law enforcement activities at the Backwater Bridge

13  on November 21 when you were there up until the, the

14  time of your injury?

15           MR. STOLL:  Again, Sophia, I'll caution you,

16  don't reveal any attorney-client communications in your

17  answer to that question.

18   A.  I don't know specifically, but if he's the

19  sheriff, he is in charge or responsible for what was

20  happening.

21   Q.  Well, was Sheriff Kirchmeier at the DAPL protests

22  either on November 20 or 21 near the Backwater Bridge,

23  if you know?

24           MR. STOLL:  Objection, calls for

25  speculation.



1    A.   I don't know.

2    Q.   Do you know anything about the chain of command

3    on November 20 and 21 in regards to who was involved in

4    directing or supervising the law enforcement activities

5    on those days?

6         MR. STOLL:   Again, Sophia, just make sure

7    you're now disclosing or relying on any attorney-client

8    communications when you answer that question.  If you

9    can answer the question without disclosing them, go

10   ahead.

11   Q.   Well, and, Ms. Wilansky, all my questions are

12   intended to have you provide information that you have

13   apart from what you've learned from your attorneys, so

14   we don't need to have that caution every time.

15   A.   I don't know.

16   Q.   Do you know which law enforcement officers that

17   were present on November 21 prior to your incident at

18   the time of your incident who were positioned on the law

19   enforcement side of Backwater Bridge were employed by a

20   State of North Dakota entity?

21        MR. STOLL:   Objection to form.

22   A.   I don't know.

23   Q.   Do you know, for instance, whether there were

24   North Dakota Highway Patrolmen present leading up to and

25   at the time of, of, of your incident on November 21?



1        MR. STOLL:  Objection to form.

2    A.  I don't know.

3    Q.  Do you know what law enforcement officers on

4    November 20 or 21 had training and were allowed to use

5    less-lethal munitions in response to the protesters?

6        MR. STOLL:  Objection to form, calls for

7    speculation.

8    A.  I don't know.

9    Q.  Do you, do you know whether it was only certain

10   of the law enforcement officers who were allowed to use

11   less-lethal munitions on November 20 and 21, 2016 at the

12   Backwater Bridge?

13   A.  I don't know.

14   Q.  Would you agree that the events of November 20,

15   2016, evening, evening while you were there the

16   three-plus hours was essentially a riot by the

17   protesters?

18       MR. STOLL:  Objection to form.

19   A.  No.

20   Q.  Okay.  No, you don't know, or, no, no, in your

21   view, it was not a riot?

22   A.  I would not characterize it as a riot.

23   Q.  And what, what do you consider to be a riot?

24   A.  I'm not sure what the exact definition is, but I

25   believe it would have to include acts of property



1   destruction or violence.

2      Q.  And if a riot is defined, taking part in a

3   violent public disturbance, would you agree these events

4   on November 20 could be defined that way?

5              MR. STOLL:  Objection to form.

6      A.  Only in reference to police violence.

7      Q.  Okay.  Is, is it your claim, in the three-plus

8   hours you were there on November 20, there was no

9   violence by the protesters towards law enforcement?

10             MR. STOLL:  Objection, lack of foundation.

11     A.  I didn't see any violence towards law

12  enforcement.

13     Q.  Did you see protesters using slingshots with

14  rocks in them hurling them and projecting at law

15  enforcement?

16     A.  No.

17     Q.  Did you see protesters throwing frozen water,

18  water bottles at law enforcement on the evening of

19  November 20?

20     A.  No.

21     Q.  Did you see them throwing rocks at law

22  enforcement on November 20?

23     A.  No.

24             MR. STOLL:  Vague.

25     Q.  Did you see protesters throwing logs and other



1  items that could cause significant injury or possibly

2  even death at law enforcement on November 20?

3     A.  No.

4     Q.  Did you see protesters throwing pieces of

5  concrete and parts of concrete at law enforcement on

6  November 20, 2016?

7     A.  No.

8     Q.  If those things happened, would it be fair to

9  categorize that based on your definition as a riot?

10           MR. STOLL:  Objection to form, calls for

11  speculation.

12     A.  Not necessarily.  But the events of November 20

13  were overwhelmingly peaceful on the protester's side and

14  violence on the police side.

15     Q.  Well, if, if those types of things were occurring

16  that I described, would you consider those to be acts of

17  violence, throwing logs, concrete blocks, slingshots

18  with rocks at them, rocks, frozen water bottles at law

19  enforcement, would, would you consider those violent

20  acts?

21     A.  It depends.

22     Q.  So you can envision, in, in your mind, that

23  throwing rocks, logs, pieces of concrete, slingshots

24  with rocks, frozen water bottles at law enforcement

25  would not be considered, in your mind, violent acts.  Is



1   that your testimony?

2           MR. STOLL:  Objection, mischaracterizes her

3   prior testimony and vague.

4       A.  A reasonable person could potentially

5   characterize actions like those as violent if they were

6   actually intended to hit and injury somebody.

7       Q.  And if law enforcement was confronted with those

8   type of acts that we've just discussed, do you think it

9   would be reasonable for law enforcement to defend

10  themselves against that type of conduct by the

11  protesters?

12          MR. STOLL:  Objection, calls for

13  speculation.

14      A.  I don't believe that a police officer in that

15  situation would need to defend themselves.

16      Q.  And why not?

17      A.  Because there are other options.

18      Q.  What are the other options?

19      A.  To move out of the way.

20      Q.  Law enforcement to move out of the way?

21      A.  Yes.

22      Q.  Okay.  So they, they, what, what you're saying is

23  the law enforcement should have, in response to that

24  type of violent conduct, simply move back away from the

25  Backwater Bridge and just let the protesters cross the



1  Backwater Bridge and do whatever they were going to do.

2  Is that what you're saying?

3          MR. STOLL:  Objection, mischaracterizes her

4  prior testimony and is argumentative.

5      A.  No, that's not what I'm saying.

6      Q.  What, was it your understanding when you were at

7  the DAPL protest that the intent and desire of the

8  protesters was to cross the Backwater Bridge and get to

9  the drilling pad where the DAPL pipeline was to go under

10 the Missouri River and cause damage or destroy it?

11         MR. STOLL:  Objection, vague, calls for

12 speculation.

13     A.  I don't know what every person's goals or

14 motivations were.

15     Q.  I didn't ask you about everyone's goals and

16 motivations where.  I'm asking, wasn't that the intent

17 of the DAPL protesters, was to stop the completion of

18 the DAPL pipeline?

19         MR. STOLL:  Objection, vague and calls for

20 speculation.

21     A.  Not necessarily.

22     Q.  If we turn to, to your specific involvement on

23 November 21 at the burnt out truck, and I know you

24 disagree with this, but if, if law enforcement on the

25 other side of the barricade near the burnt out truck



1  believed that you and Mr. Joachinson and the other

2  protesters were there to try to blow up the truck and/or

3  chain so the truck could be removed by the protester,

4  would it be appropriate for them to use less-lethal

5  munitions to prevent you from doing that?

