UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

SOPHIA WILASKY,

Plaintiff,

vs.

PAUL D. BAKKE, in his personal capacity;
THOMAS M. GROSZ, in his personal
capacity; MATTHEW J. HANSON, in his
personal capacity; MICHAEL W.
HINRICHS, in his personal capacity;
TRAVIS A. NELSON, in his personal
capacity; JOSHUA W. RODE, in his personal
capacity; EVAN M. SAVAGEAU, in his
personal capacity; TRAVIS M. SKAR, in his
personal capacity; GLEN G. TERNES, in his
personal capacity; JUSTIN W. WHITE, in his
personal capacity; DEREK J. ARNDT, in his
personal capacity; KYLE KIRCHMEIER, in
his official capacity; and MORTON
COUNTY, NORTH DAKOTA,

Defendants.

**MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS AMENDED
COMPLAINT**

**Case No. 3:23-cv-00142**

## BACKGROUND

While this case was filed less than three months ago, it is part of a wider litigation dating back nearly five years. *See Wilansky v. Morton County et al.*, No. 1:18-cv-00236 ("Companion Case.") The Companion Case has followed an unusual course; its procedural history was recently described by Magistrate Judge Senechal as "atypical, pronged, and tortuous." ECF # 275 at 1.

As such, this Court is in the somewhat unusual position of adjudicating a motion to dismiss a Complaint which is actually the *fifth* Complaint to be filed by this Plaintiff against these Defendants. Further, the various Complaints filed in the case have been interspersed with a variety of dispositive motions and at least two periods of limited discovery. *See generally* "Procedural History," *infra*.

Yet from the Companion Case, certain key facts are clear. All parties agree on the location and timeframe of Plaintiff's injury, which occurred around 4:00 in the morning on the

Backwater Bridge on November 21, 2016. The surrounding interaction with law enforcement, which took place over mere minutes, was partially captured in an audio recording by a dashboard camera. The events of the preceding hours, days, weeks, and months have been the subject of frequent litigation in this District over the past six years, and the findings of those Courts must be acknowledged for context in addressing Plaintiff's allegations here, some of which appear drafted to avoid that essential context.

Many of Plaintiff's claims merit a swift dismissal, because she fails to set forth *any* factual allegations supporting her claim against at least three of the State Defendants. The remaining claims are clear-cut questions of qualified immunity, which Plaintiff cannot overcome due to the clarity of the governing law and the inability of her allegations to meet it. For the reasons set forth in the remainder of this brief, State Defendants Paul Bakke, Michael Hinrichs, Travis Nelson, Joshua Rode, Evan Savageau, Travis Skar, and Derek Arndt respectfully request that the claims against them be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## I.    Procedural History.

Without subjecting to the Court to a lengthy recitation of the Companion Case, the State Defendants will briefly outline its history to give context to the instant Motion.

Plaintiff's initial Complaint in the Companion Case was filed on November 19, 2018. ECF # 1, Companion Case. It concerns the injury she sustained on November 21, 2016, which she alleges was caused by the actions of law enforcement. *See generally id.*

Notably, the initial Complaint named only one state Defendant: Major Tom Iverson of the North Dakota Highway Patrol. *See* ECF # 1, Companion Case, at ¶ 11. Specifically, he faced a defamation claim stemming from his role as public information officer, which was dismissed by the Court on October 29, 2020. ECF # 46 at ¶ 1, Companion Case.

The initial Complaint also named as defendants Morton County, Kyle Kirchmeier, and Paul Laney, as well as "John Doe" law enforcement officer who was alleged to have caused her arm injury. *See* ECF # 1, Companion Case, at ¶ 8. In the same Order which dismissed the claims against

NDHP Major Tom Iverson, the Court converted portions of the Motion to Dismiss filed by Defendants Morton County and Kyle Kirchmeier (hereinafter, "Municipal Defendants") to a Motion for Summary Judgment. ECF # 46, Companion Case, at ¶ 126. The Court then proceeded to issue an order for limited discovery on that converted motion. ECF # 51, Companion Case.

Limited discovery proceeded between the remaining parties from November 6, 2020, until the filing of the remaining Defendants' supplemental memorandum regarding the converted Motion for Summary Judgment, on June 4, 2021. *See* ECF ## 51, 110, Companion Case.

On March 9, 2022, Plaintiff requested that the Court stay its adjudication of the pending motion for summary judgment so that she could file an Amended Complaint to substitute the "John Doe" placeholder with "the specific law enforcement officers responsible for causing her injury." *See* ECF # 140, Companion Case. She cited the state of limitations on her excessive force claims which was set to run in November of that year as justification for her request. *See id.* at 1. She stated that she did not "intend to add any new causes of action or allege any new facts other than those already contained in the summary judgment briefs and appendices." *Id.* at 2.

Having received the permission of the Court, Plaintiff filed her Amended Complaint on July 21, 2022. ECF # 153, Companion Case. In addition to replacing the "John Doe" defendant who allegedly caused her arm injury with Deputy John Moll of the Morton County Sheriff's Office, *see generally id.*, she also added eleven new individual law enforcement defendants to the case. Included among these were six members of the North Dakota Highway Patrol : Paul Bakke, Adam Dvorak, Travis Nelson, Joshua Rode, Evan Savageau, and Travis Skar. *Id.* at ¶¶ 10-22.

Accordingly, from October 29, 2020, when Tom Iverson was dismissed, to July 21, 2022, when six new Defendants were added, nobody from the North Dakota Highway Patrol was a party to the case.

Once brought into the case, all Defendants filed respective motions to dismiss invoking qualified immunity. Further, the Municipal Defendants additionally filed a Motion to Strike, asserting that the Amended Complaint exceeded the Plaintiff's representations as to its contents. *See* ECF # 174, Companion Case.

In November of 2022, while the Motions to Dismiss and Motion to Strike were pending, all Defendants entered into a tolling agreement with Plaintiff stating that if the Court granted the Motion to Strike, Plaintiff would have 20 days to file a new case against the Municipal Defendants and the then-current State Defendants, as well as one other member of the North Dakota Highway Patrol (Michael Hinrichs).

In the meantime, while the Motions to Dismiss and Motion to Strike were pending, the Court allowed limited discovery to commence. ECF # 219, Companion Case. This occurred over the objection of State Defendants, who had asked the Court to address their qualified immunity defense before authorizing discovery. *See* ECF # 191, Companion Case. Discovery proceeded from roughly December 2022 until May 2023.

In May 2023, the Court issued an Order to Show Cause regarding the filing of Plaintiff's Amended Complaint, citing her "cavalier disregard for the Court's narrow permissions to amend her original Complaint." ECF # 235, Companion Case, ¶ 2. After further briefing, on July 14, 2023, the Court struck many of Plaintiff's allegations as impertinent, effectively dismissing six of the seven State Defendants from the case, but allowing Plaintiff to retain her claims against State Defendant Dvorak. *See generally* ECF # 254, Companion Case.

Pursuant to the Court's Order, Plaintiff filed a Second Amended Complaint in the Companion Case. State Defendant Dvorak, the sole State Defendant in that case, has again filed a Motion to Dismiss, and again asked that discovery be stayed, but the Court has again ordered that discovery proceed. ECF # 275, Companion Case. As such, the Companion Case against State Defendant Dvorak is ongoing. The Companion Case also retains as a defendant Deputy John Moll, the individual whom Plaintiff alleges to have injured her arm.

In accordance with the tolling agreement, Plaintiff filed the instant case on August 2, 2023. ECF # 1. Plaintiff filed an Amended Complaint on October 11, 2023. ECF # 14. Six of the seven current State Defendants – Arndt, Bakke, Nelson, Rode, Savageau, and Skar – were previous defendants in the Companion Case. One additional officer of the North Dakota Highway Patrol, Michael Hinrichs, is also a defendant in this case.

For the reasons set forth below, all claims against the seven State Defendants should be dismissed.

## II. Factual Allegations in the Amended Complaint.

Plaintiff bases her Constitutional claims against the seven State Defendants on a shifting set of allegations. Through the use of group pleading – *i.e.*, her collective description of *all* 11 named individual defendants as "Law Enforcement Officer Defendants" – and her inconsistent use of that term, it is not clear who is alleged to have done what. Indeed, three of the State Defendants are not specifically alleged to have done anything at all.

From the seven State Defendants' perspective, then, Plaintiff asks this Court to adjudicate *eight* sets of allegations: the personal allegations against each of the seven, and the *collective* allegations against the "Law Enforcement Officer Defendants," a term which appears in 68 separate paragraphs which may or may not apply to any of the seven individuals. As set forth in more detail below, this ambiguity alone demonstrates unequivocally that these claims fail to meet the standard of *Iqbal* and *Twombley*. *See Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012) ("A complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant.").

