# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

SOPHIA WILANSKY,

                Plaintiff,

v.

PAUL D. BAKKE, *et al.*,

                Defendants.

Case No.  3:23-cv-00142

Honorable Judge Traynor
Honorable Judge Senechal

---

## PLAINTIFF'S CONSOLIDATED OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS
## THE AMENDED COMPLAINT

---

Benjamin M. Stoll
CARLTON FIELDS P.A.
Suite 400 West
1025 Thomas Jefferson Street, NW
Washington, DC 20007
(202) 965-8160
bstoll@carltonfields.com

Edward C. Barnidge
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
ebarnidge@wc.com

Lauren C. Regan
CIVIL LIBERTIES DEFENSE CENTER
1430 Willamette Street #359
Eugene, Oregon 97401
(541) 687-9180
lregan@cldc.org

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ....................................................................................................... 1

FACTS ........................................................................................................................ 2

    A.    Key Facts Relevant to Motions to Dismiss ............................................. 2

    B.    The Additional Facts Proposed by Defendants Are Either Irrelevant or Actively Support Plaintiff's Claims ......................................................... 6

    C.    Plaintiff's Concealment Allegations Should Not Be Struck Because They Show Culpability and Are Therefore Relevant ...................................... 9

ARGUMENT ........................................................................................................... 10

I.        LEGAL STANDARDS. .................................................................................. 10

II.      PLAINTIFF WAS SEIZED. ......................................................................... 10

    A.    Plaintiff Was Physically Restrained, so *Torres* Does Not Apply. ........ 11

    B.    Plaintiff Satisfies the *Torres* Test for Seizure by Force ....................... 13

    C.    The Seizure Requirement Does Not Apply to Plaintiff's Fourteenth Amendment Claim ............................................................................... 14

III.    PLAINTIFF PLAUSIBLY PLEADS EXCESSIVE FORCE IN VIOLATION OF BOTH THE FOURTH AND FOURTEENTH AMENDMENTS ................................... 15

    A.    Fourth Amendment Excessive Force. ................................................... 15

    B.    Fourteenth Amendment Excessive Force. ............................................ 18

IV.    THE AMENDED COMPLAINT CONTAINS PARTICULARIZED PLAUSIBLE CLAIMS AGAINST EACH DEFENDANT FOR FAILURE TO WARN ..................... 19

V.     DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY. ..................... 22

    A.    It Was Clearly Established in November 2016 that the Attack on Sophia Constituted a Seizure. ......................................................................... 23

B.      It Was Clearly Established in November 2016 that the Use of Explosive and Less-Lethal Munitions Against Sophia Was Excessive and Violated the Fourth and Fourteenth Amendments. ................................................................ 24

C.      Qualified Immunity Has No Basis in the Constitution or the Law and Should Be Categorically Rejected. ................................................................ 26

VI.      IN LIGHT OF *MITCHELL*, PLAINTIFF HAS ADEQUATELY PLEADED HER *MONELL* CLAIM. ................................................................ 28

CONCLUSION ................................................................ 30

# TABLE OF AUTHORITIES

*Page*

## Cases

Baxter v. Bracey,
    140 S. Ct. 1862 (2020) ............................................................................ 26, 27

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007) .......................................................................................... 10

Black Lives Matter D.C. v. Trump,
    544 F. Supp. 3d 15 (D.C. 2021) ..................................................................... 11

Boyd v. Benton County,
    374 F.3d 773 (9th Cir. 2004) ............................................................................ 24

Braden v. Wal-Mart Stores, Inc.,
    588 F.3d 585 (8th Cir. 2009) ............................................................................ 10

Brower v. County of Inyo,
    489 U.S. 593 (1989) .......................................................................... 10, 13, 23

Brown v. City of Golden Valley,
    574 F.3d 491 (8th Cir. 2009) ............................................................................ 25

Burke v. Sullivan,
    677 F.3d 361 (8th Cir. 2012) ............................................................................ 25

California v. Hodari D.
    499 U.S. 621 (1991) ................................................................................. 11, 23

Deorle v. Rutherford,
    272 F.3d 1272 (9th Cir. 2011) .......................................................................... 25

Dobbs v. Jackson Women's Health Organization,
    142 S. Ct. 2228 (2022) ............................................................................. 27, 28

Dundon v. Kirchmeier,
    577 F. Supp. 3d 1007 (D.N.D. 2021) .............................................................. 11

Edwards v. Byrd,
    750 F.3d 728 (8th Cir. 2014) ............................................................................ 25

Estate of Escobedo v. Bender,
    600 F.3d 770 (7th Cir. 2010) ............................................................................ 24

**TABLE OF AUTHORITIES**

(continued)

*Page*

*Ferguson v. Short*,
    840 F.3d 508 (8th Cir. 2016) ...................................................22

*Fogarty v. Gallegos*,
    523 F.3d 1147 (10th Cir. 2008) ................................................25

*Gonzales v. Douglas*,
    No. cv-15-00064, 2016 WL 4530442 (D. Ariz. Aug. 30, 2016) ......................................24

*Graham v. Barnette*,
    5 F.4th 872 (8th Cir. 2021) ...................................................22

*Graham v. Connor*,
    490 U.S. 386 (1989) ...........................................................15

*Hall v. Ramsey County*,
    801 F.3d 912 (8th Cir. 2015) .................................................19

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ...........................................................27

*Hoggard v. Rhodes*,
    141 S. Ct. 2421 (2021) ....................................................26, 27

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ...........................................................22

*Jackson v. Gerl*,
    622 F. Supp. 2d 738 (W.D. Wis. 2009) ......................................24

*Johnson v. McCarver*,
    942 F.3d 405 (8th Cir. 2019) .................................................25

*Karels v. Storz*,
    906 F.3d 740 (8th Cir. 2018) .................................................25

*Kingsley v. Hendrickson*,
    576 U.S. 389 (2015) ...........................................................18

*Kohorst v. Smith*,
    968 F.3d 871 (8th Cir. 2020) .................................................15

*Krout v. Goemmer*,
    583 F.3d 557 (8th Cir. 2009) .................................................26

*Lambardo v. City of St. Louis,*
    38 F.4th 684 (8th Cir. 2022) ........................................................22

*Martinez v. Sasse,*
    37 F.4th 506 (8th Cir. 2022) ........................................................11

*Meloy v. Backmeier,*
    302 F.3d 845 (8th Cir. 2002) ........................................................22

*Michael v. Trevena,*
    899 F.3d 528 (8th Cir. 2018) ........................................................15

*Mitchell v. Kirchmeier,*
    28 F.4th 888 (8th Cir. 2022) ................................................ *passim*

*Nance v. Sammis,*
    586 F.3d 604 (8th Cir. 2009) ........................................................22

*Neal v. Ficcadenti,*
    895 F.3d 576 (8th Cir. 2018) ....................................................9, 15

*Oglesby v. Lesan,*
    929 F.3d 526 (8th Cir. 2019) ........................................................12

*Quraishi v. St. Charles County, Missouri,*
    986 F.3d 831 (8th Cir. 2021) ...................................................11, 12

*Roe v. Wade,*
    410 U.S. 113 (1973) ......................................................................27

*Robinson v. Payton,*
    791 F.3d 824 (8th Cir. 2015) ........................................................20

*Scott v. Harris,*
    550 U.S. 372 (2007) ......................................................................23

*Small v. McCrystal,*
    708 F.3d 997 (8th Cir. 2013) ........................................................25

*Taylor v. City of Middletown,*
    436 F. Supp. 2d 377 (D. Conn. 2006) ..........................................24

*Terebesi v. Torreso,*
    764 F.3d 217 (2d Cir. 2014) .........................................................24

