UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| SOPHIA WILASKY,<br><br>                     Plaintiff,<br><br>vs.<br><br>PAUL D. BAKKE, in his personal capacity; THOMAS M. GROSZ, in his personal capacity; MATTHEW J. HANSON, in his personal capacity; MICHAEL W. HINRICHS, in his personal capacity; TRAVIS A. NELSON, in his personal capacity; JOSHUA W. RODE, in his personal capacity; EVAN M. SAVAGEAU, in his personal capacity; TRAVIS M. SKAR, in his personal capacity; GLEN G. TERNES, in his personal capacity; JUSTIN W. WHITE, in his personal capacity; DEREK J. ARNDT, in his personal capacity; KYLE KIRCHMEIER, in his official capacity; and MORTON COUNTY, NORTH DAKOTA,<br><br>                     Defendants. | **REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Case No. 3:23-cv-00142 |

State Defendants submit this Reply in support of their Motion to Dismiss Amended Complaint, Doc. No. 23, and respectfully request that the Court dismiss the claims against them on the basis of qualified immunity. Whatever Plaintiff's predictions as to the ultimate fate of the doctrine, it is the binding law of the land, and Defendants are entitled to its protection in this case. Plaintiff fails to set forth factual allegations establishing any Constitutional violation against any defendant, let alone one that was clearly established such that any officer would have been on notice of it in November of 2016. The Court should dismiss Plaintiff's Amended Complaint for all the reasons set forth below.

**I.     Plaintiff Cannot Defeat State Defendants' Qualified Immunity on Her Fourth Amendment Claim.**

State Defendants are entitled to qualified immunity at the motion to dismiss stage unless Plaintiff can make two showings: **first,** she must state a "plausible claim" for violation of a Constitutional right, **and second**, she must demonstrate that the right was "clearly established" at

1

the time. *Dadd v. Anoka Cnty.*, 827 F.3d 749, 754-55 (8th Cir. 2016). Importantly, Plaintiff must meet both these requirements to defeat State Defendants' qualified immunity from suit. She meets neither here.

**A.     Plaintiff Fails to State a Claim for a Violation of Her Constitutional Rights.**

For two reasons, Plaintiff fails to state a claim that the State Defendants violated her Fourth Amendment right to be free from excessive force during a seizure. First, she wasn't seized. Second, even if the Court finds that Plaintiff was seized, she fails to state a claim for any excessive or unreasonable force associated with the seizure. As such, she is unable to allege a violation of her Fourth Amendment rights, thereby failing the first prong of qualified immunity and entitling State Defendants to dismissal of Count I.

**1.     Plaintiff Fails to Allege a Seizure Under Any Theory.**

**a.     Plaintiff Misapprehends the Governing Law.**

In their Opening Brief, Doc. No. 23-1, the State Defendants outlined in detail the three distinct kinds of Fourth Amendment seizures and their required elements, *id.* at 22-25, and then explained why none of the three seizures were alleged in the Amended Complaint, *id.* at 25-31. Rather than address these arguments, Plaintiff brushes them aside and presents her own test: when there is "actual restraint," there will be a seizure if the force is "intentional" as opposed to accidental, and courts will not inquire a law enforcement officer's motivations. Doc. No. 28, ("Response") at 19. Plaintiff asserts that a seizure exists whenever "an officer intentionally applied force to an individual and that force resulted in the termination of that individual's movement." *Id.*

This is incorrect. The recent Eighth Circuit case of *Martinez v. Sasse,* previously cited by all Defendants, involved a plaintiff who was attempting to enter a building when she was pushed backwards by an ICE officer, causing her to fall to the ground and suffer a broken foot. *Martinez v. Sasse*, 37 F.4th 506, 508 (8th Cir. 2022). Applying the rule set forth by Plaintiff in her Response, the *Martinez* plaintiff was seized, because the force resulted in the termination of her movement when she was thrown on the ground, and the Court need not inquire into the officer's motivation for using force. But the officer's motivation is exactly what the Court examined. *Martinez*, 37 F.4th

at 509. Observing that the force was used by the officer "only to repel," *id.*, and was "not employed to apprehend," *id.* at 510, the Court held that the use of force with the intention to repel someone was not clearly established as a Fourth Amendment seizure. *Id.* The Court proceeded to dismiss the Fourth Amendment claim on the pleadings, which is exactly what the Court should do here. *Id.*