6          MR. STOLL:  Objection, lacks foundation.

7      A.  I don't want to speculate about something so

8  different from what was actually happening.

9      Q.  So you're not willing to agree that, if that was

10  the information that law enforcement have, it would be

11  reasonable to use less-lethal munitions to get Mr.

12  Joachinson and you and any other protesters off the

13  bridge?

14          MR. STOLL:  Objection, lacks foundation,

15  calls for speculation.

16      A.  I don't know the ins and outs of when police or,

17  when police consider it reasonable to use less-lethal

18  munitions.

19      Q.  If, if law enforcement officers believe the

20  propane tanks or cylinders they saw and heard on the

21  Backwater Bridge prior to the explosion were going to be

22  used against them to either seriously injure or kill

23  them, would you agree it would be appropriate to use

24  less-lethal munitions to remove you and Mr. Joachinson

25  and any other protesters from the bridge?



1          MR. STOLL:  Objection, lacks foundation,

2    calls for a hypothetical, object to the form of the

3    question.

4        A.  I haven't thought about what's reasonable because

5    this is so far outside the realm of possibility.

6        Q.  Have you given any statements other than to your

7    attorneys regarding the events of November 20 or 21,

8    2016 at the Backwater Bridge?

9        A.  Yes.

10       Q.  Okay.  And, and what other statements have you

11   given, and to whom?

12       A.  I did a couple of interviews with journalists.

13       Q.  And who was that with?

14       A.  I don't remember their names.

15       Q.  And when was this?

16       A.  Sometime in 2017.

17       Q.  Do you know which news media or publication they

18   were with?

19       A.  The New York Post.

20       Q.  Okay.  Was that the only one, or was there more

21   than one?

22       A.  I also talked to someone from The Intercept.

23       Q.  Okay.  Anyone else?

24       A.  Not that I can remember.

25       Q.  Were you ever subpoenaed to appear before any



1   grand jury in relation to the events surrounding your

2   injury?

3       A.   No.

4       Q.   Are you aware of anyone who was?

5       A.   Yes.

6       Q.   Pardon?

7       A.   Yes.

8       Q.   And who was that?

9       A.   Steve Martinez.

10      Q.   Okay.  And other than what you may have learned

11  from your attorney, what do you know about Steve

12  Martinez being subpoenaed to testify?

13      A.   I believe that he's refused to testify.

14      Q.   Anyone else that you know who's been subpoenaed,

15  testified regarding your incident?

16      A.   No.

17  (Defendant's Exhibit #10 was marked for identification.)

18      Q.   I'm going to show you what's been marked as

19  Exhibit 10.  This is called a "Potential

20  Plaintiff/Witness Intake Form," and have you seen a

21  document like this before?

22      A.   No.

23      Q.   This, this is a form that was completed by Frank

24  Finan, another protester who is involved in a lawsuit

25  against Morton County.  Were you aware, during the



1   protest, that there were forums being completed by

2   someone who was thinking about being a plaintiff or a

3   claimant in a lawsuit against law enforcement?

4           MR. STOLL:  Objection to the

5   characterization of the document and objection to form.

6     A.  Can you rephrase the question?

7     Q.  Yeah.  What I'm wondering about is, were you

8   aware that, during the protests, there were forms like

9   this available, perhaps through lawyers or people who

10  were attending the protests where there were these forms

11  that you could complete if you were a potential

12  plaintiff thinking about bringing a claim or you were a

13  witness to some incident involving law enforcement?

14          MR. STOLL:  Objection to the

15  characterization of the document and objection to form.

16    A.  No.

17    Q.  Did you ever complete a form like this in

18  relation to the DAPL protest activities?

19    A.  No.

20  (Defendant's Exhibit #11 was marked for identification.)

21    Q.  I'm going to show you what's been marked as

22  Deposition Exhibit 11.  This is another form that was

23  available at the DAPL protest called an "Evidence

24  Collection Form."  Have you seen this before, this type

25  of form?



1    A.  No.

2    Q.  Do you know whether there was any type of

3  evidence collection form prepared by any other protester

4  or others following your incident on November 21, 2016?

5    A.  I don't know.

6    Q.  Are you aware of any efforts to gather evidence

7  from the Backwater Bridge area following your incident

8  by protesters after you were taken from the, the scene?

9    A.  I vaguely remember something like that.

10    Q.  Okay.  And what do you remember about that?

11    A.  I remember hearing that people went to look for

12  evidence in the following days.

13    Q.  Okay.  And did you learn whether they found

14  anything?

15    A.  No.

16    Q.  Was the device that you believe exploded and

17  caused your injury ever found at the scene by anyone, to

18  your knowledge?

19    A.  No, not to my knowledge.

20    Q.  Okay.  Were any fragments or pieces of that

21  device ever found at the, the scene following your

22  incident, to your knowledge?

23    A.  No, not to my knowledge.

24         MR. STOLL:  Objection to form, vague.

25    Q.  Okay.  Has, has anyone done, has anyone done any



1  testing that you're aware of in relation to any

2  artifacts or evidence that might be related to your

3  explosion incident?

4           MR. STOLL:  Objection, vague.  I, I also

5  just caution you one more time, Sophia, not to disclose

6  any attorney-client communications in your answer to

7  that question.

8     A.  I, I don't know outside of privileged

9  communications.

10 (Defendant's Exhibit #18 was marked for identification.)

11    Q.  I'm going to show you part of deposition

12 Exhibit 18 which is some photographs of some weapons

13 that Morton County and law enforcement was, believed was

14 used or intended to be used by the protesters on

15 November 20 and 21, and the one I'm showing you now is

16 two, what are identified as Coleman fuel canisters which

17 is on the page MOR-0083 which were found on the

18 Backwater Bridge following your incident.  Have you seen

19 these before?

20           MR. STOLL:  Objection to the

21 characterization of the document and to the form of the

22 question, and, Mr. Bakke, if you're going to put this

23 document into the record or you're going to try to use

24 it as an exhibit, I'd like you to give the witness an

25 opportunity to see the whole document.  You're just



1  showing her one snippet of what appears to be a

2  nine-page document that you're going to put in the

3  record.

4          MR. BAKKE:  Yeah.  I'll, I'll, I'll give her

5  plenty of time to look at each page I question her

6  about.

7          MR. STOLL:  I, I, she should get the

8  contents for the whole document.  Just let her see the

9  whole document.

10          MR. BAKKE:  Okay.  We can run through it

11 quickly.  I don't have questions on some of the pages,

12 but they're just photographs, just like any other

13 photograph that can be asked about individually so...