Accordingly, it is difficult to set forth even the background factual allegations applicable to the seven NDHP defendants named in the case. To impose some order on this situation, this Brief will first set out the factual allegations regarding the collective group of "Law Enforcement Officer Defendants," and next address the allegations against the seven individual State Defendants, starting with Bakke, Nelson, and Savageau and ending with Arndt.

### A. Allegations Against "Law Enforcement Officer Defendants."

Plaintiff initially uses the term "Law Enforcement Officer Defendants" in the first paragraph of her Amended Complaint, explaining it as a reference to the 11 individually-named defendants. Doc. No. 14, Amended Complaint at ¶ 1. It is clear, however, that Plaintiff does not mean to refer to all 11 defendants every time she uses the term. For instance, she alleges that the

Law Enforcement Officer Defendants "rapidly fired at Sophia with less-lethal munitions," id. at ¶ 2, but several lines later explains that the Law Enforcement Officer Defendants "all actively participated in the attack from the beginning by *either* firing less-lethal munitions themselves *or* assisting the Law Enforcement Officer Defendants who were firing less-lethal munitions." *Id.* at ¶ 5. As such, it is clear at the outset that the identities of the Law Enforcement Officer Defendants change according to the particular allegation. This is clear even as to the heart of the Complaint, i.e., its discussion of the events of November 20-21, 2016.

Plaintiff starts her explanation of the events of November 20, 2016 at ¶ 105 of her Complaint. She first sets forth her version of the situation leading up to November 20, including the establishment of the law enforcement barricade, its subsequent partial dismantling by a semi-truck, and the confrontation between protestors and law enforcement earlier in the evening of November 20, 2016, which she describes as lasting until "approximately midnight." Amended Complaint at ¶¶ 105 to 122. Next, Plaintiff discusses the alleged tranquility of the bridge between midnight and 4:00 AM the following morning. *Id.* at ¶¶ 123 to 128. Then, she describes her own journey to the DAPL protests in general. *Id.* at ¶ 129-132.

Finally, Plaintiff sets forth the allegations surrounding her injury, including what she describes as her "vigil" by the burned-out truck, the issuance of a law enforcement command to disperse, and what she describes as a sudden, unprovoked, and coordinated "attack" by law enforcement resulting in the injury to her arm. Amended Complaint at ¶¶133-199.

In this critical portion of her Complaint, she mentions the term "Law Enforcement Officer Defendants" 35 separate times. At many of these times, it is not clear who she is referring to.

The confused natured of Plaintiff's allegations is apparent from an examination of two paragraphs. For instance, in ¶ 150, Plaintiff states that "as a pretext for attacking Sophia and Stephen, the Law Enforcement Officer Defendants issued a command for an unnamed undescribed individual to get out from under the truck." In the next paragraph, she alleges that "Upon information and belief, this command was issued by Defendant Ternes." *Id.* at ¶ 151.

These two paragraphs illustrate the fatal ambiguity on the face of her Complaint. Is Plaintiff attempting to convey in the first paragraph that *multiple* law enforcement officers simultaneously issued a command, and, that it was a "pretext" for everyone who spoke? But if so, why didn't she confirm in the second paragraph that this command was issued by Defendant Ternes *together with* other unknown officers?" Conversely, if she meant to indicate in the first paragraph that only one law enforcement officer issued the command, why didn't she state as much in the first paragraph, before offering her belief that the single officer was in fact Ternes? Furthermore, is she alleging that the command was known to be a "pretext" *only* by the officer who issued it, or by several officers who issued it, or all the officers, including those who did not issue it? More importantly, if Plaintiff did mean to allege any of these things, she would need to support them with factual allegations pertaining to each individual defendant – which she did not.

In sum, Plaintiff's inconsistent pleading – i.e., her unpredictable switching from individual defendants to groups of officers using the phrase "Law Enforcement Officer Defendants" – makes it extremely difficult for any individual defendant to respond to the Amended Complaint.

**B.    Allegations Regarding Paul Bakke, Travis Nelson, and Evan Savageau.**

Plaintiff names as individual defendants Bakke, Nelson, and Savageau, but she does not actually attribute any specific conduct to them in the Complaint. Defendants Bakke, Nelson, and Savageau are described in the Amended Complaint's opening paragraph as "law enforcement officers" who attacked Plaintiff with "less-lethal and explosive munitions." Amended Complaint at ¶ 1. Their names are mentioned again parenthetically under "Claim I. . . Fourth Amendment – Excessive Force" and "Claim II. . . Fourteenth Amendment – Excessive Force." *See id.* at ¶¶ 236, 251.

Aside from this, Defendants Bakke, Nelson, and Savageau are not the subjects of any allegations in the Complaint. As discussed further below, these allegations fail to meet the standards of *Twombly* and *Iqbal*.

**C.    Allegations Regarding Michael Hinrichs and Joshua Rode.**

Like Bakke, Nelson, and Savageau, defendants Hinrichs and Rode are described in the Amended Complaint's opening paragraph as "law enforcement officers" who attacked Plaintiff with "less-lethal and explosive munitions." Amended Complaint at ¶ 1. Their names are mentioned again parenthetically under "Claim I. . . Fourth Amendment – Excessive Force" and "Claim II. . . Fourteenth Amendment – Excessive Force." *See id.* at ¶¶ 236, 251.

In addition to the above allegations which are similar to those against Bakke, Nelson, and Savageau, they are the subject of one additional allegation in the Amended Complaint:

> **166.** While Sophia and Stephen were pinned behind the metal sheet, Jonathan Moll and at least Defendant Skar, <u>Defendant Hinrich [sic], Defendant Rode</u>, and Defendant Arndt all moved west to get a better line of sight on Sophia.

Amended Complaint at ¶ 166.

Much like the first three Defendants, nothing in this single allegation fairly puts Hinrichs and Rode on notice of any improper conduct, let alone unconstitutional conduct.

### D.    Allegations Regarding Travis Skar.

Like Bakke, Nelson, Savageau, Hinrichs, and Rode, Skar is described in the Amended Complaint's opening paragraph as one of the "law enforcement officers" who attacked Plaintiff with "less-lethal and explosive munitions." Amended Complaint at ¶ 1. His name is mentioned parenthetically under "Claim I. . . Fourth Amendment – Excessive Force" and "Claim II. . . Fourteenth Amendment – Excessive Force." *See id.* at ¶¶ 236, 251.

In addition to the above, Skar is also the subject of two additional allegations in the Amended Complaint. These are set forth below, together with the immediately preceding paragraph for context.

> **153.** Instead of responding to Stephen's explanation or issuing further commands, the Law Enforcement Officer Defendants immediately began rapidly firing less-lethal munitions at Sophia and Stephen.
>
> **...**
>
> **156**. <u>Defendant Skar</u> began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so far approximately several minutes.
>
> …

**166**.     While Sophia and Stephen were pinned behind the metal sheet, Jonathan Moll and at least <u>Defendant Skar</u>, Defendant Hinrich [sic], Defendant Rode, and Defendant Arndt all moved west to get a better line of sight on Sophia.

Amended Complaint at ¶¶ 153, 156, and 166.

In sum, the allegations against Skar are that he deployed a less-lethal weapon – which, standing alone, is not unconstitutional.

### E.     Allegations Regarding Derek Arndt.

Like every other State Defendant, Arndt is described in the Amended Complaint's opening paragraph as "one of the "law enforcement officers" who attacked Plaintiff with "less-lethal and explosive munitions." Amended Complaint at ¶ 1. His name is mentioned parenthetically under "Claim I. . . Fourth Amendment – Excessive Force" and "Claim II. . . Fourteenth Amendment – Excessive Force." *See id.* at ¶¶ 236, 251.

In addition to the above, Arndt is the subject of several specific allegations in the Amended Complaint:

**153**.     Instead of responding to Stephen's explanation or issuing further commands, the Law Enforcement Officer Defendants immediately began rapidly firing less-lethal munitions at Sophia and Stephen.

**154**.     <u>Defendant Arndt</u> began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them so for approximately several minutes.

…

**166**.     While Sophia and Stephen were pinned behind the metal sheet, Jonathan Moll and at least Defendant Skar, Defendant Hinrich [sic], Defendant Rode, and <u>Defendant Arndt</u> all moved west to get a better line of sight on Sophia.