**TABLE OF AUTHORITIES**
(continued)

-right>Page

*Torres v. Madrid*,
 141 S. Ct. 989 (2021) .............................................................................. *passim*

*United States v. Dortch*,
 868 F.3d 674 (8th Cir. 2017) ...........................................................................12

*United States v. Warren*,
 984 F.3d 1301 (8th Cir. 2021) .........................................................................12

*Ware v. Jackson County*,
 150 F.3d 873 (8th Cir. 1998) ...........................................................................29

*White v. Pauly*,
 137 S. Ct. 548 (2017)........................................................................................22

*Wilson v. Lamp*,
 901 F.3d 981 (8th Cir. 2018) ...........................................................................15

*Young v. City of St. Charles*,
 244 F.3d 623 (8th Cir. 2001) ...........................................................................10

*Z.J. v. Kansas City Board of Police Commissioners*,
 931 F.3d 672 (8th Cir. 2019) ...........................................................................24

*Ziglar v. Abbasi*,
 137 S. Ct. 1843 (2017).................................................................................26, 27

*Zutz v. Nelson*,
 601 F.3d 842 (8th Cir. 2010) ...........................................................................10

**Statutes**

42 U.S.C. § 1983......................................................................................1, 19, 20, 22

**Rules**

Federal Rule of Civil Procedure 12(b)..........................................................................10

# INTRODUCTION

Plaintiff's story has never changed: after walking around the Backwater Bridge for more than hour and standing next to a truck for more than 30 minutes, Plaintiff was attacked by a group of law enforcement officers without adequate warning or an opportunity to leave. Those officers rapidly fired numerous less-lethal munitions at her. They deployed two stinger ball grenades toward her. They continued firing at her while she fled, eventually hitting her with an explosive munition that destroyed her left hand and forearm. The attack lasted several minutes. Sophia was unarmed. She was never violent and never resisted. She was not engaged in any crime. This attack—particularly the use of explosive munitions—was excessive force in violation of the Fourth and Fourteenth Amendments. This case involves the officers who observed this attack and did nothing to intervene. Those officers violated 42 U.S.C. Section 1983.

This attack constituted a seizure of Sophia. Sophia was stopped and her freedom of movement was actually restrained. The officers objectively manifested an intent to restrain and injure (not simply disperse) her. The attack was objectively unreasonable: more than *de minimis* force was used against a non-violent, non-resisting civilian who was not plausibly engaged in any serious crime. Many of the Defendants in this case actively participated in the attack on Sophia. The rest knew that the attack was happening and had an opportunity to tell their colleagues to stop using excessive force, but failed to do so. Thus, at a minimum, all of the officer Defendants are liable for failing to intervene. It was clearly established long before 2016 that the force used against Sophia was unconstitutional. It was clearly established long before 2016 that failing to intervene in the use of such force was unconstitutional. Thus, Defendants are not entitled to qualified immunity.

Defendants try to resist this conclusion mostly by attempting to rewrite the facts. That is not appropriate on a motion to dismiss. And the legions of facts Defendants proffer do not change the legal analysis here anyway. None of the proposed facts undermines the plausible inference that Defendants were trying to restrain and injure Sophia, not disperse her. None of the proposed facts changes the plausible inference that Sophia was not suspected of presenting a serious safety threat or engaging in a serious crime. And none of the proposed facts changes the plausible inference that Sophia was peaceful, non-violent, unarmed, and not resisting. While Defendants once tried to tell this Court that law enforcement didn't use explosive munitions against Sophia, they now concede the truth that law enforcement used several explosive munitions against Sophia. These few basic facts are sufficient for the First Amended Complaint to survive Defendants' motions to dismiss.

## FACTS

### A.     Key Facts Relevant to Motions to Dismiss.

At approximately 4:00am on November 21, 2016, a group of law enforcement officers attacked Sophia Wilansky at Backwater Bridge (the "Attack"). ECF No. 14 ("Am. Compl.") ¶¶ 150–192. Defendants Arndt, Bakke, Grosz, Hanson, Hinrichs, Nelson, Rode, Savageau, Skar, Ternes, and White ("Eleven Officer Defendants") all either actively participated in this Attack, or, at the very least, observed it without attempting to intervene. Over the course of several minutes, law enforcement officers fired numerous less-lethal munitions at Sophia, threw two stinger grenades at her, and ultimately shot her with an explosive munition that completely destroyed her left forearm.[1]  *Id.*  Sophia had no opportunity to avoid this attack, which continued even after she

---

[1] The stinger grenades were thrown by Officer Dvorak and the explosive munition that destroyed Sophia's arm was fired by Officer Moll, neither of whom are Defendants in this case. Both Officer

was actively fleeing and pleading for it to stop.  *Id.*  Defendants Arndt, Hanson, Skar, and White actively participated in the attack on Sophia by shooting at her with less-lethal munitions.  *Id.* ¶¶ 154–157, 182–184. The other Defendants—Bakke, Grosz, Hinrichs, Nelson, Rode, Savageau, Ternes—were physically present during the attack and witnessed the entire thing without taking any steps to try to stop it.[2]  *Id.* ¶¶ 186–188.  As a result, at a minimum, each of the Eleven Officer Defendants failed to intervene in the use of excessive force in violation of the Fourth and Fourteenth Amendments.

At the time of the Attack, there was no justification for the use of force against Sophia for several reasons.  *First*, for several hours before the Attack, the Backwater Bridge had been calm and peaceful, with only a handful of protestors present, none of whom were threatening law enforcement or the barricade.  *Id.* ¶¶ 125–126, 134.  During this time, numerous law enforcement officers were present, and none of them (including the Eleven Officer Defendants) objected in any way to the protesters' continued presence on the bridge and near the burned-out truck.  *Id.* ¶ 135. *Second*, Backwater Bridge was located in a remote area far from any population center and a mile away from the DAPL drill-pad, such that there were no people or property that needed immediate protection.  *Third*, Sophia was present on the bridge in clear view of law enforcement for over an hour before she stood near the burned-out truck, so the law enforcement officers (including the Eleven Officer Defendants) were aware that she was unarmed and empty-handed and that she believed she was allowed to be at the bridge.  *Id.* ¶¶ 135–136. *Fourth*, Sophia stood next to the

---

Dvorak and Officer Moll are Defendants in the related case before this Court, *Wilansky v. Morton County*, No. 1:18-cv-00236, hereinafter referred to as the "Related Case."

[2] Plaintiff believes these Defendants actively assisted in the attack as well, but discovery is required to determine precisely how they participated.  That information is uniquely in Defendants' possession.

burned-out truck for thirty minutes (and others stood there before her) without any objection from any law enforcement officer (including the Eleven Officer Defendants), implying that none of these officers were worried about her presence or believed she presented a safety risk. *Id.* ¶ 145. *Fifth*, Sophia did not threaten any of the law enforcement officers and did not attempt to tamper with or climb under the truck or do anything else that law enforcement might find menacing or objectionable. *Id.* ¶¶ 145–149. *Sixth*, when law enforcement officers did issue an order to get out from under the truck, Stephen Joachinson ("Stephen") promptly responded by explaining that there was no one under the truck. *Id.* ¶ 152. If law enforcement believed this response was insufficient or untrue, they could have responded to Stephen and Sophia or issued a more detailed order directing everyone in the vicinity of the truck to move away. *Seventh*, Defendants concede that they could have gone around the barricade and taken Sophia into custody if they had wanted to, but instead they choose to shoot at her for multiple minutes. ECF No. 23-1 ("State Mot.") at 29. For all of these reasons, the use of force against Sophia was completely unnecessary and clearly excessive.