Even more recently, the Eighth Circuit confirmed the importance of law enforcement intention when analyzing whether use of force is a seizure. In *Dundon v. Kirchmeier*, a case stemming the same protest at issue here, the Court considered the claims of protestors who alleged excessive fourth in violation of the Fourth Amendment based on law enforcements' deployment of less-lethal munitions. *Dundon v. Kirchmeier*, 85 F.4th 1250 (8th Cir. 2023). The protestors, like Plaintiff here, contended that they were seized under the Fourth Amendment because the force operated to "restrain their 'freedom of movement' because the force 'knocked most of the Appellants and many of the other assembled persons off their feet or otherwise restricted their freedom of movement by stopping them in their tracks." *Dundon,* at 85 F.4th at 1255-1256. In rejecting this argument, the Eighth Circuit cited the potential distinction between "force used with intent to apprehend and force used with intent to disperse or repel," *id.* at 1256, and determined that "it was not clearly established as of November 2016 that use of force *to disperse the crowd* was a seizure." *Id*. at 1257. In sum, contrary to Plaintiff's argument, the intent behind the use of force is critical for Fourth Amendment purposes even in the face of alleged restraint of freedom of movement. Plaintiff cannot state a claim for a seizure simply by establishing "restraint."

In light of the above law, Plaintiff fails to plausibly allege a seizure either by physical force under *Torres v. Madrid,* 592 U.S. 306, (2021) or by a theory of restraint of freedom of movement.

### b. Plaintiff Does Not Allege a Seizure by Physical Force by Any Defendant

Plaintiff argues that even if the test for *Torres* applies, her Amended Complaint still states a claim for a seizure because the law enforcement officers "*objectively* manifested an intent to restrain" her. Response at 20. But her allegations show the opposite. Taking the contents of her Amended Complaint as true, the intent to disperse is overwhelmingly clear throughout the duration

3

of the incident. And this is fatal to a physical force seizure under *Torres*, which "requires the use of force with intent to restrain." 592 U.S. 306, 317.

The intent to restrain is first clear from the law enforcement command immediately preceding the deployment of less-lethal munitions. Due to the Skogen dashcam videos,[1] Plaintiff cannot reasonably dispute that soon after she was joined by Joachinson on the bridge, she received an order explicitly instructing her to disperse:

> **[Inaudible] We see you behind the truck and underneath the truck. Get out now. Return to the south side of the bridge. Otherwise, we will use less-lethal munitions.**

Timestamp 3:57:51 in NDHP Dashcam 2, Companion Case, Doc. No. 126-29.

Incredibly, in the face of the full text of the command, Plaintiff continues to maintain that it was not "clearly directed" at her. Response at 24. She asserts that she and Joachinson were not *behind* the truck. Response at 11. These assertions should be disregarded by the Court as contrary to Plaintiff's original Complaint, *see* Doc. No. 1, Companion Case, at ¶ 104 ("[L]aw enforcement officers **ordered them** to move away from the burned-out vehicle,") as well as her current Complaint, which indicates that "immediately after the order was issued," law enforcement began deploying less-lethal which allegedly resulted in Plaintiff "cowering **behind**" the metal sheet. Doc. No. 14 at ¶¶ 153 – 162 (emphasis added). The Court should refuse to credit the improbable and new argument that this command was not directed at Plaintiff. Faced with the text of the command, and the Supreme Court's requirement that officer conduct be evaluated *objectively* in the Fourth Amendment context, *Torres* at 317, Plaintiff can give no plausible reason that this command meant anything other than what it said. And what it said shows the intent to disperse.

After the command was given, officers continued to manifest an intent to disperse through the duration of the encounter.[2] Plaintiff attempts to manufacture an intent to restrain by making

---

[1] Plaintiff does not object to the Court's consideration of the dashcam videos. Response at 14. More detail on the videos and their timestamps are given in State Defendants' opening brief. *See* Doc. No. 23-1 at 13-14.