14 Well, you have your objection.  I'm, I'm not going to

15 spend time on other photographs that don't necessarily

16 relate to my questions.  They're not going to shed any

17 light on the specific one I'm asking about, but we're

18 putting them all up on the screen for you now.

19    Q.  So we'll go back, Ms. Wilansky, to the propane

20 tanks which is the 0083, and do you have any explanation

21 for those propane tanks being on the Backwater Bridge on

22 November 21 other than to use as an explosive device by

23 the protesters?

24          MR. STOLL:  Objection.  There's no

25 foundation that they were on the bridge on that night.



1    A.  I have no reason to believe those were ever on

2  the bridge.

3    Q.  Were, were Mr. Joachinson and you using any type

4  of propane heater or device when you were at the sheet

5  metal in the Backwater Bridge near the burnt out truck

6  on November 21?

7    A.  No.

8    Q.  And showing you what's part of Exhibit 18,

9  propane canisters that say "Punctured Canisters," and we

10  can see some holes on the bottom of the propane

11  canisters, had you heard or were you aware of efforts by

12  protesters on November 20 and 21 to improvise explosive

13  devices to be used against law enforcement?

14          MR. STOLL:  Objection to the

15  mischaracterization of the document.

16          THE STENOGRAPHER:  Can you restate that

17  objection, please.  I didn't get it.

18          MR. STOLL:  Yeah.  I'm objecting to the

19  characterization of the document.

20          THE STENOGRAPHER:  Thank you.

21          MR. STOLL:  And the form of the question.

22    A.  Can you repeat the question.

23          MR. BAKKE:  Jesse, did you get the question,

24  that you could read it back?

25          THE STENOGRAPHER:  Yep.



1          (The requested portion of the record was

2    read by the reporter.)

3      A.  No.

4      Q.  On the evening of November 20, did you hear

5    explosions from the protest side in relation to some

6    locations away from the Backwater Bridge?

7          MR. STOLL:  Objection, vague.

8      A.  Explosions other than police munitions?

9      Q.  Yes.

10     A.  No.

11     Q.  Did, did you hear about testing by protesters of

12   improvised explosive devices that they were doing on

13   November 20, 2016?

14     A.  No.

15     Q.  Were you aware, when you were on the Backwater

16   Bridge on November 20, that the protesters had

17   previously used Molotov cocktails during the protests?

18     A.  I had read about one such instance.

19     Q.  Okay.  And, and what incident was that?

20     A.  The night of the raid on the north camp which I

21   believe was October 27th.

22     Q.  Okay.  And, and is that the incident where, when

23   the trucks were placed on the bridge by law enforcement

24   and/or governmental agencies that the protester used one

25   or more Molotov cocktails to start those trucks on fire?



1          MR. STOLL:  Objection to form.

2     A.  I don't remember, I don't remember reading about

3    how the trucks were burned.

4          MR. BAKKE:  Off the record.

5          MR. STOLL:  Sorry.  Are we going off the

6    record?

7          MR. BAKKE:  Yes.

8          MR. STOLL:  Okay.  Five minute break?

9    Sorry --

10          MR. BAKKE:  Can I hear the time from --

11          THE VIDEOGRAPHER:  We are off the record at

12    5:41 p.m.

13          (Recess taken at 5:40 p.m.)

14          THE VIDEOGRAPHER:  We are back on the record

15    at 5:53 p.m.

16     Q.  Okay.  Ms. Wilansky, prior to the protests on

17    November 20, I understand that, while you were at the

18    DAPL protests, you had participated in other protest

19    activities; is that correct?

20     A.  Yes.

21     Q.  Okay.  And one of those was in Bismarck?

22     A.  Yes.

23     Q.  And there were also some other protests that you

24    participated in, in other areas in Morton County?

25     A.  I assume so.



1    Q.  Well, I'm, I'm looking at your answers to the

2    discovery requests in this case that you provided,

3    Interrogatory No. 2, and it talks about some other

4    protests in Downtown Bismarck that you participated in

5    and some other protests on what you call "unoccupied

6    rural areas of Morton County," and do you recall those

7    events?

8            MR. STOLL:  Objection, mischaracterizes the

9    interrogatory answer.

10   A.  I'm just not sure where the county boundaries

11   are.

12   Q.  Well, apparently at one or more of these events,

13   some less-lethal munitions were used by law enforcement

14   when you were one of the protesters; is that correct?

15           MR. STOLL:  Objection, lacks foundation.

16   Q.  In the incident where there was some pepper spray

17   used, does that refresh your memory?

18   A.  Yes.

19   Q.  Okay.  And where was that at, and what was your

20   involvement in that protest?

21   A.  I just remember being in a group of people and

22   the police pepper sprayed people close to me.

23   Q.  Okay.  And this was a protest event on a date

24   sometime prior to November 20?

25   A.  Yes.



1    Q.   Okay.  And so you knew, at that prior protest

2    event, that law enforcement would use less-lethal

3    munitions such as pepper spray against the protesters if

4    they deemed it appropriate to do so?

5              MR. STOLL:  Objection to form, calls for

6    speculation.

7    A.   My understanding is that their usage of, of

8    weapons such as pepper spray was indiscriminate.

9    Q.   Well, this, this prior event, did you end up

10   being affected or inhaling any of the pepper spray?

11   A.   No.

12   Q.   In, in your answer to Interrogatory No. 4, you

13   discuss, as being present on the bridge at certain

14   times, Richard Fisher, Brandi King, Steve Martinez and

15   Stephen Joachinson, and, and, other than Mr. Joachinson,

16   do you remember either a Steve Martinez, Brandi King or

17   Richard Fisher being there with you on the Backwater

18   Bridge at any point between 2:00 a.m. and 4:00 a.m. on

19   November 21?

20   A.   I don't remember being with Richard Fisher, and I

21   didn't know the other people.

22   Q.   Your cellphone, you said you had that on you at

23   the time of this incident.  Correct?

24   A.   Yes.

25   Q.   Was that in your coat pocket?



1    A.  I believe it was in my vest pocket.

2    Q.  And that was preserved by you following the

3   incident?

4    A.  I gave it to my lawyers.

5    Q.  And when did you give it to your lawyers?

6    A.  I don't remember.

7    Q.  How long was it after the incident?

8    A.  Within a few days.

9    Q.  Were you still at the hospital in Minneapolis?

10   A.  Yes.

11   Q.  So did you first meet with Mr. Stoll while you

12  were at the hospital in Minneapolis?

13   A.  I don't remember.

14   Q.  I mean is that, is that the only attorney that

15  you retained following the explosion was Mr. Stoll and

16  perhaps other lawyers at his office?

17   A.  No.

18   Q.  Okay.  Who were the other lawyers you retained?

19   A.  Lauren Regan.

20   Q.  Well, which lawyers do you recall seeing at, when

21  you were in the hospital in Hennepin County?