…

**175**.     Eventually, one or more of the Law Enforcement Officer Defendants – including at least <u>Defendant Arndt</u> – hit Sophia with at least one less-lethal munition.

…

**182**.     Upon information and belief, <u>Defendant Arndt</u> continued to shoot at Sophia while she was retreating and pleading for him to stop.

Amended Complaint at ¶¶ 153, 154, 166, 175, 182. Again, nothing on the face of these allegations indicates unconstitutional conduct. It does not violate the Constitution for a law enforcement officer to deploy less-lethal munitions at a person, to move west to get a better view of the person, or to deploy less-lethal munitions at a person who may be retreating, particularly in the context of a protracted attempt to disperse an individual who has already received warnings from law enforcement.

## LAW AND ARGUMENT

### I.     Legal Standards Applicable to a Motion to Dismiss.

#### A.     General Standard Under Rule 12(b)(6).

The State Defendants move to dismiss all the claims brought against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Under Rule 12(b)(6), a defendant can test the legal sufficiency of a complaint in order to eliminate those actions "which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). Although a court must accept the complaint's allegations as true, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007), and view them in the light most favorable to the nonmoving party, *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009), the complaint must still "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face. Thus . . . a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010) (internal citations and quotation marks omitted). Indeed, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)). For purposes of analyzing a motion to dismiss pursuant to 12(b)(6), this Court must accept Plaintiff's factual allegations as true, but the Court is not required to accept her legal conclusions. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459 (8th Cir. 2010) (citing *Twombly*, 550 U.S. at 556.)

### B.    Requirement of Personal Involvement.

The requirement of personal involvement is particularly apposite here in light of Plaintiff's reliance on the term "Law Enforcement Officer Defendants" through her Amended Complaint. In order to state a claim under § 1983, "a plaintiff must plead that *each* Government-official defendant, through the official's own individual actions, has violated the Constitution." *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011), citing *Iqbal*, 556 U.S. 662 (emphasis added). Accordingly, a state official sued in an individual capacity will only be liable for money damages if a plaintiff shows the official was directly and personally involved in the constitutional violation. *See*, *e.g.*, *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) ("Government officials are personally liable only for their own misconduct."); *Faulk*, 30 F.4th at 744 ("Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed.")

### C.    Motions to Dismiss on Qualified Immunity Grounds.

As a general rule, government officials such as the State Defendants are protected by qualified immunity unless "a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Faulk*, 30 F.4th at 744  (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, (2011)). When considering qualified immunity at the motion to dismiss stage, then, a court considers "[1] whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right and [2] whether the right was clearly established at the time of the alleged infraction." *Dadd v. Anoka Cnty.*, 827 F.3d 749, 754-55 (8th Cir. 2016).

Particularly critical here, where six of the seven State Defendants have faced continuous litigation for 15 months without having their qualified immunity defense adjudicated, is the nature of the defense: Qualified immunity is "*immunity from suit* rather than a mere defense to liability." *Faulk*, 30 F.4th at 744 (emphasis in original). All individual State Defendants raise qualified immunity through this Motion to Dismiss.

## II.    This Court Should Consider Three Matters Outside the Pleadings.

Although a Rule 12 motion tests the legal sufficiency of the pleadings, some matters outside the pleadings can be considered. *State ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999) (citing *Martin v. Sargent*, 780 F.2d 1334, 1336-37 (8th Cir. 1985)); *see also* Wright & Miller, *§ 1366 Conversion of a Rule 12(b)(6) Motion Into a Summary Judgment Motion*, 5C Fed. Prac. & Proc. Civ. § 1366 (3d ed.) (Observing that items *not* considered to be "outside the pleadings" include "various types of exhibits that are attached to the pleading, matters of which the district court can take judicial notice, and items of unquestioned authenticity that are referred to in the challenged pleading and are "central" or "integral" to the pleader's claim for relief.")

Here, the State Defendants submit that three items may be considered by this Court without converting this motion to one for summary judgment: the NDHP dashcam video which has been relied upon by Plaintiff for roughly five years in the Companion Case, Plaintiff's prior allegations regarding the law enforcement barricade and the burned-out truck attached to it, and the analysis of previous Courts in this District regarding the events of November 20th through November 21st 2016.

Importantly, however, if this Court should disagree with its analysis as regards any item, and find that one, two, or all three are not embraced by the pleadings, the State Defendants request that the Court simply exclude the items discussed below and continue to adjudicate this motion under Rule 12(b)(6), because even without external items, all State Defendants are entitled to qualified immunity.

**A.    NDHP Dashcam Video from 3:56:56 AM to 3:59:50 AM on November 21, 2016.**

The consideration of video at the motion-to-dismiss stage was recently confirmed by the Eighth Circuit in *Ching as Tr. for Jordan v. City of Minneapolis*, where the Court held that "videos of an incident are necessarily embraced by the pleadings" and went on to consider videos capturing a law enforcement use-of-force incident before dismissing a complaint under Rule 12(b)(6) on qualified immunity grounds. 73 F.4th 617, 621 (8th Cir. 2023). *See also Jackson v. Brooklyn Ctr.*, No. 21-CV-2072 (SRN/DJF), 2023 WL 2368032, at *4–6 (D. Minn. Mar. 6, 2023), aff'd sub nom.

*Jackson v. City of Brooklyn Ctr.*, No. 23-1678, 2023 WL 6876550 (8th Cir. Sept. 28, 2023) (collecting cases).

Here, the Court should not hesitate to consider the NDHP dashcam video, which was filed by Plaintiff as ECF ## 126-29, Companion Case (hereinafter, "NDHP Dashcam 2.") For nearly five years, Plaintiff has relied upon this video – or, more precisely, the accompanying audio – which captures the law enforcement command given shortly before her injury. Yet over the past half decade, despite invoking the law enforcement command in a total of five Complaints and several dispositive briefs, Plaintiff has <u>never</u> disclosed to the Court the full text of the command. State Defendants respectfully request that, based on Plaintiff's yearslong reliance on this video, and its capture of the command which is key to Plaintiff's allegations of an unconstitutional seizure, the Court consider this matter to be "embraced by the pleadings" and consider it without converting this matter to one for summary judgment.

The NDHP Dashcam 2 video, and Plaintiff's characterization of the same, has an interesting history in this case. According to Plaintiff's initial Complaint in her initial suit, Plaintiff received NDHP Dashcam 2, along with three other related videos, in or around February of 2017. *See* ECF #1, ¶¶ 153-158, Companion Case ("Attorneys for Morton County disclosed one dash cam video they claimed to have received from the North Dakota State Highway Patrol. The video purports[1] to cover the time period from 3:49 a.m. to 4:15 a.m. on November 21.")

---

[1] In her Complaint, Plaintiff erroneously asserts that the video and its three companion videos were originally one continuous video which had been deliberately edited to create "unexplained gaps." ECF #1 at ¶ 155, Companion Case. However, the "unexplained gaps" are not actually gaps, because the four videos were originally recorded as separate non-contiguous videos, *not* as one video with portions later edited out. Plaintiff eventually filed the four videos as separate summary judgment exhibits at the following document numbers in the Companion Case:

| Name for Purposes of This Motion | Time Period Captured on Nov. 21, 2016 | ECF # in Companion Case |
|---|---|---|
| NDHP Dashcam 1 | 3:49 AM to 3:54 AM (approximately) | ECF # 126-42 |
| NDHP Dashcam 2 | 3:57 AM to 3:59 AM (approximately) | ECF #126-29 |

In her initial Complaint, Plaintiff candidly discussed the command issued in the dashcam video, opining "the officers do not appear scared or worried that there might be an explosive device nearby,[2] **even when they order protestors away from the burned-out vehicle**." *Id.* at 157 (emphasis added). And indeed, in the factual allegations of the same original Complaint, Plaintiff alleges the contents of this command in similar terms: "While Sophia was talking with this other water protector, law enforcement officers ordered ***them*** to move away from the burned-out vehicle." *Id.* at ¶ 104, Companion Case.