The circumstances surrounding the attack on Sophia and the conduct of the participating law enforcement officers (including the Eleven Officer Defendants) are inconsistent with an intent to *disperse*, rather than restrain. *First*, if the Eleven Officer Defendants and their colleagues had wanted to disperse Sophia, they would have objected to her presence next to the vehicle as soon as she approached, rather than waiting 30 minutes. Am. Compl. ¶ 145. *Second*, the order issued by Defendant Ternes prior to the Attack was not clearly directed at Sophia and Stephen, who were not under or behind the truck,[3] and when Stephen responded by explaining that no one was under

---

[3] Defendants agree the exact order was "We see you behind the truck and underneath the truck. Get out now. Return to the south side of the bridge. Otherwise, we will use less-lethal munitions." State Mot. at 16.

the truck, law enforcement officers immediately initiated the Attack without first responding to Stephen or clarifying the order. *Id.* ¶¶ 150–153. If the Eleven Officer Defendants and their colleagues had wanted to disperse Sophia and Stephen, they would have clarified their order and given Stephen and Sophia an opportunity to comply. Law enforcement's failure to do so implies that the order was a pretext. *Third*, rather than fire one or two shots, the Eleven Officer Defendants and their colleagues rapidly fired many munitions at Sophia, which trapped her behind the metal tarp, rather than giving her an avenue to retreat.[4] *Id.* ¶¶ 154–162. Officer Dvorak's deployment of explosive munitions that detonated south of Sophia further prevented her from leaving. *Id.* ¶¶ 163–165. If law enforcement had wanted to disperse Sophia, they would not have attacked her in a way that prevented her from leaving. *Fourth*, law enforcement officers used multiple explosive munitions against Sophia, a disproportionate level of force that is blatantly inconsistent with an intent to merely disperse, especially because few protesters were present and there was no emergency or active resistance. *Id.* ¶¶ 163–165, 189–191. If the law enforcement officers had actually wanted to disperse Sophia, they would have refrained from using weapons that could (and did) critically injure her. *Fifth*, the Attack continued even after Sophia she was actively fleeing south. Id. ¶¶ 180–191. If the officers merely wanted to disperse Sophia, they would have stopped shooting once she was fleeing. *Sixth*, the Eleven Officer Defendants and their colleagues laughed and cheered when Sophia was restrained and severely injured, a reaction inconsistent with a desire to merely disperse her. *Id.* ¶ 195.

---

[4] Defendants argue that nothing about the rapid firing of munitions from multiple directions prevented Sophia from retreating south. This ignores the basic geometry of the scene. Officers were shooting at Sophia from both the northeast and northwest. As long as she stayed right behind the metal sheet, these munitions were not hitting her, but if she moved south, the sheet would no longer protect her. Sophia only ran south after Defendant Arndt moved sufficiently west that he was able to hit her. Am. Compl. ¶ 175.

Defendants assert that Plaintiff's allegations are "legal" and "conclusory," Municipal Mot. at 5, but the facts described above are all concrete factual allegations: they are all verifiable factual statements about the who, what, when, and where surrounding Sophia's injure. None are legal conclusions. Defendants also complain that Plaintiff's exact allegations have changed over the course of the numerous complaints that have been filed in this and Related Case. Plaintiffs has updated her allegations in small ways over time as discovery and her investigation into the facts continues. Those updates are intended to correct small inaccuracies and focus on the most relevant facts. Nothing about that is improper. And Plaintiff's core allegations have never changed: Defendants and their colleagues attacked her with less-lethal and explosive munitions while she was unarmed and non-threatening without justification and without giving her an opportunity to leave. This attack continued non-stop for several minutes while Defendants participated or watched, even while Plaintiff was retreating, and it did not stop until Plaintiff was critically injured at which point Defendants and their colleagues cheered. Plaintiffs has never changed or waivered on those basic allegations, and they are sufficient, by themselves, to plausibly support Plaintiffs' causes of action here.

B.     **The Additional Facts Proposed by Defendants Are Either Irrelevant or Actively Support Plaintiff's Claims.**

Defendants spend dozens of pages of their briefs attempting to inject their own factual allegations into Plaintiff's complaint. State Mot. at 11–20; ECF No. 21 ("Municipal Mot.") at 3–24. This should immediately raise suspicion that Defendants are not merely objecting to the legal sufficiency of Plaintiff's causes of action. Indeed, Defendants propose so many new facts that their inclusion would essentially double the size of the Amended Complaint. Defendants cite no authority for such a massive expansion of the facts on a motion to dismiss. Regardless, the facts Defendants propose are almost entirely irrelevant.

Defendants propose five categories of additional facts: Plaintiffs' prior deposition testimony (Municipal Mot. at 12–17), Officer Skogen's Dash Camera Video (State Mot. at 13–14), allegations in Plaintiff's pleadings in the Related Case (State Mot. at 16–18; Municipal Mot. at 10); twenty one supposed matters of public record (Municipal Mot. at 18–23), and prior legal decisions by this Court (Municipal Mot. at 23–24; State Mot. at 19–20).

Sophia's Deposition Testimony. While Plaintiff disagrees with Defendants' characterizations of numerous aspects of her deposition testimony, Plaintiff has no objection to the Court considering her deposition as part of the record on the motion to dismiss. Everything Plaintiff said in her deposition is true to the best of her knowledge, and she stands by all of it.

Skogen Dash Camera Videos. Plaintiff likewise has no objection to the Court's consideration of the Skogen Dash Camera videos, which are consistent with and supportive of Plaintiff's allegations. The order described in the First Amended Complaint is heard in the video at 3:57:51. It does not specify Sophia or Stephen and incorrectly indicates there is someone under the truck. Because the camera is not aimed at the barricade, the video does not capture Stephen's response to the order or the munitions being fired at Sophia.[5] Defendants suggest that the explosion heard at 4:01:50 in the video is the munition that destroyed Sophia's arm. State Mot. at 14 n. 1. While it is not possible to know that for sure, that would be consistent with Plaintiff's allegation that the attack on her lasted several minutes and gave Defendants ample time to intervene. Several other aspects of the video further corroborate Plaintiff's allegations. *First*, the camera operator's decision not to turn the camera to face the barricade suggests he did not want to capture the Attack. If the camera operator believed the Attack was appropriate or that Sophia and

---

[5] If you turn the sound on the video up extremely loudly, you can hear what might be Stephen yelling his response to the order and then numerous popping sounds of munitions being fired.

Stephen were dangerous, he presumably would have wanted to capture video of the interaction. _Second_, the video shows that the area surrounding the bridge was peaceful, quiet, and calm. _Third_, both immediately before and immediately after the Attack, the law enforcement officers in the video are milling about without urgency and the camera operator's tone is calm and bored. This is completely inconsistent with Defendants' assertion that they believed they were under attack or in danger.

Plaintiff's Prior Pleadings. Defendants object that Plaintiff did not include in her First Amended Complaint allegations about protesters "actively attempting to dismantle the law enforcement barricade" on the north side of Backwater Bridge. State Mot. at 16–18; Municipal Mot. at 10. But protesters never attempted to dismantle the barricade; instead, a few protesters removed one of the burned-out trucks from _in front_ of the police barricade, _before_ the large confrontation between protesters and law enforcement that itself _preceded_ the attack on Sophia by several hours. Defendants argue that the fact that individuals with no relationship to Sophia used a tow-truck to remove a different truck from the bridge ten hours before Sophia was attacked somehow justifies the attack or suggests that Defendants were sacred. It doesn't. The Skogen dash camera video clearly shows that the Eleven Officer Defendants and their colleagues were not scared, and it is absurd to suggest that these officers believed Sophia and Stephen might remove the second truck from the bridge by themselves while empty handed and with no tow-truck in sight. Plaintiff declined to include allegations that _different_ protesters removed a _different_ truck at a _different_ time because it is irrelevant to her case.