[2] Plaintiff does not contend that Arndt's munition which allegedly impacted her arm, *see* Amended Complaint at ¶ 175, constitutes a seizure in itself. This is yet another reason why the

4

allegations regarding the officers' subjective intentions. For instance, she contends that "[t]he officers **_trapped_** Sophia by shooting at her rapidly from multiple directions (and deploying explosives that detonated south of her), which is the opposite of what they would do if they wanted to disperse her." Response at 21. But this mischaracterizes the factual allegations. Presumably, Plaintiff *felt* trapped, and she is within her rights to allege as much. But her thoughts are ultimately irrelevant in the Fourth Amendment context. *See Hernandez v. Jarman,* 340 F.3d 617, 622 (8th Cir. 2003) (disregarding the possibility that suspect "may have felt trapped" and explaining that "for purposes of whether a Fourth Amendment seizure occurred during this collision, it is irrelevant what [suspect] may have been thinking.") *Objectively*, the only factual allegations present in this portion of the Amended Complaint are that officers shot at her rapidly from multiple directions and deployed what she calls explosive munitions south of her.[3] These allegations are completely consistent with an intent to disperse. The whole point of deploying the less lethal was the hope that it would achieve what mere spoken orders had not: that Plaintiff would disperse to the south.

When Plaintiff finally does disperse south, she alleges that law enforcement continued to shoot while she did so, and in her Response she describes this as "perhaps the most important" proof of the officers' intent to seize her. Response at 21. This is striking, because the allegation that law enforcement continued to deploy munitions as Plaintiff fled to the south was absent from her original Complaint (filed in 2018), and from her 2021 deposition testimony, where she testified that she did not recall hearing or seeing anything to suggest that anyone was shooting at her during this time. *See* Doc. No. 1, Companion Case, ¶¶ 107-108; *see also* Doc. No. 22-1, 134-135. Even if this new allegation is considered by the Court, the only plausible inference is that the officers were attempting to keep Plaintiff moving to the south.

In sum, Plaintiff cannot allege an intent to restrain on the part of any State Defendant. She therefore fails to state a claim for a physical force seizure under the test set forth in *Torres v Madrid*.

---

claims against Arndt should be dismissed.

[3] In Plaintiff's deposition, she testifies that these munitions were deployed to the west of her, not to the south. *See* Doc. No 22-1, 116-117 (discussing "explosive munitions" deployed "a few feet west of where [Plaintiff] was standing.")

5

### c. Plaintiff Does Not Allege a Seizure by Control

Plaintiff's theory of seizure by control appears to center on her claim that she was "trapped behind the metal tarp" while law enforcement were deploying munitions. Response at 12. She also alleges that she was "restrained for the period between being knocked down [by the alleged munition] and being carried away." *Id.* at 19. These claims are unavailing for several reasons.

First of all, under governing law, the intent behind the force is determinative even if "restraint" is alleged. As set forth above, from the factual allegations in the Amended Complaint, it is clear that the officers intended to disperse her. This destroys her ability to state a claim for a seizure. Second, Plaintiff's conclusory allegation that she was "restrained" is simply not correct. First of all, she was not "restrained" when she was behind the shield, because she remained there of her own free will until she was hit by a less-lethal munition and decided to finally comply with the order to move south. And when she was allegedly hit by a law enforcement munition in the forearm and knocked to the ground, her fellow protestors carried her away without any resistance.

Here, by any definition, Plaintiff was never under the Defendants' control and she was simply never seized. She cannot state a claim for a violation of the Fourth Amendment, and Defendants are entitled to dismissal on qualified immunity grounds.

### 2. The Alleged Force Applied by State Defendants Was Objectively Reasonable.

Even if Plaintiff would have alleged a claim for a seizure, a seizure itself does not violate the Constitution; Plaintiff must further allege that the force was unreasonable under the totality of the circumstances. *Mitchell v. Kirchmeier,* 28 F.4th 888, 898 (8th Cir. 2022). This she cannot do.