22        MR. STOLL:  Objection, mischaracterizes her

23  prior testimony.

24   Q.  Did you see them or did you just have a, a phone

25  or Zoom conversation with them?



1          MR. STOLL:  Objection to form.

2     A.  I think there were lawyers who came in person but

3   I'm not sure.

4     Q.  When you were at the DAPL protests, you would

5   have been using that Apple iPhone with phone number

6   (347)647-1894?

7     A.  Yes.

8     Q.  And that's the one you turned over to your

9   lawyers?

10    A.  Yes.

11    Q.  And were you someone who texted frequently?

12          MR. STOLL:  I want to object to the form of

13   that last question.

14    A.  No.  I wouldn't say I texted frequently.

15    Q.  And did you text multiple times throughout each

16   day when you were at the protests?

17    A.  No.

18    Q.  Did you text other protesters?

19    A.  No.

20    Q.  Did you get the contact information for any other

21   protesters?

22    A.  Like phone numbers?

23    Q.  Contact information of any, any type, phone

24   numbers, e-mail address, street address, where there

25   permanent address was, user names on Facebook?



1    A.  Yes.

2    Q.  Okay.  And which ones?

3    A.  I, I got, maybe, a few phone numbers.

4    Q.  Okay.  For, for which individuals?

5    A.  Genevieve Wallace.

6    Q.  Okay.  Anyone else?

7    A.  Erin Hesla.

8    Q.  And were these people that were participating in

9   the DAPL protests with you?

10   A.  I don't know if they ever attended any of the

11  protests.

12   Q.  Well, in, in your response to Interrogatory

13  No. 1, you indicate that the people you interacted with

14  on a daily or regular basis while you were at the DAPL

15  protest included Richard Fisher, Erin Hesla and

16  Genevieve Wallace.  Is that an accurate answer?

17             MR. STOLL:  Objection to the form of that

18  question, mischaracterization of the interrogatory

19  answer.  I think the interrogatory answer asks about a

20  camp, not during the protests.

21   A.  Right.  Those were people I interacted with at my

22  camp.

23   Q.  And have you had communications with them by text

24  or instant messaging or Facebook messaging or some other

25  means of electronic communication during the protests or



1  after?

2     A.  I have been in touch with them since.

3     Q.  And how do you communicate with them?

4     A.  Well, I haven't talked to them recently, but I

5  have, I believe I've talked to all three on Facebook, at

6  least Erin and Genevieve.

7     Q.  And then I asked you about texting before, during

8  the protest.  Would you use other means of electronic

9  communication regarding the protest activity, instant

10 messaging, Facebook messaging, some other means of

11 electronic communication?

12    A.  Can you repeat the question.

13    Q.  Yeah.  What, what I'm trying to find out, you're

14 at the protest from November 4 through November 21,

15 2016.  I'm just trying to find out, did you use any type

16 of electronic communication whatsoever to communicate

17 with people during that timeframe?

18    A.  Not people who were also there.

19    Q.  I'm talking about other people as well.  Did you

20 have a preferred method of electronic communication used

21 while you were at the protest or since then?

22         MR. STOLL:  Objection, vague and compound.

23    A.  I'm sure that I called my mom sometimes.

24    Q.  Okay.  But, but you're not somebody who used any

25 type of electronic messaging or instant messaging or



1  Facebook messaging or anything of that nature.  Your,

2  you used your cellphone strictly for purposes of making

3  phone calls; is that your testimony?

4     A.  No, I don't --

5          MR. STOLL:  Mischaracterizes her prior

6  testimony.

7     A.  No.  I had a Facebook account.

8     Q.  Okay.  And were you posting on that?

9          MR. STOLL:  Objection.  During what time

10  period?

11          MR. BAKKE:  During, during the protests or

12  after regarding the protest activities.

13          MR. STOLL:  Object, it's a compound

14  question.

15     A.  As far as I can remember, I wasn't posting

16  regarding the protest activities.

17     Q.  And your cellphone, it indicates in your response

18  to Interrogatory No. 5, it was turned over to some

19  expert.  Who was it turned over to?

20          MR. STOLL:  I'm going to object that that

21  calls for an attorney-client communication.  I mean, I'm

22  happy to answer that, Randy, but the reason she would

23  know that is that her lawyers told her.

24     Q.  Okay.  Well if you could provide me that

25  information, Ben, including what information has been



1  downloaded, whether a mirror image has been done,

2  whether anything's been deleted or changed, I'd

3  appreciate that.

4          MR. STOLL:  Yeah.  I'll have to talk to you

5  at length about the phone off the record.

6  Q.  You don't know what happened to the phone after

7  it was taken by your lawyers; is that correct?

8  A.  Not outside of privileged communications.

9  Q.  What would have been the user names you would

10  have used during the protests and following that in

11  relation to social media?

12          MR. STOLL:  Randy, are you, if I let her

13  answer that, are, will you stipulate that we're going to

14  redact this from any public version of this transcript?

15          MR. BAKKE:  Well, not, not redact, no.  I, I

16  guess, if you file something or I do, but not redact

17  because there may be a need for the court to look at

18  that.  I'll, I'll agree that it can be kept

19  confidential.

20          MR. STOLL:  And that it will be sealed from

21  public view in some form or another?

22          MR. BAKKE:  Yeah.  In, in any court filings,

23  I assume that's what you're referring to?

24          MR. STOLL:  Yeah.  I just want to make sure

25  that the public doesn't get to see her answer to this.



1          MR. BAKKE:  Sure.

2     Q.  Okay.  Go ahead, Ms. Wilansky.

3     (Confidential Portions Lines 3 through 18 Redacted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19     Q.  In your interrogatories, you identified a list of

20  what you described as, "The following people witnessed

21  her injury on November 21, 2016," and I want to know,

22  from you, what these individuals know in relation to

23  witnessing your injury and whether you've communicated

24  with them.  The names are Will Adams --

25          MR. STOLL:  Sophia, I just caution you, when



1  you're answering these questions, just don't reveal any

2  attorney-client communications, so, with that caveat,

3  answer away.

4     A.  Do you want me to respond one by one?

5     Q.  Sure?

6     A.  You said Will Adams.

7     Q.  Will Adams?

8     A.  That doesn't sound familiar.

9     Q.  Walter Brave?

10    A.  I don't know.

11    Q.  Justin Cohn, C-o-h-n?

12    A.  I don't know.

13    Q.  Naomi Langley, L-a-n-g-l-e-y?

14    A.  Yes.

15    Q.  Okay.  What do you know about her, and what does

16  she know about the explosion?

17          MR. STOLL:  Objection, compound.

18    A.  I know that she identified herself as a witness.

19    Q.  Okay.  So have you ever communicated with her

20  about that?

21    A.  I don't remember if she told me that directly.

22    Q.  Well, have you communicated with her since the

23  incident occurred?