Over the next several years, Plaintiff continues to reference the law enforcement command, but gradually erases her initial admissions that a) the command was issued to her, as opposed to someone else and b) that it contained the general order to move away from the burned out vehicle, as opposed to a more specific order to get out from underneath the burned out vehicle. In her 2021 response to Defendants' motion for summary judgment, for instance, she files all four of the NDHP Dashcam videos and describes the command as an "ambiguous announcement," writing, "[a]t approximately 3:57 a.m., law enforcement issued a command *for **someone** to get out from under the truck*." ECF #124 at ¶ 24, Companion Case. The following year, in her 2022 Amended Complaint, she further modifies the individual to whom this command is directed: "At approximately 3:57 a.m., as a pretext for attacking Sophia and Stephen, the Law Enforcement

| NDHP Dashcam 3 | 4:00 AM to 4:06 AM (approximately) | ECF #126-43 |
| NDHP Dashcam 4 | 4:11 AM to 4:15 AM (approximately) | ECF #126-44 |

Notably, Plaintiff appeared to base her theory of unexplained gaps in part on her assertion that the videos failed to cover "the exact time Sophia was injured." ECF # 1 at ¶ 155, Companion Case. While not necessarily relevant at the motion-to-dismiss stage, to the extent it bears on the Court's view of the videos now, the State Defendants submit that audio from the exact moment of the injury *does* appear to be captured, although again that is immaterial for purposes of addressing this motion. *See* NDHP Dashcam 3, ECF #126-43 at roughly 4:01:50.

[2] As is clear from the content of the video, none of the four dashcam videos show any of the events depicted in the Complaint, because the camera is not pointed at the law enforcement barricade where the alleged injuries took place, but instead is pointed at the protestors south of the barricade.

Officer Defendants issued a command *for **an unnamed undescribed individual** to get out from under the truck.*" ECF # 153, ¶ 134, Companion Case.

These changes did not go unnoticed. Upon Judge Traynor's Order criticizing this alteration, ECF # 235, ¶ 5, Companion Case, Plaintiff defends the change as "more accurate in light of the discovery record, including Plaintiff's deposition testimony and videos of the moments before her injury." ECF # 246 at 3, Companion Case. Curiously, in related briefing, she describes the video containing the command as *new* evidence "uncovered" in discovery. *See* ECF # 251-2 at 2, Companion Case; *see also* ECF # 211 at 2 n.1,Companion Case, filed on November 2, 2022 ("Plaintiff learned more details about [the command] in discovery, including from a video that appears to actually show the command being given. It is totally appropriate for an amended complaint to contain *new allegations* learned in discovery.") (emphasis added). This is puzzling, because the video was not new discovery –it was invoked in her initial Complaint and has been available to her for many years.

Now, State Defendants simply request that the Court consider the actual text of the command when adjudicating the instant Motion to Dismiss, given the fact that Plaintiff has relied on this command in her Complaint and has gone so far to file the video herself in the Companion Case. In Plaintiff's current Amended Complaint, she writes:

**150.** At approximately 3:57 a.m., as a pretext for attacking Sophia and Stephen, the Law Enforcement Officer Defendants issued a command for an unnamed undescribed individual **to get out from under the truck**.

**151.** Upon information and belief, this command was issued by Defendant Ternes.

**152.** Stephen responded to this command by telling the Law Enforcement Officer Defendants that no one was under the truck.

**153.** Instead of responding to Stephen's explanation or issuing further commands, the Law Enforcement Officer Defendants immediately began rapidly firing less-lethal munitions at Sophia and Stephen.

ECF # 14 at ¶ 150-53 (emphasis added).

Again, this is not exactly what the video captures. While the recording speaks for itself, State Defendants provide the following transcript:

**[Inaudible] We see you behind the truck and underneath the truck. Get out now. Return to the south side of the bridge. Otherwise, we will use less-lethal munitions.**

Timestamp 3:57:51 in NDHP Dashcam 2, ECF # 126-29.

    **B.**    **Allegations in the Companion Case Regarding Protestor Attempts to Dismantle the Barricade.**

Another significant shift in Plaintiff's allegations over the years has been her attempt to walk back her original admission that protestors were actively attempting to dismantle the law enforcement barricade on the north side of Backwater Bridge via removal of the burned-out truck – the very burned-out truck where Plaintiff coincidentally found herself later that evening. Indeed, by the time of Wilansky's injury, the protestors had enjoyed partial success in this attempt already. Her Original Complaint prominently features these efforts:

**80.**    While at Oceti Sakowin, Sophia learned that law enforcement had erected a barricade immediately north of Backwater Bridge.

**81.**    The barricade spanned the width of the highway and consisted of concrete roadblocks covered in multiple rings of concertina razor wire. Immediately in front of these concrete roadblocks were two large burned-out vehicles.

**82.**    This barricade prevented water protectors and others from traveling between Bismarck/Mandan and Oceti Sakowin on Highway 1806. Such travelers, including emergency medical personnel, were forced to use a considerably longer and more circuitous route between the camp and Mandan.

**83.**    Throughout November 2016, water protectors attempted to negotiate the reopening of Backwater Bridge with Morton County to no avail. The County kept the bridge closed and barricaded.

**84.**    On the afternoon of November 20, several water protectors arrived at Backwater Bridge with a semi-truck and towed one of the burned-out vehicles off of the bridge and into a nearby ditch.

**85.**     Law enforcement officers prevented these water protectors from towing away the second burned-out vehicle.

**86.**     Over the next several hours, hundreds of water protectors gathered south of the barricade on Backwater Bridge to protest the continued closure of the bridge.

Complaint, ECF # 1, Companion Case, at ¶¶ 80-86.

However, at the time she filed her First Amended Complaint four years later, she omitted certain allegations, such as the fact that she learned about the barricade upon arriving at camp, as well as the fact that law enforcement officers prevented the protestors from removing the second burned-out truck. First Amended Complaint, ECF # 153, Companion Case, at ¶¶ 97-99. She also replaced the sentence "**several water protectors arrived at Backwater Bridge with a semi-truck** and towed one of the burned-out vehicles off of the bridge" with "**a semi-truck** towed one of these burned-out trucks off the bridge into a nearby ditch." *See id*. at ¶ 99.

When the Court in the Companion Case noted and criticized this change[3], *see* Doc. No. 235 at ¶ 5, Plaintiff defended it on the grounds that the truck was irrelevant, and that Plaintiff "did not participate in *or know about* the towing away of the first truck." ECF # 251-2 at 1 (emphasis added). This is puzzling, because Plaintiff's deposition testimony indicated the opposite. *See* ECF # 120-10, Companion Case, p. 81 at ll. 21-24 (Plaintiff testifying that she learned that the protestors successfully removed one of the trucks). Indeed, at one point in her deposition Plaintiff testifies that, while she stood next to the burned-out truck with Stephen Joachinson moments before her injury, they were discussing this very topic: "Well, because we were standing near the truck, we talked about how people had moved the other truck and tried to move the one that was still there." *Id.* at p. 97, ll. 17-21.

---

[3] The Court in the Companion Case eventually struck Wilansky's changes and directed her to adopt the original version of her allegations on this point. *See* ECF # 254-1, Companion Case, at 22-23.

Turning to the instant case, Plaintiff's current Amended Complaint continues to omit the information regarding the identify of the persons operating the semi-truck, as well as the other allegations set forth above. *See* Amended Complaint at ¶ 108.

Relevant to the instant motion, this alteration of pleadings is significant because the protestors' previous success in compromising the barricade is an important aspect of the potential threat posed by concealed protestor activity in the immediate vicinity of the second burned-out truck later in the evening. The law enforcement officers' perception of that potential threat, and the high level of tension between law enforcement and protestors, is directly relevant to their qualified immunity defense. And although the general rule is that an amended pleading replaces a former pleading, the rule is not without exception. Where a plaintiff has "manipulated the allegations in their pleadings to avoid a dispositive defense . . .the Court [should] recite the pertinent facts here as they previously appeared." *Fernandez v. School Bd. of Miami-Dade Cnty.*, 201 F. Supp. 3d 1353, 1361 n.1 (S.D. Fla. 2016); see also *Davis v. Williamson*, No. 4:08-CV-2009, 2009 WL 136815, at *4 n.4 (M.D. Pa. Jan. 20, 2009) (considering the original complaint when dismissing an amended complaint where the "amended complaint conveniently omits some of the potentially damning details of this incident which were included in his original complaint" and concluding the plaintiff "is bound by the admissions made in his original complaint and cannot simply erase these details by omitting them from his amended complaint"); *Andrews v. Metro N. Commuter R.R. Co*, 882 F.2d 705, 707 (2d Cir. 1989) ("The amendment of a pleading does not make it any less an admission of the party."); *cf. Sunkyong Int'l, Inc. v. Anderson Land & Livestock Co.*, 828 F.2d 1245, 1249 n.3 (8th Cir. 1987) (indicating that a pleading superseded through amendment can still be used as the admission of a party).

Accordingly, the State Defendants ask that the Court exercise these same principles and consider Plaintiff's original allegations as set forth at ¶¶ 80-86 of her Original Complaint (ECF # 1 in the Companion Case) when adjudicating the instant motion.