Supposed Matters of Public Record. Defendants propose 21 supposed matters of public record that the Court should consider. Municipal Mot. at 18–23. All of these proposed facts are irrelevant because they relate to events that occurred hours, days, or even weeks before the Attack

on Sophia. Sophia was attacked during a period of peace and calm when law enforcement was not outnumbered and not under attack. Defendants cannot rely on earlier events—such as the chaotic mass protest that occurred hours earlier—because "a reasonable [law enforcement] officer is not permitted to ignore changing circumstances." *Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018)). Indeed, what makes the attack on Sophia excessive and outrageous is that it occurred under circumstances where the use of force was completely unnecessary and unjustified.

Prior Judicial Decisions. This Court's prior judicial decisions in *Dundon* are irrelevant to this case because they involve a different confrontation, one that involved huge numbers of protesters and a significant amount of chaos. Moreover, the decisions Defendants cite were preliminary rulings in which the Court was not making factual findings.

**C.     Plaintiff's Concealment Allegations Should Not Be Struck Because They Show Culpability and Are Therefore Relevant.**

Defendants ask this Court to strike Plaintiff's allegations regarding Defendant Kirchmeier's attempts to conceal his and the other Defendants' role in injuring Sophia by repeatedly telling the media that law enforcement officers did not use explosive munitions against her, a statement he knew was not true. Municipal Mot. at 24–25 (citing Am. Compl. ¶¶ 204–216). Defendants argue these allegations should be stricken because they are irrelevant and were stricken by this Court in the First Amended Complaint in the Related Case. But these allegations are directly relevant because Defendant Kirchmeier's knowingly false statements are evidence that he knew the use of explosive munitions against Sophia was excessive and illegal. If he believed this use of force was appropriate, he would have admitted to it. These allegations are therefore evidence of culpability. And the Court did not strike these allegations in the Related Case because they were irrelevant, but because it concluded that their inclusion violated its Order regarding the scope of permissible amendments. Related Case ECF No. 254.

## ARGUMENT

### I. LEGAL STANDARDS.

The parties agree on the applicable legal standards for Defendants' motions to dismiss. A Rule 12(b)(6) motion to dismiss eliminates only those actions "which are fatally flawed in their legal premises." State Mot. at 10 (quoting *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001)). Therefore, on a motion to dismiss, the Court must "accept the complaint's allegations as true," and "view them in the light most favorable to the nonmoving party." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) and *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009)). To survive the motions to dismiss, Plaintiff need only plead "sufficient factual matter . . . to state a claim for relief that is plausible on its face." *Id.* & Municipal Mot. at 3 (both quoting *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010)). At this stage, the illegality of Defendants' conduct need only be *a* plausible inference from the facts alleged in the Second Amended Complaint; it need not be the *only* plausible, or even the *most* plausible, inference.

### II. PLAINTIFF WAS SEIZED.

Defendants repeatedly ask this Court to take judicial notice of its conclusions in its prior DAPL-related decisions. This Court already held that Sophia was seized: "The Court finds based on the allegations outlined in Wilansky's Complaint, she has alleged Defendant Officer [Moll] may have seized her. Her facts support a plausible finding Defendant Officer [Moll] intended to control her physical movement, and he succeeded in doing so when he terminated her freedom of movement by intentionally throwing an explosive less-lethal munition at her." Related Case ECF No. 46 at 47. By Defendants' own logic, this should be the end of the seizure inquiry. As this Court already recognized, it can only dismiss Plaintiff's Fourth Amendment claim "if, taking the allegations of the complaint in the light most favorable to p[laintinff], [the court] nonetheless

conclude[s] that they could prove no set of facts entitling them to relief for a 'seizure.'"  *Brower v. Cnty. of Inyo*, 489 U.S. 593, 598 (1989) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

### A. Plaintiff Was Physically Restrained, so *Torres* Does Not Apply.

Defendants argue this Court should revisit its prior finding that Sophia was seized in light of *Torres v. Madrid*, 141 S. Ct. 989 (2021), a case involving an officer who shot at and hit a fleeing suspect who nevertheless got away (at least temporarily).  *Id.* at 994.  *Torres* is inapposite because the plaintiff in that case was never actually restrained.  *Torres* was an expressly "narrow" ruling regarding whether the use of force can be a seizure <u>when the victim is not successfully restrained</u>. *Id.* at 998.  The *Torres* Court specifically disavowed application of its holding to situations like this involving crowd-control weapons like "pepper spray, flash-bang grenades, lasers, and more." *Id.*  In other words, Defendants' assertion that *Torres* controls the present case is directly contrary to the express language of *Torres* itself.

The other cases Defendants cite are likewise inapposite because each involved a situation where the victim of the use of force was not actually restrained.  *Torres*, 141 S. Ct. at 994 (fleeing driver not restrained); *California v. Hodari D.*, 499 U.S. 621 (1991) (juvenile did not submit to show of authority); *Quraishi v. St. Charles Cnty., Mo.*, 986 F.3d 831 (8th Cir. 2021) (use of force did not terminate or restrict protesters' freedom of movement); *Martinez v. Sasse,* 37 F.4th 506, 509 (8th Cir. 2022) (plaintiff prevented from entering ICE facility but not physically restrained); *Dundon v. Kirchmeier*, 577 F. Supp. 3d at 1038-39 (protesters not restrained by use of crowd-control devices); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15 (D.C. 2021) (same).  All of these cases involved the question of whether there can be a seizure without actual restraint.  That question is not present here because Sophia was actually restrained: she was restrained when she

was trapped behind the metal sheet, and she was restrained when an explosive munition knocked her to the ground and blew apart her forearm, rendering her unable to get up or leave.[6]

Defendants' attempt to use *Torres* to overturn this Court's prior conclusion that Sophia was seized is particularly ironic because *Torres* was intended to expand, not constrict, the scope of what can constitute a seizure. The holding of *Torres* is that "application of physical force to the body of a person with intent to restrain is a seizure *even if* the person does not submit and is not subdued." *Torres,* 141 S. Ct. at 1003 (emphasis added). The *Torres* Court never suggested this expansion was intended to disrupt the longstanding rule that a seizure occurs whenever there is actual "termination of freedom of movement." *Id.; see also United States v. Dortch*, 868 F.3d 674, 677 (8th Cir. 2017) (seizure occurs whenever a reasonable person under the circumstances "would have believed [s]he was not free to leave."); *Oglesby v. Lesan*, 929 F.3d 526, 532 (8th Cir. 2019) (seizure by control occurs when law enforcement "restrain[s] the liberty of a citizen"); *Quraishi*, 986 F.3d at 839 (seizure occurs when officer "has in some way restrained the liberty of a citizen."); *United States v. Warren*, 984 F.3d 1301, 1303 (8th Cir. 2021) ("[A] person is seized within the meaning of the Fourth Amendment 'when the officer, by means of physical force or show of authority, terminates or restrains [the person's] freedom of movement.'").

Defendants do not cite a single case were any court has declined to find a seizure when an officer intentionally applied force to an individual and that force resulted in the termination of that individual's movement. Where there is actual restraint, courts ask only whether the force was intentional (rather than accidental) and do not inquire into the officer's motivation for using force. Defendants' suggestion that the Court must always inquire into the officer's motivation would lead

---

[6] Defendants object that other protesters eventually picked-up Sophia and carried her south, but that does not change the fact that Sophia was restrained for the period between being knocked down and being carried away.

to troubling results: officers could knowingly use excessive (even lethal) force to severely injure or even kill civilians without implicating the Fourth Amendment as long as their goal was dispersing a crowd. That cannot be correct.