In her Response, Plaintiff makes several attempts to minimize the risk facing the State Defendants and other law enforcement officers shortly before her injury. She attempts to distance herself from the violent protests earlier in the night. Response at 15. Defending the omissions from her Amended Complaint of the allegations regarding protestors who removed the burnt-out truck from the barricade, she writes: "Plaintiff declined to include allegations that <u>different</u> protestors removed a <u>different</u> truck at a <u>different</u> time because it is irrelevant to her case." *Id.* But her original pleadings highlight the protestors' desire to clear the barricade and implicitly connect it to

Plaintiff's participation in the protest. *See* Doc. No. 23-1, 26-27; *see also* Doc. No. 1, Companion Case, ¶¶ 79, 80 ("… Sophia traveled to Oceti Sakowin and began living at the camp. While at Oceti Sakowin, Sophia learned that law enforcement had erected a barricade immediately north of Backwater Bridge.") Apparently, the barricade was important to Plaintiff at one point. The Court should at the very least turn a skeptical eye to her claims of disinterest now.

But even if Plaintiff succeeds in persuading this Court that she had no interest in partial dismantling of the barrier, it is immaterial to the objective threat that Plaintiff posed to a reasonable law enforcement officer. This is because none of the Defendants knew who Plaintiff personally was when she approached the truck. All they knew is that she was one of *hundreds* of protestors who gathered illegally on a state highway to "protest the continued closure of the bridge" after other protestors took the extraordinary step of using a semi-truck to forcibly dismantle the barricade themselves. Doc. No. 1, Companion Case, ¶ 84-86. Indeed, the law enforcement officers who were standing on the bridge at 4:00 AM on November 21– rather than asleep in their homes across the state – were only there *because* of the protestors' refusal to accept the bridge closure. *See* Doc. No. 1, Companion Case, ¶¶ 86-87 (". . . hundreds of water protectors gathered. . . Morton County Sheriff's Office requested the assistance of every available law enforcement officer in the entire state of North Dakota.")

In light of these foundational details, it is absurd to suggest that, in the eyes of a reasonable law enforcement officer, a protestor again approaching the burned-out truck posed no threat, particularly when she was joined by another protestor. While Plaintiff alleges that she and Stephen were just "standing peacefully," *something* about their conduct obviously caused law enforcement to order them away from the truck. The "immediate threat" posed by Plaintiff and Stephen cannot plausibly be denied. All Plaintiff can say is that she was "unarmed," Response at 23, but she does not respond to State Defendants' argument that law enforcement would have no way to know what devices she might be carrying on her person. Additionally, at least one explicit warning was given to Plaintiff and she did not comply.

Plaintiff's other attempts to minimize the threat facing the officers should not be credited. For instance, she writes that "two unarmed non-menacing individuals could not plausibly be engaged in a "serious crime"." Response at 24. This is untrue. Serious crimes are committed by pairs of individuals – and indeed, single individuals – all the time. And Plaintiff's attempt to equate the law enforcement defendants with the officers in the Skogen dashcam video, whom she describes as looking calm, should be rejected. Again, the video does not *show* the officers at the barricade and it is disingenuous of Plaintiff to claim that it does.[4]

Looking to the totality of the circumstances, Defendants' actions were reasonable in light of the situation they faced. As such, even if this Court finds that Plaintiff has alleged a seizure, it should not find that Defendants employed any excessive force.

### B. Plaintiff Does Not Show the Violation of a Clearly-Established Right.

But even if this Court would find that Plaintiff did allege a seizure against any of the Defendants *and* that it involved excessive force, thereby violating her Fourth Amendment rights, she would still need to show that the right was clearly established. In other words, Plaintiff would need to demonstrate that "existing precedent [has] placed the statutory or constitutional question beyond debate." *Lombardo v. City of St. Louis,* 38 F.4th 684, 690 (8th Cir. 2022). This Plaintiff cannot do, because as explained above, the Eighth Circuit recently held in *Dundon* that it was not clearly established as of November 20, 2016, that officers' use of less lethal force to *disperse* a crowd constituted a seizure under the Fourth Amendment. *Dundon*, 85 F.4th at 1257. The *Dundon* Court held that the officers were entitled to qualified immunity. The same logic applies to the nearly identical situation in this case, and this Court should likewise find that Defendants are entitled to qualified immunity and dismiss the claim against them.