24    A.  Yes.

25    Q.  How?



1    A.  Through Facebook, and I've seen her in person a
2  couple of times.
3    Q.  Where at?
4    A.  The first time was in North Dakota, and the
5  second time was at her apartment.
6    Q.  And where is her apartment?
7    A.  I don't know where she lives now.
8    Q.  So where was her apartment?
9    A.  Nashville, Tennessee.
10   Q.  Is she someone you met at the protests?
11   A.  I don't think I met her until later.
12   Q.  And did you go see her in Nashville?
13   A.  That wasn't the purpose of the trip.
14   Q.  Okay.  Did, did you go visit her, or what was the
15  purpose of the trip?
16   A.  I was on a road trip, and I stayed at her house
17  for a night.
18   Q.  And do you know what she does for a living?
19   A.  I haven't talked to her recently.
20   Q.  Do you have any idea where she's from originally
21  or what she's done for a living?
22   A.  I believe that she's from Nashville.
23   Q.  Do you have her contact information?
24   A.  I don't think so.
25   Q.  Harmony -- did, did Ms. Langley tell you what she



1   observed in relation to the incident?

2       A.  I don't remember.

3       Q.  Harmony Lauritzen, L-a-u-r-i-t-z-e-n, do you know

4   who that is?

5       A.  Yes.

6       Q.  Okay.  Who is she?

7       A.  Another person who identified herself as a

8   witness.

9       Q.  Okay.  Have you ever communicated with her?

10      A.  I'm not sure.

11      Q.  Do you know anything about her, have her contact

12  information, know what she observed?

13      A.  I think we're Facebook friends.

14      Q.  Where is she from?

15      A.  I don't know.

16      Q.  Julian Sniesak, S-n-i-e-s-a-k, do you know who

17  that is?

18      A.  No.

19      Q.  Ever communicated with that person?

20      A.  No.

21      Q.  Who is McKenzie McDonald Wilkins?

22      A.  Sorry.  That's a complicated question.

23      Q.  Give me a short answer.

24      A.  He's my friend and we were in a relationship

25  also.



1    Q.  At the time of the protest activities?

2    A.  No.

3    Q.  After the protest activities?

4    A.  Yes.

5    Q.  And, and where is he from?

6    A.  He's from both Michigan and Arkansas.

7    Q.  Okay.  Where in Michigan?

8    A.  I believe around Ann Arbor.

9    Q.  Okay.  And where in Arkansas?

10   A.  Hot Springs, Arkansas.

11   Q.  Okay.  And where, where is the last place out of

12   those two you understood he was at?

13   A.  That's where he grew up.  I have no reason to

14   believe he's in either of those places or has been there

15   recently.

16   Q.  Okay.  Don't have his contact information?

17   A.  I have his phone number.

18   Q.  In, in your discovery responses, it says your

19   expert has preserved some law enforcement munitions.

20   What do you know about that?

21           MR. STOLL:  You can answer that to the

22   extent it doesn't come from attorney-client

23   communications, Sophia.

24   A.  I'm not sure if anything I know would fall

25   outside attorney-client privilege.



1    Q.  Do you know a Brock Thomas?

2    A.  No.

3    Q.  Do you have any knowledge or information that any

4    of the less-lethal munitions used by attorney-client

5    privilege on November 20 or 21 were modified or altered

6    in any way by law enforcement?

7    A.  I have heard something like that.

8    Q.  Okay.  And what have you heard about that?

9    A.  I've heard rumors that law enforcement could have

10   been taping munitions to alter them.

11   Q.  But is, is that, all you know about it is rumor?

12   A.  Yes.

13   Q.  Okay.  Are you aware of, of law enforcement using

14   any less-lethal munitions on November 20 or 21 in any

15   manner not recommended by the manufacturer of the

16   less-lethal munitions?

17           MR. STOLL:  Objection to form.

18   A.  Yes.

19   Q.  Okay.  Tell me about that.

20   A.  I don't see how they could have been using them

21   properly when they caused my injury.

22   Q.  Are you aware of anyone at the DAPL protests

23   other than you who claims to be injured by a flash-bang

24   device?

25           MR. STOLL:  Objection, mischaracterizes



1   prior testimony and form.

2       A.  There were so many people injured, I can't

3   remember specifically.

4       Q.  Well, when you say "There were so many people

5   injured," I'm, I'm just asking the ones that you know

6   about, and did you ever personally observe someone

7   during the DAPL protests who you believe was injured by

8   a flash-bang?

9       A.  Not that I remember other than myself.

10      Q.  And did you ever personally witness any other

11  protester who was injured by any impact munitions used

12  by law enforcement?

13      A.  Yes.  I saw lots of people being shot.  I didn't

14  look up close at their injuries.

15      Q.  Are, are you aware of anyone other than yourself

16  who, at the, the DAPL protests, sustained any type of

17  more serious injury?

18          MR. STOLL:  Objection, vague.

19      A.  Do you mean more serious than my injury?

20      Q.  No.  I mean a, a, a serious injury of, of any

21  type due to less-lethal munitions?

22      A.  Yes.

23      Q.  Okay.  Who do you know and what was the nature of

24  their injury, and how do you know it?

25          MR. STOLL:  Objection, that's a lot of



1  different questions.

2      A.  Can you break that down.

3      Q.  Sure.  What other protesters at the DAPL protests

4  are you aware of who had significant injuries from

5  less-lethal munitions?

6      A.  Vanessa Dundon.

7      Q.  Okay.  And were you, did you personally observe

8  that?

9      A.  No.

10          THE STENOGRAPHER:  What was that last

11  answer?

12     Q.  Do you know Vanessa Dundon?

13          MS. WILANSKY:  No.

14          THE STENOGRAPHER:  No, the name?

15          MR. BAKKE:  Vanessa Dundon, D-u-n-d-o-n.

16          THE STENOGRAPHER:  Thank you.

17          MS. WILANSKY:  Sorry.

18     Q.  Have you ever spoken to Ms. Dundon?

19     A.  Yes.

20     Q.  Was it while you were at the protests or some

21  other time?

22     A.  Some other time.

23     Q.  Any other protesters that you're aware of that

24  suffered a significant injury during the DAPL protests?

25     A.  Yes.



1    Q.  Who else?

2    A.  I believe his name is Israel Hoagland.

3    Q.  Okay.  And were you present when he was injured?

4    A.  I don't know.

5    Q.  Did you see his injury occur?

6    A.  No.

7    Q.  Other than, than what you've told me about today,

8    which is, it's quite a lot, is there anything else you

9    know about law enforcement's use of flash-bangs during

10   the DAPL protests that we haven't already discussed here

11   today?

12          MR. STOLL:  Objection, vague.

13   A.  I'm not sure.

14   Q.  Is, is the only less-lethal munition that you're

15   aware of during the DAPL protests where the less-lethal

16   munition supposedly broke apart into metal fragments is

17   your injury?