### C.     Former Judicial Analyses of the Night in Question.

In addition to the dashcam video and Plaintiff's previous allegations regarding the protestors dismantling the barricade, the general background of the events of the night in question may be considered by this Court at the motion-to-dismiss stage. *See Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record[.]").

Items subject to judicial notice, as well as matters of public record, generally include court records, *see Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007) ("In Missouri, **as in other states**, court records are public records.") (emphasis added), and more specifically, "court filings" from related proceedings. *See Amerind Risk Mgmt. Corp. v. Malaterre*, 633 F.3d 680, 685 n.6 (8th Cir. 2011) (citing *Biomedical Patent Mgmt. Corp. v. Cal., Dep't of Health Servs.,* 505 F.3d 1328, 1331 n.1 (Fed. Cir. 2007)); *see also Freshman v. Atkins*, 269 U.S. 121, 124 (1925) (holding that a court may "take judicial notice of, and give effect to, its own records in another, but interrelated proceeding"); *Enter. Bank v. Magna Bank of Mo.*, 894 F. Supp. 1337, 1341 (E.D. Mo. 1995), aff'd, 92 F.3d 743 (8th Cir. 1996).

Based on this body of law, the State Defendants ask that the Court consider one additional source: the previous analysis of Courts in this district of the events of November 20, 2016. Plaintiff's Amended Complaint acknowledges that the Backwater Bridge on the evening of November 20, 2016, and early morning of November 21, 2016 was the location where her constitutional rights were allegedly violated. *See* Amended Complaint at ¶¶ 105-198. Significantly, Courts of this district have examined "the existence of and basic facts surrounding" the events at the Backwater Bridge prior to and on November 20th and 21st on several previous occasions. *See Dakota Access, LLC v. Archambault*, No. 1:16-cv-296, 2016 WL 5107005 (D.N.D. Sep. 16, 2016) (hereinafter *Archambault*); *Dundon v. Kirchmeier*, No. 1-16-cv-406, 2017 WL 5894552 (D.N.D. Feb. 7, 2017) (hereinafter *Dundon I*); *Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007 (D.N.D. 2021) (hereinafter *Dundon II*). This Court may take judicial notice of "the existence of and basic facts surrounding"

the closure of the Backwater Bridge as demonstrated by matters filed in these related proceedings. *Insulate SB, Inc. v. Advanced Finishing Sys., Inc*, 797 F.3d 538, 543 n.4 (8th Cir. 2015).

In *Dundon II*, the Court specifically noted many facts leading up to and including the evening/early morning hours of November 20/21 at the Backwater Bridge that it referred to as "undisputed facts," including facts whose accuracy cannot seriously be questioned because they are recorded on videotape. 577 F. Supp.3d at 1018-23. Many of those undisputed facts are relevant to the State Defendants' qualified immunity defense in this case because they put in context the overall circumstances that would be perceived by a reasonable police officer on the evening/early morning in question. Those facts include, for example, the rising tension between law enforcement and protestors that preceded November 20/21 (including one protestor arrested for attempted murder for firing three shots at law enforcement officers), the fact that two vehicles had been placed on Backwater Bridge and disabled as part of a barricade, that within minutes protestors set the vehicles on fire, that Backwater Bridge was deemed unsafe because of the fires and closed to all access due to damage, that the burned-out trucks were interconnected to the jersey barrier and concertina wire barricades located on the north side of the Bridge. The factual findings made by the Court in *Dundon I* were examined on appeal, with the Eighth Circuit affirming the district court's decision. *See Dundon v. Kirchmeier*, 701 F. App'x 538 (8th Cir. 2017).

Along similar lines, the Court should also consider the comments and analysis of the Court in the Companion Case, including the Court's previous order granting, in part, a motion to dismiss Plaintiff's original complaint in that matter. *See* ECF # 46, ¶¶ 51-53, Companion Case.

## III. Plaintiff's Claims against Bakke, Nelson, Savageau, Rode, and Hinrichs Fail as a Matter of Law

Plaintiff's allegations against these individuals range from the non-existent (Bakke, Nelson, and Savageau) to the fact that they "moved west to get a better line of sight on Sophia" (Hinrichs and Rode). *See* Amended Complaint at ¶ 166.

It is well-established that, in order to state a claim under § 1983, "a plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated

the Constitution." *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011), citing *Iqbal*, 556 U.S. 662 (emphasis added). Failing to mention a defendant cannot possibly meet this standard, nor can the allegation that a particular defendant "moved west to get a better line of sight" on a rapidly evolving situation. Presumably, Plaintiff wishes to attribute some portion of the collective actions of the "Law Enforcement Officer Defendants" to these five individuals – but it is Plaintiff's responsibility to *actually do so*, particularly in light of the discovery Plaintiff has been permitted to conduct for several years now. The case of *Faulk v. City of St. Louis, Missouri* is particularly apposite here, particularly with regards to the situation, present here, where a "John Doe" defendant is identified after subsequent discovery:

> At the district court's direction, Faulk was permitted to engage in extensive discovery to replace John Doe Defendants with named defendants who participated in the alleged First and Fourth Amendment violations. As a result, Faulk added new defendants identified as members of the "arrest team" and specific allegations of the roles played by many of the initial defendants. But as to Wood, all Faulk could factually allege in 332 paragraphs was that he was working on September 17 and took custody of Faulk's bicycle. Requiring Wood to devote time to multi-party discovery in which Faulk fishes for something more . . . is precisely what *Iqbal* precludes.

30 F.4th 739, 746 (8th Cir. 2022)

Here, too, the Court should find that *Iqbal* precludes Plaintiff's attempts to keep Bakke, Nelson, Savageau, Rode, and Hinrichs in this litigation. Her failure to specify what, if any, conduct was engaged in by these particular defendants deprives them of "fair notice of what the ... claim is and the grounds upon which it rests." *Twombly,* 550 U.S. at 545. All claims against Bakke, Nelson, Savageau, Rode, and Hinrichs should be dismissed for failure to state a claim.

In the event that the Court directs that some or all of the allegations against the "Law Enforcement Officer Defendants" be imputed to these five individuals, however, Plaintiff still fails to state a claim under the Fourth or Fourteenth Amendment, as set forth below.

IV.    **Plaintiff Cannot Defeat the State Defendants' Qualified Immunity on Her Fourth Amendment Claim.**

Wilansky's claims against the State Defendants under the Fourth Amendment are fatally flawed. Again, the State Defendants are entitled to dismissal on qualified immunity grounds unless Plaintiff can meet two elements: first, she must state "a plausible claim for violation of a constitutional or statutory right," and, second, show that the right was "clearly established at the time of the alleged infraction." *Dadd*, 827 F.3d at 754-55. Plaintiff's failure here to meet either of these requirements mandates dismissal in the State Defendants' favor.

### A. Plaintiff Does Not State a Plausible Claim Against Any State Defendant for Violation of Her Fourth Amendment Rights.

The deficiency inPlaintiff's Fourth Amendment claim against is clear from the face of the Complaint. First, she fails to allege a seizure as required to state a claim for a violation of the Fourth Amendment. Further, she fails to allege any conduct that was objectively unreasonable in light of the facts and circumstances confronting the State Defendants. Last, she fails to allege any injury resulting from her non-seizure from any State Defendant except a new but untenable alleged injury as to Defendant Arndt. For all of these reasons, she fails to meet the first prong of the qualified immunity test.

### 1. Governing Law Regarding Seizures.

Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. CONST. amend. IV. While seizures an take several forms, State Defendants respectfully submit that none of them are alleged here.

The governing law defining seizures was most recently clarified by the United States Supreme Court in the 2021 case of *Torres v. Madrid*. As explained therein, seizures can take two distinct forms: those effected by physical force, and those effected by a show of authority which restrains a person's liberty. *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021). The latter kind, also described by the Court as a "seizure by control," has two distinct subvariants: "**either** voluntary submission to a show of authority **or** the termination of freedom of movement." *Id.* at 991. The distinction between a seizure by physical force and a seizure by control is critical to Fourth Amendment jurisprudence as explained below.

### a. Physical Force Seizures.

The requirements of a seizure by physical force were addressed by the Court in *Torres*, where it was faced with deciding whether a woman who started to flee the police when she was struck by a bullet, but continued driving, was seized. *Torres v. Madrid*, 141 S. Ct.at 995. Looking to common law, the Court concluded that the plaintiff *was* seized "for the instant that the bullets struck her." *Id.* at 999. However, the Court placed important limits on its holding regarding a physical force seizure:

> We stress, however, that the application of the common law rule does not transform every physical contact between a government employee and a member of the public into a Fourth Amendment seizure. **A seizure requires the use of force with intent to restrain.** Accidental force will not qualify. Nor will force intentionally applied for some other purpose satisfy this rule. In this opinion, we consider only force used to apprehend.