Defendants conflate two types of intent here: the intent to use force, and the intent behind the use of force. The first inquiry asks whether the officer intended to use force at all, to distinguish situations in which force applied purely by accident (such as inadvertently bumping into someone). When a plaintiff has been physical restrained, courts only engage in this first inquiry. *See Brower v. County of Inyo*, 489 U.S. 593 (1989) (distinguishing between officer intentionally applying force and accidentally applying force). The second inquiry—why the officer applied force—is only relevant in cases like *Torres* where the force does not actually restrain the individual. Those cases are not relevant here because Sophia was undeniably restrained by the use of force against her.

### B.    Plaintiff Satisfies the *Torres* Test for Seizure by Force.

Even if this Court concludes that *Torres* applies here, Plaintiff satisfies the *Torres* test because she has alleged facts plausibly implying that the officers who attacked her intended to restrain her. The *Torres* test is objective, so the subjective intent of the officers (including the Eleven Officer Defendants) and the subjective beliefs of Plaintiff are both irrelevant. *Torres*, 141 S. Ct. at 998–99. Instead, the only question is whether the use of force objectively manifested an intent to restrain Sophia. When evaluating this question on a motion to dismiss, the Court must make all reasonable inferences in Plaintiff's favor. *Id.* at 999.

The circumstances surrounding the Attack and the officers' conduct before, during, and after it together objectively manifest an intent to restrain and injure Sophia. Indeed, the officers' conduct was inconsistent with an intent to merely disperse Sophia for all the reasons described above in the facts section. *See, supra,* pp. 4–6. The officers let Shopia stand next to the burned-

out truck for thirty minutes without objection, suggesting that they did not think she was trespassing or presenting a threat and that they did not want her to leave. The officers did not respond to Stephen's explanation that no one was under the truck, issue any additional order to disperse, or give Sophia an opportunity to leave before attacking her. If the officers merely wanted her to disperse, they would have answered Stephen's explanation by clarifying their order and would have given Sophia time to leave before attacking. The officers trapped Sophia by shooting at her rapidly from multiple directions (and deploying explosives that detonated south of her), which is the opposite of what they would do if they wanted to disperse her. Officer Dvorak deployed two explosive munitions at Sophia, a wildly disproportionate level of force that is inconsistent with an intent to merely disperse. And perhaps most importantly, officers continued shooting at Sophia and eventual hit her with an explosive munition *while she was actively dispersing*.[7] That cannot be reconciled with an intent to disperse.

For all these reasons, the most plausible inference is that officers intended to restrain and injure Sophia, not disperse her. This makes the use of force a seizure, even under the *Torres* test.

C.     **The Seizure Requirement Does Not Apply to Plaintiff's Fourteenth Amendment Claim.**

In the alternative to her Fourth Amendment claim, Plaintiffs pleads an excessive force claim against Defendants under the Fourteenth Amendment. Am. Compl. ¶¶ 251–268. This Fourteenth Amendment claim has no seizure requirement and should proceed even if the Court concludes no seizure occurred.

---

[7] Defendants object that this allegation is inconsistent with Sophia's deposition testimony, Municipal Mot. at 45, but that is not true. Sophia simply testified that she did not know whether officers (other than Officer Moll, who hit her with an explosive munition) were firing at her while she retreated because she was running away in a panic. Other witnesses will likely corroborate that officers continued to fire at Sophia while she was fleeing.

III.    **PLAINTIFF PLAUSIBLY PLEADS EXCESSIVE FORCE IN VIOLATION OF BOTH THE FOURTH AND FOURTEENTH AMENDMENTS.**

A.      **Fourth Amendment Excessive Force.**

The Parties and the Court agree on the standard for excessive force under the Fourth Amendment: "whether the amount of force used was objectively reasonable under the particular circumstances." Related Case ECF No. 46 at 48 (quoting *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020)); *accord*. Municipal Mot at 44. To determine whether force is objectively reasonable, Courts look at three factors: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Mitchell v. Kirchmeier*, 28 F.4th 888, 898 (8th Cir. 2022) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal punctuation omitted)); *accord Neal*, 895 F.3d at 580–81. In light of these factors, "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Michael v. Trevena*, 899 F.3d 528, 532–33 (8th Cir. 2018). The Eighth Circuit has "held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him." *Mitchell*, 28 F.4th at 898; *see also Wilson v. Lamp*, 901 F.3d 981, 989 (8th Cir. 2018) ("Force may be objectively unreasonable when a plaintiff does not resist, lacks an opportunity to comply with requests before force is exercised, or does not pose an immediate safety threat.").

Applying the *Graham* factors—severity of crime, immediacy of safety threat, and existence of resistance—the use of explosive munitions and the use of less-lethal munitions against Sophia were both objectively unreasonable. Sophia was not plausibly suspected of a <u>*serious*</u> crime—the Defendants allege that at worst officers suspected Sophia of tampering with a burned-out truck

that was in front of, not part of, a huge barricade of concrete and razor wire.  Nor is it actually

plausible that officers suspected Sophia even of tampering with the truck, since the officers present

(including the Eleven Officer Defendants) knew Sophia was empty handed and allowed her to be

next to the truck for thirty minutes without objection.  There was no immediate safety threat, since

Sophia was not threatening anyone and was, again, unarmed.  Sophia was not resisting, and officers

(including at least some of the Eleven Officer Defendants) continued shooting at Sophia while she

was actively fleeing.  And the force used against Sophia was not *de minimis*, as a matter of law.

*Mitchell*, 28 F.4th at 898 (holding that less-lethal munitions are not *de minimis* force).  As a result,

*Graham* dictates that Sophia was subjected to objectively unreasonable and therefore excessive

force.

       In *Mitchell*, the Eighth Circuit held that the use of even *non-explosive* less-lethal munitions

against an unarmed DAPL protesters was not objectively reasonable.  *Mitchell*, 28 F.4th at 898.

And the facts in *Mitchell* were less favorable to the plaintiff, who was obstructing a government

function, given a clear prior warning to disperse, and had an opportunity to leave before being

shot.  *Id.*  In light of *Mitchell*, there is no question that Plaintiff has adequately pled that the use of

force against her was objectively unreasonable.

       The State Defendants devote a mere two sentences of their 39-page motion to the excessive

force issue, arguing only that Defendants Arndt's and Skar's uses of less-lethal munitions against

Sophia were not excessive because they "were intended to disperse Plaintiff from a concealed area

of the critical defensive barricade that protestors had already partially dismantled earlier in the

day" and that "Plaintiff was given an explicit warning that less-lethal force would be used if she

did not disperse."  State Mot. at 32.  No part of these two sentences is accurate in light of Plaintiff's

well-pled allegations.  As discussed above, Defendants Arndt and Skar and the other officers did

not plausibly intend to disperse Sophia but instead objectively manifested an intent to restrain and injure her. Sophia was not in a concealed area of a critical defensive barricade; she was next to a truck that was in front of the barricade, which protesters had never partially dismantled. And Defendant Ternes's order was not clearly directed at Sophia and Stephens, and officers did not attempt to clarify the order when Stephen responded to it.