### C. Conclusion as to Fourth Amendment.

For all the reasons set forth above, Plaintiff fails to state a claim against any of the State Defendants for violation of her Fourth Amendment rights. State Defendants respectfully request

---

[4] Indeed, if the video *did* show the barricade and the law enforcement defendants, the entire case should be dismissed, because no one visible on the video deploys any munitions whatsoever.

that the claims against them be dismissed with prejudice.

## II. Plaintiff Cannot Defeat Defendants' Qualified Immunity on the Fourteenth Amendment Claim.

Again, in order to overcome State Defendants' qualified immunity at the motion-to-dismiss stage, Plaintiff must first allege the violation of a Constitutional right, and then show that the right was clearly established. Neither showing is possible with regards to her claim under the Fourteenth Amendment.

In order to state a claim under the Fourteenth Amendment, a plaintiff must show that an official violated a Constitutional right, and that their conduct "was shocking to the contemporary conscience." *White v. Smith*, 696 F.3d 740, 754 (8th Cir. 2012). Here, Plaintiff does not even approach such a showing. For the reasons set forth above, the alleged conduct of the State Defendants was objectively reasonable.[5] Nothing in the Amended Complaint even hints at conduct fairly characterized as the "brutal and inhumane abuse of official power," or "intended to injure in some way **unjustifiable by any government interest**." *White*, 696 F.3d at 757, quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833*,* 849 (1998). There is nothing unreasonable, and certainly nothing "shocking to the contemporary conscience," about law enforcement officers deploying less-lethal munitions to disperse an individual posing a serious safety threat, particularly after a warning has been given in an attempt to deescalate the situation and that warning was ignored. Furthermore, the State Defendants' (reasonable) conduct was entirely justifiable by their "government interest": they were on the bridge that night in response to a Code Red issued to defend against a dangerous riot, and they were trying to maintain the integrity of the barricade and their own safety. Even taking all the allegations in Plaintiff's Amended Complaint as true, she fails to state a claim for violation of her Fourteenth Amendment rights.

Further, even if the Court would find a violation of Plaintiff's Fourteenth Amendment rights to be alleged here, State Defendants would still be protected by qualified immunity

---

[5] Accordingly, even if the Court would apply the *Kingsley v. Hendrickson* "objective reasonableness" standard as urged by Plaintiff, Response at 25, the result here is the same.

because Plaintiff has failed to demonstrate that "existing precedent [has] placed the statutory or constitutional question beyond debate." *Lombardo v. City of St. Louis,* 38 F.4th 684, 690 (8th Cir. 2022). Plaintiff cites numerous cases for the general proposition that it is excessive force to deploy "explosive less-lethal munitions towards individuals," Response at 31-32, but an examination of these cases shows that they are markedly distinguishable from the allegations here. For instance, *Edwards* involved security guards deploying a flash-bang at plaintiffs inside a prison pod who were submissively lying face-down on the ground. *Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014). The *Jones* case involved a law-enforcement officer who threw a flash-bang into someone's living room, where a two-year-old child and two elderly women were standing, for purposes of executing an investigatory search warrant after the suspect was already in custody. *Z.J. by & through Jones v. Kansas City Bd. of Police Commissioners*, 931 F.3d 672, 678 (8th Cir. 2019). Such cases do not suffice. As the Supreme Court has stressed, "courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *D.C. v. Wesby*, 583 U.S. 48, 63–64, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018). The particular circumstances here do not resemble the circumstances in the cases Plaintiff cites.

For all of these reasons, Plaintiff is unable to make either of the necessary showings to overcome the State Defendants' qualified immunity on the Fourteenth Amendment claims, and they are entitled to dismissal.

### III. Plaintiff Cannot Overcome Defendants' Qualified Immunity on Her Failure to Intervene Claim.

Because all defendants are entitled to qualified immunity on all counts, Plaintiff's failure to intervene claim is subject to automatic dismissal; with the underlying violations dismissed, there is nothing for the State Defendants to have intervened in. But even if the Court were to find that a Constitutional violation *did* occur, but that the right violated was not clearly established, there is still no mechanism for the failure-to-intervene claims alone to survive because any officer with the chance to intervene would have lacked notice that a right was being

violated. *See Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015) ("Here, because it was not clearly established that [the officer's] actions constituted excessive force, a reasonable officer was not on fair notice that his failure to intervene ... violated [the plaintiff's] Fourth Amendment rights.").