18          MR. STOLL:  Objection, lacks foundation.

19   A.  I don't know the medical details of other

20   people's injuries.

21   Q.  And I'm not asking about the medical details, but

22   am I correct in understanding that you believe whatever

23   struck you at the time of the incident broke apart, and

24   that's why you had the metal fragment found in your arm

25   after the incident occurred?



1          MR. STOLL:  Objection, mischaracterizes her

2    prior testimony and calls for speculation.

3      A.  Can you rephrase the question.

4      Q.  Sure.  My understanding is that you believe that

5    the, what you're calling a flash-bang that caused your

6    injuries during the incident broke into one or more

7    metal fragments.  Correct?

8          MR. STOLL:  Objection, mischaracterizes her

9    prior testimony.

10     A.  I believe that the munition that caused my injury

11   must have broken into fragments because there was at

12   least one fragment found in my body.

13     Q.  Okay.  And so that, my question was, are you

14   aware of any other less-lethal munition during the DAPL

15   protest that broke apart and caused injury to any

16   protester?

17     A.  I don't know, specifically, if those injuries

18   were caused, to any extent, by the munition breaking

19   apart.

20     Q.  And other than this flash-bang that you believe

21   broke apart to cause your injury, are you aware of any

22   other less-lethal munitions used during the DAPL protest

23   breaking apart into metal fragments?

24         MR. STOLL:  Objection to form.

25     A.  Not specifically.



1      Q.  Okay.

2           MR. BAKKE:  And, Jeff, I'm assuming I'm

3  getting close.  Can you tell me the time.

4           THE VIDEOGRAPHER:  6 hours and 53 minutes --

5           MR. BAKKE:  Okay.

6           THE VIDEOGRAPHER:  -- and 14 seconds.

7           MR. BAKKE:  Okay.  Let's go off the record.

8           THE VIDEOGRAPHER:  We are off the record at

9  6:34 p.m.

10          (Recess taken at 6:34 p.m.)

11          THE VIDEOGRAPHER:  We are back on the record

12  at 6:45 p.m.

13     Q.  Okay.  Ms. Wilansky, from when you arrived at the

14  bridge at around 2:00 a.m. on November 21 to when the

15  explosion occurred, do you recall any warnings being

16  given by law enforcement, other than, get out from

17  underneath the truck?

18     A.  No.

19     Q.  Okay.  Do you recall law enforcement verbalizing

20  any commands or speaking over the LRAD or by their

21  natural vice or by bullhorn between 2:00 a.m. and

22  4:00 a.m. when the incident occurred other than, get out

23  from underneath the truck?

24     A.  Okay.

25     Q.  Do you deny such commands were, and warnings were



1    given to you while you were on the Backwater Bridge

2    between 2:00 and 4:00 a.m.?

3                MR. STOLL:  Objection, calls for

4    speculation.

5        A.  I don't remember.

6        Q.  So that doesn't mean that they weren't giving

7    other commands, you're saying you just don't remember

8    one way or the other?

9        A.  Yes.

10        Q.  And then turning back to the three-plus hours you

11    were at the Backwater Bridge near or on, on November 20,

12    do you recall there being multiple warnings and

13    directives given by law enforcement over the LRAD while

14    you were present?

15                MR. STOLL:  Objection to form.

16        A.  I don't recall specifically.  There were a lot of

17    different sounds.

18        Q.  Okay.  Were they using the LRAD to address the

19    protesters when you were there for that three-plus hours

20    on November 20?

21        A.  I don't remember.

22        Q.  Do you recall, while you were on the Backwater

23    Bridge on November 20, hearing any of the following

24    commands by law enforcement, "Get back"?

25        A.  No.



1    Q.  "Stay away from the bridge"?

2    A.  No.

3    Q.  "Get off the bridge"?

4    A.  No.

5    Q.  "Move back"?

6    A.  No.

7    Q.  "Back away from the concertina wire and return to

8    the south side of the bridge"?

9    A.  No.

10   Q.  "Back away from the barricades"?

11   A.  No.

12   Q.  "Stop trying to cut the razor wire"?

13   A.  No.

14   Q.  Protesters were told they were trespassing and

15   would be arrested if they trespassed?

16          MR. STOLL:  Objection, that's not a

17   question.

18   Q.  Do you recall that order being given?

19   A.  No.

20   Q.  Protesters being told to stay away from the burnt

21   out vehicle and the razor wire?

22          MR. STOLL:  Objection, not a, vague, not a

23   question.

24   A.  No, I don't remember that.

25   Q.  "Disbursed immediately and return to the camp"?



1    A.  No.

2    Q.  "Stay back and stop throwing rocks"?

3    A.  No.

4    Q.  Do you deny that warnings of that type were given

5    to the protesters during the time period you were there

6    for the three-plus hours near or on the Backwater Bridge

7    on November 20?

8            MR. STOLL:  Objection, vague and compound

9    and calls for speculation.

10   A.  I don't remember those commands being given.

11   Q.  Okay.  Are you saying they weren't given, or are

12   you saying you just don't remember what commands were

13   given by law enforcement on November 20 while you were

14   present on or near the bridge?

15           MR. STOLL:  Objection, call for speculation

16   and vague.

17   A.  I don't remember if there were, if these commands

18   were given or if commands like that were given, but

19   there were a lot of other sounds, so I don't know if I

20   would have heard them.

21   Q.  Well, was the, the, the loudest things that was

22   occurring while you were there on November 20 was the

23   LRAD?

24   A.  It depends.

25   Q.  Okay.  Do you agree there were commands given by



1  the law enforcement on November 20 while you were on or

2  near the Backwater Bridge, but you just don't remember

3  what the specific words were?

4      A.  I don't remember those commands being given at

5  all.

6      Q.  Okay.  But do you remember commands being given

7  by law enforcements to the protesters to the affect that

8  they should get off the bridge on November 20?

9              MR. STOLL:  Objection, vague.

10     A.  No.

11     Q.  On November 20, were there flares that were being

12  lit on fire by the protesters?

13     A.  Not that I saw.

14     Q.  Were there fireworks being used by the

15  protesters?

16     A.  On November 20?

17     Q.  Yes.

18     A.  Not that I saw.

19     Q.  Did you see the protesters direct fireworks

20  towards law enforcement on November 20?

21     A.  No.

22     Q.  Have you ever seen a flash-bang go off after

23  November 21, 2016?

24     A.  Yes.

25     Q.  Okay.  And, and where did you see that and when?



1    A.  I saw some this summer.

2    Q.  And where was that at?

3    A.  Portland, Oregon.

4    Q.  And did that flash-bang break apart into metal

5    pieces?

6              MR. STOLL:  Objection, calls for

7    speculation.