*Torres*, 141 S. Ct. at 998 (internal citations omitted)(emphasis added).

### b. Seizures by Control.

The other form of seizure is a seizure by control, and critically, there are two types: voluntary submission to a show of authority, **or,** termination of freedom of movement. Describing the two variants of seizure by control, the Court in *Torres* explains:

> Unlike a seizure by force, a seizure by acquisition of control involves **either** voluntary submission to a show of authority **or** the termination of freedom of movement. A prime example of the latter comes from *Brower*, where the police seized a driver when he crashed into their roadblock. 489 U.S., at 598–599, 109 S.Ct. 1378; see also, e.g., *Scott v. Harris*, 550 U.S. 372, 385, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (ramming car off road); *Williams v. Jones*, Cas. t. Hard. 299, 301, 95 Eng. Rep. 193, 194 (K. B. 1736) (locking person in room). Under the common law rules of arrest, **actual control** is a necessary element for this type of seizure. *See* Wilgus, *Arrest Without a Warrant*, 22 Mich. L. Rev. 541, 553 (1924). Such a seizure requires that "**a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.**" *Brower*, 489 U.S., at 599, 109 S.Ct. 1378.

*Torres,* 141 S. Ct. at 1001 (emphasis added).

These two subtypes – seizure by show of authority and seizure by termination of freedom of movement – each have their own distinct features.

### i. Seizures by Show of Authority.

The foundational case for understanding of the requirements for a show-of-authority seizure is *California v. Hodari D.*, 499 U.S. 621 (1991). *See Torres* (explaining that *Hodari* "principally concerns a show of authority.") There, the Court confronted the case of a juvenile who saw an officer chasing him. *Id.* at 623. He continued to flee, but was tackled soon after. *Id.* at 623. The lower court held that Hodari had been "seized" not only at the moment he was tackled, but before that, when he saw the officer running towards him. *Id.* at 623. The Supreme Court reversed, holding that in a show-of-authority situation, a seizure does not occur *unless the subject yields to the authority*. *Id.* at 626. The Court held that, because Hodari did not yield, he was *not* seized merely by the unsuccessful pursuit. *Id.* at 629. Other cases in this subtype include the older case of *United States v. Mendenhall*, 446 U.S. 544, 554, (1980), which set forth the familiar tenet that, in the context of street encounters with police, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554.

### ii.     Seizures by Termination of Freedom of Movement.

As noted by the Court in *Torres*, the "prime example" of termination-of-freedom-of-movement seizures is *Brower v. Cnty. of Inyo*, 489 U.S. 593, 595-96 (1989).[4] There, the Court considered whether police use of a roadblock during a high-speed chase was a seizure when the suspect car's movement was not restrained by law enforcement *until* he hit the roadblock. *Brower*, 489 U.S. at 595-96. The Court noted that, if a suspect was being chased by police and accidentally lost control of their car, that would not be a seizure – because "[v]iolation of the Fourth

---

[4] The 1924 law review article by Professor Wilgus which is cited by the Court in *Torres* gives even more examples of both subtypes of seizures by control. See Wilgus, *Arrest Without a Warrant*, 22 Mich. L. Rev. 541 (1924).Wilgus explains that "show of authority" subtype includes situations where a bailiff locates someone and says, "You are my prisoner," and the person goes back to the jail with him. *Id.* at 553. As for the "freedom of movement" subtype of seizures by control, other examples include preventing someone from leaving a room or preventing them from leaving a ship. *Id.* Wilgus concludes the discussion of both types by stating "all are sufficient detentions to constitute arrest in each case, **if the purpose was to make an arrest**." *Id.* at 555.

Amendment requires *an intentional acquisition of physical control.*" *Id.* at 595-596. But the Court reasoned that the accidental crash hypothetical was distinguishable from the present case, which involved the use of a police roadblock "crossing both lanes of the highway." *Id.* at 598. Discussing the distinction, the Court wrote that for a seizure, "the detention or taking itself *must be willful.*" *Id.* at 596. In other words, a Fourth Amendment seizure only occurs "when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Id.* at 597-599. Noting that the police roadblock crossing the entire highway "is *designed* to produce a stop by physical impact," the Court held the stop to be a seizure. *Id.* at 598.

        **c.**      **Dictate of *Torres* on Maintaining the Distinction Between Types of Seizures.**

As set forth above, *Torres* instructively clarifies the distinction between seizures by physical force and those imposed by control through termination of movement. In the former, the physical force directly impacts a person; in the latter, a person, by means intentionally applied to do so, is physically boxed in in some manner – for instance, by a roadblock crossing two lanes of a highway down which they are driving, or by virtue of being locked in a room, or trapped aboard a ship.

*Torres* also sets forth the Supreme Court's position that these types of seizures must be kept distinct. Indeed, in deciding *Torres*, the Supreme Court explicitly rejected a test that "improperly erases the distinction between seizures by control and seizures by force." *Id.* at 1001. The Court explained that concepts of "control" would be challenging to apply in physical force situations:

> Courts will puzzle over whether an officer exercises control when he grabs a suspect, when he tackles him, or only when he slaps on the cuffs. Neither the officers nor the dissent explains how long the control must be maintained—only for a moment, into the squad car, or all the way to the station house.

*Torres v. Madrid*, 141 S. Ct. 989, 1001–02, 209 L. Ed. 2d 190 (2021)

        **2.**      **Defendant Arndt Did Not Seize Plaintiff.**

Even taking Plaintiff's factual allegations as true, she has failed to allege that Arndt seized her at any point in her Complaint, under any legally cognizable theory.

### a.   Arndt Did Not Seize Plaintiff by Physical Force Because His Actions Showed An Objective Intent to Disperse.

Plaintiff alleges that Defendant Arndt hit her with at least one less-lethal munition. Amended Complaint at ¶ 175. As such, she has alleged physical contact between his munition and her person. But as the Court in *Torres* cautions, not "every physical contact between a government employee and a member of the public" constitutes a Fourth Amendment seizure. *Torres*, 141 S. Ct. at 998. Rather, "a seizure requires the use of force with intent to restrain." *Id.* Not only is the intent to restrain missing from Plaintiff's allegations, but the allegations show the opposite: Arndt and the other members of law enforcement were trying to disperse her from the scene.

By the time Plaintiff allegedly arrived on the Bridge (and particularly in the event the Court takes into account the allegations regarding the burned-out truck as they were originally set forth by Plaintiff) the threat to the defensive barricade would have been in the front of any reasonable officer's mind. *See generally* ECF # 1, Companion Case, at ¶¶ 80-86. According to Plaintiff's allegations, protestors had not merely "attempted to negotiate the reopening of Backwater Bridge." *Id.* at ¶ 83. They did not simply take no for an answer when "[t]he County kept the bridge closed and barricaded." *Id.* Instead, on November 20, they took the extraordinary step of using a semi-truck to *forcibly dismantle the barricade themselves*, in defiance of the County authorities. *Id.* at ¶ 84. This is extraordinary conduct, indicating not mere defiance of law enforcement orders, but literal forcible destruction of a law enforcement barricade.

However, due to the efforts of law enforcement, the protestors were only partially successful: "law enforcement officers prevented these water protectors from towing away the second burned-out vehicle." ECF # 1, Companion Case, at ¶¶ 80-86. But there is no indication that law enforcement's success in partially protecting their barricade placated protestors in any way. Quite the opposite. "Over the next several hours, *hundreds* of water protectors gathered south of the barricade on Backwater Bridge to protest the continued closure of the bridge." *Id.* at ¶ 86 (emphasis added). In light of the rapidly swelling numbers of protestors, "Morton County Sheriff's

Office requested the assistance of every available law enforcement officer in the entire state of North Dakota." *Id.* at ¶ 87.