The Municipal Defendants make the additional argument that a "[r]easonable officer under the totality of the circumstances would have believed Wilansky and Joachinson presented an imminent threat to their safety and were engaged in a serious crime." Municipal Mot. at 44. But this _factual_ assertion is also contrary to Plaintiff's well-pled allegations. Two unarmed non-menacing individuals could not plausibly be engaged in a "serious crime" or present an imminent safety threat. Nor is the existence of such a threat consistent with officers letting Sophia stand next to the truck for 30 minutes without objection. And the conduct, posture, and tone of the officers (as corroborated by the Skogen dash camera video) are all completely inconsistent with the officers being afraid, believing they were under attack, or worrying that there was a serious safety threat. Moreover, if Defendants had truly believed Sophia and Stephen were engaged in a serious crime or presented a serious safety threat, then Defendant Kirchmeier and Morton County would have brought charges against them or at least conducted some investigation into the events of the morning of November 21, 2016. Morton County conducted no investigation at all, suggesting law enforcement did not want the public to know what really happened that morning.

The Municipal Defendants also argue that the force was not excessive because Sophia was given a prior warning and because she did not say anything to the officers in response to the warning or while the attack was occurring. Municipal Mot. at 45. But, as discussed above, Defendant Ternes's order was not clearly directed at Sophia, and Stephen responded to it, so there

was no reason for Sophia to do so. And Sophia did speak during the attack—she told the officers she was leaving and pleaded with them to stop shooting at her, a pleading they ignored.

More broadly, Defendants attempt to justify the Attack by pointing to events that occurred hours earlier. Municipal Mot. at 44. Again, conduct by different protesters involving different law enforcement officers at a different time cannot justify the use of force against Sophia.

### B. Fourteenth Amendment Excessive Force.

Plaintiff respectfully requests that the Court apply the same "objective reasonableness" standard to her Fourteenth Amendment excessive force claim. This Court previously ruled that *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), changed the Fourteenth Amendment excessive force standard from "shocks the conscience" to "objective reasonableness" for pretrial detainees. Related Case ECF No. 46 at 19. That same change should be applied to free citizens like Plaintiff.

The *Kingsley* Court indicated that it intended the objective reasonableness standard to apply not just to pretrial detainees but also to those who are free on bail: "Our standard is also consistent with our use of an objective 'excessive force' standard where officers apply force to a person who, like Kingsley, has been accused but not convicted of a crime, but who, unlike Kingsley, *is free on bail*." 576 U.S. at 399. Declining to apply *Kingsley* to regular civilians makes the applicable standard turn on the irrelevant fact of whether or not the civilian happens to be on bail. Moreover is makes no sense to apply the less demanding "objective reasonableness" standard to a pretrial detainee—someone who has already been arrested and arraigned and charged with a crime—while applying the more demanding "shock the conscience" standard to a free citizen not accused of any crime. If anything, this is backwards: the pretrial detainee should face the more demanding standard.

Even if the Court disagrees and applies the "shocks the conscience" standard proposed by Defendants, State Mot. at 35, Municipal Mot. at 46, the Amended Complaint satisfies this standard. The Eleven Officer Defendants and their colleagues: (1) allowed Sophia to be on the bridge for an hour and near the truck for 30 minutes without objection before attacking her, (2) knew she was unarmed, (3) failed to give her a reasonable opportunity to leave before attacking her, (4) deployed multiple explosive munitions at her over the course of several minutes, and (5) laughed and cheered after she was injured. These allegations give rise to the plausible inference that there was no legitimate government interest justifying the use of force, and therefore the force was "inspired by malice or sadism rather than a merely careless or unwise excess of zeal." *Hall v. Ramsey Cnty.*, 801 F.3d 912, 918 (8th Cir. 2015) (internal quotation marks omitted). Whether this conduct shocks the conscience is a factual determination that should be decided by a jury, not a motion to dismiss.

## IV. THE AMENDED COMPLAINT CONTAINS PARTICULARIZED PLAUSIBLE CLAIMS AGAINST EACH DEFENDANT FOR FAILURE TO WARN.

Plaintiff alleges that each of the Eleven Officer Defendants violated 42 U.S.C. Section 1983 by failing to intervene in their colleague's use of excessive force against her. Defendants accuse Plaintiff of engaging in "shotgun pleading" that does not put each Defendant on notice of what they are accused of doing wrong. State Mot. at 5, 7. Not so. Each of the Eleven Officer Defendants is directly and specifically accused of doing the same thing: not intervening to stop the clear use of excessive force that occurred over the course of several minutes and involved multiple explosive munitions. True, each of the Defendants participated in the Attack in different ways (and more discovery is required to determine exactly how and to what extent each Defendant actively participated), but this information is not required for Plaintiff to state her basic claim. Regardless of what actions each of the Eleven Officer Defendants took to actively try to injure Plaintiff, at a minimum, each of these Defendants was present during the entire Attack, knew about

the Attack, and failed to take any steps to try to mitigate or stop it. Those are the only allegations Plaintiff needs to state her claim for failure to intervene against each of the Eleven Officer Defendants.

The Municipal Defendants correctly state the standard for a failure to intervene claim: an officer is "liable if he does not intervene to prevent the use of excessive force when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." Municipal Mot. at 46 (quoting *Robinson v. Payton*, 791 F.3d 824, 829 (8th Cir. 2015)).[8] Under this standard, each of the Eleven Officer Defendants violated 42 U.S.C. Section 1983 when they observed their colleagues attack peaceful unarmed Sophia with less-lethal and explosive munitions for several minutes without taking any action to try to prevent her from being seriously injured.

Defendants assert they cannot be liable for excessive force because (with the exception of Defendant Arndt) they did not personally use any force against Sophia. Municipal Mot. at 43 (arguing Defendants Bakke, Grosz, Hanson, Nelson, Rode, Savageau, Skar, Ternes, and White applied no force to Sophia); State Mot. at 5–7, 8, 10 (arguing Defendants Bakke, Nelson, and Savageau are not alleged to have done anything; Defendants Hinrichs and Rode are only alleged to have moved west; and Defendant Skar did not hit Sophia with any munition). This fundamentally misunderstands the entire idea of a "failure to intervene" claim. Plaintiff is not accusing these Defendants of personally using excessive force; Plaintiff is accusing them of violating their duty to intervene when they observe their colleagues using excessive force. In this way, each of the Eleven Officer Defendants was "directly and personally involved in the

---

[8] The State Defendants never even attempt to articulate the requirements for a failure to intervene claim.

constitutional violation." State Mot. at 11. Each of the Eleven Officer Defendants had a personal duty to intervene in the use of excessive force by his colleagues, and each directly violated that duty, resulting in Sophia suffering a grievous permanent injury.

Defendants do not appear to dispute that Plaintiff has adequately pleaded that each of the Eleven Officer Defendants was present and observed the entire attack on Sophia. Am. Compl. ¶¶ 135–136, 142, 161, 170–172, 186, 187. Instead, Defendants argue that they had no way of knowing that the force being used was excessive and therefore did not have an opportunity to intervene. State Mot. at 10, 33; Municipal Mot. at 47. More specifically, Defendants argue that they could not have known that Officer Dvorak was going to deploy explosive munitions at Sophia or that Officer Moll would shoot her with an explosive munition. *Id.*

This is factually incorrect. The Eleven Officer Defendants *did* have prior warning that explosive munitions were being used against Sophia before she was injured. Officer Dvorak threw two Stinger Grenades at Sophia. After the first grenade exploded, the Eleven Officer Defendants were all undoubtedly on notice that their colleagues had resorted to deploying explosive munitions. At this point, the Eleven Officer Defendants had a duty to intervene and to try to prevent their colleagues from continuing to deploy explosive munitions. The officers could, for example, have yelled to their colleagues to stop using explosives. If any of the Eleven Officer Defendants had done that, Officer Moll would likely not have deployed the explosive munition that destroyed Sophia's arm. In other words, each of the Eleven Officer Defendants had ample opportunity to intervene *after realizing that explosive munitions were being used*. None of them did so, which resulted in Sophia permanently losing the use of her left hand and forearm.