And lastly, even if this Court would find that a defendant violated Plaintiff's clearly-established Constitutional right and denies qualified immunity, allowing the underlying claim to proceed, the failure to intervene claims against the State Defendants must still be dismissed.

A. **Plaintiff Fails to Plausibly Allege That Any Defendant Failed to Intervene**.

In order to state a claim under § 1983, "a plaintiff must plead that *each* Government-official defendant, through the official's own individual actions, has violated the Constitution." *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011), citing *Iqbal*, 556 U.S. 662 (emphasis added). "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." *Faulk v. City of St. Louis, Missouri*, 30 F.4th 739, 744 (8th Cir. 2022), citing *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006). Here, Plaintiff's Amended Complaint contains limited factual allegations against Arndt and Skar, even fewer against Rode and Hinrichs, and does not even mention the remaining three State Defendants (Bakke, Nelson, and Savageau). As set forth in Defendants' opening brief, Doc. No. 23-1 at 5-10, Plaintiff's failure to specify what, if any, conduct was engaged in by these particular defendants deprives them of "fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545.

In her Response, Plaintiff defends these omissions by asserting that all eleven law enforcement defendants are "directly and specifically" accused to have failed to intervene. Response at 26. But looking to Plaintiff's Amended Complaint, this is simply incorrect. Aside from repeatedly alleging that all seven Defendants were "present" during her confrontation with law enforcement, ¶¶ 170, 186, Plaintiff makes no factual allegations setting forth specific objective conduct by any State Defendant which plausibly alleges an ability or duty to intervene. Instead, Plaintiff makes conclusory allegations regarding the officers' state of mind, which is

irrelevant on the issue of qualified immunity. For instance, she alleges, "Defendants were aware that Sophia was being attacked without any legitimate law enforcement justification." Doc. No. 14 at ¶ 170. But this is not a factual allegation setting forth specific, objective conduct. It is merely a legal conclusion which should be disregarded by the Court. *See Faulk,* 30 F.4th at 746 ("Without factual enhancement, the naked allegations that Wood "agreed" to participate in illegal kettling and unlawful arrests are "merely legal conclusions."")

In order to state a claim for failure to intervene, Plaintiff must allege each defendant "observed or had reason to know that excessive force would be or was being used," **and** each defendant "had both the opportunity and the means to prevent the harm from occurring." *Mitchell,* 28 F.4th at 901 (8th Cir. 2022. Plaintiff's conclusory statements merely amount to a restatement of this rule, and should be disregarded by the Court.

But even if one scours the Complaint for factual allegations which *could* demonstrate either of these elements, the search is futile. First of all, Plaintiff does not even clearly allege that the seven State Defendants could see her, with the possible exception of Arndt and Skar who allegedly deployed munitions at her. *See* Amended Complaint at ¶ 161 ("The Law Enforcement Office Defendants [were] helping to move obstructions so their fellow Defendants could **get a better line of sight**"); ¶ 162 ("Sophia and Stephen cowered **behind** the metal sheet") ; and ¶ 166 ("at least Defendant Skar, Defendant Hinrich, Defendant Rode, and Defendant Arndt all moved west **to get a better line of sight** on Sophia.").

But Plaintiff's claim faces deeper problems. Because even if excessive force *was* used during Plaintiff's encounter (which it was not) none of the seven State Defendants knew or had reason to know about it. If they were present on the scene as Plaintiff alleges, they would have heard the LRAD announcement warning protestors out from underneath, and behind, the truck. Plaintiff tries to minimize this announcement as "incorrect" or "a pretext," Response at 12, 14, but she does not explain how a reasonable officer within earshot of the announcement could possibly have known that. Rather, a reasonable officer would have objectively concluded that someone was concealed under the truck, posing a threat to the safety of officers. Further, the

warning would have reassured a reasonable officer that an attempt to deescalate the situation was being made, which is the opposite of alerting them to excessive force.[6]