8    A.  I don't know.  I didn't look at them after.

9    Q.  Okay.  Were you, did you see one or more

10   flash-bangs deployed in relation to your involvement in

11   protest activities in Portland, Oregon in the summer of

12   2020?

13   A.  Can you repeat the question?

14   Q.  Yes.  Did you see flash-bangs being used in

15   relation to your, your participation in protest

16   activities in Portland, Oregon in the Summer of 2020?

17             MR. STOLL:  Objection to form.

18   A.  I can't say that they were in relation to my

19   activities, personally.

20   Q.  I didn't ask you that.  Was it in relation to a

21   protest?

22             MR. STOLL:  Objection, objection to form.

23   Randy, you're well over your seven hours now.

24             MR. BAKKE:  Well, let me just finish this

25   topic quickly.  I'm not getting an answer.



1    Q.  Let, let me try to speed this up.  In relation to

2  the flash-bang or flash-bangs you saw in Portland,

3  Oregon in the summer of 2020, were those being used by

4  law enforcement?

5    A.  Yes.

6    Q.  Was, was anyone injured from those flash-bangs?

7         MR. STOLL:  Objection.

8    Q.  That you saw?

9    A.  No.

10    Q.  And how many flash-bangs did you personally

11  observe go off in Portland, Oregon?

12    A.  I don't know exactly, several.

13    Q.  And was that the only other time since you

14  incident where you'd seen, personally seen flash-bangs

15  deployed?

16    A.  Yes.

17    Q.  Okay.

18         MR. BAKKE:  Thanks for the indulgence, Ben.

19         MR. STOLL:  Certainly.

20  BY MR. STOLL                      CROSS EXAMINATION

21    Q.  I have just a few questions for you, Ms.

22  Wilansky.  The, the first is, between 2:00 a.m. and

23  4:00 a.m. on November 21, 2016, how would you describe

24  the general atmosphere on the Backwater Bridge?

25    A.  It was very calm and tranquil.  There were people



1  cleaning up objects from the roadway.  There were

2  actually people sledding on bin lids on, off the side of

3  the bridge, but most people were just sitting around

4  campfires quitely.

5      Q.  During that two-hour period, did you see anybody

6  throw anything at law enforcement?

7      A.  No.

8      Q.  During that two-hour period, did you see anyone

9  act violently?

10     A.  No, other than the police.

11     Q.  Understood.  During that time period, did you see

12  anybody, like screaming or yelling at law enforcement?

13     A.  No.

14     Q.  During that time period, did you see anyone

15  threatening to use force or violence against law

16  enforcement?

17     A.  No.

18     Q.  Did you see anything during that period that

19  could possibly be described as a riot or riot-like

20  behavior?

21     A.  No.

22     Q.  During that time period, were any of the law

23  enforcement officers doing anything to try to remove the

24  protesters from the bridge?

25     A.  No.



1    Q.  During that time period, did any of the law

2    enforcement officers appear to be acting in a defensive

3    posture or position?

4              MR. BAKKE:  Objection as calling for

5    speculation, no foundation.

6    A.  No.

7    Q.  During that time period, did any of the law

8    enforcement officers appear, to you, to be scared or

9    intimidated?

10             MR. BAKKE:  Object to lacks of foundation,

11   calls for speculation.

12   A.  No.

13   Q.  During that time period, did any of the law

14   enforcement officers articulate, in any way, that they

15   were scared or intimidated or afraid for their life?

16   A.  No.

17   Q.  During that time period, if the police had been

18   worried about securing the truck that was on the bridge,

19   could they have just walked around the barricades and

20   concertina wire and gotten onto the south side of the

21   bridge and physically secured the truck?

22             MR. BAKKE:  Objection as calling for

23   speculation, no foundation.

24   A.  I think they could have.

25   Q.  And my, my final question for you is, had that



1    truck on the bridge not been chained or secured to the

2    bridge or the Jersey barrier, would you or anyone around

3    you have any ability to get it off the bridge?

4           MR. BAKKE:  Objection as calling for

5    speculation, no foundation.

6    A.  No.  I believe it took a big truck to move the

7    other one.

8    Q.  Okay.  I have no further questions.

9           MR. BAKKE:  Okay.  Let's go off the video

10   record but stay on the written record.

11          THE VIDEOGRAPHER:  We ask that all

12   participants please stay connected to provide your

13   transcript and video orders.  This concludes today's

14   videoconference.  We are off the video record at 7:01

15   p.m.

16          MR. BAKKE:  And then, Ben, do you want to

17   advise her of her, her right to read and sign?  And then

18   I just have another housekeeping matter to, to follow up

19   on, on the record.

20          MR. STOLL:  Sure.  Sure.  So, Sophia, you

21   have the right to review the transcript and, you know,

22   make sure it doesn't have typos or errors in it.  You

23   can, and my advise to you is that you reserve you right

24   to do that.  Do you reserve your right to do that?

25          MS. WILANSKY:  Yes.



1           MR. STOLL:  Okay.  Jesse, I, I'd like a copy

2   of that transcript, and I will make sure that Sophia

3   yeah gets it and, and review it.

4           THE STENOGRAPHER:  Okay.  I'll get your

5   orders after --

6           MR. BAKKE:  Okay.

7           THE STENOGRAPHER:  -- we're done.

8           MR. BAKKE:  And then, Jeff, before we let

9   Jesse go, I think I mentioned before that I want a copy

10  of the video of Ms. Wilansky's deposition.

11          THE STENOGRAPHER:  Are we off the record

12  now?

13          THE VIDEOGRAPHER:  Do you need that

14  synchronized?

15          MR. BAKKE:  Yes, please.

16          THE STENOGRAPHER:  Are we off the record?

17          MR. STOLL:  Jeff, I'd like the same.

18          MR. BAKKE:  Well, I'm going to go back on

19  the record, but if you want to go off for this, that,

20  that, that's fine.  I --

21          THE STENOGRAPHER:  Yeah.  I can just get --

22  yeah.  Go ahead and get your orders, Jeff.  Sorry.

23          THE VIDEOGRAPHER:  No, we're good.  I got

24  it.

25          THE STENOGRAPHER:  Okay.



1    MR. BAKKE:  Okay.  So, Jesse, back on the

2    record.  Ben, just a topic just so I remember later what

3    we talked about, so the two cellphones, well, you, you

4    indicated you'd talked to me about that.  What's, what's

5    that status and what's been downloaded, and is there a

6    mirror image and who has them and...