After several hours of intense confrontation, the barricade was still intact by the time the protests died down. *See* Amended Complaint at ¶ 126. And the burned-out truck was still in place when Plaintiff arrived on the bridge. *See* Amended Complaint at ¶ 140. Plaintiff alleges that, after "walking around the Bridge for approximately an hour" and speaking with various individuals, she decided to stand "vigil." *Id.* at ¶¶ 140, 144. Plaintiff does not explain what the purpose of her vigil was, or what the protestors intended to achieve by remaining on the bridge. She does, however, disclose the location of her unexplained vigil: at the very burned-out truck which law enforcement had protected from protestors hours before. *Id.*[5]

Even from this background,[6] it is clear that any member of law enforcement would be particularly attentive to, and suspicious of, any protestor activity near the burned out truck. Plaintiff attempts to downplay the risk posed by her presence by the truck, asserting that she was unarmed, ¶ 142, that she was empty-handed, ¶ 145, and that she "never shouted or made any threats." ¶ 147. But none of this mitigates the objective risk of the situation. While Plaintiff successfully alleges that she had no *visible* weapons or means of harming the burned-out truck, law enforcement such as Arndt would have no way of knowing what any protestor could have on their person, such as hidden in a pocket or inside a winter coat. This is obviously true for weapons in general, and also for items that could damage a barricade. For example, a pair of bolt cutters could fit inside a pocket; an improvised explosive device could be similarly concealed.

Any risk would presumably be compounded if Plaintiff were joined by another protestor at the burned-out truck, which is exactly what happens next. Plaintiff writes, "Shortly before 4:00 a.m. Stephen Joachinson approached Sophia, and they began to talk." *Id.* at ¶ 146. She then alleges,

---

[5] Even if the Court would elect *not* to consider Plaintiff's previous allegations regarding the protestors' involvement in the removal of the first burnt-out truck, the significance of Plaintiff's vigil at this location is clear considering the detail she retains in her current Complaint – i.e., that a semi-truck towed one of the burnt-out trucks away earlier that same day.

[6] Again, all the facts alleged here are merely drawn from Plaintiff's pleadings, without the benefit of the State Defendants' evidence regarding their *actual* knowledge of risk that night.

"At approximately 3:57 a.m., as a pretext for attacking Sophia and Stephen, the Law Enforcement Officer Defendants issued a command for an unnamed undescribed individual to get out from under the truck." *Id.* at ¶ 150.

First of all, Plaintiff cannot assert, in a conclusory fashion, that a command was merely a "pretext" and thereby evade the requirement that conduct be evaluated subjectively. *See Torres* at 998 ("[W]e rarely probe the subjective motivations of police officers in the Fourth Amendment context. Only an objective test 'allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment."). Indeed, the issuance of the command immediately after Joachinson joined her at the barricade indicates that it was triggered by the changing activity of the protestors on the scene. Further, her unsupported claim of "pretext," based on her alleged confusion as to who the command was directed at, collapses entirely when judged against the actual text of the law enforcement command:

> **[Inaudible] We see you behind the truck and underneath the truck. Get out now. Return to the south side of the bridge. Otherwise, we will use less-lethal munitions.**

Timestamp 3:57:51 in NDHP Dashcam 2, ECF #126-29.

This command is clear and comprehensible. The law enforcement officer is speaking to a protestor or protestor(s) underneath the truck, *and*, to a protestor or protestor(s) behind the truck, where Plaintiff alleges that she and Stephen were located. *See* Amended Complaint at ¶ 163 ("To avoid getting hit, Sophia cowered behind the metal sheet.") There is no plausible reason to suspect that this command was meant to indicate anything other than what it said. And what it said unequivocally manifests an intent to disperse.

Plaintiff next alleges that Defendant Arndt, among others, "began firing less-lethal munitions at Sophia and Stephen and continued to shoot at them" for several minutes, *Id.* at ¶ 154, and eventually hit her. *Id.* at ¶ 175.

As such, in this paragraph, Plaintiff alleges the application of physical force against her person. But none of the preceding paragraphs or any reasonable inference made from them, could possibly, let alone plausibly, manifest an intent to restrain. On the contrary, Defendant Arndt's

deployment of less-lethal munitions was intended to disperse Plaintiff. This is most readily obvious from the text of the law enforcement command, but it is also implicit in every paragraph leading up to this point. Again, Defendant Arndt and all the other defendants had an objective reason to disperse any protestor from the burned-out truck, namely, the protestors' attempt to remove it mere hours before and the threat that they would try again.

Further, Defendant Arndt's alleged "celebration" of Sophia's injury and his "failure to render aid" supports an intent to disperse. Amended Complaint at ¶¶ 195, 196. If he wanted to restrain Wilansky, he would have taken her into custody when she was allegedly lying on the ground. It is not plausible that a member of law enforcement – let alone a whole group of them – who inflicts physical force to restrain someone would, moments thereafter, forget about the fact that they were trying to restrain the person and simply let their friends carry the person away. And here, Plaintiff was never actually restrained, further militating against her finding of a seizure.

In sum, Plaintiff cannot show a seizure by physical control here, because the objective allegations in the Complaint and the text of the law enforcement command show that Arndt's objective actions manifested no intent to restrain, but rather an intent to disperse.

**b.      Defendant Arndt Did Not Seize Plaintiff Under a Control Theory.**

Should Plaintiff attempt to argue that Arndt seized her not by physical force but through a "seizure by control," by either his first munition which impacted her or his later (unsuccessful) attempt to impact her (Amended Complaint at ¶ 182), she has no more success under this alternate theory.  A seizure by control still requires an intent to actually seize someone, *see*  p. 24 *supra,* which is absent here for the reasons discussed above.

Further, Plaintiff does not actually allege *control* in any real sense. While she alleges she was "pinned behind the sheet," Amended Complaint at ¶ 163, it is unclear how the munitions of law enforcement could have prevented her from proceeding *south* away from the barricade when Arndt and the others were to her *north and northwest*, respectively. Amended Complaint at ¶ 166. Again, Plaintiff alleges a law enforcement barricade in front of her. Behind her was an entire

highway. As evidenced by the fact that she did, eventually, move to the south, nothing was preventing her from doing so earlier.

The Eighth Circuit recently refused to find clearly established law establishing a seizure by control in a very similar case. There, plaintiffs were dispersed at a protest and attempted to invoke a *Brower*-like seizure by control. In *Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 840 (8th Cir. 2021), the Court stated:

> The reporters cite Supreme Court cases to argue they were restrained because they could not stay in their chosen location. *Brendlin*, 551 U.S. at 257, 127 S.Ct. 2400; *Brower v. Cnty. of Inyo*, 489 U.S. 593, 598-99, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). But these cases did not give fair warning. *Brendlin* held that, during traffic stops, passengers are seized. *Brendlin*, 551 U.S. at 257, 127 S.Ct. 2400. *Brower* held that setting up a roadblock that stops a fleeing suspect is a seizure. *Brower*, 489 U.S. at 598-99, 109 S.Ct. 1378. **Brendlin and Brower are inapposite because both involve police action that terminated or restricted freedom of movement.** See *Brendlin*, 551 U.S. at 257, 127 S.Ct. 2400; *Brower*, 489 U.S. at 598-99, 109 S.Ct. 1378. **Here, the reporters' freedom to move was not terminated or restricted.** *See Johnson*, 926 F.3d at 506 (no seizure where plaintiff was not "ordered to stop and remain in place" and "was able to leave the scene"). **They were dispersed.**

*Quraishi,* 986 F.3d at 840.

Here, likewise, Plaintiff's freedom to move was not terminated or restricted – rather, she was dispersed. She was not an inhabitant of a car seized at a traffic stop as in *Brendlin*, nor did she crash into a police roadblock stretching across an entire highway as in *Brower*. *Brower* provides an illustrative factual distinction: there, the object of the seizure was moving *towards* a police barricade which law enforcement intentionally set up to intercept them; here, law enforcement was trying to move Plaintiff *away* from the police barricade, as she concedes in her Complaint. Amended Complaint at ¶ 255. *See also Ratlieff v. City of Fort Lauderdale, Fla.*, No. 22-CV-61029-RAR, 2023 WL 3750581, at *8 (S.D. Fla. June 1, 2023) ("It is instead clear that Ramos fired the Direct Impact Round for some other purpose, namely, to disperse crowds of peaceful demonstrators, and that any reasonable person in Ratlieff's position would feel free—perhaps even encouraged—to leave.") (internal citations and quotations omitted).

In sum, Plaintiff does not plausibly allege that Defendant Arndt seized her for purposes of the Fourth Amendment under a seizure by control theory. As such, she cannot show the violation of a constitutional right, and her claim must be dismissed on grounds of qualified immunity.