But regardless of whether the Eleven Officer Defendants knew about the specific use of explosive munitions, the entire Attack was unconstitutionally excessive. The attack involved

repeated use of less-lethal munitions over the course of several minutes, which gave the Eleven Officer Defendants plenty of opportunity to intervene by calling on their colleagues to stop firing. The excessiveness of the force only became more obvious when Sophia was actively fleeing, and again the Eleven Officer Defendants had time to call on their colleagues to stop shooting before Officer Moll ultimately hit Sophia.

As a result, each of the Eleven Officer Defendants violated 42 U.S.C. Section 1983.

## V.     DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

There are myriad precedents—both binding and persuasive—clearly establishing that Sophia was seized, that the use of force against Sophia was excessive, and that failing to intervene to stop the use of excessive force violates the Constitution.

The parties agree on the standard for qualified immunity: "Qualified immunity shields government officials from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would know." *Ferguson v. Short*, 840 F.3d 508, 510 (8th Cir. 2016); State Mot. at 33 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); Municipal Mot. at 50 (quoting *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009)). A constitutional violation is "clearly established," if the plaintiff can "point to existing circuit precedent that involves sufficiently similar facts to squarely govern the officers' conduct in the specific circumstances at issue," or "present a robust consensus of cases of persuasive authority constituting settled law." *Graham v. Barnette*, 5 F.4th 872, 887 (8th Cir. 2021); *see also White v. Pauly*, 137 S. Ct. 548, 551 (2017), *Meloy v. Backmeier*, 302 F.3d 845, 848 (8th Cir. 2002); *Lambardo v. City of St. Louis*, 38 F.4th 684, 690 (8th Cir. 2022).

## A. It Was Clearly Established in November 2016 that the Attack on Sophia Constituted a Seizure.

The "clearly established" requirement ensures that law enforcement officers have reasonable prior notice that their force is excessive before being held liable for that force. This requirement therefore applies to the question of whether the force is excessive, not whether the force resulted in a seizure. It would be strange—and contrary to the idea of qualified immunity— for a law enforcement officer to use force that was clearly excessive but still obtain qualified immunity because it was unclear that the force constituted a seizure. The Court should not apply the "clearly established" requirement to the seizure inquiry, which is not relevant to Plaintiff's Fourteenth Amendment claim anyway.

Regardless, it was clearly established long before 2016 that the use of force to restrain movement constituted a seizure by control. *Torres* explicitly recognized that the standard for seizure by control dated back to at least 1989, and the *Torres* Court did not purport to alter this standard in any way. *Torres*, 141 S. Ct. at 1001 (noting distinction between seizures by control and seizures by force and reiterating that "each type of seizure enjoys a separate common law pedigree that gives rise to a separate rule."). As examples of seizures by control, the *Torres* Court cited its 2007 decision in *Scott v. Harris*, 550 U.S. 372 (2007) and its 1991 decision in *California v. Hodari D.* 499 U.S. 621 (1991), both of which long predate the use of force against Sophia. Moreover, it was clearly established as far back as 1989 that a seizure occurs when officers intentionally apply force to an individual and that force results in the individual being restrained. *Brower v. County of Inyo*, 489 U.S. 593 (1989). That is precisely what occurred to Sophia here.

Defendants' contrary argument that *Torres* rendered their actions not "clearly established" by changing the law regarding what constitutes a seizure cannot possibly be true. If it were, then this change in seizure law would provide qualified immunity to all officers for all uses of force

until subsequent cases generate new precedents for what constitutes a seizure. The Supreme Court

could not possibly have intended a complete reset of the qualified immunity doctrine *sub silentio*.

**B.      It Was Clearly Established in November 2016 that the Use of Explosive and Less-Lethal Munitions Against Sophia Was Excessive and Violated the Fourth and Fourteenth Amendments.**

Defendants assert there were no precedents prior to 2016 squarely establishing that the use

of force against Sophia was excessive. Municipal Mot. at 32. That simply isn't true. There are

numerous pre-2016 decisions holding that it is excessive force to deploy explosive less-lethal

munitions toward individuals, especially ones who are not violent or resisting. *Terebesi v. Torreso*,

764 F.3d 217, 237 (2d Cir. 2014) (denying qualified immunity to officer who threw explosive

munition at suspect and holding "[t]he Court cannot conceive of a set of circumstances that would

permit an officer, contrary to the intended use of the device, to throw a flash-bang directly at

someone); *Gonzales v. Douglas*, No. cv-15-00064, 2016 WL 4530442, *9 (D. Ariz. Aug. 30, 2016)

(same); *Taylor v. City of Middletown*, 436 F. Supp. 2d 377, 386–87 (D. Conn. 2006) (same);

*Jackson v. Gerl*, 622 F. Supp. 2d 738, 748 (W.D. Wis. 2009) (denying qualified immunity to officer

who deployed stinger grenade at non-compliant prisoner who refused to leave his cell).

Numerous courts (including ones prior to November 2016) have held that it is clearly

established excessive force even to deploy an explosive less-lethal munition without first visually

inspecting the detonation zone to ensure no one is present. *Z.J. v. Kan. City Bd. of Police Comm'rs*,

931 F.3d 672, 683 (8th Cir. 2019) (blindly throwing explosive munition without prior visual

inspection to ensure suspect is not in detonation zone was clearly established excessive force in

2010); *Estate of Escobedo v. Bender*, 600 F.3d 770, 779–81 (7th Cir. 2010) (blindly throwing

explosive munition into area that may contain civilians is objectively unreasonable excessive

force); *Boyd v. Benton Cnty.*, 374 F.3d 773, 779 (9th Cir. 2004) (same). In fact, years before

Sophia was attacked, the Eighth Circuit denied qualified immunity to an officer who deployed a less-lethal explosive munition *near* peaceful non-resisting detainees, holding that such behavior constituted clearly established excessive force even under the much more exacting Eighth Amendment standard. *Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014). *Edwards* indisputably put Defendants on notice that they could not deploy explosive less-lethal munitions *toward* non-resisting civilians, such as Sophia.

If these numerous precedents—several from this Circuit—were not enough, courts have also long and consistently held that even the use of non-explosive less-lethal weapons against nonviolent, non-resisting civilians constitutes excessive force. *Johnson v. McCarver*, 942 F.3d 405, (8th Cir. 2019) (denying qualified immunity to officer who deployed Taser against suspect when there was genuine dispute about whether suspect was resisting); *Burke v. Sullivan*, 677 F.3d 361, 367 (8th Cir. 2012) (same); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) (same); *Fogarty*, 523 F.3d at 1161 (denying qualified immunity to officer who deployed less-lethal munition against nonviolent arrestee); *Deorle v. Rutherford*, 272 F.3d 1272, 1285–86 (9th Cir. 2011) (denying qualified immunity to officer who deployed less-lethal bean bag round against nonviolent arrestee); *Johnson*, 658 F.3d at 828 (denying qualified immunity to officer who tackled and deployed mace against suspected misdemeanant who was nonviolent and not resisting); *Karels v. Storz*, 906 F.3d 740, 745 (8th Cir. 2018) (denying qualified immunity to officer who body slammed suspect when there was genuine dispute about whether suspect was resisting); *Small v. McCrystal*, 708 F.3d 997, 1005–06 (8th Cir. 2013) (denying qualified immunity to officer who tackled non-resisting suspect).