Next, after the command was given, the officers would have *not* witnessed anyone retreating south in compliance with it. Rather, Joachinson allegedly stood in place arguing with the officers about whether someone was under the truck, and Plaintiff didn't move at all. Even after less lethal munitions were deployed, Plaintiff remained immediately behind the barricade in defiance of the law enforcement order. Nothing about this situation would indicate to a reasonable officer that the use of less-lethal munitions ought to be halted, nor would Dvorak's deployment of a Stinger ball grenade which did not impact her in any way (and also failed to disperse her) have indicated that such a halt was necessary. While Plaintiff alleges that the deployment of the Stinger ball grenades were "terrifying", Doc. No. 14 at ¶ 165, she does not explain how the fact of her fear would have been objectively transmitted to the officers or how her feelings made the force unreasonable. The final application of force occurs in the last few seconds of the encounter, but Plaintiff alleges no facts establishing that any law enforcement officer would have been objectively aware that a fellow officer was on the verge of (allegedly) deploying a munition directly at Plaintiff which (allegedly) was capable of destroying her arm. She accordingly fails to state a claim for failure to intervene against any defendant.

B.     **Plaintiff Fails to Allege that Any Right at Issue Was Clearly Established**.

In order to defeat the qualified immunity of the State Defendants on the failure to intervene claim, Plaintiff would have needed to show that the law was "clearly established," *i.e.*, "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotations omitted). Because a failure to intervene claim is dependent on "an underlying constitutional violation," *Peterson*, 2023 WL

---

[6] The LRAD announcement undermines Plaintiff's insistence that the law enforcement defendants "failed to take any steps to try to mitigate or stop" the use of force. Response at 27. Of course they did: the officer making the announcement asks Sophia to retreat south in order to *avoid* deploying less-lethal at her. Only she can explain why she disobeyed this order, but the objective fact remains that the attempt to deescalate was made.

8884982, at *7, one must address the precise underlying unconstitutional act alleged. On the Fourth Amendment claim, Plaintiff must clearly establish an objective basis for imputing knowledge of the force to be deployed **and** that the force was objectively being used to effectuate a seizure. Such a showing is impossible here.

Plaintiff makes the conclusory allegation there was a seizure here, but the actual factual allegations establish the opposite. The LRAD announcement, which Plaintiff acknowledges is embraced by the pleadings, places beyond debate the objective intent of the officers. Under the governing law, no seizure occurred. *See infra* at 2-6.

Plaintiff can only establish excessive force in the Fourth Amendment context by showing that a seizure occurred, and she can only show that a seizure occurred if there was *intent* to seize her. Accordingly, she can only state a claim for failure to intervene by alleging that each officer was objectively on notice, both by properly-plead facts and clearly-established case law, that force was being used to effectuate a seizure. But in a crowd-control situation like this, when officers are not attempting to effect arrests but to disperse lawbreakers – without the deployment of force, if possible – one cannot merely look back, with the benefit of hindsight, and ask whether a seizure occurred due to the actions of a nearby officer. *Dundon* held that "it was not clearly established as of November 2016 that the use of force to disperse the crowd was a seizure." *Dundon*, 85 F.4th at 1257. Here, Plaintiff has not set forth any clearly-established caselaw showing that a reasonable officer engaged with other officers to disperse protestors would have been on notice of a duty to intervene and prevent a seizure under these circumstances. For all of these reasons, this Court should find the State Defendants entitled to qualified immunity on Plaintiff's failure to intervene claims.

## CONCLUSION

For all of these reasons, and all of the reasons set forth in the State Defendants' opening brief, Doc. No. 23-1, the State Defendants respectfully request that the claims against them be dismissed with prejudice.

Dated this 12th day of January, 2024.

        State of North Dakota
        Drew H. Wrigley
        Attorney General

        /s/ Jane G. Sportiello
        Jane G. Sportiello
        Assistant Attorney General
        State Bar ID No. 08900
        Office of Attorney General
        500 North 9th Street
        Bismarck, ND 58501-4509
        Telephone (701) 328-3640
        Email jsportiello@nd.gov

Attorneys for State Defendants