7    MR. STOLL:  Yeah.  So I think you're talk,

8    there's the iPhone that you referenced earlier.  That

9    was what she was carrying when she was injured.  Our

10   expert Dr. Buck has that, and before we can do anything

11   with it we need a joint protocol as to how we're going

12   to remove information from it.  I also, like, I, I had

13   forgotten this the last time we talked, but Dr. Buck

14   reminded me that there is residue on that phone.  We're

15   going to want to test that residue, but, again, we've

16   been waiting until we have some kind of joint protocol

17   to do that, so I'm happy to work with you to, on

18   protocols, to, to remove the residue.  I have a separate

19   expert who is an expert at removing information from old

20   phones in a forensically sound way, and I can provide

21   you with a proposed protocol for him of how he's going

22   to do that, but I just want to make sure that it gets

23   approved before it gets done.  The, the second phone is

24   the Alcatel phone that Sophia had after she was injured,

25   and we, we imaged that phone, and I reviewed that image



1  and produced everything off of it that was responsive.

2          MR. BAKKE:  So the, the iPhone she had with

3  her at the time, do you want to send me or proposed

4  joint protocol --

5          MR. STOLL:  Sure.

6          MR. BAKKE:  -- with the residue issue or

7  damage issue?

8          MR. STOLL:  Yes, absolutely.

9          MR. BAKKE:  Okay.  And then in relation to

10 the cellphone, the forensic protocol, am I correct in

11 understanding that since whatever lawyer received it

12 from Ms. Wilansky in Minneapolis, that it's not been

13 powered on since then?

14         MR. STOLL:  Correct.  I, you have me on the

15 record here, so I want to be a little careful, my memory

16 is that we had Sophia or Sophia's father send that phone

17 directly to Dr. Buck.  I don't think any lawyer ever

18 touched it between when it was sent and when it got to

19 Dr. Buck, but I can confirm that if you want.

20         MR. BAKKE:  Okay.  Yeah.  I mean, I just, as

21 you probably know, if you power it on and it doesn't

22 connect to a, a cell tower or if the battery is dead and

23 you try to power it on, you can lose everything on the,

24 the cellphone.

25         MR. STOLL:  Yeah.  And, you know, I'm not



1  going to put myself out there as a technology expert,

2  but, roughly, what I think our, like cellphone forensic

3  technology guy is proposing to do is to power it on in

4  some, in, in sort of, like a safe mode.  You have to, I

5  guess, do a bunch off special button touches to get it

6  on in its non-normal boot mode, and, also, to do that

7  in, like something called a faraday bag that prevents

8  the phone from contacting a cell tower, and that allows

9  him to be able to image the phone without either, A,

10  connecting to a cell tower, or, B, even, like the phone

11  really knowing that it was on.

12          MR. BAKKE:  That sounds generally consistent

13  with what I understand as well.

14          MR. STOLL:  Okay.

15          MR. BAKKE:  Okay.  Then the other topic is,

16  you referred to some law enforcement munitions, or Ms.

17  Wilansky does in her Answer to Request No. 8, and you

18  say we can inspect that at a time and place agreeable to

19  both parties after we've agreed to an inspect protocol.

20  Before doing that, is that, is that Dr. Buck as well?

21          MR. STOLL:  Correct.  Dr. Buck has that

22  stuff.

23          MR. BAKKE:  Yeah.  So, you know, before we

24  decide where to go with that and what we might need to

25  do, can you send us some photographs of those munitions



1   so we can see what's there?

2                MR. STOLL:  Yes.

3                MR. BAKKE:  Okay.

4                MR. STOLL:  I can do that.

5                MR. BAKKE:  Do you know, generally, what it

6   consists of?

7                MR. STOLL:  Yeah.  I, I think, generally, my

8   guess is that there's, like somewhere between a dozen

9   and two dozen, like spent munitions.  I think it's, like

10  there's some impact munitions, you know, those, like

11  blue-tipped rubber bullets.  I think there's some bean

12  bag fragments.  I think there's some CF canister

13  fragments and maybe, like some other sort of, like bits

14  and pieces that are harder to identify, or that don't

15  immediately jump out to me as being obvious what they

16  came from.

17               MR. BAKKE:  Okay.  But not, not anything

18  that's purported to be or believed to be from a

19  flash-bang?

20               MR. STOLL:  I would say that, at this point,

21  I don't have any reason to believe that any of the stuff

22  she has came from a flash-bang or a Stinger ball

23  grenade.

24               MR. BAKKE:  Okay.

25               MR. STOLL:  Or anything that has a light



1  sound diversionary aspect to it.

2         MR. BAKKE:  Okay.

3         MR. STOLL:  Tested, we haven't tested the

4  stuff but I'm eyeballing it.  That's my current belief.

5         MR. BAKKE:  Okay.  That's, that's helpful.

6  Okay.  Okay.  That's, that's all I had before we close

7  out the record unless you had something else, Ben, or,

8  or Lauren.

9         MR. STOLL:  Nope.  That's all I had.

10         MR. BAKKE:  Okay.  Thank you.

11     (This deposition was concluded at 7:08 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1          NOTARY REPORTERS CERTIFICATE

2     STATE OF MINNESOTA

3          I, JESSE LEE ANDERS, a Notary Public, within and

4     for the County of Clay and State of MINNESOTA did hereby

5     certify:  That the afore-named witness was by me sworn

6     to testify the truth, the whole truth and nothing but

7     the truth.

8          That the foregoing two hundred and eight(208)

9     pages contain an accurate transcription of my shorthand

10    notes then and there taken.

11         I further certify that I am neither related to

12    any of the parties or counsel, nor interested in this

13    matter directly or indirectly.

14          WITNESS my hand and seal this 1st day of

15    March, 2021.

16    _____

17    JESSE L. ANDERS

18    NOTARY PUBLIC

19

20    THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT

21    APPLY TO THE PRODUCTION OF THE SAME BY ANY MEANS, UNLESS

22    UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE

23    CERTIFYING STENOGRAPHER.

24

25    My commission expires:  Jan 31, 2024



```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NORTH DAKOTA
 2
                                       )
 3     SOPHIA WILANSKY,                )
                                       )
 4                   Plaintiff,        )
                                       )        Civil No.
 5        vs.                          )   1:18-cv-00236-CSM
                                       )
 6     MORTON COUNTY, NORTH DAKOTA;    )
       "JOHN DOE" law enforcement officer)
 7     in his personal capacity; KYLE  )
       KIRCHMEIER; in his personal and )
 8     official capacities; PAUL LANEY,)
       in his personal capacity; and   )
 9     THOMAS IVERSON, in his personal )
       capacity,                       )
10                                     )
                     Defendants.       )
11
                 DECLARATION UNDER PENALTY OF PERJURY
12
13     I declare under penalty of perjury

14     that I have read the entire transcript of

15     my Deposition or the same has been read to me, and

16     the same is true and accurate, save and

17     except for changes and/or corrections, if

18     any, as indicated by me on the

19     ERRATA SHEET hereof, with the understanding

20     that I offer these changes as if still under

21     oath.

22     Signed on the _____ day of

23     _____, 20___

24     _____

25     SOPHIA WILANSKY
```



```
                    DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

SOPHIA WILANSKY
```



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

SOPHIA WILANSKY