### 3. No Other Defendants, including Defendant Skar, Seized Plaintiff Under Any Theory.

For the same reasons that apply to Arndt, none of the other State Defendants – all of whom are alleged to have engaged in conduct with even less of an impact on Plaintiff than Defendant Arndt, who at least was alleged to have stricken her with a single less-lethal round – face a cognizable claim for a seizure here. Only Defendant Skar is alleged to have even deployed less-lethal munitions at her, but there is no allegation that he actually struck here, precluding a physical force seizure under *Torres*; further, any claim of a seizure by control fails for the same reasons applicable to Arndt, above. The same is certainly true for Rode, and Hinrichs, who are simply have alleged to "move west" – hardly indicative of a seizure – and for Bakke, Nelson, and Savageau, who again are not specifically alleged to have done anything at all. The failure to allege a seizure by Bakke, Nelson, Savageau, Rode, Hinrichs, and Skar remains true even if the Court would impute any of the 35 allegations regarding the Law Enforcement Officer Defendants to any of the State Defendants, as those allegations are uniformly *less* factually developed than those attributable to Defendant Arndt.

For all of the above reasons, Wilansky fails to allege a seizure, a necessary component of her Fourth Amendment claim. Accordingly, since she has failed to "state a plausible claim for violation of a constitutional or statutory right," *Dadd*, 827 F.3d at 754-55, all seven State Defendants are necessarily entitled to qualified immunity on the Fourth Amendment Claim.

### 4. Even if Plaintiff Did Allege a Seizure by Any State Defendant, She Failed to Allege Any Unreasonable Force.

Even setting aside the lack of seizure here, Plaintiff's allegations do not actually state a claim of excessive force under the Fourth Amendment. The test for whether force is excessive under the Fourth Amendment is "whether the amount of force used was objectively reasonable

under the particular circumstances." *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020). "The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). *Williams v. City of Burlington, Iowa*, 27 F.4th 1346, 1351 (8th Cir. 2022).

Even if the Court would find a seizure here, the "force" used would not be objectively unreasonable for either the State Defendants who were alleged to have directly used force (Arndt and Skar), or, the State Defendants who were not alleged to have used force at all (Bakke, Nelson, Savageau, Rode, and Hinrichs).

### a.  Arndt and Skar Did Not Use Objectively Unreasonable Force.

The reasonableness of the force allegedly used by these two defendants is clear from the above discussion regarding Arndt's intent to disperse. Arndt's and Skar's deployments of munitions were intended to disperse Plaintiff from a concealed area of the critical defensive barricade that protestors had already partially dismantled earlier in the day. Further, as is evident from the law enforcement command, Plaintiff was given an explicit warning that less-lethal force would be used if she did not disperse.

### b.  Bakke, Nelson, Savageau, Rode, and Hinrichs Did Not Use Objectively Unreasonable Force.

Plaintiff's attempts to tie these five Defendants to the other Defendants' use of force through conclusory claims of "conspiracy" or "failure to intervene" must fail, even setting aside the fact that there is no excessive force for them to have either conspired in or failed to intervene against. *See, e.g.,* Amended Complaint at ¶ 173 ("All of the Law Enforcement Officer Defendants worked together in a conspiracy to injure Sophia and Stephen.") In order to plead a claim for conspiracy under § 1983, a plaintiff must show (1) that the defendant conspired with others to

deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *Faulk*, 30 F.4th at 747 (8th Cir. 2022) (internal citations omitted). The first element "requires allegations of specific facts tending to show 'meeting of the minds' among the alleged conspirators." *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010). Here, Plaintiff alleges no such factual claims; rather, Plaintiff makes conclusory claims such as "Law Enforcement Officer Defendants conspired in, encouraged, and assisted in the unconstitutional attacks." Amended Complaint at 245. This is insufficient to state a claim that any of the State Defendants had a "meeting of the minds" so as to show conspiracy under § 1983. As for the "failure to intervene" claim, not only was there no use of excessive force to intervene in, but Plaintiff does not set forth factual allegations supporting the idea that any of the State Defendants could have known the force was excessive, given Plaintiff's presence at the barricade and the clear warning giving her a chance to disperse, all facts which would indicate to an observing officer that the force used was completely reasonable.

**B.      Even if Plaintiff Did Show a Violation of a Constitutional Right, It Was Not Clearly Established as of November 21, 2016.**

In addition, Plaintiff cannot satisfy the second prong of the State Defendants' qualified immunity defense. Qualified immunity protects government officials from liability under § 1983 when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The defense must be evaluated from the perspective of a reasonable officer based on facts available to the officer at the time of the alleged constitutional violation. *Gladden v. Richbourg*, 759 F.3d 960, 964 (8th Cir. 2014.). If "based on those facts, the officer reasonably failed to comprehend that he was violating a person's clearly established constitutional rights, he is entitled to qualified immunity from suit." *Louden v. City of Minneapolis, Minn.*, 233 F.3d. 1109, 1110 (8th Cir. 2000).

Qualified immunity protects all but the "plainly incompetent." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Consequently, to defeat qualified immunity a plaintiff must demonstrate that "existing precedent [has] placed the statutory or constitutional question beyond debate." *Lombardo*

*v. City of St. Louis*, 38 F.4th 684, 690 (8th Cir. 2022). To show that defendants had fair notice that their conduct violated clearly established rights, a plaintiff **must** establish that "various courts have determined that certain factually similar conduct is a constitutional violation." *Dixon v. Lowery*, 302 F.3d 857, 861 (8th Cir. 2002). "[P]olice officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). When law enforcement are presented with a unique set of circumstances, that alone should be "an important indication . . . that [the officials'] conduct did not violate a clearly established right." *White v. Pauly*, 580 U.S. 73, 137 S.Ct. 548, 552 (2017).

In this context, given the extraordinarily unique set of circumstances present on the Backwater Bridge on the morning of November 21, 2016, no caselaw existed which would put any of the seven State Defendants on notice that they would, without regard to subjective motivation, be deemed to have effectuated a seizure while engaging in conduct objectively intended to disperse Plaintiff. The lack of clearly established law on this topic was recognized in this District by the Court in *Dundon II,* 577 F. Supp.3d at 1041–44, which discussed the protests of November 20, 2016 and stated that "the law was not clearly established at the time of the protest that their actions constituted a seizure."

On the subject of force used to disperse vs force used to restrain, the Eighth Circuit case of *Martinez v. Sasse*, 37 F.4th 506 (8th Cir. 2022) clearly shows that any right violated here was not clearly established as of November 2016. That case concerns conduct which took place in June of 2018, concerning an ICE officer who physically pushed an attorney to keep them out of an ICE facility. Martinez, 37 F.4th at 508. Considering whether the push was a seizure as a matter of clearly-established law, the Court explained, "If there is a constitutional distinction between force used for repulsion that momentarily restricts forward movement and force used for dispersion that impels retreat, the distinction is not so readily apparent that every reasonable officer would have

understood it." *Id.* at 510. This Court should recognize the same and dismiss these claims based on qualified immunity. *See also Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 840 (8th Cir. 2021) (where force was used to disperse reporters at a protest, finding right not clearly established.)

## V.    Plaintiff Cannot Overcome State Defendants' Qualified Immunity on Her Fourteenth Amendment Claim.

The Fourteenth Amendment Due Process Clause protects citizens from governmental deprivation of life, liberty and property without due process of law. U.S. CONST. AMEND. XIV. In order to establish a violation of substantive due process, a plaintiff must show "(1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the executive official was shocking to the 'contemporary conscience.' "*White v. Smith*, 696 F.3d 740, 754 (8th Cir. 2012). State Defendants' deployment (or lack thereof) of less-lethal munitions did not deprive Wilansky of liberty. But even more obviously, her conduct does not "shock the conscience." "Only the most severe violations of individual rights that result from the brutal and inhumane abuse of official power rise to this level." *White v. Smith*, 696 F.3d 740, 757–58 (8th Cir. 2012) (citations and quotations omitted). Here, even taking Plaintiff's allegations as true, she was on a bridge closed to the public, specifically located at a defensive barricade which had already been partially dismantled hours earlier, and was warned to leave or less-lethal munitions would be used. In such a scenario, it does not shock the conscience to deploy less-lethal munitions at a person. As such, Plaintiff fails to allege a violation of a Constitutional right, and certainly not one that was clearly established such that a reasonable person would have known about it. Accordingly, State Defendants are entitled to qualified immunity on Plaintiff's Fourteenth Amendment claims.

For all of these reasons, the State Defendants respectfully request that the Court dismiss the claims against them found in Plaintiff's First Amended Complaint.

Dated this 30th day of October, 2023.

State of North Dakota
Drew H. Wrigley
Attorney General

_/s/ Jane G. Sportiello_____
Jane G. Sportiello
Assistant Attorney General
State Bar ID No. 08900
Office of Attorney General
500 North 9th Street
Bismarck, ND  58501-4509
Telephone (701) 328-3640
Email jsportiello@nd.gov

Attorneys for State Defendants