Defendants only retort to this myriad of prior case law is to assert that there is no precedent that "the use of less-lethal munitions from a strictly defensive posture to repel or disperse"

constitutes excessive force, Municipal Mot. at 54, and that the "circumstances present on the Backwater Bridge on the morning of November 21, 2016" were "extraordinarily unique," State Mot. at 34. Defendants are just asserting different facts here. According to the well-pled allegations in the Amended Complaint, law enforcement was not in a defensive posture and was not using force to repel or disperse. And the circumstances present when Sophia was injured were not "extraordinarily unique"; instead, this is a run-of-the-mill case of force being used against a nonviolent, non-resisting civilian who was not plausibly perceived as committing any serious crime. As a result, the precedents listed above squarely and clearly establish that the attack on Sophia constituted excessive force.[9]

### C. Qualified Immunity Has No Basis in the Constitution or the Law and Should Be Categorically Rejected.

This Court should reject Defendants' qualified immunity defense for an additional reason: it has no basis in the text or spirit of the Constitution, Section 1983, or any other law. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., dissenting) ("[W] are no longer engaged in interpret[ing] the intent of Congress in enacting [Section 1983]. Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make."); *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., dissenting from denial of cert.) ("[O]ur qualified immunity jurisprudence stands on shaky ground . . . [it] cannot be located in Section 1983's text and may have little basis in history."); *Baxter v. Bracey*, 140 S. Ct. 1862, 1862–63 (2020) (Thomas, J., dissenting from denial of cert.)

---

[9] Defendants do not appear to dispute that it was clearly established that failing to intervene in the use of excessive force was unconstitutional. "As of July 2006, it was clearly established that a state actor may be liable for an unreasonable seizure under the Fourth Amendment if he fails to intervene to prevent the unconstitutional use of excessive force by another official." *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009).

("The text of Section 1983 'ma[kes] no mention of defenses or immunities' . . . For the first century of the law's existence, the Court did not recognize an immunity under Section 1983 for good-faith official conduct.").

Justice Thomas has long called for the abolishment (or at least the reassessment) of qualified immunity.  *See Ziglar*, 137 S. Ct. at 1871; *Hoggard*, 141 S. Ct. at 2421; *Baxter*, 140 S. Ct. at 1862–63.  While Justice Thomas has historically been in the minority on this issue, that no longer appears to be the case.  In *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), the Supreme Court recently struck down the right to an abortion on the grounds that it did not have sufficient basis in the text of the Constitution and was not adequately supported by *stare decisis*. *Id.* at 2265.  In *Dobbs*, the Supreme Court applied the five traditional *stare decisis* factors to determine whether to adhere to a prior judicial precedent:  "the nature of their error, the quality of their reasoning, the 'workability' of the rules they imposed on the country, their disruptive effect on other areas of the law, and the absence of concrete reliance."  *Id.*

If *Roe* was an "abuse of judicial authority," then so is qualified immunity.  *Dobbs*, 142 S. Ct. at 2243.  <u>First</u>, the Court's error in creating qualified immunity is immense.  Qualified immunity protects public officials who are guilty of violating the Constitution, and it denies victims of constitutional violations a remedy for the harm they suffered.  <u>Second</u>, qualified immunity has less basis in the law than the right to an abortion and is a more recent doctrine. *Compare Harlow v. Fitzgerald*, 457 U.S. 800 (1982) *with Roe v. Wade*, 410 U.S. 113 (1973). While the *Roe* Court invoked the penumbra of the Bill of Rights, *Roe*, 410 U.S. at 129, the *Harlow* Court made no attempt at all to ground qualified immunity in any law or Constitutional provision. *Harlow*, 457 U.S. at 807.  <u>Third</u>, while the right to an abortion has been the subject of great controversy, it has generated far fewer judicial decisions than qualified immunity.  Qualified

immunity is one of the least workable and most often litigated judicial doctrine of all time.  *Fourth*,

because qualified immunity applies to all manner of public officials and all manner of civil rights

violations, it has impacted and disrupted numerous areas of the law, including free speech, the

right to assemble, searches and seizures, and employment discrimination.  Applying qualified

immunity routinely "requires courts to engineer exceptions to longstanding background rules, [so]

the doctrine has failed to deliver the principled and intelligible development of the law that *stare*

*decisis* purports to secure."  *Dobbs*, 142 S. Ct. at 2276 (internal quotation marks omitted).  *Fifth*,

public officials have no legitimate reliance interest in qualified immunity because the doctrine only

applies when the official is already found to have broken the law.  Law enforcement officers who

are acting legally do not need to rely on qualified immunity—they are already protected by the

objective reasonableness standard.  Abolishing qualified immunity would do nothing more than

require police officers—who the public pays with their tax dollars and imbues with the unique

right to use violence—to abide by the same basic "reasonable person" standard that every member

of the public must adhere to with respect to every common-law tort.

Qualified immunity has no basis in the text or spirit of the Constitution or any law.  Its

continued existence is not justified by the traditional *stare decisis* factors, and this Court should

decline to apply it here.

## VI.    IN LIGHT OF *MITCHELL*, PLAINTIFF HAS ADEQUATELY PLEADED HER *MONELL* CLAIM.

This Court should permit Plaintiff's *Monell* claim against Defendants Kirchmeier and

Morton County to proceed to discovery in light of *Mitchell*.  28 F.4th at 899–901 (holding that

*Monell* claim against Morton County brought by DAPL protester injured by less-lethal munitions

fired by law enforcement officers was adequately pled). "A plaintiff may establish municipal

liability under Section 1983 by proving that his or her constitutional rights were violated by an

'action pursuant to official municipal policy' or misconduct so pervasive among non-policymaking employees of the municipality 'as to constitute' a 'custom or usage' with the force of law." *Id.* at 899 (quoting *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998)).  To establish this "custom or usage," a plaintiff must plausibly allege three things:  "[t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees . . . deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct[, and] an injury by acts pursuant to the governmental entity's custom." *Id.*

The plaintiff in *Mitchell* adequately pleaded a *Monell* claim by plausibly alleging:  (1) that law enforcement officers acting under Defendant Kirchmeier had "engaged in a persistent pattern of unconstitutional conduct" throughout October and November 2016 by unconstitutionally using less-lethal munitions against peaceful protesters; (2) that Defendant Kirchmeier was "a policymaking official in Morton County for purposes of 'law enforcement practices'"; and (3) that Defendant Kirchmeier tacitly authorized the persistent pattern of excessive force by defending that conduct and calling it "lawful tools." *Id*. at 900–01.  The Eighth Circuit concluded that Defendant Kirchmeier "had been supervising law enforcement's response to the [DAPL] protests since they began, [so] he 'must have been aware' that they were peaceful." *Id.*

Plaintiff has alleged literally *the exact same* prior pattern of conduct by law enforcement officers and *the exact same* knowing tacit authorization by Defendant Kirchmeier.  Am. Compl. ¶¶ 269–287.  *Mitchell* is binding, and Defendants make no attempt at all to distinguish it (because they cannot).  Thus, the Court should allow Plaintiff's *Monell* claim to proceed to discovery.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the Court deny both of

Defendants' motions to dismiss in full.


Dated:  December 15, 2023

Respectfully submitted,

*/s/  Benjamin M. Stoll*
Benjamin M. Stoll
CARLTON FIELDS P.A.
Suite 400 West
1025 Thomas Jefferson Street, NW
Washington, DC 20007
(202) 965-8160
bstoll@carltonfields.com

Lauren C. Regan
CIVIL LIBERTIES DEFENSE CENTER
1430 Willamette Street #359
Eugene, Oregon 97401
(541) 687-9180
lregan@cldc.org

Edward C. Barnidge
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, DC 20024
(202) 434-5000
ebarnidge@wc.com

*Attorneys for Plaintiff*